# EXHIBIT 1

# In the Matter of:

## *Nina Greene and Gerald Greene*
### *vs.*
## *Sears Protection Company, et al.*

---

# *Christopher Jackman*

## *August 22, 2017*

---

# *REDACTED VERSION*



**DTI** **Court Reporting Solutions**

105 W. Adams, Suite 1200, Chicago, IL 60603
Phone: 312.386.2000 – Fax: 312.386.2275

IN THE SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA

CIVIL DIVISION

```
-----------------------------+
                             |
NINA GREENE and GERALD GREENE|
                             |
                   Plaintiffs|
                             |
      V.                     | No. 1:15-CV-02546
                             |
SEARS PROTECTION COMPANY,    |
                             |
SEARS ROEBUCK AND COMPANY AND|
                             |
SEARS HOLDING CORPORATION    |
                             |
                   Defendants|
                             |
-----------------------------+
```

Deposition of CHRISTOPHER JACKMAN

(REDACTED VERSION)

Washington, D.C.

Tuesday, August 22, 2017

9:31 a.m.

Job Number: CH-139244

Pages: 1-116

Reported by: Jennifer Bosley

REDACTED VERSION
Christopher Jackman          8/22/2017

---

**Page 2**

1    Deposition of Christopher Jackman held at the offices
2    of:
3              Baker & Hostetler, LLP
4              1050 Connecticut Avenue, NW, Suite 1100
5              Washington Square
6              Washington, D.C. 20036
7
8              Pursuant to notice, before Jennifer Bosley,
9    Court Reporter and Notary Public in and for the
10   District of Columbia.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

**Page 4**

1                    C O N T E N T S
2    EXAMINATION OF CHRISTOPHER JACKMAN          PAGE
3    BY MS. HINES.................................5
4
5
6
7
8                    E X H I B I T S
9              (Retained by Counsel)
10   JACKMAN                              PAGE
11   Exhibit 1  Curriculum Vitae.....................17
12   Exhibit 2  Article in Corporate Disputes Magazine..28
13   Exhibit 3  Christopher Jackman's Report..........55
14
15
16
17
18
19
20
21
22
23
24
25

---

**Page 3**

1                    A P P E A R A N C E S
2    ON BEHALF OF THE PLAINTIFFS:
3              ANDREW J. BELLI, ESQUIRE
4              Kaufman, Coren & Ress, P.C.
5              Two Commerce Square
6              2001 Market Street, Suite 3900
7              Philadelphia, Pennsylvania 19103
8              (215)735-8700
9              abelli@kcr-law.com
10
11
12   ON BEHALF OF THE DEFENDANTS:
13              ERIN BOLAN HINES, ESQUIRE
14              Baker & Hostetler, LLP
15              191 N. Wacker Drive, Suite 3100
16              Chicago, Illinois 60606
17              (312)416-6215
18              ehines@bakerlaw.com
19
20
21   ALSO PRESENT: Madona Howard
22
23
24
25

---

**Page 5**

1                    P R O C E E D I N G S
2              CHRISTOPHER JACKMAN
3         Having been duly sworn testified as follows:
4         EXAMINATION BY COUNSEL FOR DEFENDANTS
5    BY MS. HINES:
6         Q   Can you state your name.
7         A   Christopher Jackman.
8         Q   And common spelling?
9         A   Oh, C-H-R-I-S-T-O-P-H-E-R, J-A-C-K-M-A-N.
10        Q   Have you been deposed before?
11        A   Yes.
12        Q   I'm going to go over the ground rules just
13   to refresh your memory on that.
14             You understand you are under oath?
15        A   Yes.
16        Q   And you understand I'm an attorney
17   representing the defendants in this case?
18        A   Yes.
19        Q   If you don't understand a question, ask me
20   to rephrase it.  And if you don't ask me, can we agree
21   that you understand the question?
22        A   Yes.
23        Q   The court reporter is taking everything down
24   here today.  So let me finish the question before you
25   answer it, agreed?

---

2  (Pages 2 to 5)

REDACTED VERSION
Christopher Jackman          8/22/2017

Page 6

1    A   Agreed.
2    Q   And it's important to speak verbally with
3  not nods or "uh-huhs" so she can take down what you're
4  saying.
5    A   Okay.
6    Q   And if at any time you need a break, just
7  tell me. I would just ask that if there was a
8  question pending that you finish answering the
9  question.
10   A   Okay.
11   Q   Okay. Are you taking any medication or
12 substance today that would affect your ability to
13 testify truthfully or accurately?
14   A   No.
15   Q   Can you think of any reason why you could
16 not answer the questions today completely, accurately,
17 and truthfully?
18   A   No.
19   Q   And you understand that even though we're in
20 an informal conference room that your testimony is
21 taken under oath and has the same force and effect if
22 given in a court of law?
23   A   Yes.
24   Q   And you understand that your testimony is
25 subject to the penalties of perjury as if you were

Page 7

1  testifying in court?
2    A   I do, yes.
3    Q   Okay. I'm going to start with your
4  background.
5    A   Okay.
6    Q   You graduated from Johns Hopkins in 2002,
7  correct?
8    A   Yes.
9    Q   With a bachelor's in economics?
10   A   Correct.
11   Q   Okay. And then you received an MBA from
12 Indiana University in 2014?
13   A   Correct.
14   Q   Was that in finance?
15   A   In management.
16   Q   Management, okay.
17   A   Yes.
18   Q   Okay. After graduating from Johns Hopkins
19 in 2002, what did you do until February of 2014 before
20 you started at LECG?
21   A   I worked at a number of firms. Before I
22 worked at LECG, I worked at a company called Icon
23 Office Solutions where I had a sales and marketing
24 position for a year. I believe I left in July of
25 2003.

Page 8

1        And then there was a space in between before
2  I began working at LECG in February of 2004.
3    Q   Okay. And when you started at LECG, you
4  were a Senior Associate, correct?
5    A   I was a Research Analyst ultimately promoted
6  to Senior Associate.
7    Q   Okay, started as Research Analyst?
8    A   Yes. And then and after Research Analyst
9  was Associate and then Senior Associate.
10   Q   What do you do in your job at LECG?
11   A   Gosh, a number of things. It was a support
12 position supporting the various cases that we were
13 working on. It was litigation consulting.
14       I worked in the finance and damages division
15 at LECG for much of my time. Before I left, for about
16 a year, I was doing some more antitrust work while I
17 was there. But it was a lot of data work, document
18 review, preparation of backup materials, basically
19 anything and everything that was required to support
20 the case that I was on at the time.
21   Q   Did LECG do any other consulting other than
22 for litigation?
23   A   I believe they did some business consulting
24 as well. I wasn't involved with any of that.
25   Q   And did they represent plaintiffs?

Page 9

1    A   Some, but it was mostly a
2  defendant-side-job.
3    Q   And what type of cases, litigation?
4    A   All different kinds. You know, I did --
5  again, I did finance and damages where it was a lot of
6  valuation work.
7        But just in the offices, I worked in -- they
8  had a big energy department and airlines department
9  related to the airlines litigation, environmental. I
10 believe they had e-discovery work at the time,
11 antitrust obviously was a big one.
12       I'm trying to -- I'm sure there were many
13 others that are slipping my mind right now. But they
14 were involved in a lot of different kinds of
15 litigation.
16   Q   Are they located in Virginia?
17   A   Well, LECG doesn't exist anymore. It went
18 bankrupt. But it sort of has emerged as Berkeley
19 Research Group or BRG. A lot of the same people are
20 at that firm. And they are located in D.C. as well as
21 Cambridge, Massachusetts; Emeryville, California; many
22 other locations.
23   Q   Did you leave before they went out of
24 business?
25   A   I did.

                                    3  (Pages 6 to 9)

REDACTED VERSION
Christopher Jackman          8/22/2017

|  | Page 10 |
|---|---|

1     Q    And that was in September of 2008?
2     A    Correct.
3     Q    And you went to Econ One Research?
4     A    Yes.
5     Q    And tell me what type of consulting you did
6  with Econ One?
7     A    Primarily antitrust and consumer fraud
8  matters.
9     Q    Did you say "ranks"?
10    A    No, I'm sorry, consumer fraud and antitrust.
11        MR. BELLI:  Matters.
12        MS. HINES:  Matters, okay.
13        THE WITNESS:  Oh, sorry.
14  BY MS. HINES:
15    Q    And was it all litigation-related, your
16  consulting?
17    A    I believe it was.  There may have been one
18  or two assignments that were business consulting, but
19  I can't recall any specifics.
20    Q    Did you represent plaintiffs or defendants?
21    A    Primarily plaintiffs.
22    Q    Primarily plaintiffs.  And do you recall the
23  type of consumer fraud consulting matters?
24    A    It was -- there was a number of cases
25  involving the automobile industry.  I'm trying to

|  | Page 11 |
|---|---|

1  think back.  This goes back a little ways here, sorry.
2        One had to do with the functionality of
3  wireless connectivity in laptops.  I'm sure there were
4  a couple others.  I apologize.  I'm not thinking of
5  them off the top of my head.  We have done more
6  antitrust work as of late.  The consumer fraud matters
7  were a bit earlier.  So it's a little more difficult
8  to recall.
9     Q    And were you promoted while you were there?
10    A    At Econ One?
11    Q    Uh-huh.
12    A    No, I believe I stayed a consultant while we
13  were there.
14    Q    And then you left in March of 2011 to go to
15  Advanced Analytical Consulting Group, correct?
16    A    Correct.  The practice I -- maybe I should
17  clarify a little bit.  The practice that I was working
18  with at Econ One moved as a whole to Advanced
19  Consulting Group, so it was the same type of work at
20  the new firm.
21    Q    And I forgot to ask you, why did you leave
22  LECG?
23    A    Most -- well, a couple reasons.  One, it did
24  seem like the writing was on the wall, that the
25  company was not heading in the right direction.  So I

|  | Page 12 |
|---|---|

1  wanted to get out while I could.  But then also I just
2  felt professionally that I was just not getting the
3  opportunities that I was hoping to get to advance
4  professionally in my career.  So I was looking for an
5  alternative that would allow me to do that.
6     Q    Was it the advance on the type of cases you
7  were consulting on?
8     A    I just think the amount of responsibility.
9  But it was a big shop with a lot of people and a lot
10  of staff, and it was harder to move ahead.  So I
11  wanted an opportunity where I would be able to do
12  that.
13    Q    Now we're back to Advanced Analytical
14  Consulting where you said your group from Econ One
15  moved over to, correct?
16    A    Yes, correct.
17    Q    Okay.  And what was your title when you
18  moved over?
19    A    Economist.
20    Q    Is -- what does "economist" mean?
21    A    It means -- it could mean a lot of things.
22  It's just a funny question because the titles mix and
23  vary at different consulting firms.  It was a senior
24  staff position at Advanced Analytical Consulting
25  Group.  And, at that time, I was managing cases,

|  | Page 13 |
|---|---|

1  supporting a testifying expert.  So, you know, I had a
2  lot of responsibilities in doing that.
3     Q    So you were a consultant, but your title was
4  Economist?
5     A    Right, because the work that we do is
6  primarily, you know, economic consulting, so, yeah.
7     Q    Okay.  And you continued doing litigation
8  primarily?
9     A    Yes.
10    Q    Or exclusively?
11    A    I would say exclusively -- then, again,
12  there might have been one or two occasional
13  assignment, none that I'm thinking of specifically,
14  but --
15    Q    And primarily plaintiffs?
16    A    Yes.
17    Q    Okay.  And the types of matters at -- when
18  you were at Advanced Analytical, was it antitrust and
19  consumer fraud; or did that change?
20    A    Yeah, so it was the same type of work that
21  we were doing at Econ One.  I would say it started to
22  become more antitrust than consumer fraud at that
23  point but still a mix of the two.
24    Q    And were you promoted while you were there?
25    A    No, I stayed an economist while I was there.

REDACTED VERSION
Christopher Jackman          8/22/2017

## Page 14

1      Q   And in January 2013, you moved to Nathan
2  Associates?
3      A   Correct.  Again, with the same practice, we
4  moved again.
5      Q   Okay.  And why did the practice move?
6      A   We just thought at the time that it would be
7  a better fit at Nathan that had -- it was a bigger
8  company, and it was a bit more -- it was a bit better
9  established in the areas of economic consulting that
10 we were in, so we thought we would have better support
11 from a company like Nathan at the time.
12     Q   Did you come in as a Managing Director?
13     A   No, I went in as Managing Economist; and I
14 was promoted to Managing Director.
15     Q   And when were you promoted, after how much
16 time?
17     A   I want to say it was April 2015.
18     Q   Okay.  And, again, you were doing
19 100 percent litigation consulting?
20     A   Yes, yes.
21     Q   And, again, primarily plaintiff?
22     A   Yes.
23     Q   Did you do any defendant work?
24     A   At Nathan?
25     Q   At Nathan.

## Page 15

1      A   I don't recall having done any plaintiff
2  work.
3      Q   Okay.  Who did you work under?
4      A   Primarily, a testifying expert by the name
5  Russell Lamb.
6      Q   When did you start working with him?  Was it
7  back at Econ One?
8      A   Yes, September 2008.
9      Q   So you first started working for him at
10 Econ One?
11     A   Correct.
12     Q   I want to make sure it wasn't the other
13 place, not LECG?
14     A   No.
15     Q   Okay.  And tell me the types of cases you
16 were working on at Nathan Associates.
17     A   These were primarily plaintiffs' class
18 action antitrust matters mostly dealing with
19 allegations of price fixing, some monopolization
20 allegations.
21         I would say that that was the majority of it.
22 There was some consumer fraud matters that we worked
23 on at the time, but that would be the majority of it.
24     Q   And you obtained your MBA from Indiana
25 University while you were working at Nathan; is that

## Page 16

1  correct?
2      A   Correct.
3      Q   And how were you able to do that living in
4  Virginia?
5      A   Yeah.  Well, it was a distance learning.  It
6  was an online component.  And then it had, you know,
7  where you would have to go for a week or two for
8  intensive like class exercises, things like that, not
9  a very fun time.
10     Q   Okay.  And then in October 2016, you
11 cofounded Monument Economics Group, correct?
12     A   Yes.
13     Q   And who did you cofound it with?
14     A   With Russell Lamb.
15     Q   And you are an Executive Vice President?
16     A   Yes.
17     Q   That's still your title?
18     A   Yes.
19     Q   How many employees does the company have?
20     A   We have just lost a few and hired a few, so
21 I would say roughly 16.
22     Q   And did the same group come over from Nathan
23 Associates that you had been working with?
24     A   A large component of the practice that we
25 were working with at Nathan came with us.

## Page 17

1      Q   And since you have been at Monument, are you
2  doing all litigation consulting?
3      A   We have so far.  You know, we are looking to
4  branch out into other areas.  But as of this point,
5  the work that we have done has been all litigation.
6      Q   And can you tell me if it's plaintiff or
7  defendant.
8      A   It is -- the work that I have done has been
9  plaintiffs' work.  We have another Vice President who
10 does securities litigation matters.  And it's possible
11 she has done some defendants' side work.  I'm not
12 exactly sure.  But as far as the work I have done,
13 it's been plaintiffs' work.
14     Q   Okay.  All right.  I'm going to show you a
15 report.
16     A   Okay.
17     Q   It should be in here.
18     A   Bear with me a second.  Here's one copy.
19         (Jackman Exhibit 1 was marked for
20 identification and was retained by counsel.)
21 BY MS. HINES:
22     Q   So let me show you what's marked as Exhibit
23 Jackman 1.
24         (Discussion off the record.)
25 BY MS. HINES:

5 (Pages 14 to 17)

REDACTED VERSION
Christopher Jackman          8/22/2017

Page 18

1    Q   Okay.  Can you turn to Exhibit A --
2    A   Sure.
3    Q   -- which is your CV.  I just have a few
4  questions.
5       On the first page, you discuss -- oh, no, on
6  the first page of your report actually, you discuss in
7  your background, Implicit Pricing Associated with
8  Bundled Goods.
9    A   Correct.
10   Q   Can you explain that.  Is that with regard
11 to the price fixing you were talking about earlier?
12   A   No.  It dealt more with certain consumer
13 fraud matters.
14   Q   Okay.
15   A   For instance, the example of wireless
16 functionality in a laptop computer.  Wireless
17 functionality is one of many components, features of a
18 laptop.
19       So when you're analyzing prices for laptops,
20 it's a way of teasing out the value or the component
21 of the price that deals with a specific component of
22 the products.
23       So, for instance, we'd be teasing out the
24 value of the wireless technology in the laptop.
25   Q   Okay.  Thank you.  Okay.  You also mention

Page 19

1  Financial Modeling --
2    A   Yes.
3    Q   -- that you have done.  Can you elaborate on
4  that.
5    A   That dealt mostly -- when I was working at
6  LECG, I did valuation work in their Finance and
7  Damages Group.  So we would value company's assets,
8  securities, whatever needed to be valued.
9       So that would involve modeling like a
10 discounted cash flow or, you know, various asset or
11 income or market-based analyses, but basically trying
12 to determine the value of an asset, a company, a
13 security, something like that.
14   Q   Okay.  And you also spoke about asset
15 security valuations.
16       Is that the same?
17   A   Yes.
18   Q   Got it.  Okay.  So you said that you have
19 been deposed before.
20   A   Yes.
21   Q   How many times?
22   A   One other time.
23       (THE FOLLOWING PORTION WAS DESIGNATED AS
24       CONFIDENTIAL AND IS BOUND SEPARATELY)
25

Page 20

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16 (THIS CONCLUDES THE CONFIDENTIAL PORTION)
17 BY MS. HINES:
18   Q   When you say, Processing the data into
19 usable formats --
20   A   Yes.
21   Q   -- what does that mean?
22   A   So the data that ultimately needed to be
23 used, it was very very large in size; and it couldn't
24 be processed using something more user-friendly like
25 Microsoft Excel.  And the data were also a little bit

Page 21

1  messy, so it had to be cleaned.  "Messy" is not a
2  technical term I realize.  But a lot of times, you
3  know, when you get data, there is variables or parts
4  of it you can't readily interpret so you have to
5  analyze to be able to understand it better.  And once
6  you do, you, what we say, you clean it or you scrub
7  it.  But, basically, you get it into a more
8  user-friendly format.
9       So to do that, we have to load those data
10 into -- I believe we use SAS.  But you want to use a
11 sophisticated programming software like a SAS or a
12 Stata which will allow you to process very large
13 databases, clean them, get them in a user-ready
14 format, and then process them so you can analyze them
15 in whichever you would like to do.
16   Q   SAS or Stata, those are?
17   A   Those are two commonly used data processing
18 or programming software, platform.  SAS is just,
19 S-A-S; and Stata, S-T-A-T-A.
20   Q   Did you represent one of the parties in that
21 case?
22   A   The plaintiffs, yes.
23   Q   Was that a class action?
24   A   Yes.
25   Q   And you provided an expert report on behalf

REDACTED VERSION
Christopher Jackman          8/22/2017

Page 22

1  of the plaintiffs?
2      A   Yes.
3      Q   And did you provide testimony?
4      A   I was just -- I was deposed.  That's it.
5      Q   And is that case still pending?
6      A   They have entered -- the Judge has approved
7  a preliminary settlement.  That's as far as I know
8  about where it stands.
9      Q   Can you, without breaching your NDA, state
10  what the opinion was that you provided in that case?
11     A   No, I'm not sure if I can -- I don't recall
12  the specifics of the confidentiality agreement, so I'm
13  not sure if I can.
14     Q   Well, are you aware of what was filed in the
15  public record?
16     A   My report was filed under seal, I believe.
17  So I don't know what aspects can be made public.  I
18  don't know if there was a redacted version made
19  public.  So I'm just not sure is the honest answer.
20     Q   Can you state what the plaintiffs would have
21  put in their pleadings or motions, what -- the
22  conclusion?
23     A   The allegation basically was that they
24  purchased protection for upholstered and leather
25  furniture, like a liquid protection to prevent

Page 23

1  staining or other damage.
2      And the allegation was that the pieces of
3  furniture either weren't treated at all or were not
4  adequately treated with enough protectant.
5      Q   Okay.  And you're opinion was that they were
6  not treated?
7      A   I didn't have an opinion about liability.  It
8  was more just -- I was running certain calculations
9  based on the amount of protectant that Rooms To Go
10  purchased and the amount of furniture that they sold
11  with the protection agreement and ransom calculations
12  based off of that.
13     Q   So it was sort of like a Scotchgard type of
14  protectant?
15     A   Yeah, you can spray it on, or you can rub it
16  on.
17     Q   Is there -- did you use a methodology in
18  that opinion that you could describe in general terms?
19     A   Basically -- I'm trying to think.  The heavy
20  lifting of the analysis was getting the data into a
21  workable format, again, because it was spread out over
22  a number of data sets that were produced.  So it's
23  reading it into SAS, stacking the data, making sure
24  everything lines up, that there aren't duplicates,
25  applying any sort of credits or rebates that might

Page 24

1  have been applied to make sure it's a net sales
2  number.
3      And then we also had separate data on the
4  amounts of barrels of the protectant that they
5  purchased and so getting those data read into a usable
6  database format.
7      And then it was a comparison of the amount
8  they purchased versus the amount they would have
9  needed to apply to the pieces of furniture in order to
10  have adequately protected them based on their
11  recommendations for that.
12     Q   And was that methodology created for --
13  expressly for testifying -- or providing your report
14  in that matter?
15     A   Yes.
16     Q   Do you know if the defendants moved to
17  exclude your testimony?
18     A   They did.
19     Q   And do you know what the outcome of that
20  was?
21     A   It didn't -- it was never decided on -- the
22  settlement agreement was reached before.
23     Q   And you said that now it's been approved for
24  settlement, right?
25     A   Yes, as far as I understand, yes.

Page 25

1      Q   And are there any other cases where you have
2  provided testimony at deposition or at a trial?
3      A   No.
4      Q   And that Hankinson matter was 2015, correct?
5      A   Sixteen.  It was last year.
6      Q   Okay.  On your CV which is Exhibit A to your
7  report, you have 22 matters, if I counted correctly,
8  listed.
9      A   I'll stipulate to that unless you want me to
10  count.
11     Q   And are these matters where you only
12  provided consulting services?
13     A   Yes, in support of another testifying
14  expert.
15     Q   And was that Mr. Lamb?
16     A   Yes.
17     Q   Was there -- did you provide consulting for
18  anyone else to testify other than Mr. Lamb in the
19  matters that you listed?
20     A   I'd have to go back and look it over.  I see
21  at least one.  And I'm looking because I know I have
22  supported this person twice.  I don't know if it's on
23  here.
24     But the McDonough, et al. v. TOYS "R" US
25  case on Page 4 of the CV, I supported an expert by the

7 (Pages 22 to 25)

REDACTED VERSION
Christopher Jackman          8/22/2017

## Page 26

1  name of Marty Asher, A-S-H-E-R.  And I also supported
2  him in a price fixing case in Canada dealing with
3  Cathode ray tube televisions.  And that matter is
4  ongoing.
5      Q   That matter is ongoing?
6      A   Yes.  But I don't see it here on my CV.
7      Q   Do you know why you didn't list it?
8      A   Probably just an oversight, no other reason.
9      Q   And in how many of these matters was your
10  client a plaintiff?
11      A   I believe all of them.
12      Q   Okay.  And are there other matters that you
13  provided consulting services for that aren't on this
14  list?
15      A   Going back -- yes, yes, there are.
16      Q   Was this chronological?
17      A   Close to it.  There might be a little that
18  are out of order as some of them are overlapping, so
19  when a report was actually filed or testimony given.
20  But, largely, it's chronological.
21      But, I mean, for instance, the first one is
22  the LECG matter in Canada; and that case is actually
23  still ongoing.  So the case is in Canada.
24      Q   Oh, is that the one with Marty Asher?
25      A   No.  So that's LCD televisions.  Russell

## Page 27

1  Lamb was the expert on that one.  Marty Asher was the
2  expert on the Cathode ray tube televisions and
3  computer monitors.
4      Q   Are there any other class actions not on
5  this list that you have consulted on?
6      A   Almost certainly.  I have to sit and think
7  of any others; but, yeah, almost certainly there are.
8      Q   And would that have been on behalf of a
9  plaintiff?
10      A   Yes.  Yes.
11      Q   So you have four consumer fraud class
12  actions that you have listed?
13      A   That's probably right.  That's probably
14  correct.
15      Q   Okay.  And those would have been for
16  Mr. Lamb's testimony?
17      A   Yes.  He'd be upset if I didn't correct you
18  and say Dr. Lamb.
19      Q   Thank you.  Okay, I'll refer to him as
20  Dr. Lamb.
21      A   Even though he's not here, it would crush
22  him if I didn't.
23      Q   Okay.  On those consumer fraud matters, do
24  you recall what the -- whether the testimony was
25  provided by Dr. Lamb in the case if it was challenged

## Page 28

1  for admissibility?
2      A   Oh, gosh, I don't remember that
3  specifically.  I'd have to go back and check.
4      Q   Okay.  At this point, you said Monument
5  Economics is providing litigation consulting only?
6      A   At this point, yes, yes.
7      Q   Okay.  Okay.  Do you charge your clients by
8  the billable hour for your services?
9      A   Yes.
10      Q   Okay.  Okay.  In your background, do you
11  have experience with retail services contracts?
12      A   No.
13      Q   Do you have any specialized training in
14  retail services contracts or education?
15      A   No.
16      Q   Okay.  You do have one publication that's
17  listed.
18      A   Yes.
19      Q   And I do have a copy of it which I'm going
20  to have to dig out.
21      (Jackman Exhibit 2 was marked for
22  identification and was retained by counsel.)
23  BY MS. HINES:
24      Q   Okay.  I'm handing you what's marked as
25  Jackman Exhibit 2.

## Page 29

1      A   Yes.
2      Q   And do you recognize this article?
3      A   Yes, I do.
4      Q   Okay.  What is this?
5      A   This is -- it's an article in the form of a
6  roundtable discussion that Russell Lamb and myself
7  participated in in Corporate Disputes Magazine back in
8  2014.  October 2014 it was published.
9      Q   Is this an online magazine?
10      A   Yes.
11      Q   Online only?
12      A   Yes -- I think -- I think it's possible to
13  subscribe to the print version if you're a subscriber,
14  but primarily it's distributed online.
15      Q   Do you know who the subscription base is,
16  the demographic?
17      A   I don't.  I believe it primarily deals with
18  litigation matters.  So I think there is a lot of law
19  firms or, you know, lawyers or attorneys that
20  subscribe to that.  But beyond that, I'm not really
21  sure.
22      Q   Okay.  Page 98 has your Bio.  And on the
23  last sentence, if you can read it -- the print is a
24  little small --
25      A   Yes.

8  (Pages 26 to 29)

REDACTED VERSION
Christopher Jackman          8/22/2017

Page 30

1    Q   -- it lists the industries where you have
2    experience.
3        A   Yes.
4        Q   And I do not see listed in there retail.
5        MR. BELLI:   Is that a question?
6    BY MS. HINES:
7        Q   Is that accurate?
8        A   Retail is not listed here.  Certain -- I'm
9    just reading, like baby products, for instance,
10   consumer electronics are sold at retail.  So, in a
11   sense, that could include retail.  But retail as a
12   separate industry is not listed here.
13       Q   Okay.  And it does not indicate that you
14   provide in your Bio consulting for companies; is that
15   correct?
16       A   Well, it says I specialize in supporting
17   analyses for expert testimony in litigation and
18   business matters; so that is meant to include
19   companies.  But it doesn't say it explicitly.
20       Q   Okay.  What percent of your practice would
21   you account for consulting defendants in litigation?
22       A   Defendants.  I would say we have worked on
23   one or two matters on behalf of defendants as far as
24   percent.  I'm not sure, but it would be quite low.
25   The vast majority of what we have done is plaintiffs'

Page 31

1    side work.
2        Q   When you say one to two, do you mean at
3    Monument or --
4        A   No.  Going back -- well, going back to my
5    time at LECG, all of my cases were on the defendant
6    side.  I was junior staff at that time, so I didn't
7    really include that as the higher-level work that I
8    have done in this industry.
9        But since leaving LECG in September 2008, I
10   would say there's only been one or two cases done on
11   the defense side.
12       Q   Okay.  Now, on Page 99, you are quoted as
13   saying in the first sentence, "One of the most
14   challenging aspects of the evaluation of damages is
15   obtaining complete and reliable data and information
16   to be used as inputs into a damages analysis."
17       Do you still believe this to be true?
18       A   Yes.
19       Q   And in that same paragraph you state,
20   "Should this information not be available elsewhere,
21   the damages expert must then seek to obtain reasonable
22   and reliable proxy information."
23       And in the last sentence, you say, "This
24   process can also negatively impact the reliability and
25   accuracy of his or her measurement of damages."

Page 32

1        And do you still believe this to be true?
2        A   Yes.
3        Q   And how can this proxy information
4    negatively affect the reliability and accuracy?
5        A   Well, oftentimes, the best source of data
6    and information is coming directly from the entities
7    which are trying to analyze in that particular matter.
8    And it can be different in that -- you know, it varies
9    from matter to matter, of course.
10       But, you know, you would seek to obtain that
11   from, you know -- if we're working on the plaintiff's
12   side, from the defendants as much as possible.  And as
13   you move away from that to -- you know, if you had to
14   supplement some data with data in the public domain,
15   for instance, it's probably not directly related to a
16   single entity, a single company, for instance.
17       And so while it might constitute a
18   reasonable substitute for any missing data that the
19   defendants didn't provide, it's not as accurate as if
20   you actually had that information from the defendant.
21   So that's how it can be somewhat less reliable than if
22   you had it from the defendant directly.
23       Q   And where is proxy information -- where do
24   you find that in your experience wherever you found
25   that?  You mentioned public domain.

Page 33

1        A   That's one area, yes.
2        Q   Where else?
3        A   You know, sometimes you can get it from
4    downstream companies.  So, for instance, if you're
5    missing some sales data from a defendant, you might
6    have data from a direct purchaser or many direct
7    purchasers that can identify the purchases they made
8    from that defendant.  And so you can use that as a
9    proxy to fill in for missing data.
10       Q   Is it your opinion that the data and
11   information you used for your report in this case was
12   complete and reliable?
13       A   Could you repeat that question.
14       Q   Would you agree that -- let me take a step
15   back.  Okay.  If the data and information you used for
16   your opinion in this case was not complete and
17   reliable, would that have a negative impact on the
18   accuracy of the damages?
19       A   Well, to start, I didn't use any data or
20   information in my report.  But I think you're
21   referring to the data or information that I describe
22   being available.
23       Q   Yes.
24       A   Okay.  So in that regard, the answer is it
25   depends.  You simply don't know until you know what

REDACTED VERSION
Christopher Jackman          8/22/2017

Page 34

1  data are available and what are missing.  Sometimes
2  you can make assumptions that don't have any real
3  impact on the reliability or accuracy of the analysis.
4  So it really just depends.
5       Q   Okay.  All right, now, on 103 of this
6  article -- I'm trying find where you state -- "As
7  discussed earlier, one of the biggest challenges an
8  expert faces in evaluating damages is when the data
9  produced in the matter is incomplete or otherwise
10  unreliable in one way or another."
11       And you still agree with this statement?
12       MR. BELLI:  Is that on Page 103?
13       MS. HINES:  Let me see, maybe I picked the
14  wrong page.
15       MR. BELLI:  Okay.  So it starts on Page 102.
16       MS. HINES:  Thank you, sorry.
17       MR. BELLI:  Okay.
18       MS. HINES:  It actually starts on 103.  It's
19  in the middle of the first sentence.
20       MR. BELLI:  Sorry, I was looking at the
21  statement that started over here.
22       MS. HINES:  That's okay.
23  BY MS. HINES:
24       Q   Do you still agree with that sentence?
25       A   Yes.

Page 36

1  filing of this case?
2       A   No.
3       Q   And there are no other publications on your
4  CV.
5       Do you have any that are not listed?
6       A   No, I do not.
7       Q   Okay.  Whenever you're ready for a break.
8       A   Okay, I'm fine if you want to keep going.
9       Q   Okay.  All right.  Have you ever worked with
10  Kaufman, Coren & Ress before?
11       A   I do not believe so.
12       Q   Okay.  How about Deborah Gross, an attorney
13  at Kaufman, Coren & Ress?
14       A   No.
15       Q   Any of the plaintiff's attorneys in this
16  case?
17       A   Yeah, we have done a number of cases with
18  Miller Law Firm in Chicago.
19       (THE FOLLOWING PORTION WAS DESIGNATED AS
20       CONFIDENTIAL AND IS BOUND SEPARATELY)
21
22
23
24
25

Page 35

1       Q   Okay.  Okay.  You also comment on the
2  Comcast case --
3       A   Yes.
4       Q   -- and how that has an impact on an expert
5  because it's created heightened burden to ensure that
6  the damage analysis is consistent with the allegations
7  in this case.
8       A   Yes.
9       MR. BELLI:  Sorry, it says "the" case.  I
10  don't --
11       MS. HINES:  Oh, "in the case," yes, yes.
12  BY MS. HINES:
13       Q   And do you think -- would you agree that
14  that applies to this case?
15       A   I would say so, yes.
16       Q   And do you agree that your methodology in
17  this case is consistent with the allegations in the
18  case?
19       A   I believe that it is.
20       Q   You also state on Page 99 that companies
21  should consider engaging a damages expert in addition
22  to legal counsel before pursuing a commercial dispute
23  as a recommendation.
24       A   Yes.
25       Q   Did you consult with the plaintiffs prior to

Page 37

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24       (THIS CONCLUDES THE CONFIDENTIAL PORTION)
25  BY MS. HINES:

10  (Pages 34 to 37)

REDACTED VERSION
Christopher Jackman          8/22/2017

| Page 38 |
| --- |

1      Q   Okay.  Did anyone else assist in that --
2      A   It's possible with some auditing at the end
3   because we usually like somebody who hasn't worked
4   directly with the data to make sure it's correct.  I
5   don't remember who that was at the time.
6      Q   Let me go back and ask you, when you stated
7   that you have assisted Miller Law Firm in litigation
8   matters --
9      A   Yes.
10     Q   -- has that been for plaintiffs?
11     A   Yes.
12     Q   Are any of those matters listed on your CV?
13     A   Yes -- oh, yes, almost certainly.  So on
14  Page 2, the Polyurethane Foam Antitrust Litigation
15  was --
16     Q   What page -- oh, 2.  I'm sorry.
17     A   Page 2, yes.
18     Q   All right.
19     A   That is the only one that's on my CV, but we
20  have assisted them in others that just didn't make it
21  on my CV.
22     Q   How long have you been working with them?
23     A   I believe they retained us on polyurethane
24  foam.  And when I say "us," Russell Lamb being the
25  expert in our team who supports him.  But primarily

| Page 39 |
| --- |

1   pertaining the expert back in late 2010, 2011 to start
2   with that.
3      Q   Is that an antitrust matter?
4      A   Yes, indirect purchaser price fixing matter.
5      Q   Okay.  Back to this report.  How many
6   people -- or did anyone assist you in preparing the,
7   report for this?
8      A   I had one Senior Research Analyst help me.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

| Page 40 |
| --- |

1      (THE FOLLOWING PORTION WAS DESIGNATE AS
2   CONFIDENTIAL AND IS BOUND SEPARATELY)
3
4
5
6
7
8
9
10
11
12
13     (THIS CONCLUDES THE CONFIDENTIAL PORTION)
14  BY MS. HINES:
15     Q   How many hours, prior to today, have you
16  worked on this case?
17     A   I would have to check the invoice.  I'm not
18  sure.
19     Q   And your fee in this is not based on the
20  outcome of this case; is that correct?
21     A   That is correct.
22     Q   Did you apply any discounts for your work on
23  this case?
24     A   No.
25     Q   Is there anything else included in your fee

| Page 41 |
| --- |

1   besides hours multiplied by the rates that you have
2   not already stated?
3      A   The only other thing I could think of is if
4   we had late nights and someone expensed a meal or a
5   late night ride home.  Typically, we'll pass that
6   through to the client.  I can't recall if that
7   happened this matter, but we could check and see if if
8   it is.
9      MS. HINES:  Can we take a break?
10     MR. BELLI:  Yeah.
11     (A brief break was taken.)
12  BY MS. HINES:
13     Q   So you provided an opinion in this case
14  regarding a methodology to allow you to use data and
15  information possessed by Sears to measure damages
16  suffered from the putative classes upon the finding
17  that the alleged misconduct took place; is that
18  correct?
19     A   That's correct.
20     Q   And you provide opinion regarding
21  methodology putative class based own breach of
22  contract?
23     A   Correct.
24     Q   When did you develop the methodology used in
25  this case?

11  (Pages 38 to 41)

REDACTED VERSION
Christopher Jackman        8/22/2017

Page 42

1    A  I would say at some point in late June or
2  early July in the lead-up to the filing of my expert
3  report just in the course of researching the case, and
4  the various issues and understanding it better, is
5  when I started to form that opinion of the
6  methodology, also understanding the data that Sears
7  claims to have and how it -- how it's stored and how
8  it could be used.
9    Q  And was this methodology developed expressly
10 for this matter?
11   A  Yes.
12   Q  And with regard to the breach of contract
13 putative class, what is your opinion generally?
14   A  That a methodology is available that would
15 allow me to use data and information that appears more
16 likely than not to be maintained by Sears and could be
17 made available.
18      That would allow me to measure damages
19 suffered by the breach of contract class without
20 resorting to individualized inquiry.
21   Q  All right.  I'm going to go through first
22 generally what your opinion proposes --
23   A  Okay.
24   Q  -- because I want to understand, make sure I
25 understand what it is.

Page 43

1    A  Of course.
2    Q  Okay.  You're going to create a data set of
3  MPAs in effect during the alleged breached contract
4  period which includes, among other things, a list of
5  all products Sears agreed to cover under those
6  agreements and the cost of coverage?
7    A  That would be part of it, yes.
8    Q  And then you will filter this for
9  aftermarket MPAs?
10   A  Yes.
11   Q  Okay.  Why did you decide to use the
12 aftermarket MPA filter?
13   A  That's the -- to be consistent with the
14 class definition.
15   Q  Do you know why that's in the class
16 definition?
17   A  No.
18   Q  Okay.  And your understanding is that this
19 filter is available?
20   A  Yes.
21   Q  You also state that the earliest date the
22 court could apply the statute of limitations would be
23 March 25th, 2005 for the breach of contract?
24   A  2000 for the breach of contract.
25   Q  2000, correct.  Where did you get this

Page 44

1  assumption from?
2    A  That was provided to me from counsel.
3    Q  And you have no other basis other than it
4  was provided to you by counsel?
5    A  Right.  As I understand it, that's just
6  purely a legal matter.  I have no opinion about that.
7    Q  And for the unjust enrichment claims, the
8  statute of limitation date is March 25th, 2005 that
9  you would apply for the relevant time period, correct?
10   A  For unjust enrichment?
11   Q  Unjust enrichment.
12   A  Yes, correct.
13   Q  And where did you get that date from?
14   A  Also from plaintiff's counsel.
15   Q  And for the Pennsylvania Consumer Fraud
16 claim?
17   A  Yes, March 25th, 2004 from plaintiffs'
18 counsel.
19   Q  Okay.  And for all products Sears agreed to
20 cover, does that mean all products listed on an MPA?
21   A  Can you rephrase that question.  I want to
22 make sure I understand.
23   Q  Okay.  Are all the products listed on an MPA
24 certificate that a customer receives, are those all
25 the products that Sears agrees to cover that -- for

Page 45

1  that consumer?
2    A  I believe so.  But the -- the way I was
3  approaching that is it's my understanding that Sears
4  takes all the information, the relevant information,
5  from their MPA agreements and loads them into their
6  data warehouse.  And, therefore -- and the data
7  warehouse is where they store all the information
8  about their MPA agreements that they have with
9  customers.
10      So that would be -- the data warehouse,
11 itself, would be the primary source of that
12 information; and that's what I understand where the
13 MPA agreement and the covered products under those
14 agreements is kept.
15      So I don't -- you know, I didn't review in
16 great detail, you know, MPA agreements on paper that
17 the customers received.  But I know that the relevant
18 information is stored on the data.
19   Q  But you did review the one attached to tell
20 first of amended complaint?
21   A  That would be the green set of MPAs.  I did
22 review those.
23   Q  Next, your opinion proposes to use the
24 eligible brands list effective at any point during the
25 relevant breach of contract, period, and create a data

REDACTED VERSION
Christopher Jackman          8/22/2017

Page 46

1  set for every brand product combination, for example,
2  Maytag refrigerator --
3      A  Yes.
4      Q  -- and include any start or end date for
5  aftermarket MPA coverage eligibility that may have
6  occurred during the time period?
7      A  Yes.  So -- would you like me to unpack that
8  a little bit?
9      Q  Yes.  And this is on Page 10 of your report.
10     A  Yes.
11     Q  And go ahead and unpack that.
12     A  So -- right, where it said, "start or end
13  date," that's probably "and/or end date."  Basically,
14  as I understand it, Sears maintained an eligible
15  brands list going back as far as at least 1996.
16         When Mr. Setzer began working with the firm,
17  he recalled that far.  And they list the brands and types of
18  that far.  And they list the brands and types of
19  products that are eligible for MPA coverage.
20         And over time, those lists were revised.
21  New products were oncoming or other products were
22  coming off.  So that would mean that over the course
23  of any of the relevant time periods, there would be a
24  number of eligible brands lists.
25         So what I would propose doing is loading all

Page 47

1  of those lists into one database where you'd basically
2  stack that information.
3         And so for every combination of product
4  brand and product type, like Maytag refrigerator, I
5  would look across all those eligible brands lists
6  using the revision dates to determine when the
7  eligibility coverage started and when it ended, if it
8  ended.
9         Now, it's possible that I'd only ever have
10  an end date because going back as far as the start of
11  the relevant time period, a certain product brand
12  combination has always been covered.
13         But I would want to find, during the
14  relevant time periods, the range, you know, the time
15  period or periods during the relevant time period
16  where a certain product brand combination had
17  coverage.  And I'd want those start and end dates.
18     Q  Okay.  When you said "stack the
19  information," can you explain that to me.
20     A  Sure.  It's just kind of a term we use when
21  we do data analysis.  But, basically, you're taking
22  data that is similar or the same but comes from
23  multiple files or just different sources.  And then
24  you want to basically combine it into one data set.
25  We typically use the term "stack."  But that's

Page 48

1  basically what it is.  It's a combination into one
2  data set.
3      Q  Okay.  And then this data set would allow
4  you to determine if a given product was covered by an
5  aftermarket MPA purchased during the relevant time
6  period if it was eligible at the time -- eligible for
7  coverage at the time of purchase?
8      A  Yes, at the time of purchase.
9      Q  Okay.  And you would eliminate from this
10  data set any products that were eligible for this
11  potential class as we filtered it down during the --
12  wait, let me step back.
13         You would eliminate the ones that were
14  eligible for coverage at the time of the purchase from
15  that group?
16     A  Yes.  So, basically, I'd look at the start
17  date of the MPA.  And if it fell inside any of those
18  ranges of coverage between the start and end date,
19  then I would drop that from the MPA database because
20  that would signal that it was eligible for coverage as
21  of the time of the purchase.
22     Q  And if the product became ineligible during
23  the term of the MPA, that was not factored into
24  whether it would be taken out of -- or whether it
25  would remain in the class or not?

Page 49

1      A  That was not a -- it was just a -- it was a
2  binary decision as to whether or not it was eligible
3  as of the purchase date.  Beyond that, it was not a
4  factor.
5      Q  Okay.  And then if this data is available,
6  the MPAs filtered out leaves a list of MPAs that Sears
7  agreed to cover but were not included on the eligible
8  brands list at the time they purchased the MPA?
9      A  That's correct.
10     Q  And this remaining list are those MPAs that
11  were breached; is that correct?
12     A  Well -- you use the term "breach."  I don't
13  have an opinion as of the liability of it.  But
14  basically what it means to me in my analysis is that
15  those particular products were not covered under the
16  eligible brands list as of the time that they were
17  purchased.
18     Q  Okay.  Does this list include MPA renewals
19  for products that are no longer on the eligible brands
20  list at the time of renewal?
21     A  Yes.
22     Q  And is that because at the time of renewal,
23  those -- that brand was not listed on the eligible
24  brands list or was listed as nonrenewable?
25     A  It was not listed on the eligible brands

                                    13  (Pages 46 to 49)

REDACTED VERSION
Christopher Jackman          8/22/2017

Page 50

1    list.
2        Q    Okay.  Then you state that there's data from
3    which you can determine the price paid by a putative
4    class member for MPA coverage for any products still
5    remaining in the data set?
6        A    Correct.
7        Q    Okay.  And then you propose to collect the
8    refunds and credits issued to -- issued and fulfilled
9    by those remaining in the data set and that you would
10   credit those toward the cost of the MPA?
11       A    Yes, for each product.
12       Q    Okay.  And if the cost of the MPA was
13   greater, then the refund or the credit, that
14   represents damages; is that correct?
15       A    That's correct.
16       Q    So your opinion does not actually calculate
17   the damages, it's just a methodology as to how damages
18   could be calculated?
19       A    In this report, yes.
20       Q    Okay.  And for the unjust enrichment class,
21   it is the same except for the relevant time period; is
22   that correct?
23       A    That's correct.
24       Q    And for the Pennsylvania Consumer Fraud Act
25   claims, it is the same except for the relevant time

Page 51

1    period?
2        A    The relevant time period; and, of course, I
3    would limit the data set to Pennsylvania residents.
4        Q    Exactly, right.  Thank you.
5        A    Sure.
6        Q    And you did not have any other opinions in
7    this case?
8        A    Well, I have opinions about the availability
9    of the data that I could use to implement my
10   methodology; but beyond that, no.
11       Q    Okay.  And all of your opinions are based on
12   the data information that Sears appears to maintain?
13       A    Yes.
14       Q    And your opinions also are based on the
15   assumption that Sears violated the law?
16       A    Would you say that again please.
17       Q    In your report, you use the word "assuming
18   this conduct occurred" several times.
19            And your opinions are based on an assumption
20   that the misconduct alleged in the complaint?
21       A    An assumption that it occurred, no opinion
22   as to whether or not it did.
23       Q    If Sears did not, you know, commit this
24   misconduct, then would your methodology be flawed?
25       A    Well, I wouldn't say the methodology is

Page 52

1    flawed.  You know, whether or not they did is up to
2    the trier of fact to determine.  And if they determine
3    that, I assume that there would be no reason to
4    implement the methodology.  But I wouldn't say that
5    the methodology, itself, is flawed.
6        Q    It would affect the opinion to the extent
7    that it is contingent upon -- your opinion is
8    contingent upon that misconduct did occur?
9        A    Yes.
10       Q    And just to be clear, your opinion assumes
11   Sears breached the contract at the time the MPA was
12   entered into?
13       A    Would you mind repeating that.
14       Q    Your opinion assumes Sears breached the
15   contract at the time the consumer entered into the MPA
16   agreement?
17       A    That is correct.  That is consistent with
18   the class definition as I understand it.  I'm assuming
19   all of those allegations are true.
20       Q    And do you know how Sears failed to comply
21   with the contract if that is what --
22       A    I don't have an opinion about that.  I
23   didn't study that issue carefully.  So I don't really
24   have an opinion about that.  I just assume that they
25   did.

Page 53

1        Q    Okay.  And the same thing with the unjust
2    enrichment, you don't have an opinion as to how Sears
3    was unjustly enriched?
4        A    Correct.
5        Q    And I'm going to ask you about the
6    Pennsylvania Consumer Fraud claim.
7            Do you know how Sears knowingly
8    misrepresented the MPAs to the plaintiffs?
9        A    No, I don't have an opinion about that.
10       Q    Okay.  In your report, on Page 5, you state
11   that your understanding is that discovery is ongoing.
12           Do you see that?
13       A    Yes.
14       Q    What is that understanding based upon?
15       A    Well, it's come to my attention that it
16   turns out it was a misunderstanding just in terms of
17   legal procedure.  I can't recall specifically how I
18   got that understanding.
19           I know discovery is something that has been
20   a part of this case, and there has been some back and
21   forth on that.  I had the misunderstanding that it was
22   still open.  But it turns out that it is not, so that
23   is a mistake on my part.
24       Q    I noticed you do not have a citation on
25   that.

14  (Pages 50 to 53)

REDACTED VERSION
Christopher Jackman          8/22/2017

Page 54

1     A   Right.  It was a misunderstanding I had
2   dated into report.
3     Q   Okay.  I'm going to ask you some questions
4   about the Sears data.
5     A   Okay.
6     Q   Okay.  Your opinion assumes that Sears could
7   retrieve data from its data warehouse going back at
8   least 20 years.  And you cited Dainon Setzer's
9   testimony for this; is that right?
10    A   For the 20 years?
11    Q   Yes.
12    A   I wouldn't say it assumes that.  You know,
13   when I talk about the availability of data, I cite to
14   each ination since the testimony that I believe
15   supports that notion.
16        And so at his deposition, Mr. Setzer said
17   the information stored in the data warehouse goes back
18   at least 20 years.
19    Q   And he stated that the data warehouse can
20   identify all MPAs in existence at any given time,
21   correct?
22    A   Correct.
23    Q   But didn't he actually state that he would
24   think the data would go back 20 years, not that he was
25   absolutely certain?

Page 55

1     A   I would have to look at his deposition
2   testimony to refresh my memory.  I don't recall that
3   as I sit here.
4     Q   I have that.
5     A   Okay.
6     Q   Let me pull his transcript.  I know I saw
7   it.  Okay.  It's S-E-T-Z-E-R, by the way.  Here you
8   go.  This is for you.
9        (Jackman Exhibit 3 was marked for
10        identification and was retained by counsel.)
11   BY MS. HINES:
12    Q   Okay.  Let's see, your opinion cites to
13   Page 176, Line 23.
14        MR. BELLI:  What page of the report are you
15   on?
16        THE WITNESS:  Seven.
17        MS. HINES:  Page 7.
18        THE WITNESS:  Okay.  I see it.
19   BY MS. HINES:
20    Q   Okay.  It goes from 123.  Okay.  Now, on --
21   if you back it up on that page, back to Line 12 --
22    A   Yes.
23    Q   Where the question is, "Can the data
24   warehouse be searched by date?"
25        In other words, would you tell how many MPAs

Page 56

1   existed on January 1st, 2012 versus January 1st, 2015?
2     A   Yes.
3     Q   And the answer which starts on Line 19, "I
4   don't know, but I would think yes.  I would think we
5   could probably figure out a way to write code for
6   that."
7     A   Yes, I see that.  That's with respect to the
8   time period.
9     Q   He thinks; he's not certain.
10    A   He thinks, yes, right.  I have elsewhere
11   seen analyses that they have done on an annual basis
12   analyzing MPAs and, you know, profit and loss they
13   have earned on them or just generally how many were
14   cancelled.
15        So while my citation was limited to this, it
16   is further informed by.
17    Q   Is that why your opinion is that it is
18   likely that Sears has this data?
19    A   It is in the sense that I did not have the
20   data in front of me to confirm it with my own eyes.
21   So just generally speaking, yes, that's why to me it's
22   more likely than not that they have it.  But, yeah, I
23   could not confirm it with the data.
24    Q   On Page 9 of your opinion in Paragraph 17,
25   you state that the data set can be queried for each

Page 57

1   MPA in existence at any given time limited to
2   aftermarket MPAs sold by Sears, right?
3     A   That's correct.
4     Q   And you believe that they have -- they're
5   able to do that on their systems?
6     A   Yes, I do.  And would it be possible to back
7   to one thing on the last question?
8     Q   Sure.
9     A   Would that be okay because there was -- we
10   were kind of talking about two things; one, the
11   availability of data going back 20 years; and then the
12   other, you know, determining the information about
13   MPAs at a certain period of time.
14        So I didn't know which if that -- there was
15   still a pending question about the, at least, 20
16   years.  But I do see that the testimony says that he
17   would say at least 20 years the information in the
18   data warehouse goes back.
19        So I just wanted to make sure I was
20   answering that line of questioning as well.  So, I'm
21   sorry, would you mind repeating -- we were talking
22   about the limiting it to aftermarket.
23    Q   Yes.  So I'm just trying to go through to
24   make sure I understand your opinion, not -- you state
25   that the data set can be queried for each MPA in

15  (Pages 54 to 57)

REDACTED VERSION
Christopher Jackman          8/22/2017

Page 58

1   existence at any given time limited to aftermarket
2   MPAs sold by Sears?
3       A   Yes.
4       Q   And your understanding is that Sears can do
5   that with their data set inquiries?
6       A   Yes.
7       Q   And then you also state that -- in the same
8   paragraph -- that within the aftermarket MPA data set
9   of MPAs sold during the relevant time period, other
10  data is likely available such as customer address,
11  customer number, MPA certificate number, MPA start and
12  end date, products covered by given MPA which includes
13  the type and the brand, correct?
14      A   That is correct.
15      Q   And is this all data that is necessary to
16  your -- to calculate the damages under your
17  methodology?
18      A   I would say it depends.  To the extent that
19  there could be missing data or incomplete data or data
20  that is perhaps difficult to interpret, there are
21  often other ways of either supplementing that data or
22  using a data or just using the data that you do have
23  with reasonable assumptions.
24      So I wouldn't say that if all of this
25  data -- if this data in its entirety didn't exist,

Page 59

1   that methodology would not be usable.
2       Q   Okay.  In its entirety.  Is there other data
3   that you need to identify each class member?
4       A   To identify class members or to measure
5   damages?
6       Q   Well, damages is based on the individual
7   consumer who purchased an MPA?
8       A   Correct.
9       Q   And you have listed customer address,
10  contact information.
11      Is there any other information you would
12  need for your damages methodology?
13      A   So the damages, okay.  I would say it's
14  possible because sometimes you see data -- you know,
15  you got data described to you or, you know, you get a
16  list of the fields that are available and something
17  you think you understand it's one thing but then, you
18  know, it just turns out to be a code, a five-digit
19  code that makes no sense and then there is a lookup
20  table that tells you what that code means.
21      So I would leave the possibility for some
22  wiggle room that if there is some misunderstanding of
23  any of this data that it's possible that some
24  additional data to understand the data that I have
25  described could be useful in performing this damages

Page 60

1   methodology.
2       But at a high level, these are the data
3   fields that could allow me to implement my methodology
4   as I have described it.
5       Q   Have you in your prior experience come
6   across, in doing a damages methodology, data is not
7   what you thought as you just stated?
8       A   Yes.
9       Q   Can you give an example?
10      A   Sure.  An example could be product
11  description which is often very important and as I
12  have described in my report, it would be important
13  here to know the type of product.
14      I have seen large data sets where the
15  product description is a -- you know, it's often
16  user-populated meaning the person enters free form
17  into the database.
18      So you'll have hundreds of different
19  iterations of what is perhaps the same product.  And
20  so it makes it difficult or very time-consuming to
21  work through that one by one to clean the codes just
22  to make sure you have a harmonized list of the product
23  descriptions.
24      But it's possible that there was also an
25  item number that has a lookup somewhere in the

Page 61

1   defendant's record where it gives a unique harmonized
2   list of the product types.
3       So you think you're getting a description of
4   a product that you're going to be able to use, but
5   oftentimes it's got gibberish.  Sometimes it just has
6   unrecognizable characters because a lot of times until
7   you see the data, you're not sure what you're going to
8   get; and you have to supplement it with additional
9   information.
10      Q   Thank you.  Okay.  I'm going to ask you
11  about the eligible brands list.
12      A   Okay.
13      Q   Now, your opinion assumes that the eligible
14  brands list will identify the start or ending of when
15  a product was eligible for coverage.  And that's in
16  Paragraph 19.
17      A   Right.  Just -- I just want to make sure I'm
18  clear in terms of assuming it.  I wouldn't say it's
19  something I assume.  It's something I researched, and
20  I have cited support that I believe demonstrates this,
21  this is the case, that the eligible brand lists do
22  maintain information on the product and type that were
23  eligible at a given point in time using a revision
24  date as an example of how you might determine the
25  date.

16  (Pages 58 to 61)

REDACTED VERSION
Christopher Jackman          8/22/2017

Page 62

1      Q   In that same paragraph, you state that this
2  is based on Sears having saved somewhere eligible
3  brands lists that -- citing to Mr. Setzer.
4      A   That's correct.
5      Q   And is it your understanding that the --
6  each list has a revision date on it?
7      A   As far as I can tell, yes.  Whether -- I'm
8  sorry, I didn't mean to cut --
9      Q   That's okay.
10     A   Whether it's -- you know, there is a
11 question of whether or not it's printed on the
12 document, itself, because I believe with -- in
13 Mr. Setzer's deposition, he was looking at it, thought
14 there ought to be a revision date on it; but he was
15 saying that perhaps it just didn't print out on the
16 page that he was looking at.
17         So it could be possible that the date is
18 available.  But, you know, unless you select a way to
19 make it maybe show up in a footer or on a print page
20 or something like that, you might not see it by just
21 hitting "print."
22     Q   The exhibit he had looked at in his
23 deposition actually didn't have it on it?
24     A   Correct.  And I believe he testified that he
25 felt there was a way to determine the revision date on

Page 63

1  that document.
2      Q   But he could actually only confirm revision
3  dates going back to when he was in charge of putting
4  those dates on the eligible brands list?
5      A   Correct.
6      Q   And that was -- at least 2010 is I believe
7  what he said?
8      A   Yes, that's what he testified to.
9      Q   But you do not know for certain whether
10 there are eligible brands lists dating back to 2000
11 with or without a revision date?
12     A   You know, it comes down to, you know, the --
13 know it for certain, I would say, no.  There were a
14 number of eligible brands lists that were produced as
15 part of this litigation that did not have dates on
16 them, so I couldn't confirm it with those.
17         We did find one that had a revision date of
18 2004.  And so that was one indication that that
19 revision date was maintained going back earlier than
20 when Mr. Setzer began taking on the task of updating
21 the eligible brands list himself.
22         And so -- yeah, that was one piece of
23 evidence that gave us that indication.  He also
24 just -- he did say that the eligible brands list was
25 in use going back to at least 1996 when he started.

Page 64

1      Q   He did not state that the revision date
2  indicates effective dates of the brands list.
3         For example, he didn't state that it says,
4  It's effective from March 31, 2004 through March 31st,
5  2005, right?
6      A   No.  Basically, if you have a revision date,
7  the idea would be that you would carry that through
8  until the next revision date, so it didn't -- when
9  they revised it, I don't know that they would know
10 when the end date would actually occur.
11         But he did not testify that, you know, you
12 could -- there is information that would tell you the
13 start and end date on a given eligible brands list.
14 It's possible that could be determined through
15 additional discovery or through other means.
16     Q   Okay.  So with an eligible brands list, if
17 you had one starting back to before January 1st -- or
18 March 25th, 2000 to the present that only had revision
19 dates, your methodology is that you would put them in
20 chronological order based on the revision date.
21         So, for example, you had one prior to
22 March 25th, 2002.  And the next one is dated March
23 31st, 2004 --
24     A   Right.
25     Q   -- and then the next one is dated

Page 65

1  January 1st, 2010.
2      A   Okay.  Yeah, so --
3         MR. BELLI:  I'm going to object to form
4  there.  I don't know a question ever got asked.  It
5  was just -- I guess I lost you.
6         MS. HINES:  Okay.
7  BY MS. HINES:
8      Q   I'm trying to figure out how you would use
9  the eligible brands list if they existed dating back
10 to the beginning of the breach of contract period
11 until present where they had -- each one had a
12 revision date on it.
13     A   Okay, correct.
14     Q   And tell me how you would use those revision
15 dates to figure out -- or to -- for your start and end
16 date of the eligible brand.
17     A   Okay.  So assuming that eligible brands
18 lists with revision dates were produced at some point
19 in this litigation, yes, what I would do to start
20 would be to line them up chronologically by the
21 revision date and so the end date of one eligible
22 brands list would be the day before a new revision
23 date.
24         Through that, we would -- I would attempt to
25 understand what you pointed out could be revision

17  (Pages 62 to 65)

REDACTED VERSION
Christopher Jackman          8/22/2017

Page 66

1  date, and their effective date be different. And if
2  that were the case, seek to determine that information
3  on the effective date if that turns out not to be the
4  case. The only date that was discussed in the
5  testimony in the record that I saw was the revision
6  date.
7      I would also seek to understand if this was
8  the complete set of eligible brands lists like so if
9  there wasn't one missing. Because if there was, I'd
10 would want to try and know about that; so, if need be,
11 I'd be aware of it. And if I had to make some
12 assumptions to account for that, I would do so.
13     But, generally speaking, that's how I
14 would -- I would line them up chronically and just
15 take the revision of the next one and the day before
16 the end date of the previous one without any
17 additional information.
18     **Q   And is there any other data you could look**
19 **to as a back check, for example, when you gave that**
20 **example where you said people wrote free form but --**
21 **so there were a hundred different ways of saying the**
22 **same thing. But then there was a code that verified**
23 **that this was actually the product that everyone was**
24 **describing.**
25     **Is there something with the eligible brands**

Page 67

1  **list that would have the same type of verification?**
2      A   I think I understand your question. And if
3  I'm not answering it, please correct me.
4      But the eligible brands lists that I saw
5  were pretty clear from the prospective of identifying
6  the type of product and the brand. And, you know,
7  these were documents that were used by Sears
8  representatives when they had to go and verify if a
9  customer called and said, Hey, I have a Maytag
10 dishwasher; I'd like to have it covered, the list
11 needed to be clear enough for them to look it up and
12 say, Under dishwashers, is Maytag a covered brand,
13 okay, we can do this.
14     So I believe that if it was clear enough for
15 the Sears representatives to use the eligible brands
16 list to verify based on product brand and type that it
17 would be simple enough for me to do that as well.
18     I'm not aware of anything else that might be
19 necessary to interpret the eligible brands list. But,
20 again, the ones that I saw were pretty clear. And
21 they seemed to hold the same format.
22     In fact, when Mr. Setzer took over the task
23 of updating it in 2010, he testified that he simply
24 took the most recent PDF version of the eligible
25 brands list and just, you know, moved it over into

Page 68

1  Excel but kept the same format. So it does appear
2  that it did keep the same -- or close to the same
3  format over that time.
4      **Q   Okay. Okay. And on Page 7 of your opinion,**
5  **moving on a little bit, you mention MMI that Sears**
6  **maintains which is incorporated into the Ciboodle**
7  **infrastructure that contains information on brands and**
8  **products that are covered under its MPAs, correct?**
9      A   Correct.
10     **Q   And this system was implemented on**
11 **March 15th, 2009?**
12     A   Correct.
13     **Q   And when this was implemented, your**
14 **understanding is that it was a required field when an**
15 **MPA was sold?**
16     A   That's my understanding that within Ciboodle
17 when a Sears associate was helping a customer, there
18 would be a drop-down menu for the product brand which
19 ostensibly was to kind of force the issue of selecting
20 a brand for -- you know, for inclusion in the ultimate
21 MPA database for -- that was being covered by an MPA.
22     **Q   And the MMI list of brands was the current**
23 **list of eligible brands at the time of the sale?**
24     A   That was available in Ciboodle.
25     **Q   Is that how you pronounce it?**

Page 69

1      A   I don't know, maybe it's Ciboodle. Yes, as
2  I understand it, and that's -- and Mr. Setzer actually
3  made the point that they didn't want printout versions
4  flying around so there would be version issues.
5      So when the new version was created, they
6  would just load that in. And then a sales associate
7  would just know they could click on that, and it would
8  be the updated list.
9      **Q   So your opinion does not assume that Sears**
10 **could run a query for whether an item was on the**
11 **eligible brands list at the time of sale?**
12     A   Are you talking about through eligible
13 brands lists or through MMI?
14     **Q   Let's -- eligible brands lists.**
15     A   Okay. I don't know if they'd have the
16 ability to run a query because I know prior to
17 Mr. Setzer taking over the task of updating the
18 eligible brands lists, there was PDF forms of those
19 documents that were sent around.
20     So I -- but he said that he thought that
21 somewhere there would be Word versions of those PDFs
22 saved somewhere. But whether or not that was also in
23 some database that could be queried, I'm not sure.
24     But as I discussed in my report, I could
25 still take those separate files and then create the

18  (Pages 66 to 69)

REDACTED VERSION
Christopher Jackman          8/22/2017

## Page 70

1  database that I would need to query the information
2  for my report -- or from my methodology.
3      Q   Okay.  And what about the same query after
4  MMI was implemented?
5      A   As I sit here today, I don't recall whether
6  they said it was something they could query.  It was
7  information that was stored in a database.  Whether or
8  not -- I don't believe anyone testified as to whether
9  or not it was queriable.
10         But I do know that at the same time, the
11  eligible brands list was separately still being
12  maintained so Sears representatives, if they wanted
13  to, they could actually verify the information from
14  MMI through the PA Resource Center using the eligible
15  brands list.
16         And so -- and those were the ones -- you
17  know, that was during Mr. Setzer's -- or for much of
18  his time period of updating those lists.  So I believe
19  that information would be saved somewhere.  So if it
20  were the case that for some reason the revision date
21  weren't available in MMI, the eligible brands list
22  could still be used during that time.
23      Q   So your opinion assumes that the eligible
24  brands list is used by Sears to determine if a product
25  was eligible for coverage under an MPA at the time of

## Page 71

1  purchase?  And I'm looking at Paragraph 19.
2      A   And, I'm sorry, would you mind repeating
3  that.
4      Q   Sure.  Your opinion assumes that the
5  eligible brands list is used by Sears to determine if
6  a product was eligible for coverage under an MPA at
7  the time of purchase?
8      A   Again, I would just take issue the word
9  "assumes."  I believe there is testimony to support
10  that notion that I cited in my report, but, otherwise,
11  yes.
12      Q   Okay.  Your opinion does not state what
13  "coverage" means or "covered" means; is that correct?
14      A   My -- in terms of what exactly?  I just want
15  to make sure I understand.
16      Q   Well, if a given product was eligible for
17  coverage, what is "coverage"?
18      A   "Coverage," as I understand it, would just
19  be coverage under the form MPA agreement that would be
20  entered into by a customer with Sears Protection
21  Company as of the time of the purchase.
22         I know they had form agreements that weren't
23  separately negotiated from customer to customer.  But
24  that template did update from time to time during the
25  relevant time period.  So whichever would be the

## Page 72

1  operative form agreement, that layout lays out the
2  terms of coverage as I understand it that would inform
3  what the meaning of "coverage" was.
4      Q   Do you understand that the amount paid for
5  an MPA is -- by the consumer is for coverage on the
6  items listed on the MPA certificate?
7      A   I understand that to be the case, yes.
8      Q   Forgive me if I already asked you this.
9         Does your opinion account for MPAs for
10  products on the eligible brands list at the time of
11  sale which are not on the time of renewal?
12      A   Can you clarify what you mean by "which are
13  not on the time of renewal."
14      Q   If a brand is on the eligible brands list at
15  the time that the consumer purchases the MPA; and
16  before they renew, it's taken off the eligible brands
17  list, how are those MPAs accounted for?
18      A   The renewals or the original MPA?
19      Q   The original MPA.
20      A   The original MPA would -- it would count as
21  a product that was eligible for coverage at the time
22  of purchase.  So that would cover the entirety of the
23  OAM contract, period.
24         Are you also asking me about the renewal?
25      Q   Yes.

## Page 73

1      A   Okay.  With respect to the renewal, it would
2  be treated almost as a separate transaction and new
3  price for the MPA.  And so the methodology
4  contemplates looking at the eligible brands list at
5  the time of renewal to see if the product was eligible
6  for coverage.
7      Q   Do you consider at all in your methodology
8  whether an MPA is on the eligible brands list at the
9  time a consumer calls for service?
10      A   Do I consider it for what purpose?
11      Q   Whether that MPA would fall under -- within
12  the data set or outside the data set?
13      A   Maybe I can answer it a different way.
14         But the only thing I would consider for
15  whether or not it, if you will, stays on the databases
16  as a potentially impacted product is whether or not it
17  was eligible for coverage at the time they purchased
18  it.  It doesn't contemplate looking at, you know, any
19  of the service calls that were made or anything like
20  that.
21      Q   What about, conversely, an MPA that sold on
22  a product that's not on the eligible brands list at
23  the time of sale but prior to the termination of the
24  MPA agreement, it is on the eligible brands list?
25      A   My methodology considers that to be a

19 (Pages 70 to 73)

REDACTED VERSION
Christopher Jackman          8/22/2017

Page 74

1   product that would stay, you know, in the analysis
2   database, if you will. That would be something that
3   would be a quote, unquote, affected product for the
4   alleged misconduct.
5        Q   So it's in the database, or it's out of the
6   database?
7        A   It would be in the database.
8        Q   Okay, in the database. And there's no
9   calculation for prorated damages because it was -- it
10  became eligible a year after the MPA was entered into?
11       A   Not at this time. I mean, that would be an
12  issue. I would probably have to study more to see,
13  you know -- one of the central, if not the central
14  allegation made by the plaintiffs here is that
15  plaintiffs were entering into MPA contracts with Sears
16  that Sears did not cover or intend to cover.
17       So whether or not it was added to the
18  eligible brands list at a certain time during that
19  period, I'd have to study as to whether or not that
20  comports with plaintiff's allegations.
21       But right now, my damages analysis is
22  consistent with the way the class has been defined.
23  So --
24       (Discussion off the record.)
25  BY MS. HINES:

Page 75

1        Q   Does your methodology take into account a
2   product on the eligible brands list at the time of
3   sale that was incorrectly given coverage because the
4   consumer had given the wrong name of the product?
5        A   Could you repeat that. I just want to make
6   sure I got it before I answer.
7        Q   Okay. The consumer gives a product name
8   when they're signing up for an MPA and that product is
9   on the eligible brands list. However, the product in
10  the consumer's home that is covered under the MPA is
11  actually not one that's on the eligible brands list.
12       A   Okay. Does it -- no. So if the consumer
13  gave information that was maybe incorrect, you know,
14  they incorrectly identified the brand, that would be
15  the information that would presumably then be stored
16  in the data warehouse and would be made part of the
17  MPA database. And that would be matched against the
18  eligible brands list.
19       So, no -- because, as I understand it, Sears
20  for aftermarket products didn't inspect the products
21  before they agreed to the MPA. So I don't believe
22  there would be other information available to do a
23  verification of the brand. So I would only have to go
24  on what would be in the database.
25       Q   What if a service call is made on the

Page 76

1   product --
2        A   Okay.
3        Q   -- do you know if that would be maintained
4   in the database?
5        A   If the technician would then update the
6   record to reflect the correct product brand, is
7   that --
8        Q   That's a possibility. Do you know if that
9   is in the database if a technician --
10       A   I'm not sure if technicians ever took on
11  that responsibility or not. I know that Sears kept
12  records of the service calls and reasons for
13  non-repair or anything like that. So it could be
14  possible that that is one of the reasons -- and that
15  might get reflected.
16       As I understand it, the data warehouse is a
17  pretty old technology. And when a correction would
18  need to be made to any record, what they would do
19  would be to delete that record and then add a new
20  record in.
21       So if that were the case, then at the time
22  that the query could be pulled to produce these data,
23  that update could be reflected in the data as of the
24  time that the data were produced. But if it wasn't
25  for any reason, then all I would have to go on is what

Page 77

1   was in the data warehouse.
2        Q   And when you were just talking about an
3   update, is it your understanding that the update would
4   override the prior technician comment?
5        A   That's my understanding that, you know, that
6   they couldn't just sort of update within the fields
7   that -- that they'd have to actually delete a record
8   and then re-enter it with new information. That's how
9   I understand it.
10       Q   What about information from the call center
11  representative when the consumer calls the call center
12  that I need a repair on this item?
13       A   And could I just go back to --
14
15       Q   Sure. Sure.
16       A   And it dovetails into this question. But,
17  again, even if they didn't have to delete the whole
18  record, if they could just simply update the brand if
19  it turned out that it was incorrectly provided by the
20  consumer and the service technician, for instance, was
21  able to relate that back to whomever it is at Sears
22  that handled that.
23       The -- my presumption would be that if the
24  query were run at a later point in this litigation,
25  that would reflect the corrected information. So,

REDACTED VERSION
Christopher Jackman          8/22/2017

Page 78

1    again, as part of my analysis, I would have the
2    correct information.
3            If for one reason or another, if it's the
4    call center, service technician, did not determine
5    that the brand information was incorrect or otherwise
6    didn't relay that back, then all I would have to go on
7    is what was in Sears's records.
8        Q   Okay.  So when you were talking about
9    updating, you were actually talking about the brand
10   information or the type of product.
11           You weren't talking about -- opposed to what
12   the technician's comments are?
13       A   Well, I was under the impression that the
14   line of questioning had to do with perhaps incorrect
15   brand information.  So that's what I was referring to
16   that, whether it was you delete the record and add a
17   new one -- or maybe they did have the capability of
18   just going in and change one field in the case of the
19   brand, changing it from Maytag to Kenmore, for
20   instance.
21           Either way, if the queries were to be run at
22   some point later in this litigation, my presumption
23   would be that it would reflect the most correct and
24   up-to-date information.
25       Q   So the MPA that was sold with the incorrect

Page 79

1    brand but with a brand that was on the eligible brands
2    list, that would not be in the data set?
3        A   It would depend on whether or not Sears
4    managed to obtain the correct brand information.  You
5    know, like I said, they didn't verify independently
6    for each aftermarket MPA that was sold.
7            But you gave some examples of maybe calling
8    from a call center and asked about their Maytag
9    dishwasher.  And it says here we have a Kenmore
10   dishwasher and correcting the data that way.  Or maybe
11   it was a technician who was called and came to find
12   out it was the wrong brand information.
13           If it got updated through situations like
14   that, yes.  If not and it wasn't otherwise determined
15   or verified, then I would just have to go with what
16   was in the data.
17       Q   Okay.  What about human error where we have
18   a misspelling that you mentioned earlier where people
19   can have a hundred different ways to say the same
20   thing or Dainon Setzer testified about having
21   "Kemmore" instead of Kenmore.
22       A   Yes.
23       Q   How -- are those -- those MPAs in the data
24   set or outside the data set?
25       A   Well, it depends.  I mean, one of the things

Page 80

1    we would do -- and this is something we have done in
2    just about every damages analysis that involves big
3    data that I can remember doing.  But a big part of
4    that is name harmonization whether it be customer
5    names or, in this case, product names, brand names.
6            So one thing we would do before we actually
7    perform the analysis of matching between the eligible
8    brands list and the MPA databases would be to go
9    through those brand names and make sure that every
10   version of Kenmore, for example, was spelled
11   consistently and correctly.
12           So then it would depend on whether or not --
13   again, you asked is it the database or not.  It would
14   depend on the matching procedure.
15       Q   Okay.  Are these the reasonable assumptions
16   that you would use that you stated in your report?
17           This I believe is in Footnote 51.
18       A   I wouldn't call it -- I wouldn't say that
19   that procedure would fall under the reasonable
20   assumptions because that happens in, again, every
21   large data analysis project that we have ever had.
22           There is usually some sort of name
23   harmonization procedure that happens early when you
24   get raw data because typically raw data is quite
25   messy, again, to use a nontechnical term.

Page 81

1            But -- so that would just be the standard in
2    my opinion.  It wouldn't fall under these other
3    reasonable assumptions.
4        Q   What about if there is no brand name?
5        A   If there is no brand name, then there are
6    other reasonable assumptions that can be used to
7    incorporate those data into my analysis.
8        Q   Can you let me know what some of those
9    reasonable assumptions are?
10       A   I can give some hypothetical examples.
11   Ultimately, that decision of how -- if and how you can
12   apply reasonable assumptions is driven by the data
13   that you do have and what those data show.
14           So, you know, in terms of being specific now
15   without having seen the data, I don't think that, you
16   know, it's -- I think it's preliminary to be specific
17   about that.
18           But I can give as an example, say, you know,
19   let's take 2004, for instance.  We have a large amount
20   of data on the MPAs that are part the analysis for
21   2004.  And then we have a smaller subset for which
22   there is missing brand information.
23           So one thing I could do to reasonably
24   estimate those damages would be to look at the data
25   for 2004 for which we had complete information and

21 (Pages 78 to 81)

REDACTED VERSION
Christopher Jackman          8/22/2017

Page 82

1  calculate the percentage of those MPAs that fell into
2  this category of being affected by the alleged
3  misconduct.
4        And then I could apply that percentage to
5  the data we're missing brand information.  But,
6  again, you want to understand the data as well as you
7  can to determine the right approach.
8        So, for instance, if it turned out after we
9  analyzed the data with missing brands that for some
10  reason 85 percent of them were for refrigerators which
11  is probably on the higher end of appliances that are
12  being covered by MPAs.  I don't know that for sure.
13  But just in this hypothetical, say they are.
14        If 85 percent of the missing data -- the
15  data with missing brands were for refrigerators, then
16  what I might do is modify the comparison data for
17  which we have the brand information to be more
18  weighted towards refrigerators to better reflect the
19  data with the missing brand information.
20        So there is so many different ways that you
21  could approach this to determine the most reasonable
22  approach.  But one of those would allow me to
23  reasonably estimate class-wide damages with the
24  inclusion of those data.
25     **Q   And have you done that in your previous**

Page 83

1  **consulting experience where you had missing data, and**
2  **you had to look at historical data and percentages?**
3     A   Yes.
4     **Q   Did that come up in the Hankinson case?**
5     A   No, I didn't have any missing data.
6     **Q   Can you recall a case where it came up in?**
7     A   Gosh, off the top of my head, no.  But I
8  would say that in almost every case there is usually
9  some component of data that, you know, is either
10  incomplete in -- you know, is unintelligible and/or,
11  you know, sometimes when you have multiple defendants,
12  you have data -- and you're trying to say, for
13  instance, come up with a net price, you don't have the
14  same categories of, you know, discounts or credits or
15  rebates.
16        You know, so -- and you want to make that
17  comparison apples-to-apples, so you make certain
18  assumptions there if some data is missing in one of
19  the defendants that the other three, for instance,
20  have, you make assumptions to try to even out and make
21  the comparison as apples-to-apples as possible.
22        The idea being is you want to make the
23  assumptions that allow you to most accurately
24  represent and analyze the data for which information
25  is missing as possible.  And that, again, is usually

Page 84

1  informed by the data you do have.
2     MS. HINES:  Can we take that short break?
3     MR. BELLI:  Sure.
4     MS. HINES:  I'm asking for the break.
5     MR. BELLI:  No problem.
6     (A brief break was taken.)
7  BY MS. HINES:
8     **Q   I'm going to ask you now about the refunds**
9  **and replacement authorizations or replacement credits**
10  **I think you call them.**
11     A   Replacement authorization credits.  I think
12  they have other -- there's other nomenclature for
13  them.
14     **Q   Okay.  So your opinion states that you can**
15  **calculate the price paid for each product covered by**
16  **an MPA?**
17     A   Yes.
18     **Q   And this is based upon Mr. Setzer testifying**
19  **that the data warehouse or MPS can tell you how much**
20  **Sears charged for a particular MPA, correct?**
21     A   That's part of it, yes.  And, I'm sorry, you
22  said, where I could calculate the price.  I believe
23  the -- just the price, itself, would be available.  I
24  don't know if that's semantics, but I wouldn't
25  necessarily have to calculate it.

Page 85

1        There was an alternative discussion about,
2  Well, if for some reason those prices aren't
3  available, then there's -- you know, their pricing
4  formula could be used, but -- I just want to make sure
5  I was clear on that.
6     **Q   Okay.  So your opinion is the actual price**
7  **is available?**
8     A   Yes.
9     **Q   Okay.  And when you say that, do you mean**
10  **the price, the sales floor price that Sears would have**
11  **or the price for the aftermarket product for the MPA?**
12     A   The aftermarket.
13     **Q   Aftermarket, okay.**
14     A   Yes.
15     **Q   Okay.  And you're talking about if an MPA is**
16  **sold where there is more than one product on that MPA,**
17  **you -- your understanding that Sears has data for the**
18  **price of each individual item?**
19     A   Yes, that's my understanding.
20     **Q   Now, you read Mr. Setzer's deposition.  So**
21  **you recall that he talked about the factors that they**
22  **consider in pricing MPAs.**
23        **Do you remember that?**
24     A   Yes, yes.
25     **Q   And he stated that it would include the**

22  (Pages 82 to 85)

REDACTED VERSION
Christopher Jackman        8/22/2017

Page 86

1    purchase price and competitor's price in the market
2    and that this would go into their point of sale
3    pricing, do you recall that?
4        A   Point of sale for --
5        Q   For products, not aftermarket.
6        A   Not aftermarket.  So then would you mind
7    restating the question.
8        Q   Okay, okay.  So aftermarket pricing differs
9    from point-of-sale pricing because -- in Sears's
10   formula because the products are not on the
11   merchandise floor; is that correct?
12       A   Right.  They don't have information on the
13   MSRP just by virtue of having sold it through Sears
14   and in their database.
15           So if there is an extra step or two to
16   determine a, if you will, like a market price or an
17   MSRP as a starting point.  And, as I understand it,
18   they look for comparable products sold at Sears as a
19   starting point for that value.
20       Q   And then these prices -- it's your
21   understanding that these prices are stored and saved
22   somewhere?
23       A   Yes.
24       Q   Okay.  And you're actually talking about the
25   aftermarket price?

Page 87

1        A   Yes, the price that customers actually paid.
2        Q   So you're not talking about the price before
3    that plugs into a formula that Sears uses to come up
4    with the aftermarket price?
5        A   No, that's not what I'm talking about in
6    Paragraph 20 of my report.  I just want to make
7    sure -- but in Paragraph 21, I do discuss as a
8    potential alternative to this pricing information that
9    they have, you know, this pricing formula that they
10   apply and that Mr. Setzer said that prices for every
11   single type of product that could be covered was
12   stored and saved by Sears so as an alternative could
13   potentially go that route to determine prices.
14           But in Paragraph 20, I talk about the
15   evidence that serves as the basis of my understanding
16   that the prices, themselves, are available or
17   maintained by Sears.
18       Q   Okay.  To the extent they aren't maintained,
19   the alternative methodology that you -- or data that
20   you propose could provide you with pricing information
21   is where you would use Sears's formula to calculate
22   the prices; is that correct?
23       A   There need to be some -- you know, an
24   understanding of how that was implemented.  It appears
25   to be done through their system, so it might be an

Page 88

1    automated process.
2            But, you know, again, coming back to what
3    Mr. Setzer says that using this approach that it's --
4    the information on these prices for all the different
5    types of products they could cover is saved somewhere.
6    So I'm going off of that.
7            How it would specifically queried or
8    implemented or involved some sort of calculation on my
9    part, that I'm not entirely sure of.
10       Q   If it did not exist and Dainon Setzer is not
11   correct on what he said and there's -- you have to get
12   the pricing through an alternative method --
13       A   Okay.
14       Q   -- how would you do that?
15       A   Is this also assuming that the data on the
16   prices, themselves, don't exist, what I'm discussing
17   in Paragraph 20 and 21?
18       Q   Well, the pricing -- the price that they
19   have for the actual product --
20       A   Okay.
21       Q   -- without factoring in the age of the
22   product and the cost of repair or replacement for that
23   product.
24       A   Okay.  So, I mean, again, I'm -- is this
25   related to Paragraph 20 or -- so it's two sources of

Page 89

1    data that I'm talking about in the report, so I just
2    want to make sure I'm clear.
3        Q   Okay.  Tell me the two sources so we're both
4    clear.
5        A   Okay.  So in Paragraph 20, I'm talking about
6    deposition testimony from Dainon Setzer where he says
7    that the price for an MPA charged by Sears is
8    available through, I'm pretty sure, the data
9    warehouse, yes.  It's in my report.  And that, of
10   course, you can -- you can determine -- I'm sorry, I
11   was trying to read while I was also trying to talk.
12           So, yes, information is available on the
13   prices charged for a given MPA and that -- they
14   generally price the products on a per-product basis
15   even though on the certificate agreement that they
16   receive, they only see a total price.
17           So, internally, they are pricing it on a
18   per-product basis.  And we know -- not to mix 20 and
19   21, but we know they have a formula that they use to
20   determine that price.
21           When they're agreeing to an MPA with a
22   customer, they price it per-product, they sum it up,
23   and then that total price is what's sent to the
24   customer --
25       Q   -- wait, let me interrupt you.  And that

23  (Pages 86 to 89)

REDACTED VERSION
Christopher Jackman          8/22/2017

Page 90

1  **price is saved and stored somewhere, is that your**
2  **understanding?**
3      A   That's my understanding, yes, because they
4  go through the, you know, the motions of pricing it on
5  an individual -- on an individual product basis.
6          And then also customers can call and inquire
7  about the individual pricing of a product under an
8  MPA.  And when they do that, a Sears representative
9  who answers the call has the ability, I believe, in
10  the PA Resource Center to look at the particular
11  product pricing.
12          So, again, that's something that informs my
13  understanding that this information is saved somewhere
14  because the Sears representatives have access to it.
15      Q   And that is Dainon's testimony that you cite
16  **for that?**
17      A   Correct.
18      Q   **Okay.  Then in Paragraph 22 --**
19      A   Twenty-one?
20      Q   No, I'm sorry, 21, yeah.
21      A   Okay.
22      Q   **It's 21.  You talk about in the event that**
23  **the single individual pricing is not available?**
24      A   Yes.
25      Q   **Okay.**

Page 91

1      A   So I talk about the price formula that they
2  use to come up with these per-product prices for MPAs
3  and how Mr. Setzer did testify that the prices, you
4  know, that were -- that you could determine the prices
5  for every type of product using information that's
6  stored and saved by Sears.
7          So while neither him nor Ms. Means went into
8  all the detail necessary to describe how that process
9  would work, it appeared from both their testimony that
10  it's on a system that -- that information could be
11  determined using their formula on their system.
12      Q   **And that would require Sears having to save**
13  **the age of the product at the time the MPA was entered**
14  **into?**
15      A   I believe Mr. Setzer did say that the age of
16  the product was taken into account.
17      Q   **And that -- would that affect the cost of**
18  **repair and replacement that's taken into account for**
19  **the aftermarket MPS?**
20      A   The age could.  Other things could affect
21  the cost of repair, but age is probably one of them.
22      Q   **Okay.  And for an aftermarket MPA, you would**
23  **need more than just the product type and brand if you**
24  **didn't have the individual pricing available, correct?**
25      A   To implement any of these formulas, the

Page 92

1  answer is I'm not sure because, again, I was saying
2  that they didn't go into enough detail to fully
3  understand the very technical steps that are involved
4  and what would be saved in their system, as Ms. Means
5  put it, that would be able to execute this analysis.
6          So I can't be specific at this point as to
7  what additional information would be needed.
8      Q   **If they had applied a discount for multiple**
9  **MPA products on one -- in one MPA sale, that would be**
10  **information that would need to be saved?**
11      A   Yes.
12      Q   **Right.  As well as if there was a**
13  **promotional discount applied at the time?**
14      A   Sure, yes.
15      Q   **But you don't know if they have these saved**
16  **at this time, that information saved?**
17      A   Well, you know, again, it comes down to what
18  I talk about in Paragraph 20.  That, as I understand
19  it, is the price they charge to the customer.
20          So in that regard -- and it's the price
21  that -- you know, if a customer is calling up and say,
22  Hey, how much did I pay for the refrigerator under my
23  MPA that the agents, using the PA Resource Center, can
24  access this information.  So the presumption there
25  would be that they're discussing the net price or the

Page 93

1  price that they actually paid.
2          If that's the case, then it's not clear what
3  any rebates or discounts -- that separate information.
4  Usually, I like to have it because I like to have as
5  much information as I can.
6          But if the net price is already calculated
7  and it reflects the price that was paid by the
8  customer, that, as I understand it as part of my
9  methodology, is the price that I would be looking to
10  use.
11      Q   **But if we didn't have that -- the PA**
12  **Resource Center, what you talk about in Paragraph 19,**
13  **if we didn't have that per-price data, we would need**
14  **to have the age of the product to determine what the**
15  **pricing was at the time of sale -- or an**
16  **aftermarket --**
17      A   So if you're talking about for the
18  implementation of what's in Paragraph 21, I believe
19  that to be the case.  And -- yes, I believe that to be
20  the case.
21          There was some -- between Mr. Setzer and
22  Ms. Means, there was perhaps some conflicting
23  information about the age of the product.  But,
24  ultimately, I couldn't say specifically what would be
25  needed until I understood the formula better.

24  (Pages 90 to 93)

REDACTED VERSION
Christopher Jackman          8/22/2017

## Page 94

1    So it's possible that the age is important.
2  I think that's what was said, but I think there was
3  some conflicting information there.  So I can't be
4  certain as I sit here.
5    Q  Okay.  In Paragraph 22, you state that the
6  refund can be used to measure damages as we -- you
7  stated earlier that was -- that's part of your
8  methodology, applying the refunds.
9    A  Yes, I would want to account for a refund up
10  in that price.
11    Q  And is it the refund amount you're talking
12  about for the premium, the MPA premium, that was paid?
13    A  What do you mean by "premium"?
14    Q  So to the extent a consumer received a
15  refund for the MPA coverage.
16    A  For a particular product?
17    Q  For a particular product, yes.
18    A  Okay, okay.  So I understand that.  Now, do
19  you mind restating the question so that I understand.
20    Q  Yeah, okay.  So when you say, "accounting
21  for the refund," you're talking about the refund
22  amount that a consumer received for an individual
23  product on their MPA certificate?
24    A  Yes.  Well -- yes, the individual products,
25  I believe, are listed on the MPA certificate.  But the

## Page 95

1  price that they paid for the individual prices are
2  not.
3    But I believe -- to answer your question,
4  yes, the refund that I would be applying would be
5  specific to the product that may or may not -- that
6  would be at issue in this matter that I would be
7  analyzing against the price that was paid for the MPA
8  for that product.
9    Q  Okay.  And to the extent that the refund
10  amount is a prorated amount from what they paid for
11  that MPA, that amount is going to be damages to that?
12    A  The difference between the price and the
13  whatever refund they received would be damages, yes.
14    Q  Okay.  And in your methodology, is the
15  refund matched to the specific product on a specific
16  MPA?
17    A  Yes.
18    Q  Okay.  And for merchandise credits, you
19  similarly state that you would apply the credit that a
20  consumer received against the cost of the MPA that
21  they paid for the individual product?
22    A  For the individual product, yes, the amount
23  of the credit they received and fulfilled.
24    Q  And fulfilled, correct.  And you're going to
25  match the -- that credit to the specific product on

## Page 96

1  the specific MPA?
2    A  Correct.
3    Q  And your understanding is that Sears has the
4  data to be able to make that match?
5    A  Yes, I believe so.
6    Q  Okay.  And the merchandise credit, is that
7  for the value of the merchandise?
8    A  Yes.  Yes, it's based on -- as I understand
9  it, they look for a comparable product that is sold by
10  Sears of the same -- you know, sometimes technologies
11  advance rapidly, so I believe Sears makes an effort to
12  match it to a comparable product or comparable value
13  and then bases the authorization of credit on that
14  amount.
15    Q  And your understanding is that Sears
16  keeps -- maintains data on the merchandise credits or
17  replacement authorization credits that are fulfilled?
18    A  Yes.
19    Q  Do you know whether they keep data on
20  merchandise credits that are not fulfilled?
21    A  I don't know that for certain.  I know when
22  Mr. Setzer was discussing Exhibit 20(a), they were
23  asking generally about merchandise authorization
24  credits.  And he stepped in to say this query was
25  specific to those that were fulfilled.

## Page 97

1    So I don't know if that means that was done
2  deliberately.  But -- so I can't say for certain.  I
3  can't recall if they covered -- I would imagine they
4  would have that, but I don't have anything to cite to
5  for that.
6    Q  Okay.  I'm going to ask you about repairs.
7  And you stated earlier that whether or not an MPA
8  holder received repairs on an MPA that's in the data
9  set is not -- was not factored into your damages
10  calculation?
11    A  If they received a repair on a product that
12  wasn't covered, is that -- I'm sorry, is that the
13  question?
14    Q  Yes.
15    A  Okay.  That is not factored in.
16    Q  Okay.  Now, you reviewed Katrina Means's
17  testimony, correct?
18    A  Yes.
19    Q  And she testified that if an item is listed
20  on an MPA, it is covered.
21    Do you recall her stating that?
22    A  No, I don't.
23    Q  So you don't have an understanding that even
24  if it's not on the eligible brands lists but if it's
25  on your MPA certificate, Sears will still repair that

REDACTED VERSION
Christopher Jackman        8/22/2017

Page 98

1  product or replace that product?
2      A   Right.  Well, I don't recall, as I sit here
3  today, the specific statement that she made.  But I
4  would come back to what I said earlier which is, you
5  know, for the purposes of my damages and methodology,
6  I assumed that the allegation was true.
7          So as I understand the allegation, that
8  while there were products for which Sears entered into
9  and an MPA with a customer, presumably when they did
10  so that it would be covered.  But then customers
11  learned that, in fact, they were not covered.
12         So that is the assumption that I am making
13  in offering my damages and methodology.  So I believe
14  the question you're asking, you know, I don't have an
15  opinion about that assumption.
16     Q   Is that something that you could factor into
17  your damages calculation if the data existed?
18     A   In what way?
19     Q   An MPA that is in the data set so it's an
20  MPA that was sold on the product that was not on the
21  eligible brands list at the time of sale but for which
22  the consumer received repairs on.
23     A   From what I recall in the testimony that
24  there is a way -- there is a database that maintains a
25  service record of products that are, you know, covered

Page 99

1  under MPAs.  So if there was any information that
2  needed to be accounted for, I presume that it would be
3  included in that database.  I'm not sure what you're
4  specifically asking for in terms of accounting for it,
5  so I can't say for certain that it's in that database
6  and what I could do with it.
7          But I know that they did keep records of
8  those service calls.  So there would be some
9  information that I would be able to use for whatever
10  accounting for purposes you're referring to.
11     Q   Because that MPA would be in the data set
12  because it was an MPA sold on an eligible brand?
13     A   Well, yes, or if there was some reason that
14  I needed to consider those, I could alter the database
15  quite easily to keep those in the database.  So one
16  way or another, I could analyze them.
17         I could keep them in the database.  And then
18  whatever information that Sears has related to the
19  service calls or the services that were done, that
20  would need to be considered.  I could in incorporate
21  that.
22     Q   In Paragraph 26, you state that your
23  methodology would identify products in the master
24  breach of contract MPA data set which includes
25  aftermarket MPAs sold by Sears yet not covered or

Page 100

1  eligible for coverage under the MPA.
2          Is there a difference between not covered by
3  or eligible for coverage under the MPA?
4      A   No.  If I were -- I mean, "eligible for
5  coverage" is the term.  I don't know if I used that
6  terminology -- that phrase consistently.  But,
7  ultimately, it comes down to the eligibility for
8  coverage as determined by the eligible brands list or
9  potentially MMI.
10     Q   Is there a reason that you did not consider
11  crediting MPAs in the data set for repairs that a
12  consumer received on those products?
13     A   The reason just being that, you know, I
14  assumed the allegations were true.  And as part of
15  those allegations was that products that were not
16  eligible for coverage but were included on under an
17  MPA were not covered by Sears.
18         And so that was the assumption that guided
19  the entirety of my analysis.  So that would be the
20  reason why I didn't consider that.
21     Q   Okay.  I didn't see that you considered
22  annual maintenance checks into your methodology.  And
23  when I say "annual maintenance checks," I mean an
24  annual maintenance check fulfilled.
25     A   You mean like preventative maintenance?

Page 101

1      Q   Yeah, understand the agreement the consumer
2  can call up once a year and have them come out.
3      A   Right.
4      Q   Did you consider that in your data set as to
5  whether that would affect the -- you know, the credit,
6  you know, against what they paid for the MPA?
7      A   Are you talking about the intrinsic value of
8  having a preventative maintenance check, or -- in what
9  way are you asking if I considered it?
10     Q   If they called for a preventive maintenance
11  check, if it was fulfilled.
12     A   If it was fulfilled.  Again, no, I didn't
13  because I was going off of the assumption that the
14  allegations were true and did not include any service
15  calls because -- service calls or maintenance checks
16  because the allegation being that if it was an
17  ineligible product that it wasn't covered by Sears.
18     Q   Do you know if Sears maintains data and
19  annual maintenance checks that were fulfilled?
20     A   No, I don't.  That was outside the scope of
21  my analysis.
22     Q   Okay.  What about buyouts?  I did not see
23  that you considered buyouts in your damages
24  methodology.
25         Do you recall what buyouts are?

26  (Pages 98 to 101)

REDACTED VERSION
Christopher Jackman          8/22/2017

Page 102

1    A   Not the terminology that you're using. I
2  mean, are you saying that differs from a refund of
3  the --
4    Q   A buyout is when -- and this is when Dainon
5  Setzer testified. When Sears does not have the
6  ability to repair a product under an MPA and it offers
7  a cash settlement in lieu of repairing.
8    A   As I understood that to me, that was akin to
9  a refund.
10    Q   So you equated that with a refund?
11    A   Yes.
12    Q   Okay. And it would be a refund that was
13  fulfilled, accepted by the consumer?
14    A   Yes.
15    Q   Do you know if Sears keeps data on buyouts
16  specifically? I'm using that term.
17    A   My -- again, my understanding is that it
18  would be part of the information that was included
19  with the refunds data.
20        I don't know if you're representing to me
21  that buyouts and refunds are different. But, as I
22  understand it, they were one and the same.
23    Q   Is there a difference between a refund and a
24  full refund?
25    A   Well, I believe in certain instances -- and

Page 103

1  I think this language is included in the MPA
2  agreement -- that sometimes the refund that was
3  offered was prorated based on the time that had lapsed
4  since the start of the MPA agreement.
5        So in those cases, sometimes Sears offered a
6  partial refund to reflect the amount of time that was
7  left.
8    Q   Okay. In Paragraph 34, when you discuss
9  the -- under the claimants under the Pennsylvania
10  consumer fraud putative class, as you stated earlier,
11  that class differs because of the statute of
12  limitations and because it applies only to
13  Pennsylvania residents?
14    A   That's correct.
15    Q   Right, okay. Did you take into account in
16  your methodology with regard to whether an MPA in that
17  class fell within the data set or not if the customer
18  relied on a misrepresentation by Sears upon entering
19  their MPA?
20    A   Would you mind repeating that question. I'm
21  sorry. I just want to make sure I have it.
22    Q   Okay. So the data set that would be for the
23  claims under the Pennsylvania Consumer Fraud Act --
24    A   Okay.
25    Q   -- would include Pennsylvania -- only

Page 104

1  Pennsylvania residents, and it would be limited to the
2  relevant time period that you have stated --
3    A   Right.
4    Q   -- as to whether an MPA was purchased with a
5  product that was on the eligible brands list at the
6  time of purchase --
7    A   Right.
8    Q   -- was there any consideration for whether
9  that MPA fell within the data set as to whether that
10  consumer had relied on the misrepresentation by Sears
11  upon entering that MPA?
12    A   I see. No, that ultimately fell outside the
13  scope of my assignment. I assumed the allegations for
14  all three claims were true and focused my analysis
15  on -- of damages methodology could be conducted
16  without individualized inquiry.
17    Q   Do you know if Sears maintains data on
18  statements made to its MPA customers at the time they
19  enter into agreements?
20    A   No, I didn't look into that.
21    Q   Okay. Okay. I wanted to ask you about your
22  sources of data that you list -- that you list in
23  Exhibit B to your report that you relied on.
24    A   Okay.
25    Q   Did you choose these sources?

Page 105

1    A   Yes.
2    Q   Did you ask for these specific documents
3  that you relied on?
4    A   From whom?
5    Q   From plaintiff's counsel.
6    A   Oh, no, not necessarily. I wouldn't have
7  known the specific documents to ask for in getting
8  started. We had the full production available to us.
9  And as I began to develop my damages methodology,
10  there were key areas of information of research that I
11  wanted to review to most importantly make sure that it
12  was a sound methodology and based on data and
13  information that appeared to be available from Sears.
14        I may have asked the same from counsel, you
15  know, is there any documents related to this question
16  or this issue or that issue. But, other than that,
17  no, I didn't.
18    Q   When you say there was "full production
19  available," what did you mean?
20    A   As I understand it, the full production that
21  has been made by Sears up until this point was also
22  produced to me; and I had access to it.
23    Q   Document production?
24    A   Yes.
25    Q   As far as pleadings, are there certain

27  (Pages 102 to 105)

REDACTED VERSION
Christopher Jackman          8/22/2017

Page 106

1  pleadings that you typically ask for in your
2  consulting?
3      A   Well, I'll start with the complaint,
4  obviously, or the most recent operative complaint.
5  And beyond that, when I'm talking with counsel about
6  the nature of the case, I'll ask, you know, have there
7  been any other, you know, any other motions or
8  anything else that would inform my understanding of
9  how the case has proceeded up until that point. And
10  if there are, I would ask to look at those as well.
11     Q   And that includes -- you said "motions" as
12  well as pleadings?
13     A   Yes, yes. Forgive me, I don't know the
14  legal terminology if that wasn't responsive.
15     Q   One of the documents you relied on was
16  Sears's answer to the complaint, the First Amended
17  Complaint?
18     A   I believe it was for the -- one of the sets
19  of interrogatories. I don't believe it was an answer
20  to a complaint.
21     Q   Okay. It's not the answer. You're right,
22  it's the answer to interrogatories.
23     A   Sorry.
24     Q   I was just going to say it wasn't cited in
25  your report.

Page 107

1      A   Footnote 23 is --
2      Q   Okay. Did you ever ask to review an
3  ineligible brands list?
4      A   No.
5      Q   Do you know if Sears maintains one?
6      A   No. I've seen on some eligible brands list
7  where they'll say the following brands are no longer
8  eligible that was included with eligible brands list.
9  If they keep a separate ineligible brands list, I'm
10  not aware of that; and I never asked to see that.
11     Q   And were there any other documents that you
12  asked to look at that are not included in your Exhibit
13  B?
14     A   In preparation for the deposition, I did
15  look at the agreement, the MPA agreements that were
16  entered into with the Greene's. I did take a look at
17  those.
18     Q   Other than the ones attached to the
19  complaint?
20     A   I believe that's the full set. They were
21  Exhibit A to the complaint, and that's what I
22  reviewed. So I believe that would be -- yes, what was
23  attached to the complaint.
24         And then I asked to look at the plaintiffs'
25  memorandum in support of class certification that was

Page 108

1  filed on the same day as my expert report. Outside of
2  that, I can't recall any other documents as I sit here
3  today.
4          MS. HINES: Let me just take a break.
5          (A brief break was taken.)
6  BY MS. HINES:
7      Q   Let's go back to Paragraph 20 of your
8  report, okay.
9      A   Okay, the prices.
10     Q   The prices, okay. You state, "According to
11  Mr. Setzer, the Dainon warehouse can be required to
12  determine how much Sears charged for a particular
13  MPA."
14         And is he talking about an -- is your
15  understanding he's talking about the individual items
16  on the MPA or just an MPA total price?
17     A   It's unclear from his testimony one way or
18  the other. It's in the preceding sentence -- the
19  following sentence, I was looking to clarify that
20  point.
21     Q   Because in the next sentence you say,
22  "Mr. Setzer further testified when a customer
23  purchases an aftermarket MPA covering multiple
24  products, the MPA is priced on a per-product basis,"
25  right?

Page 109

1      A   Yes.
2      Q   But that does not mean that the customer
3  actually gets a list of a per-product charge, right?
4      A   They do not get a per-product list charge.
5      Q   And then the next sentence, "Further, if
6  customers wish to discuss the prices they are being
7  charged for individual products covered under a single
8  MPA, Mr. Setzer indicated that Sears's sales
9  representatives would have access to the information
10  necessary to discuss these individual product prices
11  with customers," right?
12     A   Yeah.
13     Q   But would they -- he does not say that they
14  actually give -- have a list of those prices or -- I
15  think I need to go -- he -- they just can discuss it
16  with these individuals?
17     A   As I read and interpreted Mr. Setzer's
18  testimony, it's while they did not provide that on the
19  actual agreement, the individual product prices for
20  the MPA, if a customer wished to discuss any of those
21  individual prices, he or she could do so by calling a
22  Sears representative.
23         And that representative through I believe
24  the PA Resource Center, had the ability to discuss
25  those prices with the customer with the implication

28 (Pages 106 to 109)

REDACTED VERSION
Christopher Jackman            8/22/2017

Page 110

1  being that they could pull up that information and
2  discuss it. They had to have access to that
3  information in order to discuss those prices. So --
4      Q   Okay. So you reply that because they were
5  able to discuss those prices, they were pulling that
6  up from some store data that Sears maintained?
7      A   Yes, in the PA Resource Center.
8      Q   This was if a customer called up after they
9  purchased the MPA and were inquiring or at the time of
10  purchase?
11      A   It didn't say either way. I don't recall
12  him specifying one way or the other.
13      Q   And it's -- and the PABA Center maintaining
14  that data, where in Dainon's -- I think Dainon's
15  testimony doesn't say that -- or was it Katrina Means
16  who said that?
17      A   I have to look at what was said on his
18  deposition at Page 84 and 85.
19      Q   Go ahead and look. Take your time.
20      A   Okay. Does the customer receive the
21  per-product pricing. Said it would be discussed by
22  telephone, but the paperwork resent to the customer
23  would not break down the individual prices.
24          So in that regard, I misspoke a little bit
25  about the PA Resource Center. The PA Resource Center

Page 111

1  was that internal intranet that allowed Sears's
2  representatives to access customer information.
3          And so -- I may have connected those dots.
4  But it's probably why I didn't say it specifically in
5  the report. So sitting here, I may have
6  inappropriately connected those dots.
7          But from somewhere, it appears that they
8  have the ability to pull up these pricing information
9  and discuss it with customers.
10      Q   And I was just going back and checking these
11  pages to see if it was stated on these pages, and I
12  did not see that.
13      A   Right. And as it isn't mentioned
14  specifically in the report. So as I was sitting here
15  just a moment ago, I misspoke about that, the PA
16  Resource Center.
17      Q   Okay. Okay. I don't have any other
18  questions.
19          MR. BELLI: I don't have any questions. But
20  I would like when Mr. Jackman and his colleagues rates
21  to be marked confidential on the transcript and also
22  any testimony about Hankinson.
23          I mean, Hankinson would be -- I guess he
24  explicitly brings up a confidentiality agreement.
25  And then there was probably four or five pages of

Page 112

1  questions after that.
2          MS. HINES: Pursuant to the protective order
3  in this case.
4          MR. BELLI: Yeah.
5          (Signature having not been waived, the
6  deposition of Christopher Jackman was
7  concluded at 12:30 p.m.)

Page 113

1          ACKNOWLEDGMENT OF DEPONENT
2          I, Christopher Jackman, do hereby
3  acknowledge that I have read and examined the
4  foregoing testimony, and the same is true, correct,
5  and complete transcription of the testimony given by
6  me and any corrections appear on the attached Errata
7  sheet signed by me.
8
9
10    _____    _____
      (Date)             (Signature)

REDACTED VERSION
Christopher Jackman          8/22/2017

Page 114

1       E R R A T A   S H E E T
2       IN RE: Greene, et al. v. Sears, et al.
3       RETURN BY:_____
4
5       PAGE    LINE    CORRECTION AND REASON
6       ____    ____    _____
7       ____    ____    _____
8       ____    ____    _____
9       ____    ____    _____
10      ____    ____    _____
11      ____    ____    _____
12      ____    ____    _____
13      ____    ____    _____
14      ____    ____    _____
15      ____    ____    _____
16      ____    ____    _____
17      ____    ____    _____
18      ____    ____    _____
19      ____    ____    _____
20      ____    ____    _____
21      ____    ____    _____
22      ____    ____    _____
23      ____    ____    _____
24      ____    ____    _____
25      ____    ____    _____

Page 116

1       CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC
2           I, Jennifer Bosley, Court Reporter, the
3       officer before whom the foregoing proceedings were
4       taken, do hereby certify that the foregoing transcript
5       is a true and correct record of the proceedings; that
6       said proceedings were taken by me stenographically and
7       thereafter reduced to typewriting under my
8       supervision; and that I am neither counsel for,
9       related to, nor employed by any of the parties to this
10      case and have no interest, financial or otherwise, in
11      its outcome.
12          IN WITNESS WHEREOF, I have hereunto set my
13      hand and affixed my notarial seal this 1st day of
14      September 2017.
15      My commission expires:
16      August 14, 2019
17
18      _____
19      NOTARY PUBLIC AND IN FOR THE
20      DISTRICT OF COLUMBIA
21
22
23
24
25

Page 115

1       E R R A T A   S H E E T   C O N T I N U E D
2       IN RE: Greene, et al. v. Sears, et al.
3       RETURN BY:_____
4
5       PAGE    LINE    CORRECTION AND REASON
6       ____    ____    _____
7       ____    ____    _____
8       ____    ____    _____
9       ____    ____    _____
10      ____    ____    _____
11      ____    ____    _____
12      ____    ____    _____
13      ____    ____    _____
14      ____    ____    _____
15      ____    ____    _____
16      ____    ____    _____
17      ____    ____    _____
18      ____    ____    _____
19      ____    ____    _____
20      ____    ____    _____
21      ____    ____    _____
22      ____    ____    _____
23      ____    ____    _____
24      ____    ____    _____
25      ____    ____    _____

30  (Pages 114 to 116)

EXHIBIT 1 to EXHIBIT 1



# Christopher Jackman

Executive Vice President
Monument Economics Group
Phone: (703) 465-5600
Email: cjackman@megconsulting.com

## Professional Summary

Christopher Jackman has over thirteen years of experience assisting clients with complex litigation in the areas of antitrust, finance, and consumer fraud. Mr. Jackman specializes in supporting analyses for expert testimony in litigation and business matters. In addition, he has analyzed business valuation, liability, and damages issues in support of multi-million dollar awards and assisted counsel with economic damages estimates for pre-litigation and settlement purposes.

Mr. Jackman's experience spans industries including telecommunications, energy, healthcare, investment services, chemicals, airlines, cabotage, real estate, banking, baby products, oil, and consumer electronics. His experience includes developing sophisticated econometric models used to measure overcharges in horizontal price-fixing conspiracies and implicit prices associated with bundled goods in consumer fraud matters, as well as complex income, market and asset-based financial models for use in the valuation and forecasting processes. He has also developed and maintained current and interactive indexes in various industries for use in the evaluation of assets and securities.

Before co-founding Monument Economics Group, Mr. Jackman was a Managing Director at Nathan Associates. Prior to that, he was an Economist at Advanced Analytical Consulting Group, a Consultant at Econ One Research, Inc., and a Senior Associate at LECG Corp.

Mr. Jackman has a B.A. in Economics from Johns Hopkins University and an M.B.A. from Indiana University.



## Education

- B.A., Economics, Johns Hopkins University, 2002
- M.B.A., Indiana University, 2014

## Testifying Experience

*Benjamin Hankinson, et al. v. R.T.G. Furniture Corp. et al.*

- United States District Court Southern District of Florida
- Case No.: 9:15-cv-81139-COHN/SETZLER
- Declaration, August 31, 2016
- Testified at deposition, October 26, 2016
- Opinion concerning data processing and analysis issues
- Retained by Cohen Milstein Sellers & Toll PLLC

## Selected Consulting Experience

- *In Re: Ductile Iron Pipe Fittings ("DIPF") Direct Purchaser Antitrust Litigation.* In a class action antitrust matter involving ductile iron pipe fittings, managed analysis of class certification, merits, and damages issues, industry research and preparation of expert declaration and exhibits.

- *In Re: Cast Iron Soil Pipe and Fittings Antitrust Litigation.* In a class action antitrust matter involving cast iron soil pipes and fittings, managed analysis of class certification and damages issues, industry research and preparation of expert declaration and exhibits.

- *Lane's Gifts and Collectibles, LLC v. Microsoft Online, Inc.* In a class action antitrust matter involving online advertisements, managed analysis of damages issues, as well as the preparation of expert report and exhibits.

- *BlueCross BlueShield of Tennessee, Inc., et al. v. King Pharmaceuticals, Inc., et al.* In an antitrust matter involving the delayed entry of a generic muscle relaxant drug, managed analysis of defendant transaction-level database, and the preparation of expert report and exhibits.

- *Fond Du Lac Bumper Exchange Inc., et al. v. Jui Li Enterprise Company Ltd. et al.* In a class action antitrust matter involving aftermarket automotive sheet metal, managed analysis of class certification, merits, and damages issues, industry research and preparation of expert reports and exhibits.

- *In Re: Polyurethane Foam Antitrust Litigation.* In a class action antitrust matter involving flexible, slabstock polyurethane foam, managed analysis of class certification, merits, and damages issues, industry research and preparation of expert reports and exhibits, as well as critiques of opposing expert analyses.

- *Thomas Boland, v. Consolidated Multiple Listing Service, Inc., et al.* In a class action antitrust matter involving commission rates associated with real estate services, assisted expert with analysis of class certification issues, industry research, and

preparation of expert report. Managed development of damages model using defendants' transaction-level data.

- *Eugene Allan, et al., v. Realcomp II, Ltd., et al.* In a class action antitrust matter involving commission rates associated with real estate services, assisted expert with analysis of class certification issues, industry research, preparation of expert report and critique of opposing expert analysis. Managed development of damages model using defendants' transaction-level data.

- *Nancy Jean Adams v. Apple, Inc., et al.* In a class action antitrust matter involving eBooks, managed analysis of class certification issues, industry research and preparation of expert affidavit, report, and exhibits.

- *In Re: Titanium Dioxide Antitrust Litigation.* In a class action antitrust matter involving titanium dioxide pigment, managed analysis of class certification, merits, and damages issues, industry research and preparation of expert declarations and exhibits, as well as critiques of opposing expert analyses.

- *Danny Lynn Electrical & Plumbing, LLC, et al., v. Veolia ES Solid Waste Southeast, Inc.* In a class action RICO matter involving certain fees associated with waste removal services in the southeastern United States, managed analysis of class certification issues, industry research, appropriateness of defendants' fee calculations, and worked with testifying expert on development of methodology for measuring damages and the preparation of expert report and exhibits.

- *Thomas L. Logue, et al., v. West Penn Multi-List, Inc. et al.* In a class action antitrust matter involving commission rates associated with real estate services, assisted expert with analysis of class certification issues, industry research, preparation of expert report and critique of opposing expert analysis. Managed development of damages model using defendants' transaction-level data.

- *In Re: Puerto Rican Cabotage Antitrust Litigation.* In a class action antitrust matter involving cabotage services along the U.S.-Puerto Rican trade route, managed analysis of class certification issues, market research, preparation of expert affidavits and response to opposing experts' affidavits. Performed estimate of damages for settlement purposes and assisted counsel with settlement claims process.

- *In Re: Mercedes-Benz Tele Aid Contract Litigation.* In a class action consumer fraud matter involving telematic equipment in Mercedes-Benz vehicles, managed analysis of market definition and class-wide impact, discovery support, market research, and preparation of expert report and exhibits.

- *In Re: Aftermarket Automotive Lighting Products Antitrust Litigation.* In a class action antitrust matter involving aftermarket auto lights, managed analysis of defendants' transaction-level databases for use in damages model.

- *Clarke and Rebecca Wixon, et al., v. Wyndham Resort Development Corp. (F/K/A Trendwest Resorts, Inc.), et al.* In a class action consumer fraud matter involving vacation timeshares, managed class certification analysis, discovery support, industry research, preparation of expert report and testimony, estimation of damages and response to opposing expert's reports.

- *Nathan Nygren, et al, v. Hewlett-Packard Company.* In a class action consumer fraud matter involving wireless functionality in laptop computers, managed market definition, class-wide impact and damages analyses, discovery support, preparation of expert report, testimony and response to opposing expert's report.

- *In Re: General Motors OnStar Litigation.* In a class action consumer fraud matter involving OnStar telematic equipment, managed analysis of class certification issues, damages analysis, discovery support, industry research, preparation of expert report and testimony, and critique of opposing expert's analysis.

- *McDonough, et al, v. Toys "R" Us, Inc. d/b/a Babies "R" Us, et al.* In a class action antitrust matter involving resale price maintenance agreements associated with various baby products, managed industry research, discovery support, and preparation of expert report and exhibits focusing on class-wide damages associated with the alleged misconduct. Developed and implemented damages model.

- *Tess Wiltz D/B/A Opelousas Crawfish House, et al, v. Bayer Cropscience, L.P., et al.* In a class action product liability matter involving crawfish, assisted expert with industry research, discovery support, and preparation of expert report, exhibits and testimony.

- *Chevron Phillips Chemical Company LP, v. BDP International, Inc.* In a breach of contract matter involving currency exchange fees, managed industry research, discovery support, verification of plaintiff's own damages model, alternative measurement of damages, and preparation of expert report and testimony.

- *Michael Harris, v. LG Philips LCD Co., Ltd., et al.* In a class action antitrust matter involving LCD panels and products, assisted expert with analysis of class certification issues, damages analysis, industry research, discovery support, preparation of expert report and exhibits and critique of opposing expert analysis.

## Professional Experience

- Monument Economics Group, LLC, Arlington, VA, Executive Vice President, October 2016 - present

- Nathan Associates Inc., Arlington, VA, Managing Director, January 2013 – October 2016

- Advanced Analytical Consulting Group, Inc., Arlington, VA, Economist, March 2011 – January 2013

- Econ One Research, Inc., Washington, DC, Consultant, September 2008 – March 2011

- LECG, Corp., Cambridge, MA and Washington, DC, Senior Associate, February 2004 – September 2008

## Publications

- "Mini-Roundtable – Evaluating Damages" (with Russell Lamb), *Corporate Disputes Magazine, October-December 2014,* 97-103.

## Materials Relied Upon

### Pleadings and Legal Correspondence

United States District Court for the Northern District of Illinois Eastern Division, Nina Greene, et al., Plaintiffs, v. Sears Protection Company, et al., Defendants, No. 1:15-cv-02456, Memorandum Opinion and Order, filed February 2, 2016.

United States District Court for the Northern District of Illinois Eastern Division, Nina Greene, et al., Plaintiffs, v. Sears Protection Company, et al., Defendants, No. 1:15-cv-02456, First Amended Class Action Complaint, filed March 11, 2016.

United States District Court for the Northern District of Illinois Eastern Division, Nina Greene, et al., Plaintiffs, v. Sears Protection Company, et al., Defendants, No. 1:15-cv-02456, Memorandum Opinion and Order, filed March 27, 2017.

United States District Court for the Northern District of Illinois Eastern Division, Nina Greene, et al., Plaintiffs, v. Sears Protection Company, et al., Defendants, No. 1:15-cv-02456, Defendants' Second Supplemental Answer to Plaintiffs' Interrogatory No. 3 of Plaintiffs' Second Set of Interrogatories, November 30, 2016.

### Depositions and Declarations

Deposition and Exhibits of Dainon Setzer, December 17, 2015.
Deposition and Exhibits of Dainon Setzer, June 28, 2016.
Deposition and Exhibits of Katrina Means, June 29, 2016.

### Produced Documents and Data

Documents

SEARS0000397-0401.          SEARS0008985-09056.
SEARS0008724-743.           SEARS0009942.

EXHIBIT 2 to EXHIBIT 1



CD corporate disputes

OCT-DEC 2014

www.corporatedisputesmagazine.com

Inside this issue:

FEATURE
Practical approaches to dispute resolution clauses

EXPERT FORUM
Shareholder litigation

HOT TOPIC
Settling M&A disputes through arbitration

DEPOSITION
EXHIBIT
2

MINI-ROUNDTABLE

# EVALUATING DAMAGES



EVALUATING DAMAGES

MINI-ROUNDTABLE

## PANEL EXPERTS

Christopher Jackman
Managing Economist
Nathan Associates Inc.
T: +1 (703) 516 7717
E: cjackman@nathaninc.com

**Christopher Jackman** has over 10 years of experience assisting clients with complex litigation in the areas of antitrust, finance and consumer fraud. Mr Jackman specialises in supporting analyses for expert testimony in litigation and business matters. In addition, he has analysed business valuation, liability and damages issues in support of multimillion dollar awards, and helped counsel with economic damages estimates for prelitigation and settlement purposes. Mr Jackman's experience spans industries including telecommunications, energy, healthcare, investment services, airlines, cabotage, real estate, banking, baby products, oil and consumer electronics.

Russell L. Lamb
Senior Vice President
Nathan Associates Inc.
T: +1 (703) 516 7793
E: rlamb@nathaninc.com

**Russell Lamb** is an expert in antitrust economics and has testified concerning antitrust liability, impact and damages. He has an extensive background in applied econometrics and has developed econometric models to measure damages in a number of matters involving allegations of horizontal price fixing. He has provided expert testimony in State and Federal Courts in the United States and in Canada on a range of issues, including class-certification and economic damages in antitrust, RICO and consumer fraud matters. In addition, he has provided expert advice to client attorneys at all levels of the litigation.

**CD: In your experience, what are the key challenges to successfully evaluating the value of damages in relation to a commercial dispute?**

**Jackman:** One of the most challenging aspects of the evaluation of damages is obtaining complete and reliable data and information to be used as inputs into a damages analysis. In the event such information is unavailable through discovery, a damages expert must oftentimes devote significant time and resources into finding said information elsewhere, such as the public domain. Should this information not be available elsewhere, the damages expert must then seek to obtain reasonable and reliable proxy information. This process can not only drive up the cost of an expert's services, but depending on the quality of information available to the expert, it can also negatively impact the reliability and accuracy of his or her measurement of damages.

**Lamb:** To build on this, I would stress that the condition the data are in when they are produced to the expert can impact the process of evaluating damages. For example, I recently worked on a case dealing with real estate brokerage commission rates where the produced datasets contained many different fields that appeared to contain commission rate data, yet there was no clear indication as to

which of the fields was the appropriate one to use for our analysis, as no clarifying information was otherwise available. In this instance, had these commission fields been clearly identified in the data, we could have selected the correct one and continued on with our analysis. However, given the uncertainty we faced, we had to undertake an extensive comparative analysis of these data to determine which were the appropriate to use before we could continue on with our damages analysis.

**CD: How important is it for parties considering whether to pursue a commercial dispute to thoroughly assess the potential damages involved? How regularly do parties rush into proceedings without fully understanding this issue?**

**Jackman:** I would say that for any party pursuing a commercial dispute with the intention of being awarded damages, it would be a good idea to not only ascertain a preliminary understanding of the magnitude of potential damages, but also the likelihood said party will prevail on its claim. Pursuing a commercial dispute can be a costly and resource-intensive proposition. As such, parties will want to understand whether or not potential damages are high enough to not only cover all monetary costs of pursuing such a claim, but also the opportunity costs of doing so.

**Lamb:** In my experience, parties don't typically rush into corporate disputes without first gaining a preliminary understanding of potential damages at issue in the matter. Clients often contact me or my staff to conduct preliminary market and damages analyses to help their clients better understand this issue before a lawsuit is filed. By the time a lawsuit is filed and I have been retained as damages expert, parties that are being represented by my clients typically have a solid understanding of this issue and, based on this understanding, have chosen to proceed with pursuing their dispute.

**CD: Given the financial complexities of a typical claim, is it advisable that parties enlist the aid of a damages expert? What advice can you give to firms on selecting and engaging an expert?**

**Jackman:** It's no secret that, depending on the type and scope of a given dispute, legal fees incurred via corporate disputes can be quite expensive. Additionally, parties might be surprised to find that, after an independent analysis of a company and the market it operates in, a measurement of damages that they suffered as a result of an alleged misconduct could be lower than they had anticipated. In these situations, when factoring the legal fees associated with pursuing a given claim, they might determine that pursuing such a claim may not be financially prudent. As such, if a party

had any uncertainty as to the economics associated with pursuing a claim, a wise first step would be to engage an expert to aid in achieving a better understanding of their prospects.

**Lamb:** When selecting and engaging an expert, parties should seek an expert with a proven track record in disputes similar to the one they are facing. A good first step would be to ask for recommendations from legal contacts who deal in the same type of dispute as the one you're currently involved, or industry colleagues who have successfully engaged in a similar dispute. Additionally, you could search for recent court rulings dealing with similar issues as the ones you're facing to see if they cited a certain expert's analysis favourably in making their decision.

**CD: How does the role of the damages expert differ in litigation compared to arbitration or mediation, for example? How might the damages expert assist counsel in preparing a case for trial, arbitration or mediation?**

**Lamb:** The role of the damages expert is not materially different in a litigation, arbitration or mediation setting. The role of an expert hired by the plaintiffs is two-fold. First, an expert determines the amount of damages – if any – suffered by the injured party using sound economic principles and

a scientific approach. This includes determining if there are damages resulting from a defendant's prior actions or if injunctive relief is necessary to prevent future damages. Second, an expert must also be able to clearly explain to the judge, jury, arbitration panel or mediator why it is that there are damages. Arbitration and mediation share these basic requirements with litigation.

**Jackman:** The burden that a plaintiffs' expert faces in evaluating damages is a high one. Experts hired by the defendants do not share this same high burden. Rather, a defendant's expert need only demonstrate that a plaintiff's expert has not met this burden – that is, that a plaintiff's expert has demonstrated no sound or reliable analysis for determining the existence and magnitude of damages. As such, a defendant's expert's analysis will focus on determining if there are problems or concerns associated with the damages analysis conducted by a plaintiff's expert. Similar to a plaintiff's expert, however, a defendant's expert's approach will not differ depending on whether the dispute is being heard by a judge and jury, arbitration panel or mediator. While the expert's audience is different, neither his or her assignment, nor approach, differs across these settings.

**CD: Can you discuss the methods and strategies experts employ to establish the value of damages in a timely and cost effective fashion?**

**Jackman:** Each case is going to present a unique set of facts and allegations, as well as varying degrees of available data and information for use as inputs into a damages analysis. As such, the methods and strategies an expert employs are

"When selecting and engaging an expert, parties should seek an expert with a proven track record in disputes similar to the one they are facing."

*Russell L. Lamb,*
*Nathan Associates Inc.*

going to vary to some degree in order to account for the different circumstances each case presents. In this kind of environment, the key to performing a damages analysis in a timely and cost effective manner is consistency in how each case is approached from the outset.

**Lamb:** That's right. For instance, we follow a set of best practices that cover just about every aspect of the work that we do for our clients, from document review to data analysis to the formatting of reports and accompanying exhibits. These best practices are taught to every new employee upon their hiring to ensure a seamless transition of this information over time. Therefore, when performing complex analyses, often under tight deadlines, staff are always able to remain on the same page and follow along with each other's work. By strictly abiding by these best practices, we are able to eliminate many of the communication barriers that can often impede our efficiency and progress, not to mention jeopardise the consistency and accuracy of our analyses.

**CD: Are you seeing any changes in the way that damages are analysed and quantified? Do you expect further changes to the process to evolve going forward?**

**Lamb:** Regarding matters of antitrust, a string of recent Supreme Court rulings have incrementally raised the burden for plaintiffs' experts with respect to the evaluation of damages. Most recently, in the *Comcast v. Behrend* decision the Court ruled that a rigorous analysis must be performed to determine if a plaintiff's expert's damages analysis is consistent with the plaintiff's theory of liability. This ruling altered the nature of damages analysis in that experts must now pay much closer attention to the facts and details of a case to ensure that their

"One of the biggest challenges an expert faces in evaluating damages is when the data produced in the matter is incomplete or otherwise unreliable in one way or another."

*Christopher Jackman,
Nathan Associates Inc.*

damages analysis can be commonly applied to all class members in a way that aligns with plaintiffs' allegations. While this ruling is commonly applied to class action antitrust matters, it is my opinion that it may have broader implications into other types of corporate disputes.

**Jackman:** Decisions like *Comcast* will have a significant impact on the importance of a damages expert's analysis of the underlying data in the case. As the burden that the Court applies to an expert's damages methodology increases, said expert must undertake a more rigorous, and often time

consuming, analysis of the data. As discussed earlier, one of the biggest challenges an expert faces in evaluating damages is when the data produced in the matter is incomplete or otherwise unreliable in one way or another. Traditionally, experts dealt with these issues by making reasonable, simplifying assumptions about the data – to the extent possible – and proceeded on with their analysis. However, decisions like *Comcast* can significantly impact an expert's ability to do so because of the heightened burden he or she faces in ensuring that his or her damages analysis is consistent with the allegations in the case.

**CD: When it comes to quantifying damages, what final advice would you give to companies assessing their prospects for pursuing a commercial dispute?**

**Lamb:** Before pursuing a commercial dispute, companies should strongly consider investing a relatively small amount of money up front to engage an expert to assess the magnitude of damages they have suffered as a result of the disputed action on a preliminary basis, as well as legal counsel to help them determine the likelihood that they prevail on their claims. Pursuing such claims can be a capital- and resource-intensive proposition, so companies should seek to learn all that they can about their prospects ahead of time to make sure such a pursuit would be worth their while.

**Jackman:** After consulting with a damages expert on their damages prospects related to a given dispute, it is not uncommon for companies to be surprised to learn that the damages they suffered are actually much larger than they would have originally thought. In this regard, I would recommend companies that are on the fence about whether or not to pursue a dispute to make this upfront investment to consult with a damages expert and legal counsel to see what their damages prospects are. Doing so often allows a company to uncover additional sources of damages that they suffered in a given dispute, changing the dynamics of the situation and making pursuing said dispute a worthy endeavour. **CD**

EXHIBIT 3 to EXHIBIT 1

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| NINA AND GERALD GREENE, | ) | No. 1:15-cv-02456 |
| | ) | |
| Plaintiffs, | ) | Judge Jorge L. Alonso |
| | ) | |
| v. | ) | Magistrate Judge Michael T. |
| | ) | Mason |
| | ) | |
| SEARS PROTECTION Company, SEARS, | ) | |
| ROEBUCK and Co. and SEARS | ) | |
| HOLDINGS Corporation, | ) | |
| | ) | |
| Defendants. | ) | |

EXPERT REPORT

Christopher Jackman
Executive Vice President
Monument Economics Group, LLC.
1530 Wilson Blvd.
Suite 560
Arlington, VA 22209

July 28, 2017

DEPOSITION
EXHIBIT
3

# TABLE OF CONTENTS

I.   Introduction .................................................................................................. 1

    A.   Background ........................................................................................... 1

    B.   Assignment .......................................................................................... 3

    C.   Materials Reviewed ............................................................................. 5

    D.   Conclusions ......................................................................................... 5

II.   Key Sears Databases ................................................................................... 6

III.   Breach of Contract Claims ........................................................................ 8

    A.   Availability of data ............................................................................. 8

    B.   Methodology to measure damages suffered by proposed Breach of Contract Class members ....................................................................... 13

IV.   Unjust Enrichment Claims ....................................................................... 15

    A.   Availability of data ........................................................................... 15

    B.   Methodology to measure damages suffered by proposed Unjust Enrichment Class members ................................................................ 16

V.   Consumer Fraud Claims ........................................................................... 16

    A.   Availability of data ........................................................................... 17

    B.   Methodology to measure damages suffered by proposed Consumer Fraud Class members ......................................................................... 17

VI.   Conclusions .............................................................................................. 18

## I. Introduction

### A. Background

1.    I am the Executive Vice President at Monument Economics Group, LLC. ("Monument"), an economic consulting firm based in Arlington, Virginia. Monument provides economic research and quantitative and statistical analyses to clients in the United States, Canada, and elsewhere internationally. I graduated from Johns Hopkins University with a B.A. in Economics. I also earned an M.B.A. from Indiana University.

2.    Prior to co-founding Monument, I held positions at other consulting firms. From 2004 until 2008, I was a Research Analyst (later Associate and Senior Associate) at LECG in Cambridge, MA, and Washington, DC; from 2008 until 2011, I was a Consultant at Econ One Research in Washington, DC; from 2011 until 2013 I was an Economist at Advanced Analytical Consulting Group in Arlington, VA; and from 2013 until 2016, I was a Managing Director at Nathan Associates Inc. where I managed the litigation consulting activities in the Arlington, VA and Irvine, CA offices. Throughout my career, I have consulted on a variety of complex litigation matters in areas such as antitrust, finance, and consumer fraud. I have analyzed business valuation, liability, and damages issues in support of multi-million dollar awards and assisted counsel with economic damages estimates for pre-litigation and settlement purposes. My experience includes developing econometric models used to measure overcharges in horizontal price-fixing conspiracies and implicit prices associated with bundled goods in consumer fraud matters, as well as complex income, market and asset-based financial models for use in valuation and forecasting. I have also developed and maintained current and interactive indexes in various industries for use in the evaluation of assets and securities. Many of the matters I have worked on and managed have involved the cleaning, coding, compilation, and analysis of large transaction-level databases. A copy of my C.V. is attached to this report as Appendix A.

1

3.     Monument is being compensated for my work in this matter at my customary hourly rate of [Redacted] per hour.  Monument's compensation in this matter is not contingent upon the content of my Expert Report or the outcome of this litigation.

4.     I understand that Plaintiffs allege that Defendants[1] Sears Protection Company ("SPC") and Sears, Roebuck and Co. ("SRC") (collectively "Sears") entered into master protection agreements ("MPAs") that were "deceptive and illusory because Sears did not in fact provide the bargained for coverage of the products that the agreements purported to cover."[2]  I understand that customers "can enter into an MPA by adding protection coverage when the product is originally purchased at a store, or online."[3] Further, I understand customers can obtain "coverage to other products in the house, post-point-of-purchase," by speaking with a Sears technician or a Sears call center.[4]  I understand Plaintiffs allege that "Sears engaged in a course of conduct whereby it deceived consumers, misrepresenting to customers that their products were covered by the master service agreement after Plaintiffs and members of the Class identified the products that they wanted to include in the agreements and paid the charges Sears billed for such coverage."[5]  I understand Plaintiffs allege that "Sears did not determine whether Sears actually could or would provide service maintenance coverage for those products until a repair or service request was made by the owner."[6]  I understand Plaintiffs allege that "Sears continued to charge for

---

[1] I understand that the Court has dismissed Sears Holdings Corporation as a Defendant in this matter.  See United States District Court for the Northern District of Illinois Eastern Division, Nina Greene, et al., Plaintiffs, v. Sears Protection Company, et al., Defendants, No. 1:15-cv-02456, Memorandum Opinion and Order, filed February 2, 2016; and United States District Court for the Northern District of Illinois Eastern Division, Nina Greene, et al., Plaintiffs, v. Sears Protection Company, et al., Defendants, No. 1:15-cv-02456, Memorandum Opinion and Order, filed March 27, 2017.
[2] United States District Court for the Northern District of Illinois Eastern Division, Nina Greene, et al., Plaintiffs, v. Sears Protection Company, et al., Defendants, No. 1:15-cv-02456, First Amended Class Action Complaint, filed March 11, 2016 (hereafter "Complaint") at ¶¶2-3.
[3] Complaint at ¶24.
[4] Complaint at ¶24.
[5] Complaint at ¶41.
[6] Complaint at ¶41.

products it could not and never intended to repair or service, and that "Sears did not communicate to its customers that it could not or would not provide service maintenance coverage."[7] I further understand that Plaintiffs allege that Sears did not return all monies "wrongfully received for products that Sears does not actually cover."[8]

### B. Assignment

5.    I have been asked by Counsel for the Plaintiffs in this matter to analyze whether a standard and reliable methodology exists that would allow me to utilize data and information possessed by Sears to measure damages suffered by proposed class members as a result of the alleged misconduct (if it is found to have taken place) without resorting to individualized inquiry under three causes of action: a breach of express contract; unjust enrichment; and a violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law.[9] I understand from Counsel for the Plaintiffs that the proposed class with respect to Plaintiffs' breach of express contract claim ("Breach of Contract Class") is defined as follows:

> All individuals and entities who paid for aftermarket MPAs (including post-point-of-sale purchases of coverage, purchases of coverage for products bought from a retailer other than Sears, and/or subsequent renewals of coverage) for products which were not covered by or eligible for coverage under the MPA, and never received a full refund.

I understand from Counsel for the Plaintiffs that the earliest date that the Court could apply the statute of limitations with respect to the proposed Breach of Contract Class is March 25, 2000. Therefore, I have limited my analysis of the

---

[7] Complaint at ¶41.
[8] Complaint at ¶41.
[9] For the purposes of my analysis contained in this Expert Report, I have assumed that the Plaintiffs prevail on their claims with respect to the alleged misconduct.

proposed Breach of Contract Class to the period from March 25, 2000 to the present ("Relevant Breach of Contract Period").[10]

6.      I understand from Counsel for the Plaintiffs that the proposed class with respect to Plaintiffs' unjust enrichment claim ("Unjust Enrichment Class") is defined as follows:

> All individuals and entities who paid for aftermarket MPAs (including post-point-of-sale purchases of coverage, purchases of coverage for products bought from a retailer other than Sears, and/or subsequent renewals of coverage) for products which were not covered by or eligible for coverage under the MPA, and never received a full refund.

7.      I understand from Counsel for the Plaintiffs that the earliest date that the Court could apply the statute of limitations with respect to the proposed Unjust Enrichment Class is March 25, 2005. Therefore, I have limited my analysis of the proposed Unjust Enrichment Class to the period from March 25, 2005 to the present ("Relevant Unjust Enrichment Period").[11]

8.      I understand from Counsel for the Plaintiffs that the proposed class with respect to Plaintiffs' Pennsylvania Unfair Trade Practices and Consumer Protection Law claim ("Consumer Fraud Class") is defined as follows:

> All residents of Pennsylvania who paid for aftermarket MPAs (including post-point-of-sale purchases of coverage, purchases of coverage for products bought from a retailer other than Sears, and/or subsequent renewals of coverage) for products which were

---

[10] Should any additional information regarding any statute of limitation applied by the Court with respect to Plaintiffs' breach of contract claim be made known at a time following the filing of this Expert Report, I reserve the right to revise my analysis accordingly in light of such new information.

[11] Should any additional information regarding any statute of limitation applied by the Court with respect to Plaintiffs' unjust enrichment claim be made known at a time following the filing of this Expert Report, I reserve the right to revise my analysis accordingly in light of such new information.

not covered by or eligible for coverage under the MPA, and never received a full refund.

I understand from Counsel for the Plaintiffs that the earliest date that the Court could apply the statute of limitations with respect to the proposed Consumer Fraud Class is March 25, 2004. Therefore, I have limited my analysis of the proposed Consumer Fraud Class to the period from March 25, 2004 to the present ("Relevant Consumer Fraud Period").[12]

### C. *Materials Reviewed*

9. In performing my analysis, I have reviewed a variety of materials that were produced as part of this litigation, including sample datasets, deposition transcripts, and miscellaneous Sears company documents. A complete list of the materials I have relied upon in forming my opinions is contained in Appendix B. I understand that discovery is ongoing in this matter. Should any additional information regarding Sears' MPAs be made available to me at a later stage of this litigation, I reserve the right to revise my analysis accordingly.

### D. *Conclusions*

10. Based on the materials I have reviewed to date, I have determined that a standard and reliable methodology exists that could allow me to utilize data and information likely possessed by Sears to measure damages suffered by members of the proposed Breach of Contract, Unjust Enrichment, and Consumer Fraud Classes during the Relevant Breach of Contract Period, Relevant Unjust Enrichment Period, and Relevant Consumer Fraud Period, respectively, as a result of the alleged misconduct (if it is found to have taken place) without resorting to

---

[12] Should any additional information regarding any statute of limitation applied by the Court with respect to Plaintiffs' consumer fraud claim be made known at a time following the filing of this Expert Report, I reserve the right to revise my analysis accordingly in light of such new information.

individualized inquiry.[13]  I discuss the bases of these conclusions in more detail below.

## II.  Key Sears Databases

11.  Based on my review of the materials that have been made available to me to date, Sears appears to maintain data and information that could likely allow to measure damages suffered by members of the proposed Breach of Contract, Unjust Enrichment, and Consumer Fraud Classes during the Relevant Breach of Contract Period, Relevant Unjust Enrichment Period, and Relevant Consumer Fraud Period, respectively, as a result of the alleged misconduct without resorting to individualized inquiry.  This data and information appears to be spread out over a number of databases.  Connecting these databases for Sears sales associates is a software platform called Ciboodle, which is a "desktop system that associates use to retrieve and produce price quotes to customers."[14]  "Ciboodle is the more mouse-click-friendly user application that the majority of front line agents use."[15]  Feeding into Ciboodle are two key Sears databases: NPS and NPJ.[16]  According to Katrina Means, Director of Sears' Service Contracts division, NPS is a database that stores information related to "the service side of the business," while NPJ is a database related to the "service contract side" of the business and stores "all of the Pricing Customer Service Contract Agreements."[17]  Collectively, NPS and NPJ are referred to as the "Legacy system."[18]  Storing the data that feeds Sears'

---

[13] Should any additional information regarding Sears' MPAs be made available to me at a later stage of this litigation, I reserve the right to revise my opinions in light of this new information at the appropriate time.

[14] United States District Court for the Northern District of Illinois Eastern Division, Nina Greene, et al., Plaintiffs, v. Sears Protection Company, et al., Defendants, No. 1:15-cv-02456, Oral Deposition of Dainon Setzer, December 17, 2015 (hereafter "December 2015 Setzer Deposition") at 121:2-14.

[15] December 2015 Setzer Deposition at 121:21-122:9.

[16] United States District Court for the Northern District of Illinois Eastern Division, Nina Greene, et al., Plaintiffs, v. Sears Protection Company, et al., Defendants, No. 1:15-cv-02456, Deposition of Katrina Means, June 29, 2016 (hereafter "Means Deposition") at 23:13-18, 63:2-6.

[17] Means Deposition at 6:14-18, 22:23-23:12.

[18] Means Deposition at 23:19-24:1.  I have noted that, at his December 2015 deposition, Dainon Setzer of Sears appears to refer to NPS singularly as the "legacy system the lives kind of below Ciboodle," expanding further that it's a "mainframe green screen old technology, but it's still the

Legacy system is its data warehouse, or LCL.[19]  According to Dainon Setzer,
National Operations Manager at Sears, this data warehouse functions as "the
server behind NPS."[20]  Further, Mr. Setzer testified that the information stored in
Sears' data warehouse goes back "at least 20 years."[21]

12.    In addition to Sears' data warehouse and Legacy system, Sears also
maintains a "merchandise brand qualification" called Manage Merchandise
Information ("MMI") that is incorporated into Ciboodle's infrastructure that
contains information on the brands and products that are covered under its
MPAs.[22]  MMI was implemented into Ciboodle on March 17, 2009.[23]

13.    Prior to the incorporation of MMI into Ciboodle, Sears associates relied on
an "Eligible Brands List" that was maintained internally by Sears to determine if a
given product was eligible for coverage under an MPA.[24]  The information
contained in the Eligible Brands List was accessible through the PA Resource
Center, which is an internal Sears "intranet home page for protection agreement
coverage," which is "meant as the internal associate-facing helpful tool place for
administering and selling and talking about and understanding protection
agreements."[25]  From time to time, the Eligible Brands List is revised
"[c]ompletely as brands come and go in coordination with product engineers and
repair services."[26]  According to Mr. Setzer, prior versions of the Eligible Brands

---

source of most of our pricing and customer database." See December 2015 Setzer Deposition at
121:21-122:9.
[19] Means Deposition at 62:8-63:6.
[20] December 2015 Setzer Deposition at 16:1-4, 175:19-23.
[21] December 2015 Setzer Deposition at 176:23-177:1.
[22] See December 2015 Setzer Deposition at 137:18-139:9 and Exhibit 10 at SEARS0003023. See,
also, Means Deposition at 24:2-8; SEARS0009942.
[23] United States District Court for the Northern District of Illinois Eastern Division, Nina Greene,
et al., Plaintiffs, v. Sears Protection Company, et al., Defendants, No. 1:15-cv-02456, Defendants'
Second Supplemental Answer to Plaintiffs' Interrogatory No. 3 of Plaintiffs' Second Set of
Interrogatories, November 30, 2016, p. 4.
[24] Means Deposition at 93:23-94:8, 108:14-22, and Exhibit 11; December 2015 Setzer Deposition
at 152:16-157:24. The Eligible Brands List is still maintained by Sears. See December 2015
Setzer Deposition at 152:20-155:20.
[25] December 2015 Setzer Deposition at 63:13-15, 118:3-120:8; Means Deposition at 108:14-109:4.
[26] December 2015 Setzer Deposition at 153:16-154:15.

List have been "saved somewhere" by Sears, and that there is a way to determine the "revision date" of those documents.[27] Mr. Setzer also testified that his recollection was that, when accessing the Eligible Brands List in the PA Resource Center, the user was able to see the revision date of the most current list.[28]

14.    I discuss in more detail below the data and information likely contained in these databases that could allow me to apply my methodology to measure damages suffered by proposed class members as a result of the alleged misconduct (if it is found to have taken place) without resorting to individualized inquiry. Should any additional information regarding the data and information maintained by Sears with respect to its MPAs be made available to me at a later stage of this litigation, I reserve the right to revise my opinions accordingly.

### III.    Breach of Contract Claims

15.    As I previously discussed, I have been asked by Counsel to analyze whether a standard and reliable methodology exists that could allow me to utilize data and information possessed by Sears to measure damages suffered by proposed Breach of Contract Class members as a result of the alleged misconduct (if it is found to have taken place) without resorting to individualized inquiry. Based on the materials I have reviewed to date, it is my opinion that such a methodology exists. I discuss this methodology in more detail below.

#### A.    Availability of data

16.    I discussed above certain key databases maintained by Sears. In this section, I discuss the types of data and information likely contained in these

---

[27] December 2015 Setzer Deposition at 153:16-158:9. At his December 2015 deposition, Mr. Setzer caveated this testimony to reflect that he was only certain of this practice dating back to 2010, when he took over responsibility of updating the Eligible Brands List. See December 2015 Setzer Deposition at 155:15-157:24. However, evidence I have reviewed suggests that Sears has likely maintained versions of the Eligible Brands List prior to 2010 that include a revision date on them. For example, one set of Eligible Brand Lists produced as part of this litigation reflect a revision date of March 31, 2004 for certain categories of products. See, for example, SEARS0008985-09056. Further, Mr. Setzer testified that the Eligible Brands List has been used by Sears since at least 1996 when he started working for Sears. See December 2015 Setzer Deposition at 37:10-13, 142:14-143:8.
[28] December 2015 Setzer Deposition at 154:16-155:14.

databases that could allow me to measure damages suffered by proposed Breach of Contract Class members as a result of the alleged misconduct without resorting to individualized inquiry.

17. For example, to start, Sears' data warehouse can be queried in order to identify all MPAs in existence at any given time, including during the Relevant Breach of Contract Period.[29] Such a dataset can then be limited to aftermarket MPAs sold by Sears.[30] Further, based on my review of the materials produced to date, certain key information about the customers who purchased aftermarket MPAs from Sears during this time are likely available. For example, the name and address of each customer who purchased a given aftermarket MPA during the Relevant Breach of Contract Period, as well as the Sears-generated customer number associated with each of those customers, can be queried from the data warehouse.[31] In addition, the agreement number (which is also referred to as the certificate number) associated with each MPA sold by Sears can be queried from the data warehouse, as can the start and end dates associated with each MPA.[32] Furthermore, a list of the products covered by a given MPA, including information on product type and brand, can be queried from Sears' data warehouse.[33]

18. Another piece of information that could be used to measure damages suffered by proposed Breach of Contract Class members as a result of the alleged

---

[29] December 2015 Setzer Deposition at 175:1-177:1.

[30] For example, Katrina Means testified at deposition that a query could be built to identify MPAs that were sold that covered products that were not purchased at a Sears store or on Sears.com. See Means Deposition at 60:3-20, 76:20-78:17. See, also, United States District Court for the Northern District of Illinois Eastern Division, Nina Greene, et al., Plaintiffs, v. Sears Protection Company, et al., Defendants, No. 1:15-cv-02456, Deposition of Dainon Setzer, June 28, 2016 (hereafter "June 2016 Setzer Deposition") at 18:2-11, 50:20-51:5, 75:4-13; December 2015 Setzer Deposition at 29:16-30:1.

[31] See, for example, June 2016 Setzer Deposition at 6:17-12:5, Exhibit 17, Exhibit 20a; December 2015 Setzer Deposition at 171:8-16, Exhibit 16 at SEARS0002515; Means Deposition at 62:11-15.

[32] June 2016 Setzer Deposition at 6:17-16:12, Exhibit 17. The agreement number associated with a given MPA consists of the customer number of the customer who purchased the MPA, followed by a five-digit agreement suffix. See June 2016 Setzer Deposition at 12:6-18.

[33] December 2015 Setzer Deposition at 171:8-16; Means Deposition at 62:11-15; June 2016 Setzer Deposition at 6:17-19:17, 40:4-15, 62:7-63:9, Exhibit 20a.

misconduct is a record of the products that were eligible for coverage under a Sears MPA at a given point in time during the Relevant Breach of Contract Period. One such source of this information is the Eligible Brands Lists, which contain information on the brands and types of products that are eligible for coverage under an MPA at a given point in time.[34] Eligible Brands Lists have been used by Sears to determine product eligibility for MPAs since at least 1996, prior to the start of the Relevant Breach of Contract Period, and are still currently in use.[35] As I previously discussed, from time to time, Sears revised its Eligible Brands List as certain brands were added or removed from eligibility for MPA coverage over time.[36] In addition, as I previously discussed, evidence indicates that prior versions of the Eligible Brands List have been "saved somewhere" by Sears, and that there is a way to determine the "revision date" of those documents.[37,38]

19.    In order to incorporate this information into my damages methodology, I would first take the information contained in all of the Eligible Brands Lists that were effective at any point during the Relevant Breach of Contract Period and create a database that, for every brand-product type combination (e.g. Maytag Refrigerator), includes any relevant start or end date(s) for aftermarket MPA coverage eligibility that may have occurred during the Relevant Breach of Contract Period (hereafter "BOC Eligible Brands Database"). As I discuss in more detail below, this BOC Eligible Brands Database could allow me to determine if a given product that was covered by an aftermarket MPA that was

---

[34] December 2015 Setzer Deposition at 152:20-155:20.

[35] December 2015 Setzer Deposition at 37:10-13, 142:14-143:8, 152:20-155:20.

[36] December 2015 Setzer Deposition at 153:16-154:15.

[37] December 2015 Setzer Deposition at 153:16-158:9.

[38] Earlier in this Expert Report, I discussed MMI, which is "merchandise brand qualification" that is incorporated into Ciboodle's infrastructure that contains information on the brands and products that are covered under its MPAs. See December 2015 Setzer Deposition at 137:18-139:9 and Exhibit 10 at SEARS0003023. See, also, Means Deposition at 24:2-8. According to Mr. Setzer, the information contained in MMI matches the information contained on Sears' Eligible Brand Lists. See December 2015 Setzer Deposition at 152:16-153:7. Therefore, the information included in MMI could potentially serve as an alternative source of information regarding eligible brands and product types for MPA coverage for the period for which MMI was being used by Sears.

purchased during the Relevant Breach of Contract Period was, in fact, eligible for coverage at the time of purchase.

20.     Another piece of information that could be used to measure damages suffered by proposed Breach of Contract Class members as a result of the alleged misconduct is the price paid for each product covered by a given MPA. According to Mr. Setzer, the data warehouse can be queried to determine "how much Sears charged for a particular MPA."[39] Mr. Setzer further testified that when a customer purchases an aftermarket MPA covering multiple products, the MPA is priced on a per-product basis.[40] Further, if customers wished to discuss the prices they were being charged for individual products covered under a single MPA, Mr. Setzer indicated that Sears sales representatives would have access to the information necessary to discuss these individual product prices with customers.[41] This implies that individual product MPA pricing information is likely maintained internally by Sears in a database such as the data warehouse to enable Sears sales representatives to access such information in the event a customer wishes to discuss those prices.

21.     However, in the event that prices for individual products covered by a single MPA are not available through the data warehouse, evidence I have reviewed indicates that this information can likely be obtained through other means.  For instance, at deposition, Mr. Setzer described the process that Sears uses to price individual products that are covered by aftermarket MPAs.[42] Mr. Setzer further testified that a record of "prices […] for every single […] type of product that could be covered" by an MPA is "stored and saved" by Sears.[43]  Therefore, if information on the prices paid by customers for individual products covered by an

---

[39] December 2015 Setzer Deposition at 177:2-6.
[40] December 2015 Setzer Deposition at 84:16-19.
[41] December 2015 Setzer Deposition at 84:20-85:3.
[42] December 2015 Setzer Deposition at 82:5-83:12.
[43] December 2015 Setzer Deposition at 82:5-84:14.  At her deposition, Ms. Means also discussed some of the details associated with how pricing is determined for individual products covered by an aftermarket MPA.  She noted that the availability of information on prices that Sears charged for different types of products for MPA coverage was "all system."  See Means Deposition at 125:19-127:22.

MPA is not available through a query of the data warehouse or any other Sears database, then the aforementioned record of prices for product types based on Sears' pricing formula could likely be used to determine the individual product prices paid by customers associated with their MPAs.

22.     Another piece of information that could be used to measure damages suffered by proposed Breach of Contract Class members as a result of the alleged misconduct is the refund amount, if any, that was issued by Sears for a given product that was covered by an aftermarket MPA during the Relevant Breach of Contract Period. According to Mr. Setzer, the Sears Legacy system can be queried to determine if a refund was issued on a particular MPA, as well as the amount and the date of any such refunds.[44] Further, evidence I have reviewed indicates that information on refunds issued by Sears for specific products covered by aftermarket MPAs is likely available through the Sears Legacy system.[45]

23.     Furthermore, I understand that prior to offering a refund, Sears offered customers replacement authorization credits for a certain dollar amount that customers could use to purchase a replacement item from Sears.[46] Evidence I have reviewed indicates that Sears maintains data on replacement authorizations for products included in customers' MPAs that were ultimately fulfilled by the customer.[47] Included in these data are information on the brand and type of product that is included in a given MPA for which a replacement authorization was approved by Sears and fulfilled by the customer.[48] Further, these data include information on the value of the replacement authorization credits Sears offered a customer for a given product, as well as the retail price of the Sears

---

[44] December 2015 Setzer Deposition at 179:15-180:2; June 2016 Setzer Deposition at 27:2-18, Exhibit 17.
[45] See, for example, December 2015 Setzer Deposition at 190:23-191:16. See, also, June 2016 Setzer Deposition at 6:17-8:22, 19:10-17, 62:7-63:5, Exhibit 17, Exhibit 20a.
[46] See, for example, SEARS0000397-0401 at 0398; SEARS0008724-743 at 735-736. At deposition, Mr. Setzer explained how the replacement authorization credit was determined. See June 2016 Setzer Deposition at 67:22-68:6.
[47] June 2016 Setzer Deposition at 56:2-57:13, Exhibit 20a
[48] June 2016 Setzer Deposition at 62:7-63:9, Exhibit 20a.

product the customer opted to purchase as a replacement.[49] In addition, these data also include information on the "date that the replacement authorization value was given to the customer."[50]

24. As I discussed, evidence I have reviewed indicates that the data discussed above are likely maintained by Sears in the regular course of business, and could likely be used to measure damages suffered by proposed Breach of Contract Class members as a result of the alleged misconduct (if it is found to have taken place) without resorting to individualized inquiry. Should any additional information regarding these data be made available to me at a later stage of this litigation, I reserve the right to revise my opinions accordingly.

  B. *Methodology to measure damages suffered by proposed Breach of Contract Class members*

25. Above I described the data and information likely maintained by Sears that could allow me to measure damages suffered by proposed Breach of Contract Class members as a result of the alleged misconduct without resorting to individualized inquiry. Here I describe the methodology I could implement using those data to measure damages suffered by members of the proposed Breach of Contract Class. This methodology would begin by creating an MPA dataset ("Master BOC MPA Dataset") that includes the following fields of data discussed above: agreement number, MPA start date, MPA end date, MPA type (point-of-sale or aftermarket), customer name, customer address, customer number, product brand,[51] product type, and price.[52] The Master BOC MPA Dataset would then be

---

[49] June 2016 Setzer Deposition at 65:7-10, 67:11-68:6, Exhibit 20a; December 2015 Setzer Deposition at 56:14-57:3.

[50] June 2016 Setzer Deposition at 65:24-66:5.

[51] I understand that, prior to the implementation of MMI into Ciboodle in March 2009, there were instances in which the brand associated with a given product covered by an aftermarket MPA was not recorded by the Sears sales representative, leaving this field blank in the data warehouse. According to Mr. Setzer, "the majority of coverage had a brand name listed because we would always ask, but it wasn't as good as it is now because it wasn't a required field." See December 2015 Setzer Deposition at 142:14-143:24. I understand from Counsel for the Plaintiffs that it may be appropriate to include some or all of these products in my damages analysis. Should that be the case, my damages methodology would allow me to do so using reasonable assumptions where necessary. Should any additional information regarding missing product brand information

limited to aftermarket MPAs with start dates that occurred during the Relevant Breach of Contract Period (March 25, 2000 to the present).

26.   Next, in order to identify the products in the Master BOC MPA Dataset that were included as part of an aftermarket MPA sold by Sears, yet were not covered by or eligible for coverage under the MPA, I would merge certain information from the BOC Eligible Brands Database (discussed above) onto the Master BOC MPA Dataset.  Specifically, using the product type and product brand information included in both datasets, I would create two new fields of data in the Master BOC MPA Dataset: the start date and the end date during which a given product brand-type combination (e.g. Maytag Refrigerator) was included on Sears' Eligible Brands List.  Once these two fields of data are merged onto the Master BOC MPA Dataset, I could run a query to determine if the MPA start date for a given product falls inside or outside of this eligible brands range of coverage for that product.  Then, any MPA start dates that fall inside their corresponding eligible brands range of coverage will be eliminated from the Master BOC MPA Dataset.

27.   The last step before calculating damages is to determine if Sears has issued any refunds or replacement authorization credits (that were fulfilled by the customer) in connection with any of the products that remain in the Master BOC MPA Database.  I discussed the availability of such refund and replacement authorization credits above.  Using the agreement number, product brand, and product type data fields, I would merge the dollar amount of any refund or replacement authorization credit (fulfilled by the customer) issued by Sears during the Relevant Breach of Contract Period for a given product covered by a given aftermarket MPA onto the Master BOC MPA Database.  Once this information is

related to sales of aftermarket MPAs be made available to me at a later stage of this litigation. I reserve the right to revise my analysis accordingly.
[52] In the Master BOC MPA Dataset, each individual product covered by an MPA would constitute its own observation (or row) of data in the database.  For example, if a single MPA covered five different products, the data in the Master BOC MPA Dataset with respect to that MPA would constitute five separate observations.

merged, I would eliminate any observations for which a customer received a full refund (or equivalent replacement authorization credits) of the MPA price for a given product during the Relevant Breach of Contract Period from the Master BOC MPA Database.

28. Lastly, to calculate damages, I could simply subtract the refund or replacement authorization credit amounts (if any) associated with the remaining products in the Master BOC MPA Database from the MPA prices paid by customers for those products. Then, summing these differences across all products in the Master BOC MPA Database would yield damages suffered by members of the proposed Breach of Contract Class.

### IV. Unjust Enrichment Claims

29. In addition to Plaintiffs' breach of contract claims, I have also been asked by Counsel for the Plaintiffs to analyze whether a standard and reliable methodology exists that could allow me to utilize data and information possessed by Sears to measure damages suffered by proposed Unjust Enrichment Class members as a result of the alleged misconduct (if it is found to have taken place) without resorting to individualized inquiry. Based on the materials I have reviewed to date, it is my opinion that such a methodology exists. I discuss this methodology in more detail below.

#### A. Availability of data

30. In Section III.A of this Expert Report I discussed a variety of data that are likely maintained by Sears that could be used to measure damages suffered by proposed Breach of Contract Class members as a result of the alleged misconduct (if it is found to have taken place) without resorting to individualized inquiry. This included the data contained in the Master BOC MPA Database, the BOC Eligible Brands Database, and additional data with respect to the dollar amount of any refund or replacement authorization credit (fulfilled by the customer) issued by Sears during the Relevant Breach of Contract Period for a given product covered by a given aftermarket MPA. It is my opinion that these data could likely

15

also be used to measure damages suffered by proposed Unjust Enrichment Class members as a result of the alleged misconduct (if it is found to have taken place) without resorting to individualized inquiry with one key difference, which I discuss in more detail below. Should any additional information regarding these data be made available to me at a later stage of this litigation, I reserve the right to revise my opinions accordingly.

### B. Methodology to measure damages suffered by proposed Unjust Enrichment Class members

31. In Section III.B of this Expert Report, I described a methodology I could implement using data discussed in Section III.A to measure damages suffered by members of the proposed Breach of Contract Class. These data could likely also be used to measure damages suffered by proposed Unjust Enrichment Class members as a result of the alleged misconduct without resorting to individualized inquiry with one key difference. As I previously discussed, the Relevant Unjust Enrichment Period for the purposes of my analysis is March 25, 2005 to the present. In light of this later start date to the Relevant Unjust Enrichment Period as compared to the Relevant Breach of Contract Period, I would create alternate versions of the Master BOC MPA Database and the BOC Eligible Brands Database that are limited to the Relevant Unjust Enrichment Period, hereafter referred to as the "Master UE MPA Database" and the "UE Eligible Brands Database" respectively. My damages analysis could then proceed in the same manner I described above with respect to the Breach of Contract Class.

### V. Consumer Fraud Claims

32. In addition to Plaintiffs' breach of contract and unjust enrichment claims, I have also been asked by Counsel for the Plaintiffs to analyze whether a standard and reliable methodology exists that could allow me to utilize data and information possessed by Sears to measure damages suffered by proposed Consumer Fraud Class members as a result of the alleged misconduct (if it is found to have taken place) without resorting to individualized inquiry in

16

connection with an alleged violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law. Based on the materials I have reviewed to date, it is my opinion that such a methodology exists. I discuss this methodology in more detail below.

### A. Availability of data

33. In Section III.A of this Expert Report, I discussed a variety of data that are likely maintained by Sears that could be used to measure damages suffered by proposed Breach of Contract Class members as a result of the alleged misconduct (if it is found to have taken place) without resorting to individualized inquiry. This included the data contained in the Master BOC MPA Database, the BOC Eligible Brands Database, and additional data with respect to the dollar amount of any refund or replacement authorization credit (fulfilled by the customer) issued by Sears during the Relevant Breach of Contract Period for a given product covered by a given aftermarket MPA. It is my opinion that these data could likely also be used to measure damages suffered by proposed Consumer Fraud Class members as a result of the alleged misconduct (if it is found to have taken place) without resorting to individualized inquiry with two key differences, which I discuss in more detail below. Should any additional information regarding these data be made available to me at a later stage of this litigation, I reserve the right to revise my opinions accordingly.

### B. Methodology to measure damages suffered by proposed Consumer Fraud Class members

34. In Section III.B of this Expert Report, I described a methodology I could implement using data discussed in Section III.A to measure damages suffered by members of the proposed Breach of Contract Class. These data could likely also be used to measure damages suffered by proposed Consumer Fraud Class members as a result of the alleged misconduct without resorting to individualized inquiry with two key differences. First, as I previously discussed, the Relevant Consumer Fraud Period for the purposes of my analysis is March 25, 2004 to the

present. In light of this later start date to the Relevant Consumer Fraud Period as compared to the Relevant Breach of Contract Period, I would create alternate versions of the Master BOC MPA Database and the BOC Eligible Brands Database that are limited to the Relevant Consumer Fraud Period, hereafter referred to as the "Master CF MPA Database" and the "CF Eligible Brands Database" respectively. In addition, as I previously discussed, the proposed Consumer Fraud Class is limited to residents of Pennsylvania. As such, as part of my damages analysis, I would also limit the Master CF MPA Database to residents of Pennsylvania using the customer address data field. My damages analysis could then proceed in the same manner I described above with respect to the Breach of Contract Class.[53]

## VI.  Conclusions

35.  Based on the materials I have reviewed to date, I have determined that a standard and reliable methodology exists that could allow me to utilize data and information likely possessed by Sears to measure damages suffered by members of the proposed Breach of Contract, Unjust Enrichment, and Consumer Fraud Classes during the Relevant Breach of Contract Period, Relevant Unjust Enrichment Period, and Relevant Consumer Fraud Period, respectively, as a result of the alleged misconduct (if it is found to have taken place) without resorting to individualized inquiry.

Christopher Jackman

July 28, 2017

---

[53] I understand from Counsel for the Plaintiffs that under Pennsylvania's Unfair Trade Practices and Consumer Protection Law, the Court may award damages up to three times the actual damages suffered by the Plaintiffs.  Should the Court decide to do so, I could adjust my measurement of damages accordingly.

EXHIBIT 2

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION


NINA GREENE and GERALD GREENE,)

              Plaintiffs,    )

   -vs-            ) Case No.

SEARS PROTECTION Company,   ) 1:15-cv-02546

SEARS ROEBUCK and Co. and   )

SEARS HOLDINGS Corporation,   )

             Defendants.    )


ORAL DEPOSITION OF DAINON SETZER

CHICAGO, ILLINOIS

THURSDAY, DECEMBER 17, 2015


Reported by:

DEBORAH HABIAN, CSR, RMR, CRR, CLR,

JOB NO: 8903

Page 2

```
 1
 2
 3
 4
 5
 6                    DECEMBER 17, 2015
 7                    9:31 A.M. CST
 8
 9
10          Oral deposition of DAINON SETZER, held
11    at the offices of Dentons, 233 South Wacker
12    Drive, Suite 5900, Chicago, Illinois, before
13    Deborah Habian, a Certified Shorthand Reporter,
14    Registered Merit Reporter, Certified Realtime
15    Reporter and a Certified LiveNote Reporter.
16
17
18
19
20
21
22
23
24
```

Page 3

```
 1              A P P E A R A N C E S
 2
 3    FOR THE PLAINTIFFS
 4        KAUFMAN COREN & RESS, P.C.
 5        BY:  DAVID M. DeVITO, ESQ.
 6        Two Commerce Square
 7        Suite 3900, 2001 Market Street
 8        Philadelphia, Pennsylvania 19103-7042
 9
10    FOR THE DEFENDANTS:
11        SALANS FMC SNR DENTON McKENNA LONG
12        BY: LEAH R. BRUNO, ESQ.
13           KRISTINE M. SCHANBACHER, ESQ.
14        233 South Wacker Drive,
15        Suite 5900,
16        Chicago, Illinois 60606-6361
17
18
19
20
21
22
23
24
```

Page 4

```
 1                   I N D E X
 2    WITNESS      DAINON SETZER         PAGE
 3      Exam by Mr. DeVito ................. 7
 4
 5    REQUESTS AND INSTRUCTIONS OF COUNSEL
 6      By Ms. Bruno       ................. 222
 7
 8            PLAINTIFFS' EXHIBITS
 9    NUMBER         DESCRIPTION        PAGE
10    Exhibit 5  Product management/product   22
11        support team org chart
12        Bates SEARS0003969 - SEARS0003978
13
14    Exhibit 6  Defendant's Rule 26(a)(1)(A)   39
15        Initial Disclosures, 6 pp
16        no Bates stamping
17
18    Exhibit 7  Sears Protection Agreements   54
19        Coverage Grid, Bates SEARS0000587
20
21    Exhibit 8  Sears Service Fulfillment:   63
22        In-House Providing Service
23        Bates SEARS0000013 - SEARS0000015
24
```

Page 5

```
 1    (CONTINUING)
 2            PLAINTIFFS' EXHIBITS
 3    NUMBER         DESCRIPTION        PAGE
 4    Exhibit 9  Master Protection Agreement   67
 5        Bates SEARS0000410 - SEARS0000414
 6
 7    Exhibit 10  15 Aug 2011 Sears Home   101
 8        Services National Inbound Sales
 9        NHT Facilitator Guide
10        Bates SEARS0002639 - SEARS0003838
11
12    Exhibit 11  Sears Eligible Brands List   152
13        Bates SEARS0000516 - SEARS0000323
14
15    Exhibit 12  Brand List - Sears HA/HVAC   162
16        Non-Serviceable Brands
17        Bates SEARS0000336 - SEARS0000337
18
19    Exhibit 13  Sears Cancel Reasons document  186
20        no Bates stamping
21
22    Exhibit 14  PA Cancel Reason Code Overview 204
23        Bates SEARS0003967 - SEARS0003968
24
```

Thompson Court Reporters, Inc
(312) 421-3377

Page 6

1  (CONTINUING)
2       PLAINTIFFS' EXHIBITS
3  NUMBER       DESCRIPTION        PAGE
4  Exhibit 15 Sears PA welcome letter to   212
5      Nina Greene
6      Bates Greene0150 - Greene0151
7
8  Exhibit 16 Case Ciboodle: Introduction  217
9      Bates SEARS0002497 - SEARS0002617
10
11
12     PREVIOUSLY MARKED PLAINTIFFS' EXHIBITS
13  NUMBER       DESCRIPTION        PAGE
14  Exhibit 1 Sears Agreement       198
15      Bates SEARS0003969 - SEARS0003978
16
17
18
19
20
21
22
23
24

Page 7

1       (Oath administered at 9:31 a.m. CST)
2
3           DAINON SETZER,
4  called as a witness herein by the plaintiffs,
5  having been first duly sworn, was examined and
6  testified as follows:
7           EXAMINATION
8  BY MR. DEVITO:
9      Q. Good morning, Mr. Setzer. My name is
10  David Devito. I represent the plaintiffs, the
11  Greenes, in this case. I'm just going to go
12  over a few preliminary matters.
13      I don't know whether you've -- well,
14  here's the first question: Have you ever been
15  deposed before?
16      A. No, sir.
17      Q. Okay. So you understand that you're
18  under oath which means you have the obligation
19  to tell the truth the same as if you were in
20  court?
21      A. Yes.
22      Q. The court reporter sitting to my left
23  is going to take down everything that's said
24  here, so I'd ask that you allow me to finish my

Page 8

1  question before you give an answer and likewise,
2  I will wait until you finish your answer before
3  I start talking so that we have a clear record.
4  Is that okay?
5      A. Yes.
6      Q. If I ask a question and you don't
7  understand it, I'd ask that you tell me that,
8  because if you just go ahead and answer, I will
9  assume that you understood my question. Is that
10  okay?
11      A. Yes.
12      Q. If you need to take a break at any
13  time, just let me know. All I ask is that if
14  there's a question pending when you want to take
15  break, that you answer that question and then
16  we'll go ahead and take a break.
17      A. Okay.
18      Q. Are you under the influence of any
19  medications or drugs that would impair your
20  ability to testify truthfully and completely?
21      A. No.
22      Q. What, if anything, did you do to
23  prepare for your deposition today?
24      A. Met with Leah and team a couple of

Page 9

1  times. Other than that, nothing.
2      Q. How many times?
3      A. Two in person.
4      Q. And when did you do that?
5      A. Yesterday afternoon and two Fridays
6  ago. Without looking at a calendar, I'm not
7  sure when that was.
8      Q. And about how long did those meetings
9  last?
10      A. Two or three hours two Fridays ago and
11  an hour yesterday.
12      Q. Did you look at any documents during
13  those meetings?
14      MS. BRUNO: I'm going to caution the
15  witness, that's a yes-or-no question.
16      THE WITNESS: Yes.
17  BY MR. DEVITO:
18      Q. Could you tell me what those documents
19  were?
20      A. It was a variety of documents. I
21  wouldn't be able to specify them. It was some
22  things from that pile (indicating) and some
23  things that I have provided to Leah and team
24  from the Sears side, all things related to the

Page 10

1  case.
2      Q. Did you go over e-mail communications?
3      MS. BRUNO: I'm going to caution the
4  witness -- I think you're getting a little bit
5  farther into attorney-client privileged
6  information.
7      MR. DEVITO: Well, I'm not asking him
8  to tell me anything he said to you. I'm just
9  asking whether he looked at e-mails.
10     MS. BRUNO: You can answer that with a
11 yes-or-no answer.
12     THE WITNESS: Yes.
13 BY MR. DEVITO:
14     Q. I don't want you to tell me anything --
15 any of your discussions with counsel.
16     A. Okay.
17     Q. If my question asks you -- you know,
18 what you think your answer is requires you to
19 divulge anything that you discussed with
20 counsel, I don't want to hear that. She's
21 correct in telling you not to tell me that.
22     A. Okay.
23     Q. Could we -- I'm just going to sort of
24 do some background now, if you could tell me

Page 11

1  what your educational background is?
2      A. Went to a variety of colleges as I
3  moved around with the company trying to work
4  towards my bachelor's degree in business
5  management, so community college in Spokane,
6  then Texas A&M satellite campus in San Antonio
7  and finally, a bachelor's degree from National
8  Louis University out in Lisle.
9      Q. And when did you get the bachelor's
10 degree?
11     A. Probably 2008.
12     Q. And how long had you been attending
13 these various colleges?
14     A. Oh, off and on since 1996.
15     Q. Okay. So it sounds like the
16 educational history kind of is wrapped up with
17 your employment history because you said you did
18 it with Sears?
19     A. Yeah, I started with Sears in Spokane,
20 Washington, got my associate's degree there, was
21 about to move to a four-year school in Spokane
22 when a promotion opportunity to San Antonio came
23 up, and the reason I was going to school was to
24 expand my career possibilities so if the

Page 12

1  promotion was in front of me, put school on
2  hold, take the new job, get comfortable in the
3  new job, and then get back to school in the new
4  city.
5      Q. So what was the job you had in Spokane?
6      A. A variety of them. The final job after
7  I moved out of Spokane was team manager, 20 call
8  center representatives approximately reporting
9  to me in an outbound sales environment.
10     Q. Okay. So can you sort of explain to me
11 what you mean by "outbound sales environment"?
12     A. Oh, yeah. Outbound telemarketing call
13 center, so we would call customers that had
14 provided their information to Sears for the
15 purpose of selling them new or renewing existing
16 protection agreements.
17     Q. Okay. So this is already -- even when
18 you were in Spokane is sort of -- it's focused
19 on sales of protection agreements; is that
20 accurate?
21     MS. BRUNO: Objection as to form.
22     You can answer.
23     THE WITNESS: You said "can" or
24 "can't"?

Page 13

1      MS. BRUNO: You can answer.
2      THE WITNESS: Okay.
3      Yes. It was the Spokane call center --
4  as long as I've been with the company has been
5  an outbound telemarketing office selling
6  protection agreements.
7  BY MR. DEVITO:
8      Q. And so when you transferred to
9  San Antonio, when did that happen?
10     A. March of 2003.
11     Q. Okay. And what did you -- what was
12 your job there?
13     A. Okay. The new position was sales
14 manager, which would have been just one bump
15 directly up the ladder, so had a group of four
16 to eight team managers reporting to me, and that
17 was an inbound protection agreement call center,
18 so answering calls still in that same line of
19 business, protection agreements, a variety of
20 customer service, sales and cancellation
21 requests.
22     Q. "Inbound," meaning that the customers
23 are calling in to Sears?
24     A. Yes.

4 (Pages 10 to 13)

Page 14

1  Q. And how long did you do that?
2  A. March of '03 to May of '05.
3  Q. And is that when you transferred to
4  Chicago?
5  A. Yes. Went to -- at the time we had a
6  Naperville call center in home delivery. It was
7  also inbound. I worked in that home delivery
8  field for just over a year before moving to the
9  Bridgeview call center, also here in
10  Chicagoland, that is protection agreement
11  office, so one year outside of the protection
12  agreement line of business and then back --
13  Q. Okay.
14  A. -- back to PAs. And that was an
15  outbound call center virtually identical in
16  structure and certainly identical in business
17  purpose as Spokane.
18  Q. And how long did you stay in that role?
19  A. Moved over there as a sales manager as
20  well, so did that for a year from like -- '05?
21  September of '06 to late 2007, then was the
22  general manager of the Bridgeview call center,
23  did that for two years before moving into a
24  corporate role at headquarters.

Page 15

1  Q. So can you give me the year on that
2  just --
3  A. I'm trying to, yes. I'm trying to do
4  the math here.
5  Q. So was I.
6  A. September '05, '06 was the year that --
7  '07 -- 2000 -- late 2009. 2007 to 2009 would
8  have been general manager, I think. I want a
9  piece of paper to do that math to see if I'm
10  working it out correctly.
11  MS. BRUNO: You're doing just fine.
12  MR. DEVITO: I don't think your lawyer
13  wants you doing that.
14  BY MR. DEVITO:
15  Q. So when you took the corporate role at
16  corporate headquarters when -- that was in '09?
17  A. Late '09 or early '10.
18  Q. And what was your title there?
19  A. Then I became manager of marketing and
20  customer segmentation. I would describe it in
21  practice as more of a channel manager position,
22  meaning I worked with both the inbound and
23  outbound protection agreement call centers on
24  sales initiatives and projects of bringing

Page 16

1  different product offers to the customers.
2  Q. And is that your current title?
3  A. No. This summer, so July of 2015, I
4  moved into national operations manager role.
5  Q. And is that the only step in between
6  manager of marketing and customer segmentation?
7  A. Yeah. I was general manager in
8  Bridgeview. Then I did manager of marketing
9  customer segmentation for five-ish years and
10  since this summer, I've been national operations
11  manager.
12  Q. So 2010 to 2015 or thereabout, late --
13  perhaps late '09?
14  A. Yeah, that would be a good close
15  summary.
16  Q. Okay.
17  And could you just tell me now what you
18  are doing as national operations manager?
19  A. I work with, again, all the six call
20  centers that we have in the protection agreement
21  line of business on call center productivity and
22  efficiency and maintaining things like safety
23  teams and PCI compliance, payment card industry,
24  protecting customer credit card information,

Page 17

1  those kind of things.
2  Q. And what's the name of the entity that
3  employs you?
4  A. Sears Holdings Corporation, to the best
5  of my knowledge. Over the years it's been Sears
6  Protection Company or Sears and Roebuck, but I
7  think my official W-2 says Sears Holdings
8  Corporation.
9  Q. And what is Sears Protection Company?
10  A. That's a wholly-owned subsidiary under
11  the Sears Holdings Corporation that is built for
12  the -- as the obligor of protection agreements.
13  Q. And that continues to today to be the
14  case?
15  A. Sears Protection Company?
16  MS. BRUNO: Objection as to form.
17  But you can answer if you know.
18  THE WITNESS: Okay.
19  Yes.
20  BY MR. DEVITO:
21  Q. What's Sears Home Services?
22  MS. BRUNO: Objection as to form.
23  You can answer if you know.
24  THE WITNESS: It is the business unit

5  (Pages 14 to 17)

Thompson Court Reporters, Inc
(312) 421-3377

Page 18

1  that -- within the holding company, Home
2  Services is the business unit that houses
3  protection agreements and in-home repair, home
4  improvement, parts direct. A lot of those after
5  retail type interactions that customers would
6  have with Sears exist under the Home Services
7  business unit.
8  BY MR. DEVITO:
9      Q. So -- so it's business unit, not an
10  entity; is that correct?
11     **A. To my knowledge, it's not set up as an**
12  **entity, like a -- like, we have -- Sears**
13  **Protection Company is, to my knowledge,**
14  **registered as an operating business, because**
15  **that's on the back and bottom of a**
16  **certificate -- when we send a customer a**
17  **confirmation of protection agreement, that's set**
18  **up. I've never seen Sears Home Services as**
19  **anything more than a business structure, but**
20  **I've never been part of the finance team to**
21  **fully understand that.**
22     MS. BRUNO: And I think this is a good
23  point to put this on the record: Dainon is here
24  as Sears 30(b)(6) witness on certain identified

Page 19

1  topics. The subject matter of the corporate
2  structure for Sears and its affiliated entities
3  is not a subject matter in which he's been
4  identified as a 30(b)(6) witness. I'm going to
5  let him answer the questions, that's fine, but I
6  just want to be clear --
7      MR. DEVITO: Okay.
8      MS. BRUNO: -- that he's not Sears's
9  witness on that subject matter.
10     MR. DEVITO: Okay.
11  BY MR. DEVITO:
12     Q. The sale of protection agreements fits
13  within the Sears Home Services business unit; is
14  that right?
15     MS. BRUNO: I'm going to object as to
16  form.
17     You can answer.
18     THE WITNESS: Yes.
19  BY MR. DEVITO:
20     Q. So I guess I'd like you to focus,
21  unless I say otherwise in my question, on the
22  time when you were manager of marketing and
23  customer segmentation rather than your current
24  job.

Page 20

1      A. Okay.
2      Q. So with that in mind, do you supervise
3  people in your current role?
4      A. No.
5      Q. So I believe you said that you work
6  with six call centers; is that accurate?
7      A. Yes.
8      Q. And could you tell me approximately --
9  well, just tell me how those are set up in terms
10  of structure.
11     MS. BRUNO: Objection as to form.
12     But you can answer if you know.
13     THE WITNESS: Four of them are set up
14  as what we would call outbound telemarketing
15  call centers and two are set up as inbound
16  customer service/sales protection agreement call
17  centers.
18  BY MR. DEVITO:
19     Q. And in terms of the people that work
20  there, could you describe that for me, how it's
21  structured in terms of management layers?
22     A. Like a --
23     MS. BRUNO: Objection as to form.
24     But you can answer.

Page 21

1      THE WITNESS: Like an org chart?
2  BY MR. DEVITO:
3      Q. Yes.
4      **A. Okay. Each of the call centers has a**
5  **general manager reporting to him or her, is**
6  **typically two sales managers. One of our call**
7  **centers is larger and has four. There's also an**
8  **operations manager reporting to the general**
9  **manager and then the -- there's some offshoots**
10  **here and there, but the majority of the**
11  **structure is general manager, a couple of sales**
12  **managers.**
13     **Each of those sales managers would have**
14  **four to six average team managers, and each**
15  **of those team managers would have 18 to 20**
16  **hourly associates on the phones making or**
17  **receiving phone calls.**
18     Q. So do you know how many people work in
19  that business unit?
20     MS. BRUNO: Objection as to form.
21     But you can answer if you know.
22     THE WITNESS: My best guess today would
23  be right around 500, between associates and
24  managers in those six call centers, but I

6 (Pages 18 to 21)

Page 22

1  haven't seen a -- didn't check a recent head
2  count in anticipation of this.
3  BY MR. DEVITO:
4      Q. I'll note for the record that it looked
5  like you were doing the math in your head.
6      A. Okay.
7      Q. So who is -- well, okay. Back up a
8  second.
9          When you were the manager of marketing
10  and customer segmentation, who was your boss?
11     **A. Katerina Means, K-A-T-R-I-N-A,**
12  **M-E-A-NS.**
13     Q. And what was her title?
14     **A. Director of service contracts.**
15     Q. Does she still work for Sears?
16     **A. Yes.**
17     Q. In that same role?
18     **A. Yes.**
19         **(Exhibit 5 was marked for**
20         **ID.)**
21  BY MR. DEVITO:
22     Q. You've been handed what's been marked
23  as Exhibit 5. Could you please just take a look
24  at that for me?

Page 23

1      **A. Yes. I'm familiar with it.**
2      Q. Okay. So could you just describe for
3  me what this represents?
4      **A. This is an organizational chart of**
5  **Katrina and her team, which includes myself and**
6  **the -- kind of the rest of the product**
7  **management/product support team.**
8      Q. So this is a current org chart?
9      **A. (Reviewing document.)**
10     **All except for the TBD under Joe**
11  **Finley. Joe did fill that position. It's now**
12  **Marcus Gonzalez. But other than that, yes.**
13     Q. Okay. And could you tell me where, if
14  anywhere, you would have been on this chart
15  before you became national operations manager?
16     **A. Oh, that's easy. Under -- right under**
17  **Katrina is Demi Richardson. That would have**
18  **been my old role for that five years. When I**
19  **moved over to the national operations manager**
20  **role, Demi backfilled into my position, my**
21  **former position.**
22     Q. Okay. There it says "Channel &
23  Customer Segmentation Manager" is that -- that's
24  a little different than what you told me. Is

Page 24

1  that the same thing?
2      **A. It is. She's doing the exact role that**
3  **I had in the Sears intranet directory. She's**
4  **listed as manager of marketing and customer**
5  **segmentation. I think that's the HR job code.**
6  **In practice around the office and sharing org**
7  **charts like this with other teams, we -- you**
8  **know Katrina, myself, when I was in that role,**
9  **Demi used that channel manager because the**
10  **marketing part got confusing and people from the**
11  **actual marketing division, chief marketing**
12  **officer and down thought wait, should that**
13  **person be part of our team? And it's not really**
14  **a marketing role. So in practice and in**
15  **introducing that person around the office, we**
16  **use channel manager.**
17     Q. Okay. And so the marketing division --
18  there's a separate team that's responsible for
19  marketing even with respect to protection
20  agreements, for instance?
21         MS. BRUNO: Objection as to form.
22         You can answer if you understand.
23         THE WITNESS: I don't think I do.
24  There is a separate marketing team. The

Page 25

1  responsibility -- help me understand that
2  question one more time, please.
3  BY MR. DEVITO:
4      Q. Sure. It was prompted by you saying
5  that the marketing part of that title was
6  somehow confusing to perhaps other people within
7  Sears who were responsible for marketing, and
8  I'm just trying to understand who that is -- you
9  know, who you're talking about there.
10     A. Okay.
11         MS. BRUNO: Is there a question
12  pending? What's the question pending?
13  BY MR. DEVITO:
14     Q. Could you please explain for me what
15  you meant when you referred to other marketing
16  people?
17     **A. Okay. There is a separate line that**
18  **reports up through a chief marketing officer,**
19  **whereas Katrina would report up more through an**
20  **operational VP and, yeah, they will offer their**
21  **expertise and partner with Katrina and her team**
22  **on marketing tactics and best strategies and**
23  **those kind of things.**
24     Q. With respect to the things that

Page 26

1   Katrina's team does, including sales of
2   protection agreements?
3       A. Um... yes.
4       Q. So on this chart, below your name is a
5   block that says "SC Operation" and then I think
6   it's the No. 6 in parentheses and then "Team
7   Managers." Could you explain that?
8       A. Yes, the dotted line is because they do
9   not report to me. I'm not responsible for those
10  six operations team managers' performance,
11  annual reviews, even hiring, firing, you know,
12  job decisions, but as a subject matter expert
13  within the Sears organization, those — there's
14  one in each call center.
15      So when I was describing that general
16  manager, a couple of sales managers and also an
17  operations manager, each one of those report up
18  to the general manager on the site, but I work
19  with them as my point of contact for anything
20  operational going on in the call center, any
21  kind of initiative, local or line of
22  business-wide.
23      Q. So they report up to a general manager
24  at this particular call center?

Page 27

1       A. Correct.
2       Q. But who do the managers of the call
3   center report to?
4       A. The general managers?
5       MS. BRUNO: Objection as to form.
6       But if you know, you can answer.
7       THE WITNESS: Okay.
8       The general managers report to Matt
9   Pennies, who is director of call center
10  operations.
11  BY MR. DEVITO:
12      Q. Could you spell that last name?
13      A. Yeah, P-E-N-N-I-E-S.
14      Q. And so I guess the opposite of the
15  dotted line, being the solid line, that means
16  that that -- the person connected by the solid
17  line is a direct report to the person above them
18  on this chart?
19      A. Correct.
20      Q. And those team managers that you work
21  with, what is it that they do?
22      A. They have a — it kind of depends on
23  the call center in particular. Some of them
24  serve in a facilities manager role, some of them

Page 28

1   are in a call center that has its own facilities
2   manager. All of them are responsible for things
3   like our PCI audit, that payment card industry
4   audit.
5       They are responsible for the local
6   resource management team, which would be a
7   small, typically two to six associates who
8   handle associates' scheduling time off requests,
9   shift trades, those type of things, and
10  maintaining the software called e-Workforce that
11  helps us manage who we have scheduled to work on
12  what day to either make phone calls out or
13  answer phone calls in for customers.
14      Also, the clerical and the audit teams
15  that would do some of our bookkeeping and those
16  kind of things at the local level would report
17  up through that operations team manager.
18      Q. So if you'd look at the sort of bottom
19  left of this chart, there's three boxes with
20  dotted lines around them. Could you explain
21  what these are to me?
22      A. Okay. The SPP-SF and KSP-SF stand for
23  Sears protection plan and Kmart smart plan. The
24  SF in both of those cases means sales floor.

Page 29

1   Those are a couple of products we sell in the
2   Sears and Kmart respectively. They are
3   replacement-type products, so smaller
4   non-repairable merchandise that we sell.
5       For example, the SPP, a cordless drill
6   wouldn't be considered reparable, but we offer
7   the extended warranty at point of sale. And so
8   a customer buys the extra coverage. If the
9   drill breaks, they return the drill. We give
10  them a gift card or check to make them whole so
11  they can replace their product.
12      The sales floor means we only sell that
13  product on the sales floor with the new
14  merchandise being sold. It's not offered in the
15  aftermarket post-purchase and it's not renewed.
16      Q. And what do you mean when you say
17  "aftermarket"?
18      A. From the moment the customer leaves the
19  store with the product, that moment on becomes
20  the aftermarket. So in my world, we have retail
21  in the store shopping for a piece of
22  merchandise. They've gone home with the
23  product. If there's going to be a relationship
24  with that customer, it would roll into the

Page 30

1   aftermarket business.
2       Q.  Okay.  Meaning that a -- you won't sell
3   a protection agreement that covers it other than
4   at the point of purchase in the store; is that
5   right?
6       MS. BRUNO:  Objection as to form.
7       You can answer if you understand.
8       THE WITNESS:  Okay.
9   Yeah, there's no merchandise that Sears
10  sells that would be SPP or PA eligible.  It
11  would be one or the other.
12  BY MR. DEVITO:
13      Q.  Oh.
14      A.  It's either a small non-repairable item
15  or it's a repairable item so we would offer a
16  protection agreement.  It's a business decision
17  which product we offer -- which protection
18  coverage we offer, not a customer decision.
19      Q.  Okay.  So that's a different product?
20      A.  Yes.  Then do you want me to move over?
21      Q.  Well, sure.
22      A.  Okay.
23      Q.  And maybe am I -- what's the point of
24  having this information on here?  Can you tell

Page 31

1   me that?
2       MS. BRUNO:  Objection as to form.
3   BY MR. DEVITO:
4       Q.  Is this describing --
5       MS. BRUNO:  But go ahead.
6       MR. DEVITO:  Sorry.
7   BY MR. DEVITO:
8       Q.  Is this describing the various things
9   that the people on this chart are responsible
10  for?
11      A.  Yes.
12      Q.  Okay.
13      A.  So it's Jackie Kfoury is responsible
14  for the SPP and the KSP.
15      Q.  And how -- can you tell that just by
16  looking at the chart or you know that?
17      A.  I know that just from internal business
18  knowledge.
19      Q.  It has nothing to do with the fact that
20  that's like underneath of her name?
21      A.  Unfortunately, no.  It wasn't laid out
22  that well because it would imply that -- well,
23  actually, I'm sorry.  Let me take -- let me take
24  a closer look.  (Reviewing document.)

Page 32

1       The relationship would be the first
2   three managers from left to right are
3   responsible in order for the first three dotted
4   line boxes down below.  So the vertical
5   formatting gets a little out of alignment, but
6   Jackie has the SPP and the KSP.  Ashly has
7   responsibility for the MPA, RPA and EWA and that
8   open position TBD product manager, when filled
9   will have responsibility for the balance, home
10  warranty and down.
11      Q.  Okay.  Thank you.  So that if I'm
12  understanding this now correctly, the SF/AM
13  stands for sales floor/aftermarket; is that
14  right?
15      A.  Yes.
16      Q.  So then if you move over to the blue
17  box that's on the bottom right, it says "Team
18  responsible for Service Contracts:  Product
19  Development," when it says "team" there, is that
20  referring to the people listed on this chart?
21      MS. BRUNO:  Objection as to form.
22      You can answer if you know.
23      THE WITNESS:  (Reviewing document.)
24      Yes.

Page 33

1   BY MR. DEVITO:
2       Q.  And so then there's a number of things
3   listed below that, "Product pricing, legal and
4   regulatory requirements, contacts/offers and
5   member experience."
6       Which of those things, if any, do you
7   have responsibility for?
8       A.  Am I still in my old role, marketing
9   manager?
10      Q.  Yes.
11      A.  Okay.  Contacts/offers, um... yep,
12  that's it.
13      Q.  And then below that it says "Call
14  center."  Is someone on this chart responsible
15  for call center?
16      A.  Specific to those bullet points, yes.
17  The applications, campaign, Kathy Earl.  Sales
18  development, Veronica DeHerrera.  Call center
19  policy and procedures, the new me,
20  post-marketing manager.
21      Q.  Okay.
22      A.  And the operations process improvement,
23  me as well.  Applications/campaign would also be
24  Joe Finley along with Kathy Earl.

9  (Pages 30 to 33)

Page 34

1    Q. And before you became national
2  operations manager, who was that? Who had that
3  job?
4    **A. There were two of us at one time, Kevin**
5  **Warrix and myself. Kevin Warrix is no longer**
6  **with the company, but the person that I**
7  **backfilled the position for was Frank Kern,**
8  **K-E-R-N.**
9    Q. So I'm just slightly confused now by
10 the history of how that happened. Could you
11 flesh this out for me?
12   **A. At one point it was Frank and Kern --**
13 **I'm sorry -- Frank and Kevin. Frank moved into**
14 **a new role. I took Frank's old job with Kevin.**
15 **And then Kevin was no longer with the company,**
16 **so it was just me. So it was two marketing**
17 **managers. Then there were one.**
18   Q. And that all happened this year?
19   **A. 2010.**
20   Q. The year you took the job you --
21 just -- okay. The easiest way to ask this is
22 probably for me to say: Tell me when those
23 changes occurred.
24   **A. 2010 is when I replaced Frank, and then**

Page 35

1  **later in '2010 is when Kevin left the company.**
2    Q. Okay. Now I'm even more confused
3  because I thought we were --
4    MS. BRUNO: You were asking questions
5  about his prior role.
6    MR. DEVITO: Okay. Then I guess I was
7  asking questions about his prior role, but then
8  I asked after he told me that he's now the
9  person in charge of these two items within call
10 center as the national operations -- I'm sorry,
11 we're just getting confused about what time
12 period we're talking about.
13   THE WITNESS: '10 or '15.
14 BY MR. DEVITO:
15   Q. I thought we were talking about -- now
16 about '15, but you're talking about '10?
17   **A. I was.**
18   MS. BRUNO: Just wait for him to ask
19 the question and that way we're not going to get
20 things confused.
21   THE WITNESS: Okay.
22   MS. BRUNO: Don't try to anticipate his
23 question. Just wait for him to ask the question
24 and it will go smoother.

Page 36

1    THE WITNESS: Okay.
2  BY MR. DEVITO:
3    Q. So I do need to clear that up a little
4  bit.
5    Talking about 2010, when you took the
6  job, there were two people sharing that role; is
7  that right?
8    **A. Yes.**
9    Q. You and who?
10   **A. Kevin Warrix.**
11   Q. And could you spell that?
12   **A. Kevin, K-E-V-I-N, Warrix, W-A-R-R-I-X.**
13   Q. Okay. And then Kevin left; is that
14 right?
15   **A. Yes.**
16   Q. When?
17   **A. Summer of 2010.**
18   Q. Then Frank Kern comes in; is that
19 right?
20   **A. No.**
21   Q. Okay. Oh, he was there with Kevin
22 before?
23   **A. Yes.**
24   Q. You filled in for Frank?

Page 37

1    **A. Yes.**
2    Q. Okay. Now I got it. Thank you.
3    All right. So could you describe for
4  me what an MPA is?
5    **A. It stands for Master Protection**
6  **Agreement. It is a service contract that we**
7  **offer -- Sears offers in the retail and**
8  **aftermarket environment on reparable**
9  **merchandise.**
10   Q. How long have you been working with
11 MPAs?
12   **A. Since I started with the company in**
13 **1996.**
14   Q. Do you know how long Sears has been
15 selling MPAs?
16   **A. I think since the '50s.**
17   Q. And --
18   **A. The naming convention has changed over**
19 **time but the heart of the product since at least**
20 **the '50s.**
21   Q. And so going to your job in 2010, what
22 were your responsibilities with respect to MPAs?
23   **A. The how and when, we would offer master**
24 **protection agreements in inbound and outbound**

Page 38

1    calls and which types of customer groups we
2    would target for direct mail and telemarketing
3    efforts.
4        Q. As to the latter component of that, the
5    direct marketing, could you give me a little
6    more detail on what you did with respect to
7    that?
8        MS. BRUNO:  Objection as to form.
9        But you can answer.
10       THE WITNESS:  Direct mail we would --
11   again, using that same list of customers that
12   have shopped at Sears, used a Sears service
13   technician, we would send them offer letters
14   saying you can buy coverage, you can renew
15   coverage, you can bundle coverage together to
16   get a better rate, and we would send out, you
17   know, thousands of letters through a printing
18   press and customers could respond by calling an
19   800 number or by tearing off the bottom coupon
20   or, you know, the bottom, almost like credit
21   card statement and mailing it back to us to
22   purchase.
23   BY MR. DEVITO:
24       Q. And what were you doing with respect to

Page 39

1    those activities?
2        A. We used deciles, which is an internal
3    term that we would use, to say based on scoring
4    of customers that we think are most likely to
5    buy based on existing purchase history, strength
6    of relationship with Sears, how far down the
7    list should we go so that it was profitable from
8    the sales versus expense ratio, the layout and
9    form of the letter, how big do we put the
10   toll-free number on there so customers call in
11   instead of mail it back, what's our opening
12   line, kind of the physical design and layout of
13   the outer envelope, the offer letter, the
14   business reply envelope, everything involved.
15       Q. Other than MPAs, what other products
16   are you -- or were you responsible for,
17   2010/2015?
18       A. The MPA; the repair protection
19   agreement or RPA; the basic PA, BPA; the value
20   protection agreement, the VPA; and to a lesser
21   degree, the A&E RPA.
22           (Exhibit 6 was marked for
23           ID.)
24   BY MR. DEVITO:

Page 40

1        Q. I've handed you what's been marked as
2    Exhibit 6.  If you look at the bottom of page 2
3    and then going on to page 3, you'll see your
4    name and then a listing of things on which you
5    have information.  And I'm just -- I want to ask
6    about the first one of those, which says
7    "...issues relating to post-point-of-purchase
8    service agreement sales and marketing."
9        Could you explain what
10   post-point-of-purchase means there?
11       MS. BRUNO:  Objection as to form.
12   Mr. Setzer didn't write that.  So if you want to
13   ask him what post-point-of-purchase service is,
14   that's fine, but I don't think it's appropriate
15   to ask him what --
16       MR. DEVITO:  Okay.  That's fair.
17   BY MR. DEVITO:
18       Q. Not what post -- not what it means
19   there but what it means to you.
20       MS. BRUNO:  That's fine.
21       THE WITNESS:  That would be synonymous
22   to aftermarket to me, meaning not a retail
23   purchased protection agreement.  That's
24   something purchased after the customer's left

Page 41

1    the store.
2    BY MR. DEVITO:
3        Q. Okay.  So when you say "retail," that
4    means someone buying something in a store?
5        A. A brick and mortar store or Sears.com
6    and adding the protection agreement to the total
7    purchase of the refrigerator, for example.  So
8    yes, I want that refrigerator and I want a
9    three-year or a five-year Master Protection
10   Agreement with it.  In the store or online, they
11   can add that right in and it would show up as
12   one charge on their credit card statement.
13       If they decline that coverage at point
14   of sale, meaning when they bought the physical
15   product, then post-point-of-purchase would be
16   the next world aftermarket reference.
17       Q. Okay.  If they buy it in the store
18   along with the refrigerator, can they add the
19   other products in their house to the MPA while
20   they're in the store?
21       A. No.
22       Q. How could they do that?  How can that
23   be done, if it can be done?
24       MS. BRUNO:  Objection as to form.

Page 42

```
 1        But you can answer.
 2        THE WITNESS: For the customer to
 3   initiate that, they would have to call one of
 4   our inbound call centers using a toll-free
 5   number.
 6   BY MR. DEVITO:
 7     Q. Okay. And correct me if I'm wrong, but
 8   when you're making outbound sales calls, some
 9   of -- at least some of that activity is calling
10   people who have purchased a product in a store
11   and perhaps bought an MPA that covers that
12   product, and you're attempting to sell them on
13   other products in their -- an MPA that covers
14   other products in their house; is that correct?
15        MS. BRUNO: I'm just going to object to
16   form.
17        But you can answer.
18        THE WITNESS: Potentially, yes.
19   BY MR. DEVITO:
20     Q. That sort of sale that I've just
21   hypothesized to you, the selling of an MPA that
22   covers other products in the customer's home, is
23   that always then going to be a
24   post-point-of-purchase sale from your
```

Page 43

```
 1   perspective?
 2        MS. BRUNO: Objection as to form.
 3        But if you understand, you can answer.
 4        THE WITNESS: Let me have the question
 5   one more time, please.
 6   BY MR. DEVITO:
 7     Q. If a customer is going to purchase an
 8   MPA that covers products in their house that
 9   they didn't necessarily buy from Sears, is that
10   always going to be a post-point-of-purchase
11   sale?
12     A. Yes.
13     Q. Can you describe for me in general
14   terms what an MPA covers?
15     A. The -- it covers repairs, parts and
16   labor up to and including replacement of the
17   product from -- due to damages caused from
18   normal wear and tear under standard usage
19   conditions.
20     Q. We went over a little bit of this, I
21   think, but what are the ways in which customers
22   can purchase MPAs?
23     A. Point of sale, which could be brick and
24   mortar or dot com. They can call an inbound
```

Page 44

```
 1   call center. They could have been selected for
 2   marketing either through outbound telemarketing
 3   or by receiving some sort of direct mail or more
 4   recently e-mail correspondence offering them
 5   coverage, or the service technicians can, in
 6   certain circumstances, offer protection
 7   agreement coverage while they're out in the home
 8   working on that or some other item.
 9     Q. When you say "brick and mortar," that
10   obviously is a Sears store. What else could it
11   be?
12     A. Anywhere we sell -- Sears sells
13   reparable merchandise that's
14   protection-agreement eligible, so a Sears
15   outlet, a Sears hometown store. Sometimes the
16   Sears product and repair services centers will
17   have inventory, Kmart stocks, some merchandise
18   that's protection-agreement eligible. So
19   there's -- it's a large corporation. There's
20   lots of retail formats.
21     Q. Is that all of them or there could be
22   others --
23     A. Oh, I'm --
24     Q. -- that you're not remembering?
```

Page 45

```
 1     A. I'm confident there are others. I just
 2   can't --
 3     Q. Okay.
 4     A. I've never worked on the retail side of
 5   the business, so I'm -- I wouldn't be able to
 6   give you an exhaustive list.
 7     Q. You said, I think, more recently
 8   customers have been solicited via e-mail; is
 9   that correct?
10     A. Yes.
11     Q. When did you start doing that?
12     A. Early 2015. March-ish if you have an
13   "ish" on that keyboard.
14     Q. It's probably becoming increasingly
15   poplar.
16     A. Probably.
17     Q. Do you know -- and if you don't,
18   obviously just tell me that -- any sort of
19   general breakdown as to how, by percentage, MPAs
20   are sold by Sears, in which channel?
21        MS. BRUNO: I'm just going to object as
22   to form.
23        But if you understand, you can answer.
24        THE WITNESS: About half are sold in
```

Page 46

1 retail in point of sale, and about half are sold
2 in some sort of aftermarket.
3 BY MR. DEVITO:
4     Q. When is the customer required to pay
5 for the MPA?
6     A. At time of purchase.
7     Q. So in the post-point-of-purchase world,
8 is that typically the customer gives a credit
9 card either online or over the phone?
10     A. Yes. Some pay with a check.
11     Q. You'll accept checks over the phone
12 or --
13     A. Yeah, we have a check-by-phone process
14 and -- or some of them mail it back with their
15 direct mail coupon, mail a physical check back
16 to us.
17     Q. And in the cases where they don't pay
18 immediately, I guess you bill them or they --
19 at -- I'm sorry, this isn't a very good
20 question, but if they're paying by physical
21 check, you've basically made the sale and then
22 they have to pay for it; is that accurate?
23     MS. BRUNO: Objection as to form.
24     But if you understand, you can answer.

Page 47

1     THE WITNESS: I would describe it as
2 we've offered them coverage and their contract
3 would go into force and become effective when we
4 receive the check.
5 BY MR. DEVITO:
6     Q. Better at answering that question than
7 I was asking it.
8     A. Okay.
9     Q. The coverage wouldn't become effective
10 until you received the check; is that right?
11     A. Correct. We would create an agreement
12 number either when we've obtained the credit
13 card or have received the physical check or ran
14 the check by phone. That's when we would record
15 an agreement on behalf of the customer.
16     Q. So the -- when a customer purchases an
17 MPA at point of purchase, is that always limited
18 to a product that they are at the same time
19 purchasing in a Sears store?
20     MS. BRUNO: Object as to form.
21     But you can answer if you know.
22     THE WITNESS: We're talking point of
23 sale?
24 BY MR. DEVITO:

Page 48

1     Q. Yes.
2     A. Yes. It's always limited -- I'm paying
3 for that product and I want to add a protection
4 agreement on to that product. It's always that
5 product that I'm buying, that I'm eligible to
6 buy coverage on. Point of sale has no
7 visibility to other merchandise that the
8 customer my own.
9     Q. So it's only the product being
10 purchased that that MPA could cover?
11     A. Yeah.
12     Q. So now sort of focusing on
13 post-point-of-purchase, if a customer wants to
14 add products that they already own to an MPA,
15 how can that get communicated to Sears? How can
16 the products that they want to add get
17 communicated to Sears?
18     A. By telephone, if I understand the
19 question correctly.
20     Q. Is that the only way?
21     A. No. Technicians can record additional
22 coverage while they're in the home.
23     Q. How about online?
24     A. We do not currently have an aftermarket

Page 49

1 online presence, no.
2     Q. Okay. So in order do that, the
3 customer has to actually speak to someone,
4 either the technician in their house or a Sears
5 representative by telephone; is that right?
6     A. Yes.
7     Q. And when they do that, what kind of
8 product information does the customer have to
9 give to Sears?
10     MS. BRUNO: I'm just going to object to
11 form.
12     But if you understand the question, you
13 can answer.
14     THE WITNESS: Are we talking telephone
15 or technician?
16 BY MR. DEVITO:
17     Q. Well, I'd like both answers. So let's
18 start with telephone.
19     A. Okay. We would ask the customer for a
20 description of the merchandise. So, for
21 example, if it's a refrigerator, we would ask
22 some clarifying questions, like, does it have an
23 ice maker, is it side-by-side or is it one of
24 newer style trios with the French doors on top

13 (Pages 46 to 49)

Thompson Court Reporters, Inc
(312) 421-3377

Page 50

1  so that we could select the most appropriate
2  merchandise code.
3      We would ask the customer for the age
4  of the product, we would ask the customer for
5  the brand name, and we would ask the customer if
6  it is in good working order and located at their
7  residence.
8      Q. Do you ask them for a particular model?
9      A. We do not require it. We have the
10  fields to record model and serial number, but we
11  do not require the customer to provide us model
12  and serial over the telephone to sell a
13  protection agreement.
14      Q. Do you know why you don't require --
15      A. In our --
16          MS. BRUNO: Model? In the question,
17  model?
18          MR. DEVITO: Model, yes.
19          THE WITNESS: In my experience, it's
20  not a customer-friendly question to ask. Lots
21  of consumers don't know where the model number
22  tag would be located on a furnace or a water
23  heater and it's -- it's not a requirement of us
24  being able to successfully fulfill the contract.

Page 51

1      If we have the right age and brand name
2  and product description to know what it is that
3  we're talking about, we're confident that we'll
4  be able to repair it. So we don't need the
5  model and serial at point of sale -- I'm mixing
6  terms. I'm sorry. "Point of sale" means
7  retail -- at the time of recording the
8  agreement.
9  BY MR. DEVITO:
10      Q. And in terms of the -- requesting the
11  age of the product, do you just rely on the
12  customer to tell you how old it is; is that
13  right?
14      A. Over the telephone? Yes.
15      Q. So I take it from your prior testimony
16  that the -- you don't require the customer to
17  give you the serial number; is that right?
18      A. No, we do not. If a customer has it
19  available, we have the fields in Ciboodle to
20  record it, so we'll note the model and/or serial
21  during that telephone conversation, but it's not
22  a required field to continue like merchandise
23  code, brand name and age.
24      Q. So you'll get it if the customer

Page 52

1  volunteers it; is that right?
2      A. Yes.
3      Q. Now, in these types of sales, the
4  post-point-of-purchase sales of MPAs, I take it
5  that the customer doesn't need to purchase any
6  of the products from Sears in order for them to
7  be covered; is that right?
8      A. It varies by product.
9      Q. Okay. Can you explain further?
10      A. For the majority of products, the
11  common things, washers, driers, refrigerators,
12  we don't care where you bought those. There are
13  a few smaller divisions like computers, and I
14  don't think anybody still makes them anymore,
15  but rear projection TVs were a business
16  requirement, that those had been bought at Sears
17  for us to offer you protection agreement
18  coverage. Lawn and garden equipment, which is a
19  repair protection agreement -- we've been
20  talking mostly about master protection
21  agreements but --
22          MS. BRUNO: I assume you only want
23  Master Protection Agreement information, right?
24          THE WITNESS: Oh.

Page 53

1          MR. DEVITO: I do, yeah. I don't want
2  to cut you off, but if your attorney feels
3  comfortable doing that, let's --
4          MS. BRUNO: No. I don't want to be
5  interrupting things, but this case is about
6  MPAs. So I assume you're only interested in
7  information about MPAs.
8          MR. DEVITO: I am.
9  BY MR. DEVITO:
10      Q. How would Sears go about determining
11  whether or not the customer bought the item at
12  Sears?
13      A. We would ask the customer.
14      Q. And you would just take their word for
15  it, whether or not they bought it at Sears?
16      A. Yeah.
17      Q. Does the product have to be something
18  that Sears carries?
19      A. No.
20      Q. Does Sears confirm that the customer
21  actually owns the specific product that they're
22  seeking coverage for?
23          MS. BRUNO: I'm going to just object to
24  form.

14  (Pages 50 to 53)

Page 54

1  But you can answer if you understand.
2  THE WITNESS: No, we don't.
3  BY MR. DEVITO:
4  Q. And does Sears make any effort to
5  inspect products or otherwise see what condition
6  they're in?
7  **A. During that phone call?**
8  Q. Or subsequent to the phone call.
9  **A. Not a stand-alone inspection, no.**
10  Q. And not as a condition of selling the
11  MPA?
12  **A. Correct, not as a condition of selling.**
13  MS. BRUNO: David, if you're going to a
14  different area, want to take a break?
15  MR. DEVITO: Yeah.
16  MS. BRUNO: Because we've been going
17  about an hour.
18  MR. DEVITO: Sure. That's fine.
19  (Recess taken from 10:30 a.m.
20  to 10:37 a.m.)
21  (Exhibit 7 was marked for
22  ID.)
23  BY MR. DEVITO:
24  Q. Mr. Setzer, we're back on the record.

Page 55

1  You've been handed what's been marked as
2  Exhibit 7. Are you familiar with this document?
3  **A. Yes.**
4  Q. At the bottom there, where it says
5  "Multiple years of coverage available" and then
6  it says "up to five years on most products,"
7  what's your understanding of what that means?
8  **A. That on any given day, we would sell a**
9  **customer a Master Protection Agreement up to**
10  **five years in duration. So it would cover you**
11  **from today until December, whatever today is, of**
12  **2020.**
13  Q. And that would be regardless of the age
14  of the products that are being covered?
15  **A. Yes.**
16  Q. So it's just five years from when --
17  the date when the MPA is sold; is that right?
18  **A. Up to, yes.**
19  Q. And does that mean that coverage then
20  terminates on those products five years from the
21  date of the sale of the MPA?
22  **A. It means that contract expires.**
23  Q. But it could be renewed?
24  **A. Yes.**

Page 56

1  Q. So when you say "up to five years," I
2  assume that means that there are exceptions to
3  the five-year limit; is that right?
4  **A. Yes.**
5  Q. What are those?
6  **A. We offer coverage in one, two, three,**
7  **four and five-year increments.**
8  Q. It's not a product-specific exception?
9  **A. Correct.**
10  Q. So the duration of the coverage is
11  something that's selected by the customer; is
12  that right?
13  **A. Yes.**
14  Q. Below that and at the bottom there, it
15  says "Maximum repair/replace liability, no
16  maximum." What's your understanding of what
17  that means?
18  **A. That if we are going to replace a**
19  **product because it is deemed un-repairable or**
20  **uneconomical to repair by our technician and**
21  **team, that we do a feature-for-feature match-up**
22  **of the product to give the customer a new**
23  **product that's as close to the product they**
24  **currently have and it's being replaced if**

Page 57

1  **possible regardless of the current retail -- you**
2  **know, the MSRP, the retail selling price of that**
3  **replacement product.**
4  Q. Will the replacement product always be
5  something that is sold by Sears?
6  **A. Yes.**
7  Q. So even if Sears is -- even if the MPA
8  covers a product that Sears doesn't sell and
9  it's determined that that product needs to be
10  replaced, it will be replaced with a product
11  that Sears does sell; is that right?
12  **A. I don't understand the question.**
13  Q. So -- well, is it possible for Sears to
14  have sold an MPA that covers a product that
15  wasn't purchased at Sears and which Sears does
16  not sell?
17  **A. We don't sell that brand name?**
18  Q. For instance, yes.
19  **A. Yes.**
20  Q. But then the customer calls for service
21  on that product and it's determined that the
22  product needs to be replaced. What I think
23  you're telling me is that the product will
24  necessarily be replaced with a product that

15 (Pages 54 to 57)

Page 58

1   Sears does sell; is that right?
2   **A. A replacement product, yes.**
3       MS. BRUNO: Objection as to form.
4       But you can answer if you understand.
5   BY MR. DEVITO:
6       Q. And so when we're talking about here
7   this "maximum repair/replace liability," if the
8   product is covered by the MPA and -- does this
9   mean that the customer should always get either
10  a repair or a replacement --
11      MS. BRUNO: Objection.
12  BY MR. DEVITO:
13      Q. -- under the MPA?
14      MS. BRUNO: Objection as to form.
15      You can answer.
16      THE WITNESS: If it's a covered repair,
17  yes.
18  BY MR. DEVITO:
19      Q. Okay. So unless it's a noncovered
20  repair, then the customer should always get
21  either a repair or a replacement; is that right?
22      **A. Yes.**
23      Q. Are there situations in which Sears,
24  rather than either repairing or replacing the

Page 59

1   product, would just issue the customer a refund
2   for its MPA?
3       **A. Yes.**
4       Q. And why would that happen?
5       **A. The "why" is a tough one, but the most**
6   **common reason would be the customer elects to**
7   **select -- to opt for a refund of their**
8   **protection agreement rather than having us**
9   **replace it.**
10      Q. So is it always a customer-driven
11  decision?
12      **A. The --**
13      MS. BRUNO: Objection as to form.
14      But you can answer.
15      THE WITNESS: In my experience, it
16  would be we offer the replacement authorization
17  and yeah, the only reason it would be canceled
18  after that instead of replaced is if that's what
19  the customer chose to do. There's probably been
20  exceptions to that scenario, but under normal
21  business practices, yes, it's we offer to
22  replace it and if they don't want the
23  replacement item, they can say "forget it,
24  cancel it and give me my money back."

Page 60

1   BY MR. DEVITO:
2       Q. Okay. Are you aware of any situations
3   that don't fit that scenario where Sears, for
4   instance, just says "We're going to give you
5   your money back"?
6       MS. BRUNO: Object as to form.
7       But you can answer if you know.
8       THE WITNESS: I don't think I
9   understand the question. I'm sorry.
10  BY MR. DEVITO:
11      Q. So I guess it sounds like what you're
12  telling me is there's either a repair -- well,
13  okay. I don't want to be imprecise.
14      If the repair is covered or the product
15  is covered --
16      **A. Okay.**
17      Q. -- the customer will always receive
18  either a repair or a replacement authorization;
19  is that right?
20      MS. BRUNO: Object as to form,
21  misstates the prior testimony.
22  BY MR. DEVITO:
23      Q. Well, if you think my question
24  misstates your testimony, then please correct

Page 61

1   it.
2       **A. If it is a covered repair on a covered**
3   **product, then our resolution would be either a**
4   **repair or a replacement authorization or a**
5   **buy-out offer or a cancellation and refund.**
6       Q. Okay. So those other two scenarios
7   that you just brought up, buy-out offer and
8   cancellation and refund, could you explain those
9   for me?
10      **A. A buy-out offer is when we don't have**
11  **the ability to repair the product and we're**
12  **offering the customer a cash settlement in lieu**
13  **of repair or replace, and the cancellation is**
14  **what we talked about earlier, where the**
15  **customer, according to the terms and conditions**
16  **of the protection agreement, have the option to**
17  **say: Never mind, I don't like your replacement**
18  **option, I'd rather just have my money back that**
19  **I gave you for the protection agreement.**
20      Q. And why would a buy-out offer arise?
21      MS. BRUNO: Objection as to form.
22      But you can answer.
23      THE WITNESS: There's probably lots of
24  scenarios and situations that would ultimately

16 (Pages 58 to 61)

Page 62

1  get there, but the most common would be we don't
2  have -- Sears doesn't have the availability of
3  parts or technical information to repair a
4  product and we've been unsuccessful in locating
5  a third-party service provider in that
6  customer's market to repair it on behalf of
7  Sears Home Services.
8  BY MR. DEVITO:
9  Q. Okay. But then explain to me why the
10 next step wouldn't be to replace.
11 MS. BRUNO: Object to form.
12 But you can answer.
13 THE WITNESS: In -- typically, the
14 customer wouldn't want what we have in store.
15 BY MR. DEVITO:
16 Q. Because the customer has told you that?
17 **A. I'm speaking generally. I — "the**
18 **customer," but yeah, that's been our experience,**
19 **is that they don't — maybe it's a built-in**
20 **refrigerator and we don't sell those, so they**
21 **would go to a retailer that sells built-in**
22 **refrigerators.**
23 Q. But you will sell MPAs that cover
24 built-in refrigerators, right?

Page 63

1  **A. In some situations, yes.**
2  Q. Do you know why Sears sells MPAs that
3  cover things like built-in refrigerators that
4  they don't sell?
5  **A. No.**
6  **(Exhibit 8 was marked for**
7  **ID.)**
8  BY MR. DEVITO:
9  Q. So you've been handed what's been
10 marked as Exhibit 8. Are you familiar with this
11 document?
12 **A. Yes.**
13 Q. Where did this document come from?
14 **A. The Sears intranet. PA Resource Center**
15 **is the name of the page.**
16 Q. And what does this document show?
17 MS. BRUNO: Objection as to form.
18 You can answer.
19 THE WITNESS: We refer to it as our
20 covered/not covered grid. So it would show some
21 examples of things that are covered and not
22 covered by agreement type.
23 BY MR. DEVITO:
24 Q. So if you look at the first page under

Page 64

1  where it says "Covered vs. Not Covered" --
2  **A. Um-hum.**
3  Q. -- it gives a definition of "not
4  covered." That says it means that "...the
5  customer must pay for the repair/service. It
6  does not mean that Sears should cancel the PA,
7  however." And then --
8  MS. BRUNO: David, I'm sorry to
9  interrupt. You can you tell me where you are?
10 Do you know where he is?
11 MR. DEVITO: There is, very close to
12 the top of the page, "Covered vs. Not Covered."
13 One sentence in to there, it says "By 'not
14 covered,' we simply mean that the customer must
15 pay for the repair/service."
16 MS. BRUNO: Okay. Sorry. You threw me
17 off when you said "definition."
18 THE WITNESS: I was down to the grid.
19 MS. BRUNO: Sorry. I didn't mean to
20 interrupt.
21 MR. DEVITO: No problem.
22 BY MR. DEVITO:
23 Q. And then after it gives that
24 definition, the document goes on to identify in

Page 65

1  the grid things that are not covered under
2  various types of PAs including MPAs; is that
3  right?
4  **A. Yes.**
5  Q. So just to take the first one as an
6  example, the issue being "PM Check," and I
7  believe that means preventative maintenance
8  check; is that right?
9  **A. Yes.**
10 Q. And so if the customer wants more than
11 one preventative maintenance check a year, they
12 have to pay for it, right?
13 **A. Yes.**
14 Q. Does this document list all the things
15 that are not covered under an MPA?
16 **A. (Reviewing document.)**
17 **It seems to, yes.**
18 Q. So unless something is listed here as
19 not covered, it should be covered, right?
20 MS. BRUNO: Objection as to form.
21 But you can answer.
22 THE WITNESS: In my experience, yes.
23 BY MR. DEVITO:
24 Q. Can --

Thompson Court Reporters, Inc
(312) 421-3377

Page 66

1     A. I'm trying to think of an example of
2 something that came up, and I don't see it on —
3 I can't come up with one that is missing from
4 this list.
5     Q. You cannot think of anything that's not
6 listed here but should be?
7     A. Correct.
8     Q. So back to where I was reading from
9 previously on the first page, it says that if
10 something is not covered, that "does not mean
11 that Sears should cancel the PA, however. There
12 are only a few circumstances where Sears may
13 cancel a PA."
14     Are you familiar with the reasons why
15 Sears may cancel a PA -- an MPA?
16     A. Yes.
17     Q. What are they?
18     A. Some examples could include an unsafe
19 condition for the technician, so, for example, a
20 customer that has dogs and the customer refuses
21 to secure the dogs in a bedroom or the backyard
22 so the technician can safely work on the
23 product. We've had customers who were
24 threatening towards our technicians in the past.

Page 67

1 So we would say we — we're going to cancel your
2 protection agreement because we're unwilling to
3 send our technician back out there and put him
4 or her in harm's way for the sake of your
5 refrigerator.
6     We would also cancel protection
7 agreements if, on our first repair attempt, the
8 product was determined not to be in good working
9 order when the agreement was purchased, the age
10 was not correct or the model and serial is
11 illegible on the tag.
12     Q. And how would Sears go about
13 determining, for example, that the product
14 wasn't in good working order when the MPA was
15 sold?
16     A. The expertise of the technician and
17 oftentimes conversation with the customer.
18         (Exhibit 9 was marked for
19         ID.)
20 BY MR. DEVITO:
21     Q. You've been handed what's been marked
22 as Exhibit 9. Are you familiar with this
23 document?
24     A. Yes.

Page 68

1     Q. Could you tell me what it is?
2     MS. BRUNO: Before you answer, just for
3 clarity of the record, could we just put the
4 Bates number of this one on?
5     MR. DEVITO: Oh, sure.
6     MS. BRUNO: Yeah.
7     MR. DEVITO: That's been Bates-labeled
8 as SEARS 410 through 414.
9     THE WITNESS: Am I supposed to know
10 what that means? Is that supposed to mean
11 anything to me?
12     MS. BRUNO: No. No.
13     THE WITNESS: Oh, okay.
14         (Discussion off the record.)
15     THE WITNESS: This is a printout of the
16 terms and conditions for the Master Protection
17 Agreement.
18 BY MR. DEVITO:
19     Q. And if you'd look at the bottom left,
20 it says "National MPA AM E Jan2010."
21     I think I know the answer, but can you
22 tell me what those letters mean?
23     A. MPA, Master Protection Agreement;
24 aftermarket -- AM is aftermarket; E for English,

Page 69

1 and Jan2010 for the revision date.
2     Q. And do you happen to know -- well, how
3 often does this get revised?
4     MS. BRUNO: Objection as to form.
5     You can answer if you understand.
6     THE WITNESS: As needed.
7 BY MR. DEVITO:
8     Q. Do you know how often -- how many
9 revisions have been made since, say,
10 January 2010?
11     A. I think two, but I'm not positive. I
12 think April of '13 and September '15,
13 thereabouts.
14     Q. Were you involved in revisions --
15 making the revisions to this agreement?
16     A. To this one?
17     Q. Well, to any of the MPAs. Let's start
18 there.
19     A. Yes.
20     Q. What did you do in terms of giving
21 input on revisions to the MPA?
22     A. It was a team of people and we would
23 talk about what we thought we should cover or
24 not cover or include to be the -- what we feel

18 (Pages 66 to 69)

Thompson Court Reporters, Inc
(312) 421-3377

Page 70

1 **is the leader in the marketplace for**
2 **comprehensive coverage.**
3      Q.  And what time frame are we talking
4 about?
5      **A.  I was involved in the April '13 and**
6 **September -- again, please don't quote me on**
7 **these dates, but for the sake of references, the**
8 **revisions and the September of '15 discussions.**
9      Q.  And what discussions did you give in
10 terms of making changes to the form?
11      MS. BRUNO:  Objection as to form.
12      If you understand the question, you can
13 answer.
14      THE WITNESS:  (Reviewing document.)
15      The January 2010 terms and conditions,
16 for example, have a food loss reimbursement of
17 $250 per year.  The current terms and conditions
18 offer $250 in food loss per service incident
19 regardless of frequency of breakdowns per year.
20 BY MR. DEVITO:
21      Q.  And that's one of the things you
22 suggested changing?
23      **A.  Yes.**
24      MS. BRUNO:  Objection as to form.

Page 71

1      THE WITNESS:  Oh, sorry.
2      MS. BRUNO:  You can answer.  His answer
3 can stand.
4 BY MR. DEVITO:
5      Q.  Now, if you go to the third page and
6 look at Section 14, it's entitled "Cancellation
7 and Refunds."  It says "This section describes
8 all the reasons why Sears can cancel an MPA."
9      **A.  Yes.**
10      Q.  And so one of those reasons listed in
11 there is Sears may cancel the MPA "if Sears'
12 Repair or its representatives determines that it
13 cannot service or repair your covered products."
14      Who's being referred to there as "Sears
15 Repair"?
16      **A.  The team of in-home technicians that**
17 **Sears employs.**
18      Q.  So those people are all Sears
19 employees?
20      MS. BRUNO:  Objection as to form.
21      But you can answer.
22      THE WITNESS:  I don't know.  To -- the
23 majority of them are in my experience, yes, but
24 there could be markets where we've contracted

Page 72

1 out or something.  I'm not close -- that's a
2 separate line of business within our business
3 unit that I'm not directly knowledgeable of.
4 BY MR. DEVITO:
5      Q.  So you don't know whether Sears has
6 third-party people going out on service calls?
7      **A.  I don't know.**
8      Q.  But generally speaking, would you say
9 that the majority of service calls are made by
10 people employed by Sears?
11      **A.  The majority, yes, generally speaking,**
12 **yes.**
13      Q.  And so in this scenario, this
14 cancellation scenario where someone from Sears
15 Repair has determined that it cannot service or
16 repair a covered product, is that referring to a
17 situation where a person has actually gone out
18 to the customer's house and looked at the item
19 or items that they're asking for service on?
20      MS. BRUNO:  Objection as to form.
21      You can answer.
22      THE WITNESS:  Generally, yes.  There
23 are some products that are shop serviced.  So
24 they would have brought them to us.  But some

Page 73

1 sort of Sears Repair representative would have
2 looked at the item.
3 BY MR. DEVITO:
4      Q.  Are those the only scenarios that you
5 can think of that would fit into that scenario
6 of Sears Repair or its representatives
7 determining that it cannot service or repair a
8 covered product?
9      **A.  I'm sorry, I don't --**
10      Q.  Meaning that other than having a Sears
11 Repair employee go to the person's house and
12 make the assessment that it can't be repaired,
13 or having the customer bring the product into a
14 physical location, a Sears store or whatever, is
15 there any other way that Sears could cancel
16 under that provision?
17      MS. BRUNO:  Paragraph 14 or the
18 sentence?
19      MR. DEVITO:  The sentence about Sears
20 Repair or its representatives determining it
21 "cannot service or repair your covered product."
22      THE WITNESS:  May I recap the question
23 back to him to see if I understand or should I
24 ask for clarification?

19  (Pages 70 to 73)

Page 74

1    MS. BRUNO: Don't you -- why don't you
2  ask for clarification.
3  BY MR. DEVITO:
4    Q. So is it possible, for example, that
5  cancellation could be done under this sentence
6  here by telephone? The customer calls and says,
7  "I want service on this," and someone on the
8  phone makes an assessment that the thing can't
9  be repaired. Is that possible?
10   **A. I've never heard of that situation**
11 **happening, no.**
12   Q. Now, it uses the word "cannot service
13 or repair" -- the words "cannot service or
14 repair."
15   Does that mean that the product
16 literally cannot be serviced or repaired?
17   **A. My understanding of that context is**
18 **that if Sears Repair cannot because of lack of**
19 **technical information or available parts.**
20   Q. That doesn't include a scenario where,
21 for example, it's not cost effective to repair
22 an item?
23   **A. That we would cancel an agreement?**
24   Q. Yes.

Page 75

1    **A. Not to my knowledge, no.**
2    Q. Can you flip back to the protection
3  agreement's coverage grid? I'm not -- I didn't
4  mark mine as to what number it is.
5    **A. 7?**
6    Q. 7? That what we're looking at?
7    MS. BRUNO: Yes.
8    THE WITNESS: Okay.
9  BY MR. DEVITO:
10   Q. On there it says, in the left-hand
11 column, "Product replacement" in bold there, and
12 it says "Product replacement is covered if
13 repair cannot be completed due to unavailability
14 of functional parts or technical information."
15   So are those two reasons given there,
16 unavailability of functional parts and
17 unavailability of technical information, the
18 only -- let me strike that question. I've got
19 to make sure I understand it first.
20   Okay. So if a repair can't be
21 completed because of either, 1, unavailability
22 of functional parts, or 2, unavailability of
23 technical information, that's not a reason why
24 Sears can cancel an MPA, right?

Page 76

1    **A. On a covered product, correct.**
2    Q. So in that situation, they'd have to
3  provide a replacement product; is that right?
4    **A. We would -- we would provide a**
5  **replacement authorization, yes. It's up to the**
6  **customer to fulfill.**
7    Q. I think we discussed some possible
8  scenarios under this earlier, but other than the
9  two things listed here, unavailability of
10 functional parts and unavailability of technical
11 information, what are the other reasons why
12 Sears might determine it cannot service an item
13 and therefore it would cancel?
14   **A. Um... remote location. There have been**
15 **instances where a customer lives in one of those**
16 **places you have to fly a seaplane to in Alaska**
17 **to get to their cabin. We're not going to put a**
18 **technician on a plane to come service your**
19 **refrigerator. So if somehow they had bought**
20 **coverage and moved that product there, we would**
21 **offer them a cancellation because we're not**
22 **going to be able to go there to service it, for**
23 **example.**
24   Q. Okay. In the situation you just

Page 77

1  described, would that be a situation where --
2    **A. Or even --**
3    Q. -- where the customer had moved during
4  the duration of the MPA?
5    **A. Potentially. If they moved out of**
6  **country.**
7    Q. But is it possible that they just lived
8  in a remote location and bought an MPA?
9    MS. BRUNO: I'm just going to object as
10 to form.
11   But if you're following, you can
12 answer.
13   THE WITNESS: It's possible.
14 BY MR. DEVITO:
15   Q. Do you know whether that's ever
16 happened?
17   **A. I don't know of a specific example.**
18   Q. Now, you described earlier what I might
19 call sort of crazy customer scenarios, where
20 they won't lock the dogs up or they're
21 threatening a technician.
22   **A. Okay.**
23   Q. Can you think of other -- any other
24 reasons why Sears might determine it can't

Page 78

1   service an item other than the ones you've
2   described?
3       **A.  If the product is no longer accessible**
4   **and the customer's unwilling to resolve that, so**
5   **the furnace has been drywalled in and would**
6   **require the demolition of building material to**
7   **get to the furnace to repair it, we're going to**
8   **say we can't cover that unless -- if you would**
9   **like to remove that wall, we'll be happy to fix**
10  **it, but otherwise, we're going to have to**
11  **decline to repair it because we're not going to**
12  **be responsible for the reconstruction of that**
13  **wall that you built after the furnace was**
14  **installed.  That would be another example.**
15      Q.  So I think we marked this as 8, the
16  document that says "Service Fulfillment:
17  In-Home Providing Service" at the top?
18      **A.  The covered/not covered?**
19      Q.  Yes.
20      **A.  Yeah, that's 8.**
21      Q.  Okay.  If you could turn back to that,
22  please.
23      **A.  Okay.**
24      Q.  If Sears decides something is not

Page 79

1   covered for one of the reasons listed there,
2   what does it do?
3       MS. BRUNO:  Objection as to form.
4   BY MR. DEVITO:
5       Q.  With the customer, what does it do --
6   what does it tell the customer?
7       MS. BRUNO:  Objection as to form.
8       But you can answer.
9       THE WITNESS:  I think it depends on
10  what is not covered.
11  BY MR. DEVITO:
12      Q.  Okay.  Well --
13      **A.  Could I have a more specific --**
14      Q.  Well, let's take No. 8, for example, on
15  the second page, "Owner Negligence."
16      **A.  Okay.**
17      Q.  If Sears has determined that the repair
18  isn't covered due to owner negligence, what does
19  it -- what does it do?
20      **A.  "It" being Sears?**
21      Q.  Sears, yeah.
22      **A.  We would -- in most instances, we would**
23  **provide a paid repair estimate to the customer**
24  **so that the customer could pay out of pocket to**

Page 80

1   **have the noncovered repair resolved to get their**
2   **product back up and running and the contract**
3   **stays in force.**
4       Q.  Does Sears give the customer a written
5   explanation of why it believes the repair isn't
6   covered?
7       MS. BRUNO:  Objection as to form.
8       THE WITNESS:  Not to my knowledge.
9   BY MR. DEVITO:
10      Q.  So Sears -- I'm trying to get a sense
11  of how this unfolds.  The technician says:  I
12  think this thing is screwed up because you
13  failed to follow the owner's manual guidelines
14  and so we're not going to repair it.
15      Is that all that has -- and then the
16  customer just has to live with that; is that
17  fair?
18      MS. BRUNO:  I'm just going to object to
19  form.
20      You can answer.
21      THE WITNESS:  The majority of the
22  cases, it -- yeah, it's a conversation.  It's
23  the lint trap on your dryer has a quilt in there
24  because you've never cleaned out the lint trap

Page 81

1   and so that caused this chain of events and this
2   malfunction with the dryer.  The technician will
3   quite literally coach the customer on the proper
4   way to care for that dryer, recycle, clean out
5   the lint trap.  So to fix whatever has gone
6   wrong as a result of that lint trap being, you
7   know, overly full, here's what it would cost and
8   then your protection agreement remains in force,
9   of course.
10      But I don't know of ever -- I don't
11  know that I've ever seen any kind of, you know,
12  printout or tear-off that we would hand the
13  customer to explain that.
14  BY MR. DEVITO:
15      Q.  And that kind of a determination is
16  made by the technician?
17      MS. BRUNO:  I'm just going to object to
18  form.
19      But you can answer.
20  BY MR. DEVITO:
21      Q.  The determination that the repair is
22  not covered due to, for example, owner
23  negligence, that determination would be made by
24  the repair technician?

21  (Pages 78 to 81)

Page 82

1    **A. Yes.**
2    Q. So I want to ask you a few questions
3 about the pricing of MPAs.
4    **A. Okay.**
5    Q. How does Sears determine what it
6 charges for an MPA?
7    **A. There's a variety of factors involved.**
8 **It would be — on point-of-sale protection**
9 **agreements, we would consider the purchase price**
10 **of a product, we would consider the competitors**
11 **in the marketplace, and we would price it at a**
12 **spot that we feel makes us the most — most**
13 **profit, the balance between a high margin on a**
14 **few contracts and a low margin on lots of**
15 **contracts and try to pick that sweet spot that**
16 **gives the company the best returns.**
17    Q. And how about for post-point of sale?
18    **A. Almost identical with the exception of**
19 **the ratio of PA price to merchandise price.**
20 **Electronics, for example, change in price very**
21 **quickly. You know, a 40-inch TV was really**
22 **expensive when they were new. Now you can buy**
23 **them at 7-Eleven. So the retail price means**
24 **less in the aftermarket. We look at what our —**

Page 83

1 **what the rest of the marketplace is doing so we**
2 **can remain competitive and try to find that**
3 **balance between volume and margin.**
4    Q. Is the age of the product taken into
5 account?
6    **A. Yes.**
7    Q. Is the cost of the repairs for a
8 particular product taken into account?
9    **A. Yes.**
10    Q. Is the cost of a replacement product
11 taken into account?
12    **A. Yes.**
13    Q. And is there a written list or matrix
14 that sets out the prices?
15    MS. BRUNO: Objection as to form.
16    You can answer.
17    THE WITNESS: Not that's accessible to
18 the average — certainly not to the associates.
19 There is no price list for the call center
20 agents and not even one that's readily available
21 to most of the team. It's stored in a, you
22 know, software program that looks at the
23 variables that determine pricing and returns it
24 for that particular customer's quote.

Page 84

1 BY MR. DEVITO:
2    Q. But the prices exists somewhere --
3    **A. Yes.**
4    Q. -- for every single --
5    **A. Sorry.**
6    Q. -- type of product that could be
7 covered?
8    **A. Yes.**
9    Q. So such a list does exist, right?
10    MS. BRUNO: Objection as to form.
11    You can answer if you know.
12    THE WITNESS: I wouldn't describe it as
13 a list, but yes, there's set prices that are
14 stored and saved in our -- maintained.
15 BY MR. DEVITO:
16    Q. And for a customer who is purchasing an
17 aftermarket MPA on a handful of products, is the
18 MPA priced on a per-product basis?
19    **A. Yes.**
20    Q. Does the customer receive the
21 per-product pricing?
22    MS. BRUNO: Objection as to form.
23    You can answer if you know.
24    THE WITNESS: It would be discussed by

Page 85

1 telephone, but the paperwork we send the
2 customer would not break down the individual
3 prices.
4 BY MR. DEVITO:
5    Q. When you say "it would be discussed by
6 telephone," is there a policy that says Sears
7 has to, on one of these calls, explain to the
8 customer this product is going to cost you X,
9 this product is going to cost you Y? Does that
10 always happen?
11    **A. No.**
12    MS. BRUNO: Just going to object to
13 form.
14    THE WITNESS: Oh.
15    MS. BRUNO: Your answer can stand.
16    THE WITNESS: Sorry. I'll slow down.
17 BY MR. DEVITO:
18    Q. So other than the total price, is there
19 anything that's -- any pricing information that
20 is communicated to the customer in writing?
21    **A. No.**
22    Q. And who -- who at Sears is responsible
23 for setting prices?
24    MS. BRUNO: Objection.

22 (Pages 82 to 85)

Page 86

1    You can answer if you know.
2        THE WITNESS: It's --
3    BY MR. DEVITO:
4    Q. Let me ask the question more clearly.
5        Who's -- who at Sears is responsible
6    for setting the prices for an MPA with respect
7    to particular products?
8        MS. BRUNO: Same objection.
9        You can answer if you know.
10       THE WITNESS: The product manager would
11   build the price recommendation, and then it
12   would be approved by Katrina and Gary and --
13   BY MR. DEVITO:
14   Q. And the product manager is Ashly Jobin?
15   A. Yes.
16   Q. And was Ashly Jobin the product manager
17   2010 to 2015?
18   A. No.
19   Q. Who was that?
20   A. It didn't exist in this exact structure
21   in 2010. So before Ashly, Demi was the product
22   manager -- I'm sorry -- yeah, before Ashly, Demi
23   was the product manager and she was the -- Demi
24   was the inaugural product manager to have that

Page 87

1    exact pricing responsibility for the protection
2    agreement. Prior to that, it was a pricing
3    manager or underwriting manager that would build
4    pricing recommendations and present to Katrina
5    and Gary.
6    Q. I see on the org chart, there's someone
7    named Earnestine Miller, PA pricing specialist.
8        Is she involved in this pricing
9    process?
10   A. In -- yes. She's more of a data entry
11   clerk than any kind of ownership or strategic
12   decision-making level.
13   Q. Could you tell me what an MPA
14   certificate is?
15   A. It's the proof of purchase that we
16   snail mail or e-mail to a customer when they
17   either request a reprint or at time of purchase
18   that we send to them that indicates what's
19   covered, until when, and includes the terms and
20   conditions on the back.
21   Q. Does Sears maintain copies of all the
22   MPA certificates that it has issued?
23   A. At the customer level?
24   Q. Well, you tell me. As opposed to what

Page 88

1    other level?
2        MS. BRUNO: Objection as to form.
3    BY MR. DEVITO:
4    Q. I think, yes, is what I'm asking, at
5    the customer level.
6    A. Okay. No, we don't. If we've changed
7    the format over the years, we probably have an
8    old copy of that somewhere, but no, we don't
9    maintain an archival of Customer Jones got
10   certificate number on such and such a day, so
11   send one to them or put it on in the file
12   cabinet or store it on the hard drive. We don't
13   keep it that way.
14   Q. So how do you keep a record of what
15   MPAs have been sold to particular customers?
16   A. We have a data warehouse. At my level,
17   I would use a system called MPS to look up a
18   customer by phone number or name and address,
19   and it would show me on the screen the
20   agreements that they've purchased and their
21   status: Expired, active.
22   Q. When a customer calls up and asks for
23   service with respect to a particular product,
24   does someone make a check of a system to see

Page 89

1    whether that product is on an MPA?
2    A. The system prompts the service order
3    type to be created, whether it's a collect call
4    or a PA call, yes.
5    Q. What's a collect call?
6    A. The customer's going to have to pay out
7    of pocket because they have no coverage on that
8    item. So I need my refrigerator fixed, I'd like
9    Sears to come out and work on it.
10       We say: Okay. We'll come out and for
11   $89, we'll tell you what's wrong and that will
12   go towards the repair if you opt. Yes, let's do
13   it.
14   Q. So they're just calling Sears for
15   service on something they own?
16   A. Right. Right.
17   Q. But it has nothing to do with the
18   protection agreements?
19   A. Right. But when it's a PA-covered item
20   and the call center agent is creating a service
21   order, it will show that it's a PA-covered item.
22   So we would not discuss the minimum service
23   charge and so forth with the customer. We would
24   say: Yeah, we'll be right out.

23  (Pages 86 to 89)

Page 90

1     Q. Are there ever conflicts between the
2  customer and Sears concerning whether or not a
3  product is covered on an MPA?
4     A. Yes.
5     Q. And how do you resolve those?
6     MS. BRUNO: Objection as to form.
7     You can answer.
8     THE WITNESS: It completely depends on
9  the scenario. I mean, it could be that the
10  customer has multiple phone numbers, so we're
11  simply not looking in the right file. You've
12  got a house here, and you've got one out in the
13  suburbs. It could be for some reason your
14  coverage didn't get from the retail point of
15  purchase into the aftermarket computer system.
16  It just -- it fell out. Exceedingly rare, but
17  it can happen.
18     Customer confusion: I thought I had
19  covered it. Maybe I didn't. Oh, I'm calling
20  Sears. I thought I had coverage with Sears.
21  Maybe I have coverage with Acme. That's a
22  really long list of scenarios that can exist,
23  and that's why we have those inbound call
24  centers to resolve.

Page 91

1  BY MR. DEVITO:
2     Q. Are there ever scenarios in which the
3  customer has a certificate with a product listed
4  on it that Sears doesn't believe is -- has
5  coverage?
6     MS. BRUNO: Objection as to form.
7     You can answer.
8     THE WITNESS: I don't think I
9  understand the scenario.
10  BY MR. DEVITO:
11     Q. Well, just because Sears doesn't
12  maintain actual physical certificates, I'm just
13  wondering whether there's -- you're aware of any
14  scenario in which the customer says: No, I'm
15  looking at my certificate. It says I've got
16  coverage for X product. And the Sears person is
17  saying: No. I'm looking at our computer
18  system, and it says you don't have coverage for
19  that product.
20     Does that ever happen to your
21  knowledge?
22     A. Yes.
23     Q. And how -- if you know, how did that
24  happen?

Page 92

1     A. The most common would be the customer
2  canceled the protection agreement but they still
3  have the certificate. So they call us and think
4  they have coverage because they forgot -- forgot
5  or they chose (gesturing) to forget that they
6  canceled it, and we would remind them: Oh, on
7  such and such a day, we refunded X dollars to
8  the Visa ending in 1234. So that contract is no
9  longer valid because you've already been
10  refunded for it.
11     Q. Has there ever been a scenario in which
12  the customer was right about whether or not the
13  coverage existed and Sears was wrong?
14     A. The way you're describing that
15  question, no, not to my knowledge.
16     Q. The way you put the caveat on your
17  answer suggested that if I described it
18  differently, you might have a different answer.
19  What were you thinking of there?
20     A. Just those finding the right file
21  situations, where if the customer's got a
22  certificate and they had moved, so now we're
23  looking in the wrong file, but I've never come
24  across a scenario where our warehouse -- our

Page 93

1  data warehouse lost records. It's usually just
2  a matter of finding the right customer
3  agreement.
4     Q. The MPA certificates, are they -- other
5  than the listing of the particular products on
6  them, are they ever modified for particular
7  customers?
8     MS. BRUNO: Your question being the
9  actual certificate?
10     MR. DEVITO: Yes.
11     THE WITNESS: I don't -- I don't
12  understand the question.
13  BY MR. DEVITO:
14     Q. Meaning can a customer say, you know,
15  "I don't like this provision in here; would you
16  take it out," for example?
17     A. They could ask, but we've never done
18  that to my knowledge.
19     Q. So the -- I think the answer, then, to
20  my question is "no," that -- or the MPA
21  certificates are not modified on a particular --
22  on a customer-by-customer basis?
23     A. The terms and conditions, no.
24     Q. So other than the information

Thompson Court Reporters, Inc
(312) 421-3377

Page 94

1  identifying the customer and identifying the
2  products that are covered by the MPA, is there
3  anything else on those certificates that could
4  vary?
5    **A. No.**
6    Q. In other words, they're not negotiable
7  by the customer in any way?
8    **A. Correct, they are not.**
9    Q. Now, we went over a little bit earlier
10  about different versions of the MPA that have
11  been used by Sears. There's the version that
12  we're -- we were looking at in Exhibit 9.
13  That's from 2010, and you said that there were
14  two others subsequent, 2013 and 2015.
15    Do you know of, in your time working at
16  Sears, how many other versions of the document
17  there have been?
18    **A. Best guess would be ten, over twenty**
19  **years that I've been there, but that's not**
20  **something I've ever kept an accurate count on.**
21    Q. And other than the 2013 and 2015
22  versions which you talked about, did you have
23  any input regarding the terms of any of the
24  other MPAs?

Page 95

1    **A. Prior to 2010?**
2    Q. Prior to 2013. If you had input into
3  the 2010 version, tell me.
4    **A. Um... (reviewing document.)**
5    **No and no. No on 2010, and no on**
6  **prior.**
7    Q. And who at Sears is responsible for the
8  language used in the MPA?
9    MS. BRUNO: I'm just going to object as
10  to form.
11    You can answer if you know.
12    THE WITNESS: It's a team of people.
13  So "responsible" can be a tricky question, but I
14  would say the person most responsible is Sheila
15  Dunaway.
16  BY MR. DEVITO:
17    Q. And who is she?
18    **A. I call her our lawyer, but I don't**
19  **think that's at all close to the right term.**
20  **She is the manager of service contracts**
21  **administration. She's third from -- or fourth**
22  **from the left.**
23    Q. Is she a lawyer?
24    **A. No. But she's most directly**

Page 96

1  **responsible for the wording and verbiage of the**
2  **terms and conditions.**
3    Q. Now, if you'll look at Section 2 of
4  the -- I'm sorry -- of, I guess, Exhibit 9 --
5  we're still on there.
6    **A. Okay.**
7    Q. -- which describes eligibility for
8  coverage, it says "You represent that the
9  products listed on the reverse side --
10  product(s) listed on the reverse side is in
11  proper operating condition at the start of
12  coverage and the information related to 'Date
13  Purchased' is correct."
14    And we had talked a little about this
15  earlier, but is there any effort made to verify
16  condition before issuing an MPA?
17    **A. We ask the customer if it's in good**
18  **working order.**
19    Q. Other than asking the customer, is
20  there any effort made to verify the condition?
21    **A. No.**
22    Q. Now -- and there have been instances in
23  which coverage ultimately is denied because it's
24  determined that a product was not in proper

Page 97

1  operating condition at the outset of the
2  contract, right?
3    **A. Yes.**
4    Q. And does Sears have a record of those
5  instances?
6    **A. (No response.)**
7    Q. How would those instances be tracked if
8  at all?
9    MS. BRUNO: I'm just going to object as
10  to form.
11    You can answer if you know.
12    THE WITNESS: I don't know of any
13  report or system that we currently use or have
14  used to track that specific scenario.
15  BY MR. DEVITO:
16    Q. Is there a record more generally of
17  instances in which coverage is denied?
18    MS. BRUNO: I'm just going to object as
19  to form.
20    You can answer.
21    THE WITNESS: The closest would be that
22  we canceled the protection agreement and we used
23  the reason code "Technician requested" would be
24  an indicator in that direction, but it's not

Thompson Court Reporters, Inc
(312) 421-3377

Page 98

1  specific to good working order.
2  BY MR. DEVITO:
3     Q. And how about confirming the date
4  purchased, what does Sears do to confirm the
5  date purchased?
6     A. We ask the customer how old the product
7  is.
8     Q. Depending on the age of the product,
9  it's certainly possible that the customer
10 doesn't accurately remember the -- how old the
11 product is; is that fair?
12    A. I don't understand. You want me to
13 speculate whether or not a customer is -- would
14 know?
15    Q. Well, no. Let me rephrase the
16 question.
17    A. Okay.
18    Q. Are you aware of situations in which
19 the customer gave you an incorrect date as to
20 when they purchased a product?
21    A. It's happened, yeah.
22    Q. And if -- does Sears have to determine
23 that the customer did that intentionally in
24 order to cancel the contract, like that the

Page 99

1  customer had lied about how old the product was?
2     A. No.
3     Q. So if they just misremembered, you
4  know, when they bought the product because the
5  repair technician goes out and sees that the
6  thing is three years older than they were told
7  it was, is that a reason why Sears would cancel
8  coverage?
9     MS. BRUNO: I'm just going to object to
10 form.
11    You can answer if you can.
12    THE WITNESS: Yes.
13 BY MR. DEVITO:
14    Q. Now, Section 2 also says there, "We
15 reserve the right to inspect the product listed
16 on the reverse side to determine eligibility for
17 coverage."
18    I think I understand your testimony to
19 be that Sears doesn't inspect the products prior
20 to issuing an MPA; is that right?
21    A. That's correct.
22    Q. Are you aware of any instances in which
23 Sears has done an inspection prior to issuing an
24 MPA?

Page 100

1     A. No.
2     Q. When a customer makes a call for
3  service and a technician goes out there to their
4  home, does -- and let's say that this customer
5  has multiple items on an MPA. Will the
6  technician then inspect everything that's on the
7  MPA?
8     A. No.
9     MR. DEVITO: Switching gears here. Do
10 you want to take another break?
11    MS. BRUNO: Sure. Yeah. You want take
12 another -- it's 11:42. Do you want to break for
13 lunch or do you want to go for a while and then
14 have lunch? I think we're okay either way.
15    I'm not speaking for you but --
16    THE WITNESS: That's okay.
17    MR. DEVITO: I would prefer to go a
18 little longer and then take lunch.
19    MS. BRUNO: Let's do that. Yeah.
20    MR. DEVITO: So if we could just take
21 five and then I'll go for another half hour,
22 45 minutes and then we'll take lunch.
23    MS. BRUNO: That's good.
24

Page 101

1     (Recess taken from 11:42 a.m.
2        to 11:52 a.m.)
3     (Exhibit 10 was marked for
4        ID.)
5  BY MR. DEVITO:
6     Q. So you've been handed what's been
7  marked as Exhibit 10 and I'll -- the Bates
8  number on the first page in the document is
9  SEARS 2639. I'll just state that I included
10 here the table of contents and then various
11 excerpts from the document. It's a very lengthy
12 document.
13    Are you familiar with this document?
14    A. Yes.
15    MS. BRUNO: And by that you mean the
16 Facilitator Guide, not what you've put in front
17 of him with the excerpts?
18    MR. DEVITO: Not the excerpts, yes.
19 BY MR. DEVITO:
20    Q. Generally speaking, the title of the
21 document is "National Inbound Sales NHT
22 Facilitator Guide." Are you familiar with that?
23    A. Yes.
24    Q. What generally does this document

26  (Pages 98 to 101)

Page 102

1    contain?
2        A. It would be used as our training guide
3    for newly hired inbound customer service and
4    sales representatives. So it would contain the
5    policy and procedures of administering a
6    protection agreement, selling it, renewing it,
7    those kind of things.
8        Q. How often is this document updated?
9        MS. BRUNO: Objection as to form.
10       You can answer if you know.
11       THE WITNESS: As needed. It probably
12   gets a major rewrite every couple of years with
13   appendixes added as needed when policies change
14   or things are added.
15   BY MR. DEVITO:
16       Q. Do you know if this is the most current
17   version?
18       A. It's the most current version of the
19   complete facilitator guide. There might be some
20   add-on that isn't here.
21       Q. I guess therein lies the difficulty of
22   not bringing the whole document, but I didn't
23   want to put in 1,300 pages into the record.
24       But when you say "that isn't here" --

Page 103

1        A. This is the most current document that
2    we use to train new associates.
3        Q. Okay. So yeah, my -- perhaps the most
4    accurate question is: Is the August 15th, 2011
5    facilitator guide still the one you're using?
6        A. Yes.
7        Q. When it says National Inbound Sales
8    NHT, what does that mean? What does the NHT
9    mean?
10       A. New hire training.
11       Q. If you could flip to page 74, which is
12   the first page I've included after the table of
13   contents, there it says "Customer Care
14   Network/Home Services Call Center." What's that
15   referring to?
16       A. The sum of the Sears call centers that
17   handle both protection agreement phone calls,
18   the six call centers that we've been talking
19   about this morning, and then additionally the
20   call centers that handle scheduling of
21   dispatching repair technician.
22       Q. And then below that, about halfway or
23   so down the page, it says "Rapid
24   Resolution (RR)." What is that?

Page 104

1        A. When a customer -- it's a specialized
2    team within that repair scheduling group, that
3    when a customer has a covered product, we will
4    attempt to do some easy triage of the product
5    over the phone to see if we can help get the
6    customer's product up and running immediately
7    for them rather than having them have to wait
8    for a technician to come out.
9        So a silly example would be: Did you
10   check the circuit breaker?
11       Oh, it's working now. Thanks. Never
12   mind.
13       Then the customer doesn't have to wait
14   for the tech to come out and do that.
15       Q. Now, is rapid resolution used in all
16   cases where you have someone with a covered
17   product under an MPA or you'd -- it's based
18   specifically to the problem that the customer's
19   identified?
20       A. It's product-specific, but it's not
21   problem-specific, no. So they're calling from
22   their home phone and they've indicated through
23   our automated system that they need repair on
24   their refrigerator. Our system would see that

Page 105

1    that refrigerator is covered and route that call
2    to a rapid resolution agent.
3        Q. Okay. So there's an automated system
4    that directs particular calls into this rapid
5    resolution system?
6        A. Yes.
7        Q. And is there a particular call center
8    that's associated with rapid resolution?
9        A. Not a single one, no. It's spread out
10   across a few.
11       Q. Okay. Are there particular individuals
12   that are responsible for that?
13       A. Yes.
14       Q. So there are customer service
15   representatives that all they do is rapid
16   resolution calls?
17       A. Yes.
18       Q. Now, if you flip to the next page, it's
19   on -- it's double-sided, so page 75. At the top
20   there, it says "Customer Solutions." And what
21   is that?
22       A. It's a variety of teams that handle
23   escalated calls.
24       Q. What teams fit within that?

27 (Pages 102 to 105)

Thompson Court Reporters, Inc
(312) 421-3377

Page 106

1    MS. BRUNO: I'm just going to object to
2    the form.
3    You can answer if you know.
4    THE WITNESS: (Reviewing document.)
5    For example, in the service contracts
6    group, the Master Protection Agreement, that
7    would be the PABA, so the benefits
8    administration. So they'd have the ability to
9    open a case and do investigations into whether
10   or not we've lived up to our end of the
11   contract.
12   That's the most common example of an
13   escalated complaint. Customer thinks this
14   should be covered and I want you guys to fix it
15   under the protection agreement, and there's some
16   back and forth as to whether or not it's part of
17   our terms and conditions.
18   So it would be escalated to that PABA
19   group. It's described further down also. That
20   would be our service -- the customer solutions.
21   The "Retail" and the "HIPS," I'm not as familiar
22   with those. So I couldn't describe them.
23   BY MR. DEVITO:
24   Q. So you said -- you used the words "a

Page 107

1    variety of teams" and I'm -- are you just
2    referring to what it says below, "Customer
3    Solutions, Retail, Service Contracts, HIPS"? Is
4    that what you meant when you said "a variety of
5    teams"?
6    A. Yes.
7    Q. Is customer solution different than
8    rapid resolution?
9    A. Yes.
10   Q. And I think you -- so you've indicated
11   that some kind of escalation is required to get
12   into customer solutions; is that right?
13   A. Not all the time, but yeah, I -- they
14   handle some front line product -- contract
15   fulfillment, like food loss reimbursement, but
16   they also handle escalated calls.
17   Q. And what -- how does Sears define an
18   escalated call?
19   MS. BRUNO: Objection as to form.
20   You can answer if you know.
21   THE WITNESS: I don't think we've ever
22   defined that, but it's where the front line
23   agent, the national inbound sales associate
24   isn't able to help the customer answer their

Page 108

1    questions or give them a satisfactory outcome,
2    so whether it's -- I mean, let me get you over
3    to our benefits administration team and see if
4    they could help you further.
5    BY MR. DEVITO:
6    Q. And this could be because the customer
7    service representative who took the call doesn't
8    know how to answer it or because the customer
9    says, you know, I don't like what you're telling
10   me, get me somebody else or -- those are things
11   that would fit within -- that would get a
12   situation escalated to customer solutions?
13   MS. BRUNO: Just objection as to form.
14   You can answer.
15   THE WITNESS: Yeah, I would say those
16   would be good examples.
17   BY MR. DEVITO:
18   Q. And what is PABA, you referred to
19   earlier?
20   A. That's the protection agreement
21   benefits administration team. They are an
22   inbound group that handles calls from customers
23   who are looking for fulfillment of the terms and
24   conditions. So some of the call types would

Page 109

1    include food loss reimbursement, no lemon
2    guarantee qualification, general replacement
3    authorization, those kind of things.
4    Q. And that's a dedicated group of
5    employees that only does that sort of work?
6    A. Yes.
7    Q. Now, moving down the page, it says
8    "Service Contracts." And then it says --
9    there's a PABA team within service contracts.
10   Is that different than the PABA team in customer
11   solutions?
12   A. No, same thing, same team.
13   Q. Now, if you look at the two things that
14   we have just been discussing, under "Customer
15   Solutions" that says the PABA group and then it
16   gives description of what they do, "Handles
17   calls from customers concerning protection
18   agreements and policy reimbursements."
19   And then if you look to the description
20   under "Service Contract," it says "Handles calls
21   from customers concerning protection agreement
22   fulfillment and policy reimbursements."
23   Is there any difference between those
24   two other than the -- I don't mean literally.

Thompson Court Reporters, Inc
(312) 421-3377

Page 110

1 There's a one-word difference.
2     **A. The "fulfillment."**
3     Q. Right. Is there anything that is
4 supposed to be conveyed differently between
5 those two sentences?
6     MS. BRUNO: Objection as to form.
7     You can answer if you understand.
8     THE WITNESS: From my experience within
9 the team, no, there's no difference. I don't
10 know why that extra word is down below and not
11 up above. To me, it doesn't have any meaning or
12 value to differentiate a PABA customer solution
13 group from a PABA service contracts group
14 because there isn't any difference. It's the
15 same team.
16 BY MR. DEVITO:
17     Q. And then below that it says "Email
18 Team." And under PABA -- there's another PABA
19 group under there and it says "Customer
20 complaints or concerns." And is that a
21 different group of people?
22     **A. It's not a different group of people.**
23 **It may be a subset of the PABA group that's been**
24 **trained to specialize in e-mail correspondence.**

Page 111

1 **I haven't talked with Mark and team recently to**
2 **find out exactly how they divvy up that**
3 **workload, but it would be a PABA advisor that**
4 **would be handling that those e-mail**
5 **communications as well.**
6     Q. And so this is -- these are e-mails
7 that are coming in from customers with respect
8 to protection agreements?
9     **A. Yeah.**
10     Q. Where do those e-mails come from?
11     MS. BRUNO: Objection as to form.
12     You can answer if you know.
13 BY MR. DEVITO:
14     Q. Well, that's a bad question.
15     How does Sears receive those e-mails?
16     **A. Typically, the customer has either**
17 **replied to some random e-mail that they got from**
18 **Sears, whether it was about protection**
19 **agreements or not, or they've gone on to**
20 **Sears.com and clicked on "Contact us" and it's**
21 **gone -- you know, it comes to the corporate**
22 **e-mail team, who then filters out the work based**
23 **on this is a retail question, this is a service**
24 **contracts question, and they kind of send it**

Page 112

1 **down the rate path so that an expert in the**
2 **field can respond to the customer.**
3     Q. So there's a sort of general Sears
4 e-mail that you can find through the website
5 that's getting all these kinds of questions that
6 are then being routed; is that right?
7     **A. I think so. I mean, the last time I**
8 **was on Sears.com, there was -- yeah, there was a**
9 **"Contact us" and you could fill in the form. I**
10 **don't know that that's an e-mail or how that's**
11 **technically, you know, called, but for all**
12 **intents and purposes, yeah.**
13     Q. And so there's a -- I presume a team of
14 people that are -- that's monitoring that e-mail
15 address and routing e-mails to particular
16 divisions of Sears?
17     MS. BRUNO: I'm just going to object to
18 form.
19     You can answer if you know.
20     THE WITNESS: Yeah.
21 BY MR. DEVITO:
22     Q. Is there an e-mail address that's
23 specific to protection agreements?
24     **A. No.**

Page 113

1     Q. So these e-mail teams that we're
2 talking about here are getting e-mails either
3 from this generic Sears e-mail address that
4 we've been talking about or from a reply to some
5 kind of Sears-initiated e-mail.
6     Is there any other way for e-mails to
7 get to these people on the e-mail team?
8     MS. BRUNO: I'm just going to object to
9 form.
10     You can answer if you know.
11     THE WITNESS: Probably, but I don't
12 know a specific -- I can't say that there isn't,
13 but I'm not close to that process to say these
14 are -- this is every scenario that they've ever
15 received an e-mail under.
16 BY MR. DEVITO:
17     Q. Do the people on the Sears e-mail team,
18 like, respond directly to customers and then a
19 customer then a year later could have a problem
20 and just write back to that same e-mail? Is
21 that something that could happen?
22     MS. BRUNO: Objection as to form.
23     You can answer if you know.
24     THE WITNESS: It shouldn't, no.

29 (Pages 110 to 113)

Page 114

1　BY MR. DEVITO:
2　　Q. So the e-mails that go back to the
3　customer are going through some sort of
4　centralized Sears e-mail?
5　　**A. If we reply, yes.**
6　　Q. Do you know the address for the -- this
7　generic Sears e-mail that we're talking about?
8　　　MS. BRUNO: I'm just objecting to form.
9　　You can answer if you know.
10　　THE WITNESS: No, not by heart.
11　BY MR. DEVITO:
12　　Q. Do you know how many people are on this
13　e-mail team?
14　　**A. I don't know.**
15　　Q. If you could flip one full page, sort
16　of two pages to page 120, I will give the Bates
17　number for that is SEARS 2758.
18　　And on that page it is discussing
19　"serviceable merchandise." How does Sears
20　define what is meant by "serviceable
21　merchandise"?
22　　**A. Generally speaking, it's merchandise**
23　**that our technicians are trained to repair. We**
24　**have a source for replacement parts and a source**

Page 115

1　**for technical repair material.**
2　　Q. Could you explain what you meant by
3　both of those things? So you have a source for
4　replacement parts? That just means that Sears
5　has the ability to find replacement parts?
6　　**A. Yes.**
7　　Q. I'd like to try to dig a little deeper
8　into that. I mean, you have -- does Sears have
9　an established source for replacement parts?
10　I'm just trying to get an understanding of sort
11　of to what extent that means the parts are --
12　you know, can be found somewhere in the world or
13　the parts are sitting in a warehouse that Sears
14　owns or what does that mean?
15　　**A. I'm not directly involved in the parts**
16　**supply chain. I can speak to my knowledge of**
17　**it, which is we attempt to have relationships**
18　**with original equipment manufacturers to buy**
19　**parts from them. I don't know of a -- I'm**
20　**assuming there are third-party parts builders**
21　**and suppliers that we buy from. I don't know**
22　**any of them by name, and in some situations, we**
23　**will attempt to find them on the open market.**
24　**We have a team of people who try to -- in order**

Page 116

1　**to fulfill a repair, will try to find a part.**
2　　Q. And other than the availability of
3　replacement parts, what was the other component
4　of that?
5　　**A. Technical information, the schematics**
6　**and training, so a tech would know what to do.**
7　　Q. And that definition that you just gave
8　me is -- is that defined in the MPA?
9　　　MS. BRUNO: Objection as to form.
10　　THE WITNESS: I don't understand the
11　question.
12　BY MR. DEVITO:
13　　Q. Well, where are you getting that
14　definition from of "serviceable merchandise"?
15　　**A. Experience in the business. That's**
16　**not -- it's not defined in the protection**
17　**agreement, because we wouldn't have covered the**
18　**item if it wasn't what we thought was**
19　**serviceable merchandise. We don't have a**
20　**merchandise code for swing sets, so we've never**
21　**defined serviceable merchandise to the consumer.**
22　　Q. Does serviceable merchandise have a
23　brand element to it?
24　　**A. For protection agreement coverage, yes.**

Page 117

1　　Q. And so what -- could you explain that
2　to me?
3　　**A. In the Sears world, we will attempt to**
4　**repair things on collect call that we don't**
5　**necessarily enter into a protection agreement**
6　**on. So for protection agreement coverage, yes,**
7　**brand is an element.**
8　　Q. This definition of serviceable
9　merchandise that you're operating with and that
10　you gave to me, is that written down anywhere?
11　　**A. Not to my knowledge.**
12　　Q. So it's basically just your
13　understanding based on years of working at
14　Sears?
15　　**A. Yes.**
16　　Q. Does everyone at Sears have that same
17　understanding?
18　　　MS. BRUNO: Objection as to form.
19　BY MR. DEVITO:
20　　Q. I mean, how -- is --
21　　**A. In my --**
22　　Q. -- is it possible that other people at
23　Sears understand that concept differently?
24　　　MS. BRUNO: Same objection.

Page 118

1    THE WITNESS: I'm sure it is, yes.
2  BY MR. DEVITO:
3    Q. If you flip the page, about midway down
4  the page, there's reference to something called
5  "The PA Resource Center." What is that?
6    A. That's the intranet home page for
7  protection agreement coverage.
8    Q. And what --
9    A. Exhibit 8 came from it, for example.
10   Q. Came from it, okay.
11   A. Or is stored -- it's -- that's a screen
12  print of something that lives on the PA Resource
13  Center.
14   Q. What other kind of information is on
15  the PA Resource Center?
16   A. Products, so sample certificates of a
17  master repair, all the protection agreements we
18  sell, selling rules and guidelines, covered and
19  not covered grid and some general training
20  tools, frequently asked questions. It's a --
21  it's meant as the internal associate-facing
22  helpful tool place for administering and selling
23  and talking about and understanding protection
24  agreements.

Page 119

1    Q. And who has access to that?
2    A. Anyone within the Sears firewall.
3    Q. And who generally is using that?
4    A. Most often, it's the agents and
5  managers within the six call centers that we've
6  been talking about and also the agents and
7  managers in the customer care network call
8  centers and sometimes, to a lesser degree,
9  technicians and tech managers.
10   Q. And I assume you can, like, print out
11  any kind of information that is stored on there,
12  is that right, the same way that you generated
13  Exhibit 8?
14   MS. BRUNO: Objection as to form.
15   THE WITNESS: Sure. It's a website.
16  So it might not print all that pretty, but yeah,
17  we could print any screen we wanted.
18  BY MR. DEVITO:
19   Q. If you flip two pages to page 123,
20  which is SEARS 2761, there's reference near
21  the top under where it says "Trainer's Note" to
22  an authorized brand list -- "Authorized Brands
23  List." What is that?
24   A. That's the list of brands by product

Page 120

1  that we sell protection agreements on.
2    Q. So it's -- when you say "by product,"
3  it's a product type and then list of brands? Is
4  that what you're telling me?
5    A. Exactly.
6    Q. And what is that list used for?
7    A. Determining eligibility for PA
8  coverage.
9    Q. And then just below that, it says
10  "High-end merchandise products are on file with
11  special merchandise codes that will not price
12  via Ciboodle." What are high-end merchandise
13  products?
14   MS. BRUNO: Objection as to form.
15   You can answer.
16   THE WITNESS: More expensive products.
17  It would be the Bentley of cars. It's things
18  like a Viking range or a Sub-Zero refrigerator.
19  BY MR. DEVITO:
20   Q. And those are identified somewhere with
21  special coding? Is that what that's saying?
22   A. Yeah, the merchandise code, what we use
23  in our system would end with something close to
24  or similar to HI -- or HE -- I'm sorry -- for

Page 121

1  high end.
2    Q. What does it mean when it says
3  "High-end merchandise products"..."will not
4  price via Ciboodle"?
5    A. Ciboodle.
6    Q. Sorry.
7    A. No. It's an internal system. You
8  shouldn't know how to pronounce it. Ciboodle is
9  the desktop system that associates use to
10  retrieve and produce price quotes to customers,
11  and high-end merchandise codes are not built to
12  price in Ciboodle. So you wouldn't be able to
13  retrieve or produce pricing from the front end
14  application.
15   Q. So how would you obtain pricing for
16  high-end merchandise products?
17   A. In the aftermarket we wouldn't.
18  It's -- the high-end merchandise is sold -- if
19  it's sold at retail, we would sell coverage on
20  that item only.
21   Q. But how about if someone bought it and
22  then wanted to renew?
23   A. If it's renewable, we would use NPS,
24  which is the legacy system that lives kind of

31 (Pages 118 to 121)

Thompson Court Reporters, Inc
(312) 421-3377

Page 122

1 below Ciboodle. It's a mainframe green screen
2 old technology, but it's still the source of
3 most of our pricing and customer database.
4 Ciboodle is the more mouse-click-friendly user
5 application that the majority of the front line
6 agents use. If there were some extenuating
7 circumstance where we needed to retrieve a price
8 that Ciboodle wouldn't give us, a manager would
9 use NPS.
10    Q. And that system is still being
11 maintained?
12    A. Yes.
13    Q. What does NPS stand for, if you know?
14    A. Net -- national parts and service or
15 something like that, but I don't re- -- -- if
16 you found a screen that actually showed it on
17 there, I could be completely wrong.
18    Q. So other than these high-end
19 merchandise products that will not price via
20 Ciboodle, will all other products price via
21 Ciboodle?
22        MS. BRUNO: Objection as to form.
23        You can answer.
24        THE WITNESS: If it's an eligible

Page 123

1 product that has a price, yeah, Ciboodle would
2 return the pricing.
3 BY MR. DEVITO:
4    Q. If you flip the page, near the top,
5 sort of second full paragraph, it says "If the
6 customer has items that were not purchased from
7 Sears that may be eligible for protection
8 agreement coverage, you must first verify that
9 the brand and merchandise type is listed in the
10 non-Sears purchased merchandise list on the
11 authorized brands list before adding merchandise
12 for coverage."
13        Whose responsibility is it to verify
14 the brand and merchandise type?
15    A. The selling agent.
16    Q. And is -- that's done while they're,
17 for example, on the phone with the customer?
18    A. Yes.
19    Q. Now, there's a reference in the next
20 sentence to "The Great Indoors." What's that?
21    A. That's a retail format that catered to
22 high-end clientele.
23    Q. And that no longer exists?
24    A. Not to my knowledge. I'm pretty sure

Page 124

1 we've closed all of those.
2    Q. This document hasn't been updated to
3 reflect the closure of Great Indoors?
4    A. Correct.
5    Q. If you could flip a few pages until you
6 get to page 310 --
7    A. Okay.
8    Q. -- there it talks about "Refund or
9 Cancellation Policy." It says "If Sears'
10 refund or cancellation policy is mentioned
11 during the presentation, either by you or by the
12 customer, all material terms and conditions of
13 that policy must also be disclosed."
14        What kind of presentation is being
15 referred to there?
16    A. The sales presentation, whether it's --
17 in this context, this is specific for inbound.
18 So in that context, it's customers called us and
19 now we're talking to them about buying or
20 renewing coverage.
21    Q. Would it be different for outbound
22 sales?
23    A. No.
24    Q. So does this mean that there's no

Page 125

1 requirement that the refund or cancellation
2 policy be mentioned?
3    A. Is there no requirement that the refund
4 or cancellation policy be mentioned? Is that --
5    Q. Well, let me ask it differently. Is
6 there any requirement that the refund or
7 cancellation policy be mentioned?
8    A. No.
9    Q. If the subject of refund or
10 cancellation comes up, is this saying that the
11 sales rep has to read this little script here?
12    A. (Reviewing document.)
13        No. It's not a -- a script. If you're
14 asking does it have to be read verbatim?
15    Q. You tell me.
16    A. No, we don't require that it's read
17 verbatim. We train it as these are the -- this
18 is a sample script that you can use, especially
19 while you're new, but we want our
20 conversations -- our discussions with the
21 customer to sound conversational, so here's the
22 points that you need to hit. You need to make
23 sure that they understand they have 60 days for
24 a full refund or under labor warranty, and then

32 (Pages 122 to 125)

Thompson Court Reporters, Inc
(312) 421-3377

Page 126

1    after that it's prorated on a monthly basis.
2        That's the kind of stuff that you need
3    to disclose to them and make sure they
4    understand and answer any questions as does that
5    make sense, is that clear, and then you can move
6    on is how it would be trained and coached.
7        Q. So it's not a script, but they have to
8    communicate information that's contained in this
9    even though it's set out as a quote?
10       A. Correct.
11       Q. Now, if you read that section that's in
12   quotes there, that only discusses situations in
13   which the customer cancels the protection
14   agreement; is that right?
15       A. Yes.
16       Q. It doesn't mention Sears canceling the
17   protection agreement?
18       A. Correct.
19       Q. But Sears must consider its ability to
20   cancel the protection agreement a material term
21   of protection agreements, right?
22       MS. BRUNO: Objection as to form.
23       You can answer if you understand?
24       THE WITNESS: I don't understand.

Page 127

1    BY MR. DEVITO:
2        Q. It's an important term of protection
3    agreements that Sears has certain rights to
4    cancel, correct?
5        MS. BRUNO: Same objection.
6        THE WITNESS: It's important enough
7    that we included it on the terms and conditions,
8    if that's an answer to your question. I'm doing
9    my best here.
10   BY MR. DEVITO:
11       Q. That's fine. Sears includes it in the
12   terms and conditions presumably because it wants
13   the ability to cancel under certain -- certain
14   scenarios; isn't that right?
15       MS. BRUNO: Objection as to form.
16       THE WITNESS: That's my understanding
17   of it, yes.
18   BY MR. DEVITO:
19       Q. So I'm just wondering whether -- why it
20   doesn't say anything here about Sears' right to
21   cancel, even though it says, you know, if
22   cancellation or refund comes up, all material
23   terms and conditions of that policy must also be
24   disclosed.

Page 128

1        MS. BRUNO: So what's your question?
2    BY MR. DEVITO:
3        Q. Do you know any reason why it doesn't
4    say that there?
5        MS. BRUNO: Object as to form.
6        You can answer.
7        THE WITNESS: I don't know. I've never
8    heard it discussed of whether or not that should
9    be included or not.
10   BY MR. DEVITO:
11       Q. So even if the subject of refunds or
12   cancellation of policy comes up, the Sears
13   representative does not have to and is not
14   instructed to say anything about Sears' ability
15   to cancel the contract; is that correct?
16       MS. BRUNO: I'm just -- objection to
17   form.
18       If you understand, you can answer.
19       THE WITNESS: You lost me. I'm sorry.
20   BY MR. DEVITO:
21       Q. That's okay. This -- what we're
22   looking at here is what Sears wants its
23   representatives to tell someone when the subject
24   of refunds or cancellations comes up in the

Page 129

1    discussion, right?
2        A. Yes.
3        Q. And it doesn't mention anything about
4    Sears' ability to cancel, correct?
5        A. Agreed.
6        Q. Is that because Sears doesn't consider
7    its ability to cancel a material term of the
8    protection agreement?
9        MS. BRUNO: Objection as to form.
10       THE WITNESS: I wouldn't classify it
11   that way. We consider it a material term
12   because we include it in the terms and
13   conditions.
14   BY MR. DEVITO:
15       Q. So you -- Sears does consider it a
16   material term and condition of the agreement --
17       A. Yes.
18       Q. -- its right to cancel?
19       A. Yeah.
20       Q. In the next section, it says "No formal
21   script is included in the system because
22   cancellation should not be used as a selling
23   point."
24       Is that telling the people reading this

Thompson Court Reporters, Inc
(312) 421-3377

Page 130

1  that they're not supposed to mention
2  cancellation?
3  　　MS. BRUNO: Objection as to form,
4  document speaks for itself. If you have a
5  question for him, you can ask.
6  　　MR. DEVITO: Well, I did have a
7  question.
8  　　MS. BRUNO: Do you want to read --
9  　　MR. DEVITO: If you understood it --
10 BY MR. DEVITO:
11 　Q. Did you understand my question?
12 　**A. One more time, please.**
13 　Q. Sure. Is Sears discouraging sales reps
14 from mentioning cancellation policy because it's
15 not good for sales?
16 　**A. I wouldn't agree with that assessment**
17 **of why it's trained that way. We train it that**
18 **way because we don't want associates pressuring**
19 **a customer into buying and saying "And if you**
20 **change your mind later, you can always just**
21 **cancel it." We want the customer to feel good**
22 **about the purchase. It's not just about a**
23 **protection agreement relationship but the bigger**
24 **relationship with retail and repair and all the**

Page 131

1  **things that Sears can do to make a customer's**
2  **home and life easier.**
3  　　**So we don't want to pressure and so we**
4  **don't want an associate saying "You should just**
5  **take it and then you can always cancel it**
6  **later." It's the same as don't plant the seed**
7  **or it will grow.**
8  　Q. So that's the reason why cancellation
9  isn't -- Sears doesn't want cancellation used as
10 a selling point so that it -- sales reps aren't
11 pressuring people into buying protection
12 agreements?
13 　**A. Correct. We're very -- we feel very**
14 **good about our cancellation policy and that it's**
15 **very customer friendly. So we don't hide behind**
16 **it. If it comes up, here's exactly what we do**
17 **and don't do for you, but don't bring it up in a**
18 **sales presentation.**
19 　Q. I'm a little confused by that
20 because --
21 　**A. Okay.**
22 　Q. -- if you feel good about it, then
23 I'm -- you know, why it shouldn't be used as a
24 selling point is confusing to me, but there's no

Page 132

1  question there.
2  　　MS. BRUNO: David, do you want to take
3  a break at this point?
4  　　MR. DEVITO: Yeah, I'm thinking about
5  it.
6  　　MS. BRUNO: I'm just reading your body
7  language.
8  　　MR. DEVITO: Yeah, you read me
9  correctly.
10 　　MS. BRUNO: Now is fine, yeah.
11 　　MR. DEVITO: I think this would be a
12 decent spot.
13 　　MS. BRUNO: Okay.
14 　　　　(Recess taken from 12:34 p.m.
15 　　　　to 1:24 p.m.)
16 BY MR. DEVITO:
17 　Q. Good afternoon, Mr. Setzer. We're back
18 on the record, and I'd like to pick up again
19 with what we marked as Exhibit 10.
20 　　MS. BRUNO: David, before we continue
21 with the questions, while we were on break,
22 Dainon realized that there was -- he needs to
23 make a correction to his prior testimony as to
24 Exhibit No. 10.

Page 133

1  　　MR. DEVITO: Okay.
2  　　MS. BRUNO: This is not the most recent
3  facilitator guide.
4  　　MR. DEVITO: Okay.
5  　　MS. BRUNO: There's one, I believe it's
6  dated 2014. We did produce it to you, so you
7  have it.
8  　　MR. DEVITO: Okay.
9  　　MS. BRUNO: If you have any questions
10 about that, feel free to ask him. I just wanted
11 to make sure it was clear on the record.
12 　　MR. DEVITO: Sure.
13 　　THE WITNESS: Thank you.
14 BY MR. DEVITO:
15 　Q. I think I did ask another -- a question
16 about whether the facilitator agreement had been
17 updated to reflect the closure of the Great
18 Indoors stores. And do you happen to know
19 whether it has been?
20 　**A. I think it has been, but I haven't --**
21 **without having that 2014 version in front of me,**
22 **I don't want to say yes.**
23 　Q. Fair enough.
24 　　So if you could turn to page 385 --

34  (Pages 130 to 133)

Page 134

1    A. Okay.
2    Q. -- under where it says "Automatic
3  Merchandise Verification For PA Sales," you'll
4  see that it says "Although Sears repairs most
5  major brands, there are some brands we do not
6  service..." I'll stop there.
7    So it says "most major brands" there.
8  Is it fair to say that Sears does not service
9  all major brands?
10    A. Yes.
11    Q. And when it says "we do not service
12  some merchandise types," what does that mean?
13    A. I'm -- I think I understand the
14  question. I'm just trying to think of why
15  that's in there that way. "...we do not service
16  some merchandise types..."?
17    Okay, I guess if you could call a
18  central vacuum system a merchandise type, we
19  don't service those. So if it's a central vac
20  versus an upright or canister, as soon as we
21  learn it's a central, we're out.
22    Q. Is there a list or some other document
23  of some kind that would indicate what the
24  merchandise types are that Sears does not

Page 135

1  service?
2    A. No.
3    Q. Are there cases where Sears does
4  service a particular brand but not a particular
5  item or line of items that are made by that
6  brand?
7    A. Yeah.
8    Q. Could you give me example of that?
9    A. Craftsman lawn mowers versus Craftsman
10  power drills. We service lawn mowers. We don't
11  service cordless drills.
12    Q. And then the third sentence in that
13  paragraph says "For these reasons, we should not
14  sell Protection Agreements on any brands that
15  are not eligible for PA coverage."
16    Is this instructing salespeople not to
17  sell protection agreements on noncovered brands?
18    MS. BRUNO: Objection as to form.
19    You can answer.
20    THE WITNESS: This is -- can you repeat
21  the question, please?
22  BY MR. DEVITO:
23    Q. Is the purpose of this statement in
24  here to tell Sears' sales representatives that

Page 136

1  they should not be selling protection agreements
2  on brands that are not eligible for PA coverage?
3    A. Yes.
4    MS. BRUNO: Same objection.
5    Your answer can stand.
6    THE WITNESS: Okay.
7  BY MR. DEVITO:
8    Q. Does that indicate that sometimes Sears
9  does sell protection agreements on noncovered
10  brands?
11    MS. BRUNO: Objection as to form.
12    THE WITNESS: Yes, it's happened.
13  BY MR. DEVITO:
14    Q. Can you describe for me an example of
15  it happening?
16    A. Um, it would be if the customer doesn't
17  give us the correct brand name.
18    Q. Is that the only situation in which you
19  are aware of that occurring?
20    A. No. There can be human error. The
21  associate may not ask for the brand name, they
22  may make an assumption, they may mishear the
23  customer. Our associate could have put the
24  wrong brand in and said it was a Kenmore when in

Page 137

1  fact it's an Acme.
2    Q. How often does that occur?
3    A. Rarely, but I have no percentage I
4  could assign.
5    Q. From your personal experience, how many
6  times approximately have you encountered
7  situations where Sears sold a protection
8  agreement on a noncovered brand?
9    A. How many times have I experienced that?
10    Q. Yes.
11    A. At least dozens, I'm sure.
12    MS. BRUNO: And for clarification, do
13  you mean over the course of your time?
14    THE WITNESS: Twenty years, yeah,
15  that's the context I understood the question to
16  be.
17  BY MR. DEVITO:
18    Q. The next paragraph down says "Ciboodle
19  has an automated merchandise brand qualification
20  incorporated into its infrastructure." And then
21  the following paragraph says "By automating the
22  merchandise verification process the system will
23  prevent associates from or renewing Protection
24  Agreements on merchandise where the merchandise

35  (Pages 134 to 137)

Page 138

1   is not eligible for PA coverage."
2       When was that automated brand
3   qualification incorporated?
4   **A. Ooh. It's called an MMI and I don't**
5   **know. I could probably find out from some --**
6   **somebody that's an expert in MMI, but I don't**
7   **know off the top of my head.**
8   Q. Someone at Sears might know the answer
9   to that?
10  **A. Oh, yeah.**
11  Q. Would there be a documentary record
12  that would reflect that?
13  **A. I don't understand -- I don't know what**
14  **would qualify as a documentary record.**
15  Q. Well, I'm thinking normally of a
16  document or some piece of information that's
17  accessible via some sort of database or other
18  software that Sears maintains.
19    MS. BRUNO: I'm just going to object to
20  the form.
21    You can answer if you know.
22    THE WITNESS: Probably, but I don't
23  know for a fact. I know we maintain MMI as
24  current. So I'm guessing that we keep versions

Page 139

1   or that somebody could trace it back to when the
2   first one was out there. 2009-ish, that's a
3   really rough -- I could be plus or minus --
4   well, minus five years on that. I don't know.
5   BY MR. DEVITO:
6   Q. And do you know what MMI stands for?
7   **A. No. We always just call it MMI.**
8   **Everybody knows what that means. It's the brand**
9   **name list.**
10  Q. Was that -- this automated merchandise
11  brand qualification thing, can I call that MMI
12  or -- is -- is that fair?
13  **A. Yes.**
14  Q. Was the MMI instituted because Sears
15  was having issues selling protection agreements
16  on noneligible brands?
17  **A. I don't know that I would agree with**
18  **that assessment. I would say it was put in**
19  **place to further ensure that we have a brand**
20  **name on record and that it's one that's -- meets**
21  **our current brand list. It was an improvement**
22  **process.**
23  Q. Were you involved in the institution of
24  this MMI feature?

Page 140

1   **A. No, not in this creation, no.**
2   Q. Does the use of the MMI feature prevent
3   completely -- does it completely prevent Sears
4   from selling protection agreements on brands
5   that are not eligible for coverage?
6   **A. It prevents us from recording an**
7   **agreement on a brand we don't cover.**
8   **Completely? Again, the Kenmore/Acme thing, if**
9   **the associate is either behaving fraudulently,**
10  **in which case we're going to take disciplinary**
11  **steps with that associate, or if the associate**
12  **makes a, you know, good faith mistake, then**
13  **sure, we could have recorded it that way. But**
14  **we would never — the system won't allow you to**
15  **record a protection agreement on an Acme item if**
16  **Acme is not an approved brand list on that MMI**
17  **system.**
18  Q. Have you had situations where sales
19  associates were acting fraudulently and
20  recording things that they shouldn't have been?
21  **A. Yeah.**
22  Q. Approximately how many times has that
23  happened?
24    MS. BRUNO: Are you talking about --

Page 141

1    THE WITNESS: Since MMI, right?
2    MS. BRUNO: I'm just clarifying.
3   You're asking Dainon in his personal experience
4   or that he's aware of?
5   BY MR. DEVITO:
6   Q. Well, you can categorize the answer
7   however you want in time.
8   **A. I mean, since we've had MMI, have we**
9   **had to discipline people for, you know, either**
10  **not asking for a brand or putting the wrong**
11  **brand in? Yes. I'd say less than ten times**
12  **that I'm aware of. For lack of a better**
13  **description, once somebody gets caught doing**
14  **something like that, everybody else realizes**
15  **that the company can in fact track that kind of**
16  **thing and we will catch you and deal with it**
17  **very dramatically and harshly and sacrificial**
18  **lamb and nobody else does it.**
19  Q. So would you turn the page to page 386.
20  **A. Okay.**
21  Q. This is discussing where the brand name
22  is blank on merchandise and it says "Before a PA
23  can be sold, renewed, or extended on merchandise
24  where the brand name is blank, you're required

36  (Pages 138 to 141)

Page 142

1  to update the merchandise brand name."
2       How can a situation arise where the
3  brand name is blank?
4    **A. The coverage could have predated MMI or**
5  **the coverage could have been created by our**
6  **technician sales flow. They don't use Ciboodle,**
7  **so they don't have the same MMI creation**
8  **requirement, or somebody with NPS access deleted**
9  **the brand name for whatever reason.**
10     MR. DEVITO:  Would you read that answer
11  back?
12       (Record read.)
13  BY MR. DEVITO:
14    Q.  Okay.  So I just want to unpack that a
15  little bit, if I could.  If the PA predated MMI,
16  that just -- does that mean that their -- Sears
17  did not have brand information prior to that?
18    **A. As long as I've worked for the company,**
19  **we've had an authorized brands list, but it**
20  **wasn't built into the system as a required field**
21  **that bounced against its own check.  So it was**
22  **more the sales associate would, yep, we're okay,**
23  **let me key it in.  Now it's a required field in**
24  **the system that's automated.**

Page 143

1  **So if it was created prior to that,**
2  **somebody left it blank or put a period as a**
3  **placeholder, you know, that kind of thing**
4  **without checking the list, the agreement could**
5  **have been recorded.  Once we put MMI in, we said**
6  **it has to be from this drop-down list also so**
7  **there's not -- so you don't type it in as**
8  **"Kemnore" instead of "Kenmore," typos.**
9    Q.  So prior to putting in the MMI, there
10  could have been potentially a lot of situations
11  where Sears didn't have the brand information in
12  its system; is that right?
13     MS. BRUNO:  Objection as to form.
14     You can answer.
15     THE WITNESS:  Yeah, I -- define "a
16  lot," but yeah, I mean, sure, yes, it's
17  possible.
18  BY MR. DEVITO:
19    Q.  Well, you tell me what the reality was.
20  Were --
21    **A. I would say the majority of coverage**
22  **had a brand name listed because we would always**
23  **ask, but it wasn't as good as it is now because**
24  **it wasn't a required field.**

Page 144

1    Q.  So was it possible, prior to
2  instituting the MMI, to sell or renew a PA where
3  the brand name was blank?
4    **A. Prior to MMI, was it possible?  Yes.**
5    Q.  Or where Sears otherwise did not know
6  the brand name?
7    **A. Yes.**
8    Q.  So at some point, Sears became aware
9  that it had sold PAs where the brand was not
10  covered or it didn't know what brand the
11  customer owned; is that accurate?
12     MS. BRUNO:  Objection as to form.
13  BY MR. DEVITO:
14    Q.  Well, let me break it into two pieces.
15  So at some point Sears became aware that it had
16  sold PAs where the brand was not covered; is
17  that correct?
18     MS. BRUNO:  Same objection.
19     THE WITNESS:  I don't -- I don't -- I'm
20  trying to understand in the context of MMI and I
21  don't -- help me understand.
22  BY MR. DEVITO:
23    Q.  Well, you could divorce it from MMI --
24    **A. Oh, okay.**

Page 145

1    Q.  -- I guess.  I'm not necessarily
2  limiting it to MMI but it --
3    **A. Okay.**
4    Q.  You tell me if there have been
5  situations since you put in MMI where you've
6  still learned that you'd have a PA out there
7  where the brand name is blank.
8    **A. Yeah.**
9    Q.  And what does Sears do when it becomes
10  aware of that?  Does it contact the customer?
11    **A. No.**
12    Q.  So I'm assuming then, since it's
13  happened since you put in MMI, then it certainly
14  happened before you put in MMI that you would
15  become aware that there'd be a PA out there
16  where the brand name was blank; is that correct?
17     MS. BRUNO:  Just object to form.
18     If you followed it, you can answer.
19     THE WITNESS:  Okay.
20     Yes.
21  BY MR. DEVITO:
22    Q.  And similar but slightly different
23  question, Sears has at times become aware that
24  it had sold PAs where it just did not know what

37 (Pages 142 to 145)

Page 146

1    brand the customer owned; is that correct?
2        **A. Yes.**
3        Q. And when it becomes aware of that, it
4    does not contact the customer; is that correct?
5        MS. BRUNO: Objection to form.
6        But you can answer if you understand.
7        THE WITNESS: I want to give you a
8    straightforward answer, but I need to qualify it
9    a little bit. I'm sorry.
10   BY MR. DEVITO:
11       Q. Sure.
12       **A. We don't have some audit process that**
13   **searches the entire database for blank fields.**
14   **So the only way we'd become aware of that is**
15   **either a sales associate working that customer's**
16   **file and seeing, "Oh, my gosh, why is this**
17   **blank? Let me talk to the customer and ask**
18   **about it," or a technician out there trying to**
19   **work on something and get parts to fix it and**
20   **those kind of situations. So the "become aware**
21   **of it" and do we contact you, we would only**
22   **become aware of it if we were in contact with**
23   **you because nobody's searching millions of**
24   **records.**

Page 147

1        Q. Sure.
2        **A. Does that —**
3        Q. Yeah, I understand what you're saying.
4        **A. Okay.**
5        Q. So my question is then --
6        **A. Okay.**
7        Q. -- by virtue of the fact that it
8    becomes aware of it in through the means that
9    you just described --
10       **A. Okay.**
11       Q. -- Sears then must know that it -- in
12   its millions of contracts or however many there
13   are -- bound to be other similar situations,
14   right?
15       MS. BRUNO: Objection as to form.
16       You can answer if you know.
17       THE WITNESS: I mean, I'd agree with
18   that in concept, yeah. If I come across one
19   file, there's probably -- it's probably happened
20   somewhere else in the scale of Sears.
21   BY MR. DEVITO:
22       Q. I'll have you flip to the next page.
23       **A. (Witness complying.)**
24       Q. And I think we probably discussed a

Page 148

1    little bit about this, but it says "When pricing
2    a Protection Agreement, you may be required to
3    update the existing brand name if it is
4    unrecognized in our verification tables (also
5    known as the MMI tables) due to misspelling,
6    et cetera."
7        So first of all, what are the
8    verification tables?
9        **A. It's literally a list by merchandise**
10   **type of the brands that are eligible. So, I**
11   **mean, we have a kind of an Excel version of it**
12   **that just lists, you know, washer, dryer,**
13   **washer/dryer combo systems, and under each of**
14   **those are all of the brands that would be**
15   **eligible for coverage under one of those product**
16   **types.**
17       Q. And are those lists given out to
18   salespeople?
19       **A. They're available on the PA Resource**
20   **Center. So we — they can access it**
21   **electronically.**
22       Q. And how could a situation arise where
23   the brand name is not recognized in the system
24   on an existing PA?

Page 149

1        **A. I think one thing that's important to**
2    **remember is that this version that we're looking**
3    **at is, to the best of my recollection, at a time**
4    **period where MMI was fairly new and with**
5    **five-year contracts. We were in kind of that**
6    **clean-up, move over mode, where it might have**
7    **been in the system as "Kenmore" because somebody**
8    **had free-form typed it. In today's call center**
9    **environment, it's much less frequent that we**
10   **would come across a typo because it's a**
11   **drop-down, select from a list, not a free-form**
12   **typing.**
13       Q. Right.
14       **A. So keep in mind what was going on in**
15   **2011 is what kind of makes this pertinent, and**
16   **that is that yeah, it would have been misspelled**
17   **or it would have been — you know, because it**
18   **had been free-form typed in there by some call**
19   **center agent or — inbound or outbound really.**
20       Q. So generally speaking, this is
21   referring to misspellings of the brand name?
22       **A. Yes.**
23       Q. What else could it be referring to?
24       **A. Well, again, at the time of this, it**

Thompson Court Reporters, Inc
(312) 421-3377

Page 150

1 could have been that we -- somebody had covered
2 an item that they should have checked against
3 the piece of paper but they didn't, so they
4 covered an Acme and now the system's going to
5 go: No, I see it as an Acme and I say no, you
6 cannot cover that because it's not one of the
7 drop-down list that's eligible.
8     Q.  Now, if you'd just flip to the last
9 page we have here --
10     A.  Okay.
11     Q.  -- which is page 1199.  I have it in my
12 outline here.  I can't seem to find it on the
13 page, but I'm sure it's in there.  It says
14 "Protection Agreement pricing is based, in part,
15 on the age of the merchandise owned.  The age is
16 determined either by merchandise purchase date
17 or delivery/installation date."
18     A.  Yeah.  It's like the fifth paragraph
19 under "How To Make Pricing Work For You."
20     Q.  Thank you.
21     A.  Sure.
22     Q.  Is there a different price for each
23 year of aging?
24     A.  There can be -- our tables have

Page 151

1 1 through 15, which represents the age of the
2 product.  So the price will max out at 15 years
3 of age and the 16th, 17th, 18th year of age of
4 that product will be the same price but with all
5 the merchandise codes and I can't guarantee that
6 the two-year to the three-year age changes on
7 every merchandise code.  Some of them may be
8 stable for a couple of years.  Then it goes --
9 but directionally, our protection agreements
10 always get more expensive per year as the item
11 becomes older.
12     Q.  And they are -- for each product,
13 there's a pricing table that has this sort of
14 aging of the pricing?
15     A.  Even more specific than the product,
16 it's what we call a merchandise code.  By
17 "product" you mean refrigerator, to me, I would
18 say:  Well, there's a refridge IM for ice maker,
19 refridge SS for side-by-side refridge, BF for
20 bottom freezer, and those would each have
21 potentially their own pricing structure.
22     Q.  Okay.  But that is not brand-specific?
23     A.  It is not brand-specific.  We do have a
24 few merchandise codes that represent a very

Page 152

1 specific brand in certain circumstances, but for
2 the most part, it's just a refrigerator is a
3 refrigerator.  We don't care if it's a Kenmore
4 or a Maytag or a GE.
5     Q.  And it says "The age is determined by
6 purchase date or delivery installation date."
7 And how does Sears know these dates if the item
8 wasn't purchased at Sears?  Is that just the
9 customer representation to them?
10     A.  Exactly, yes.
11         MR. DEVITO:  What are we at?  11?
12         THE REPORTER:  Yes.
13             (Exhibit 11 was marked for
14             ID.)
15 BY MR. DEVITO:
16     Q.  So you've been handed what's been
17 marked as Exhibit 11.  Are you familiar with
18 this document?
19     A.  Yes.
20     Q.  Is this the verification table that
21 we've been discussing?
22     A.  Kind of.
23     Q.  Okay.
24     A.  It's the brands list that's on the

Page 153

1 PA Resource Center.  This is not MMI.  MMI is a
2 software program maintained elsewhere, but they
3 match.  The content of both would be the same.
4     Q.  So the information that MMI would spit
5 out is the same as what's on the PA Resource
6 Center which is this document?
7     A.  Yes.
8     Q.  Is there some way that those two things
9 speak to each other so that a change made to one
10 automatically is made to the other?
11     A.  Nope.
12     Q.  So if a change is being made, someone
13 has to separately input it to each of those two
14 things?
15     A.  Yes.
16     Q.  And is this a comprehensive list of all
17 the brands that Sears will cover in an MPA?
18     A.  (Reviewing document.)
19         The only qualification I have to that
20 as being a yes/no answer is I don't see a
21 revision date on here.  So I don't know by heart
22 which version I'm looking at.  But whenever this
23 would have been printed out and pulled from,
24 this would have been the representation of that,

39  (Pages 150 to 153)

Thompson Court Reporters, Inc
(312) 421-3377

Page 154

1 yes. There's not anything else anywhere that we
2 would maintain. If there's a newer version
3 where a brand has been added or taken off, I
4 don't know by heart.
5    Q. Okay. Well, that's my next question,
6 is --
7    A. I don't see a revision date on here to
8 be able to tell you.
9    Q. How often is this updated?
10    A. Completely as brands come and go in
11 coordination with product engineers and repair
12 services and, you know, we want this list to be
13 as big as possible, so it just totally depends
14 on when we have to take things off or we get to
15 add things on.
16    Q. Is there supposed to be a revision date
17 on here?
18    A. (Reviewing document.)
19       Probably. I don't know if it just
20 didn't print or if it's missing from this
21 version. We don't typically -- to try to answer
22 your question more thoroughly, internally as a
23 business, we don't print this, because I don't
24 want to have to try to go: Give me your old

Page 155

1 version, give me your old version, give me your
2 old version, and then I risk an associate
3 talking to a customer with out-of-date
4 information.
5       Absolutely anytime they need it, they
6 can just use MMI in Ciboodle. Ciboodle will
7 tell you what you need to know, but if you want
8 to fact-check the information, you can go to the
9 PA Resource Center online and look, and only the
10 most current version will be saved online as the
11 reference available. So I think we have a
12 revision date on the website page and maybe it
13 doesn't view when you print it, but the revision
14 is just always whatever's up there.
15    Q. You think there would be a way to tell
16 the revision date of this document?
17    A. Yes.
18    Q. And the prior versions of this document
19 are saved somewhere?
20    A. Yes.
21    Q. And they should have a revision date on
22 them so you could tell which one was in effect
23 at each particular time?
24    MS. BRUNO: Objection as to form.

Page 156

1    You can answer.
2    THE WITNESS: Going back to probably at
3 least 2010, yes.
4 BY MR. DEVITO:
5    Q. And how come that time is -- how come
6 you cut it off at that time?
7    A. Because that's when I made this.
8    Q. Okay. Good to know.
9    A. It was -- I took the list that was
10 already on there and made it into an Excel form
11 so I could change it, because I inherited it
12 from the previous guy.
13    Q. Okay. Then explain to me what it was
14 that you inherited.
15    A. The web page. I didn't have the
16 modifiable version, so I had to grab the
17 existing version off the web page that was just
18 a PDF, and I needed to add or take off -- I
19 don't even remember which it was at that time,
20 but I needed to modify this list. So I dumped
21 it into Excel so I could modify it from then
22 going forward in this marketing role.
23    Q. So prior to you creating this format
24 for this eligible brands list, there was a PDF

Page 157

1 document that had a list of brands on it? Is
2 that what you're saying?
3    MS. BRUNO: Object to --
4    THE WITNESS: That was the only version
5 that I -- sorry.
6    MS. BRUNO: That's okay. I was just
7 stating an objection as to form.
8    But you can answer.
9    THE WITNESS: That was the only version
10 I had access to. So to do what I needed to do
11 quickly and easily, I just grabbed the PDF I
12 knew was current and converted it. There had to
13 be some other Word or Excel document somewhere
14 that somebody used to build the PDF, but it was
15 before me and it wasn't -- at the time it wasn't
16 worth chasing down the original source. It was
17 easy enough just to copy and paste.
18 BY MR. DEVITO:
19    Q. Was this list something you dealt with
20 in your prior jobs, prior to the 2010 job?
21    MS. BRUNO: Objection as to form.
22    You can answer.
23    THE WITNESS: Used it, yes. Was not an
24 administrator of it, was a viewer of it.

40 (Pages 154 to 157)

Page 158

1 BY MR. DEVITO:
2    Q. Yeah. And so could you just describe
3 for me generally what it looked like then before
4 you reformatted it?
5    **A. Just like this (indicating to**
6 **document).**
7    Q. So you just literally put it into an
8 Excel spreadsheet so that you could change it?
9    **A. Yes.**
10    Q. Now, if we flip to the last page, which
11 is SEARS 522, at the bottom there it says
12 "Sears, Kmart, the Great Indoors, and High-End
13 Merchandise." Again, I -- we talked a little
14 bit about the Great Indoors which has closed.
15       Does that either -- do you know whether
16 this has been updated to reflect the fact that
17 the Great Indoors closed or that maybe it's
18 still relevant because something could have been
19 sold there? Do you know whether -- does that
20 suggest to you at all the date of this document
21 is what I'm trying to understand.
22       MS. BRUNO: Objection as to form.
23       If you understand, you can answer.
24       THE WITNESS: Okay. To my knowledge,

Page 159

1 this document is still just about as current --
2 this -- that section still exists on the current
3 document, yes.
4 BY MR. DEVITO:
5    Q. Okay. And it would still say The Great
6 Indoors on it, correct?
7    **A. Yes.**
8    Q. At the bottom, it says "Currently
9 bundled items cannot be bundled, upsold, or
10 renewed.
11       By "currently covered," that's
12 referring to items that are already listed on an
13 existing PA?
14    **A. Yes.**
15    Q. And the -- does this then mean that if
16 there's an existing PA with one of these brands
17 on it, that that PA should not be renewed?
18    **A. Correct.**
19    Q. And are you aware of any situations
20 where such a PA was renewed anyway?
21    **A. No.**
22    Q. Was it possible, before you put in the
23 MMI, that a purchase agreement could have been
24 renewed with a noneligible brand on it?

Page 160

1    A. Yeah.
2    Q. Was that something that Sears was aware
3 of being an issue?
4       MS. BRUNO: Objection as to form.
5       You can answer.
6       THE WITNESS: I would say we were aware
7 of the gap, yes.
8 BY MR. DEVITO:
9    Q. And this indicates that Thermador is a
10 brand that is not -- not eligible; is that
11 correct?
12    **A. (Reviewing document.)**
13       **Not eligible for protection agreement**
14 **renewal?**
15    **A. Yes. Well --**
16    **A. Agreed.**
17    **Q. Is there more to that answer that --**
18    **A. Well, I mean, it's on the list as an**
19 **authorized brand. So I can't say it's not**
20 **eligible, but it's eligible under the**
21 **circumstances of it was bought at the store at**
22 **point of sale, and then there's the whole next**
23 **paragraph that we've been discussing that says**
24 **why it wouldn't be eligible for future coverage.**

Page 161

1 **So eligible, period? Yeah, under those**
2 **circumstances. Eligible under the rest as**
3 **described? No.**
4    Q. Okay.
5    **A. Sorry if I misunderstood. I just**
6 **wanted to make sure I answered thoroughly.**
7    Q. I appreciate that.
8       And I guess the way to tell -- I mean,
9 this is not a static list, right? This changes
10 over time; is that right?
11    **A. Yes.**
12    Q. So it's possible that some of the
13 brands that are listed here were once eligible
14 for renewal and then became ineligible for
15 renewal; is that right?
16    **A. Specifically from the Sears, Kmart,**
17 **Great Indoors section down?**
18    Q. Yes.
19    **A. It's possible, although I can't think**
20 **of any instances. That high-end list is pretty**
21 **static in terms of it's either high end or it's**
22 **not. It's either eligible or it's not. I can't**
23 **think of a time where something got downgraded**
24 **from high end to normal.**

Thompson Court Reporters, Inc
(312) 421-3377

Page 162

1   Q. Is the list of high-end brands, are
2   these things that Sears still sells generally?
3   MS. BRUNO: Objection as to form.
4   If you know, you can answer.
5   THE WITNESS: I don't think so, but I
6   don't -- I can't say for sure, especially with
7   Sears.com inventory and those kind of things.
8   I'm not sure if we sell some of these or not.
9   MR. DEVITO: This is 12.
10   (Exhibit 12 was marked for
11   ID.)
12   BY MR. DEVITO:
13   Q. You've been handed what's been marked
14   as Exhibit 12. At the top it says "Brand List -
15   Sears, HA/HVAC, Non-Serviceable Brands." It's
16   Bates-labeled SEARS 336. Are you familiar with
17   this document?
18   A. I'm not.
19   Q. I guess, then, you don't know when this
20   document was created?
21   A. I do not.
22   Q. And you don't know whether there are
23   prior versions of this list that have different
24   information on them?

Page 163

1   A. Correct, I do not.
2   Q. And I take it, then, you don't know
3   where this document was collected from?
4   A. Do you want me to give it my best guess
5   based on --
6   MS. BRUNO: I don't want you to
7   speculate --
8   THE WITNESS: Okay.
9   MS. BRUNO: -- but if there's
10   information on here that you think provides some
11   information, you can respond.
12   THE WITNESS: "Not create service or
13   transfer the customer to technical specialists,"
14   that makes me think this is a document for the
15   customer care network creating service orders
16   and this is directing them on whether or not the
17   customer should go to that text spec team for
18   phone triage or should be created a collect call
19   or should be transferred to the original
20   equipment manufacturer, but that's me trying to
21   use experience to guess where this came from,
22   but that's not a factual statement.
23   BY MR. DEVITO:
24   Q. I appreciate that. I can tell you have

Page 164

1   plenty of experience to help you along in that
2   effort.
3   At the top it says this list
4   "...contains the names of product brands that
5   Sears will no longer provide In Warranty repair
6   service." The way that's written sort of
7   suggests that Sears used to provide in-warranty
8   repair service on these brands; is that fair?
9   MS. BRUNO: Objection as to form.
10   THE WITNESS: It seems -- that's how I
11   would read it as well, yeah. I'm reading it for
12   the first time with you, but yeah, that would
13   imply a change.
14   BY MR. DEVITO:
15   Q. And do know whether this means Sears
16   provides some other kind of service on these
17   brands besides in warranty?
18   MS. BRUNO: Same objection.
19   THE WITNESS: (Reviewing document.)
20   I don't think we provide collect call
21   service on these brands either, but we -- we may
22   possibly. That's not my field of expertise
23   on -- the repair technician's total coverage.
24   I'm specialized to protection agreements.

Page 165

1   BY MR. DEVITO:
2   Q. But that would be the alternative,
3   would be collect call service?
4   MS. BRUNO: Objection as to form.
5   THE WITNESS: Okay, yeah, collect call,
6   in warranty, PA.
7   BY MR. DEVITO:
8   Q. Okay.
9   A. Those would be the three
10   classifications of a service order.
11   Q. Is there a distinction between an
12   eligible brand and a serviceable brand?
13   A. Um, is eligible on here or are you just
14   talking from our conversations?
15   Q. I'm just referring to Exhibit 11 and
16   our conversations.
17   A. Oh, okay. Eligible brand means it's a
18   brand that's eligible for protection agreement
19   coverage. Serviceable brand means it may be
20   something that we will service under warranty or
21   under a collect call, but we are not willing to
22   sell a protection agreement on that item because
23   of that brand.
24   Q. And how -- or -- okay. Is it possible

Thompson Court Reporters, Inc
(312) 421-3377

Page 166

1  for a brand to be both eligible and
2  nonserviceable?
3      **A. No. I can't think of -- or at least I**
4  **can't think of an instance where that's ever**
5  **happened.**
6      Q. So we were looking at the eligible
7  brands list -- or the -- I think -- correct me
8  if I'm wrong, but if you go -- looking at the
9  high-end merchandise --
10     **A. Okay.**
11     Q. -- you told me that the brands on here
12 are eligible but classified as high end, right?
13     **A. Yeah.**
14     Q. If you take Thermador as an example,
15 it's eligible but high end on Exhibit 11 and
16 it's nonserviceable on Exhibit 12.
17     **A. It's nonserviceable under the**
18 **in-warranty repair.**
19     Q. Okay. So it's serviceable under a PA?
20     **A. In this particular situation where they**
21 **bought the PA at the retail store, yes.**
22     Q. So Sears will, for the high-end items,
23 still sell a PA at point of sale on the items
24 listed in there but that's it; is that right?

Page 167

1      **A. "That's it," meaning?**
2      Q. Meaning they won't sell an aftermarket
3  PA and they won't renew.
4      **A. Fair statement, yes.**
5      Q. And has it always been the case that
6  Sears would not renew PAs for high-end
7  merchandise listed on here (indicating to
8  document)?
9      **A. To my knowledge, yes, that's always**
10 **been the case.**
11     Q. Going back to Exhibit 12 -- I know
12 you're not familiar with it, but are there any
13 brands that are not on here that you know Sears
14 doesn't service?
15     MS. BRUNO: Objection as to form. This
16 is about in-warranty service. So I think your
17 question is going far broader than that, but --
18     MR. DEVITO: I'm happy to limit it.
19 BY MR. DEVITO:
20     Q. Are there any brands not on here that
21 you know Sears doesn't provide in-warranty
22 service for?
23     **A. Yeah, NordicTrack would be the example**
24 **that comes to mind.**

Page 168

1      Q. Does NordicTrack qualify as a home
2  appliance?
3      **A. Oh, good catch. No. I wouldn't call**
4  **it a home appliance. Recreational.**
5      Q. Okay. So it -- so then let's limit it
6  to what this says --
7      **A. Okay.**
8      Q. -- at the top of the list which is --
9      **A. HA/HVAC.**
10     Q. Right. Are there any of those brands
11 that you know that Sears does not provide
12 in-warranty service for but that are not on
13 here?
14     **A. I don't know.**
15     Q. Okay. I'd like to now sort of ask you
16 some questions about Sears' recordkeeping and IT
17 systems. You'll probably have to bear with me a
18 little bit. I'm not a technology expert, but
19 we've talked about the Ciboodle. I'll call it a
20 database. I don't know if that's a proper term.
21     **A. I wouldn't classify it that way. It**
22 **doesn't actually store the records.**
23     Q. Okay.
24     **A. It's a desktop interface.**

Page 169

1      Q. And what does store the records?
2      **A. NPS.**
3      MS. BRUNO: You know, can we take a
4  break? We can do this whole thing. I just want
5  to take a quick break to use the bathroom.
6      MR. DEVITO: Sure.
7         (Recess taken from 2:15 p.m.
8          to 2:20 p.m.)
9  BY MR. DEVITO:
10     Q. Okay. So NPS is where the information
11 in Ciboodle is stored; is that -- did I
12 understand that right?
13     **A. I would say NPS stores the data.**
14 **Ciboodle is the user interface for agents.**
15     Q. And so I'm just going to stay sort of
16 general.
17     What other kind of systems does Sears
18 use with respect to PAs?
19     MS. BRUNO: Objection as to form.
20     If you understand it, you can answer.
21     THE WITNESS: NPS, MMI, Ciboodle, Case
22 Ciboodle, those are the -- the ones that come to
23 mind.
24 BY MR. DEVITO:

43 (Pages 166 to 169)

Page 170

1  Q. So MMI is a separate software that
2  interfaces with Ciboodle; is that right?
3  **A. Yes.**
4  Q. And could you tell me what Case
5  Ciboodle is?
6  **A. It's a slightly newer version of**
7  **Ciboodle that added some functionality around**
8  **creating case numbers in a customer record to**
9  **track something that requires more follow-up**
10  **like a rental reimbursement or food loss or the**
11  **replacement authorization, those kind of things.**
12  **So it was more like that PABA group we were**
13  **talking about earlier, they use Case Ciboodle.**
14  Q. Is there a particular vendor that makes
15  Ciboodle?
16  **A. Yeah. They are from Scotland. What**
17  **the heck?**
18  MS. BRUNO: I don't know.
19  THE WITNESS: I don't know why I'm
20  looking at you. Oh, Sword? No.
21  BY MR. DEVITO:
22  Q. If you don't know, that's okay.
23  **A. Yeah.**
24  Q. I don't expect everyone to have

Page 171

1  memorized all the Scottish software vendors.
2  **A. Yeah, it was a particular firm.**
3  Q. And how does information get inputted
4  into Ciboodle? If you need to use an example to
5  explain that, go ahead.
6  **A. I'm not sure I understand the context**
7  **of the question.**
8  Q. Well, I'm not sure that there is a
9  whole lot of context to it, but I'm just trying
10  to understand. What kind of information is
11  available through Ciboodle? Let's start there.
12  **A. Okay. Customer name and details,**
13  **address, phone, e-mail, shop-your-way number,**
14  **agreement, history, merchandise list, service**
15  **order history and some interaction details of**
16  **call center to customer calls.**
17  Q. What is a shop-your-way number?
18  **A. It's the Sears loyalty program, like**
19  **a -- I don't know, I'm trying to think of**
20  **another example. Walgreens, punch in your phone**
21  **number, swipe your little Walgreens card and get**
22  **a discount. It's a points loyalty program.**
23  Q. So how -- what are the ways in which
24  that customer information can get inputted into

Page 172

1  Ciboodle? I assume one of the ways is from the
2  in-store sale of an item?
3  **A. Perfect example. Retail can create a**
4  **record on behalf of a new customer or add**
5  **merchandise to an existing customer's record. A**
6  **call center agent could create a file or modify**
7  **file or a customer shopping online.**
8  Q. So in sort of all three of those
9  different sales channels, those all interact
10  with Ciboodle?
11  **A. They interact with NPS.**
12  Q. Okay.
13  **A. Ciboodle is just the app- -- it's just**
14  **the desktop application. So --**
15  Q. So I guess a customer shopping online
16  has obviously no interaction with Ciboodle.
17  **A. Correct.**
18  Q. So then the salespeople in a retail
19  store have access to it; is that right?
20  **A. No, that is not.**
21  Q. Okay. How -- what are they doing to --
22  how do they -- how would they go about assessing
23  customer information? You know, if someone
24  walks in the store, how do they figure out what

Page 173

1  they already own and whatnot?
2  MS. BRUNO: This is the retail agent?
3  MR. DEVITO: Yes.
4  THE WITNESS: They wouldn't know what
5  the customer already owns.
6  BY MR. DEVITO:
7  Q. And they wouldn't be able to figure
8  that out or they would have to call in?
9  **A. They would have to call in and we would**
10  **talk to the salesperson just the same way we**
11  **would with a customer to say here's what we've**
12  **got, but they don't have access to Ciboodle, no.**
13  Q. Okay. If a new sale was being made in
14  a store to a new customer, how does the
15  information about that customer make its way
16  into Ciboodle?
17  **A. The retail salesperson would have,**
18  **through the register, entered the customer's**
19  **name, address, and phone number, and then when**
20  **they'd ring up the item, that would have a**
21  **division and item number, like SKU. That**
22  **information would be packaged and there's a feed**
23  **between those two systems, between the retail**
24  **register point of sale and Caboodle/NPS to**

44 (Pages 170 to 173)

Page 174

1    update our records.
2        Q. And so that's going on every day. New
3    information is from -- from new customers is
4    going into Ciboodle from retail stores?
5        A. Yeah. It's a nightly batch process,
6    yes.
7        Q. What kind of reports can be generated
8    from -- now I don't know whether I should be
9    referring to Ciboodle or NPS, but can you, for
10   example, have -- do a search on a customer and
11   have it spit you out every transaction Sears has
12   had with that customer?
13       MS. BRUNO: Objection as to form.
14       If you understand the question, you can
15   answer.
16       THE WITNESS: I mean, yes, I can search
17   by customer or, you know, relevant details to
18   find that customer record. Have it spit out
19   every transaction? No. I would have a view of
20   their serviceable merchandise that is, as far as
21   we know, currently owned, hasn't been deleted,
22   all those variables, but I wouldn't know that
23   they bought a cordless drill.
24   BY MR. DEVITO:

Page 175

1        Q. Can you use -- again, I'm -- can you
2    tell me which -- whether I'm better off
3    referring to the, you know, place where -- I
4    guess I'm referring to the place where the
5    information is stored. So can you use NPS to
6    determine how many MPAs Sears has at any given
7    time?
8        A. No.
9        Q. Is there any way to determine that?
10       A. Yes.
11       Q. How would you do that?
12       A. A query of what we --
13       MS. BRUNO: I'm sorry. I'm just going
14   to object to form.
15       You can answer if you know.
16       THE WITNESS: A query of the data
17   warehouse is what we would use.
18   BY MR. DEVITO:
19       Q. And what is -- when you say "data
20   warehouse," what do you mean?
21       A. It's the -- the server behind NPS, I
22   guess, is the best -- to my knowledge is how I
23   would describe it.
24       Q. But there's -- there's some kind of

Page 176

1    software interface that would allow you to do
2    that; is that -- is that true?
3        A. To tell you how many active protection
4    agreements or how many ever or those kind of
5    things?
6        Q. Yes.
7        A. Yes.
8        Q. Does that have a name?
9        A. In -- I would call it -- me and the
10   people that would work with that would call it
11   the data warehouse.
12       Q. And can the data warehouse be searched
13   by date? In other words, could you tell how
14   many MPAs existed on January 1st, 2012 versus
15   January 1st, 2015?
16       MS. BRUNO: Objection as to form.
17       If you know the answer, you can go
18   ahead.
19       THE WITNESS: I don't know, but I would
20   think yes. I think we could probably figure out
21   a way to write a code to do that.
22   BY MR. DEVITO:
23       Q. And do you know how far back in time
24   the information in the data warehouse goes?

Page 177

1        A. I would say at least 20 years.
2        Q. Can you use the data warehouse or NPS
3    to tell you how much Sears charged for a
4    particular MPA?
5        MS. BRUNO: Objection as to form.
6        If you understand, you can answer.
7        THE WITNESS: Yes.
8    BY MR. DEVITO:
9        Q. Can you use NPS or the data warehouse
10   to tell you whether claims were made or repair
11   requests were made under a particular MPA?
12       A. Service order information, yes. Um...
13   yeah. If that's -- when you say "claims,"
14   service order?
15       Q. Yes.
16       A. Yes. Then yes.
17       Q. What information can it tell you about
18   service orders?
19       MS. BRUNO: Objection as to form. What
20   do you mean by that?
21   BY MR. DEVITO:
22       Q. If -- if it can tell you that the
23   customer requested service on -- I presume on a
24   particular product, can it do that?

Thompson Court Reporters, Inc
(312) 421-3377

Page 178

1    A. Yeah. Data warehouses, you know, we
2 would use that to query macro things. NPS, we
3 would use that to look up Bob's file.
4    Q. Okay. That helps.
5    A. So if we're in Bob's file, I can look
6 to see that there's three service orders on that
7 refrigerator. One of them was a PM check, one
8 of them was a broken ice maker, you know, that
9 kind of thing.
10    Q. And can you see how each of those
11 service orders was resolved?
12    A. Yes.
13    Q. And will it tell you the date when the
14 service order was made?
15    A. Yes.
16    Q. And will it tell you specifically what
17 product was involved?
18    A. Yes.
19    Q. Will it tell you the identity of the
20 person, the service rep who dealt with it?
21    MS. BRUNO: Objection as to form.
22    But if you understand...
23 BY MR. DEVITO:
24    Q. Like, is there a code in there or a

Page 179

1 name or something like that that says
2 "Technician number 247 went out to the
3 customer's house"?
4    A. Yes.
5    Q. And will it tell you what -- I mean, I
6 sort of asked this already, but what was done,
7 whether a repair was done or a replacement was
8 authorized?
9    A. Yes.
10    Q. Can these systems, either the data
11 warehouse or NPS, tell you Sears' profit
12 information with respect to MPAs?
13    MS. BRUNO: Objection as to form.
14 BY MR. DEVITO:
15    Q. And let me be a little more specific.
16 Like, can Sears tell how much -- ah -- strike
17 that.
18    Can NPS tell you whether any kind of
19 refund was issued on a particular MPA?
20    A. Yes.
21    Q. Can it tell you the amount of the
22 refund?
23    A. Yes.
24    Q. Can it tell you the date when the

Page 180

1 refund was issued?
2    A. Yes.
3    Q. Can it tell you the format in which the
4 refund was issued, meaning you sent them a
5 check, they refunded a credit card?
6    A. Yes.
7    Q. When, if you know, did Sears begin
8 using NPS?
9    A. Late '80s.
10    Q. From your face --
11    A. Late '80s.
12    Q. -- it seems like a long time ago.
13    A. '84, '88, something like that.
14    Q. I assume that the -- it's been updated
15 a lot over time; is that correct?
16    A. No.
17    MS. BRUNO: Objection as to form.
18    THE WITNESS: Oh, okay.
19    MS. BRUNO: It's okay.
20 BY MR. DEVITO:
21    Q. Go ahead.
22    MS. BRUNO: It's okay. You can answer
23 if you know.
24 BY MR. DEVITO:

Page 181

1    Q. So judging by your answer, it's --
2 would you characterize it as like a relatively
3 primitive system?
4    A. Yes, in my opinion, it would be.
5    Q. Can you sort of put any color on that?
6 Describe it for me?
7    A. I think of it as primitive because it's
8 really old -- it's a black and green mainframe
9 system like how computers used to be
10 monochromatic. Nothing on there is
11 mouse-driven. It's tab from field to field, and
12 if you don't type within the fields, the screen
13 locks up and you have to hit "escape." It's all
14 menu number-driven, so it's -- there's no links,
15 there's no -- it's an old system, but it's very
16 stable and it houses a lot of really good
17 information. So we keep it in the background.
18    Q. We've been talking a little bit about
19 how Sears keeps track of service requests. Is
20 that -- how is that done and let me try to be a
21 little more specific. Like, the call
22 representative who receives the call, what do
23 they do to make a record of the repair request?
24    MS. BRUNO: Objection to form.

Page 182

1   But if you understand, you can answer.
2   THE WITNESS: Okay.
3   They would be using Ciboodle and you
4   would call in and say I -- "My refrigerator's
5   not working." We would pull up your file,
6   identify the refrigerator, ask you some
7   clarifying questions, make sure we are talking
8   about the same -- the refrigerator you're
9   thinking of as broken is the one I'm looking at
10   on my screen.
11   I would ask you some questions, those
12   triage questions we talked about, but ultimately
13   if we're talking about creating an actual
14   service order with the intent of dispatching a
15   technician, I would ask you what the symptoms
16   are, what it's doing. I would put it in as the
17   service request. We would talk about dates and
18   times of when I would have technicians in your
19   market. You would tell me which one works for
20   you. And I would schedule it and I would say:
21   We'll see you -- the tech will call you before
22   he arrives on such and such a day, between this
23   time and that time and that creates a service
24   order. It's an eight digit service order number

Page 183

1   that is assigned and stored within that
2   customer's file record that's both in Ciboodle
3   and stored really in NPS.
4   BY MR. DEVITO:
5   Q. What if it doesn't get to the point of
6   dispatching a technician? Is there a record
7   kept of a call that's resolved through some kind
8   of, you know, over-the-phone troubleshooting?
9   **A. Not in NPS, but in Ciboodle, yes, there**
10   **would be an interaction history, and it would**
11   **show that we had a successful avoid of truck**
12   **roll. We didn't roll the truck out to the**
13   **customer's home. Not rolling truck, crash,**
14   **yeah.**
15   Q. Thanks. We talked a little bit about
16   this earlier when we were looking at that
17   document that referenced an e-mail team, but
18   does Sears communicate with MPA customers by
19   e-mail? And I'm being deliberately general
20   there. So I presume the answer is probably
21   "yes" at least because there's some e-mail
22   marketing that goes to people with existing
23   MPAs; is that true?
24   **A. Yes.**

Page 184

1   Q. How about with respect to service?
2   **A. Ah... we do have a service confirmation**
3   **e-mail that we can send out, so you're**
4   **successfully scheduled for service on Tuesday**
5   **between 8:00 and noon.**
6   Q. Can a customer place a request for
7   service but over the e-mail?
8   **A. No, not successfully. I mean, they**
9   **can, but it won't go anywhere.**
10   Q. Do you ever get involved in dealing
11   with customer complaints?
12   **A. Occasionally.**
13   Q. When, for example, would you get
14   involved in a customer complaint?
15   **A. To define "involved," it's been a long**
16   **time, several years since I've personally spoken**
17   **with a customer. So by "involved," what I'm**
18   **talking about is helping an associate or a**
19   **manager figure out the right way to interpret**
20   **the policy, take care of the customer, protect**
21   **the company, those kind of things. I'm in call**
22   **centers all the time. So it's, you know, "Hey,**
23   **Dainon, can you help?"**
24   Q. When you say you're in call centers all

Page 185

1   the time, does that mean that you travel --
2   **A. Travel.**
3   Q. -- around to the different call centers
4   regularly?
5   **A. Yep.**
6   Q. How often do you do that?
7   **A. Try to get to each one at least twice a**
8   **year.**
9   Q. And these situations where you you've
10   been involved in helping other people deal with
11   customer complaints, are you communicating by
12   e-mail with the other -- with the other people
13   that are working on the problem?
14   **A. Sometimes.**
15   Q. Do you know -- this is, again, a
16   general question, but do you know what Sears'
17   policy is regarding retention of e-mails?
18   **A. I know they're -- I know that I've**
19   **received legal hold requirements before on**
20   **different things. I don't know on just a**
21   **general e-mail what the policy is. I mean, I've**
22   **just always assumed that it's on a server, so**
23   **the company can keep it as long as they want**
24   **somewhere. Even if I've deleted it from my**

47 (Pages 182 to 185)

Page 186

1   inbox, that doesn't mean it's gone.  It would be
2   a good HR practice, but I don't know what the
3   official retention policy is.
4           (Exhibit 13 was marked for
5           ID.)
6   BY MR. DEVITO:
7       Q.  I've given you what's been marked as
8   Exhibit 13.  Have you seen this document before?
9       A.  Yeah.
10      Q.  Could you describe for me what it is?
11      A.  It's a list of the cancellation reasons
12  that we would record when canceling a specific
13  protection agreement.
14      Q.  And when you say "record," what are you
15  referring to?
16      A.  In the cancellation screen flow or
17  process, one of the required fields is the
18  cancellation reason, and that would be stored
19  and captured and kept and retained in NPS.  When
20  we were talking earlier about do we capture the
21  date we cancel, the amount we refunded, the
22  refund-type credit check, that kind of stuff --
23      Q.  Um-hum.
24      A.  -- this would be one of the fields

Page 187

1   retained and stored as well.
2       Q.  And this list is used when either Sears
3   or the customer elects to cancel a PA?
4       A.  Yes.
5       Q.  And who at Sears does the coding?
6   Like, who makes the decision to -- as to which,
7   you know, reason a particular cancellation,
8   which code it should be assigned?
9           MS. BRUNO:  Object to form.
10          But if you understand, you can answer.
11          THE WITNESS:  The vast majority of the
12  time, it would be the retention specialist
13  canceling the protection agreement.
14  BY MR. DEVITO:
15      Q.  So when you say "retention specialist,"
16  does that -- that means that any time someone
17  wants to -- or you -- anyone wants to cancel a
18  PA, they have to go -- call or whatever it is,
19  that it goes to someone whose job is a retention
20  specialist?
21      A.  Yes.
22      Q.  And what does a retention specialist
23  do?  It sounds perhaps self-explanatory, but if
24  you could explain it to me.

Page 188

1       A.  They would -- their job charge is to
2   try to talk the customer into keeping the
3   protection agreement, but ultimately, if it is
4   the wishes of the customer to cancel, then they
5   would process the cancellation and issue the
6   refund.
7       Q.  So I'm just going to go through some of
8   these to see if you can sort of explain a little
9   bit more about what they mean.  Look at No. 5,
10  "Coverage misunderstood."  Would you explain
11  what was meant by that?
12      A.  That would be selected by a retention
13  agent typically when a customer says:  "I
14  thought I was going to be able to bring in the
15  broken parts after I had pushed it down the
16  stairs and you guys would give me new one, and
17  that's -- since you're telling me that you are
18  not going to cover it that way, then I don't
19  like this plan anymore and I want my money back"
20  would be an example of that, where they think
21  we're covering more or differently than what we
22  do, acts of nature, those kind of things.
23      Q.  And how about No. 7, "Service-related
24  problem"?

Page 189

1       A.  Typically that is selected when a
2   customer is voicing a complaint about something
3   technician-related or the service experience in
4   general.  I called on a Tuesday and you guys
5   said you couldn't be here until the following
6   Monday.  That's certainly not on one technician
7   but part of the service experience.  The
8   technician showed up and he, you know, was
9   impolite to me.  So I don't want you guys coming
10  back out.  Those kind of situations, something
11  relating to a service order attempt or
12  fulfillment.
13      Q.  Typically where a customer voices
14  displeasure with the service experience --
15      A.  Yes.
16      Q.  -- in some way?
17      A.  Sorry.
18      Q.  How about No. 13, "Technician requested
19  cancel"?
20      A.  Typically that would be one of those
21  Sears reserves the right to cancel if it's age
22  or good working order or if it's one of those
23  health and safety to recycle your term, you
24  know, the crazy customer situation.

48  (Pages 186 to 189)

Page 190

1    Q. Okay. So all of those sorts of things
2  would fit into "technician requested cancel"?
3    A. They could. It -- the disclaimer here
4  is these are all agent-selected user codes. So
5  there's some margin for error, some variation in
6  interpretation across the business, but the
7  major- -- if you were to survey the team, those
8  would be the scenarios that I'm confident most
9  would give you.
10    Q. How about No. 17, "Coverage credit
11 cancel"?
12    A. That one is really not used much
13 anymore. It existed from when we would move
14 customers from a -- an à la carte Master
15 Protection Agreement to what we call "a cap
16 plan" that was a flat rate for any combination
17 of items, and so we would cancel off your
18 existing coverage and transfer your stuff --
19 your items to a new plan. So it was kind of
20 more like bookkeeping. NPS is really old,
21 doesn't have drag and drop, so needed to cancel
22 and create new, but no money was changing hands.
23    Q. And how about No. 24, "Revise number
24 items covered"?

Page 191

1    A. Typically that would be used where the
2  customer has buyer's remorse of some sort or
3  has -- no longer owns the merchandise or
4  whatever, but it was a multiple appliance plan
5  and they say, you know, "I sold that
6  refrigerator. I still want coverage on the
7  dishwasher and the washer and dryer, but that
8  refrigerator is long gone. Take it off my plan
9  and refund me for that portion of my Master
10 Protection Agreement."
11    So we'd cancel the coverage on the
12 refrigerator and the associate could put 24, but
13 they also could put something like -- no longer
14 has -- 14, "no longer has merchandise." So
15 that's a good example of that kind of
16 interpretation and user selection.
17    Q. How about No. 3, "priced too high"?
18    A. It's a value proposition question in
19 the customer mind. Our retention agents would
20 try to show the customer why it's a great deal,
21 and if we're not successful in that conversation
22 and the customer says "No, I just don't feel
23 it's worth it; I can't afford it," you know,
24 those kind of things, then we would put in

Page 192

1  "Price too high."
2    Q. But this is a situation where the
3  customer has already paid?
4    A. Yes.
5    Q. So --
6    A. It's buyer's remorse.
7    Q. Okay. And that leads me to No. 4,
8  which is "Questions value." And so how do those
9  two differ?
10    A. Not a lot. They are very similar in --
11 and it's more about how the customer
12 communicates that to us. Sometimes they will
13 say: I can't -- you know, I bought it and I saw
14 my new credit card bill and my payments -- you
15 know, my monthly -- I've been paying it off and
16 it's -- my minimum payment went from 60 to 80
17 and oh, my gosh. Most agents would quote --
18 would code that as a "price too high" reason
19 code or as another customer who says, you know,
20 "$200 for two-year's of coverage, geez, after
21 four years I could buy a new one" or whatever
22 that dialogue sounds like, that agent -- that
23 retention specialist may code that one as
24 "questions value."

Page 193

1    Q. Is --
2    A. But they get interchanged pretty
3  easily.
4    Q. Is there any informational value to
5  Sears to having two basically interchangeable
6  codes?
7    A. Probably not, to be frank. If we were
8  going to rewrite this today, we'd probably write
9  it differently. It's legacy.
10    Q. Do you know when this was created?
11    A. I know we added 29 through 32 within
12 the last few years. A lot of the rest of the
13 ones have been there for a -- as long as I can
14 remember.
15    Q. I just want to go through a few more of
16 these. No. 12, "Transfer coverage," what does
17 that mean?
18    A. Typically, that's used when Bob sells
19 or gives the refrigerator to Mary and part of
20 that transaction was the protection agreement
21 with it. So we allow customers to move the
22 coverage from one owner to another. So we would
23 be canceling it off of Bob's file and entering
24 the coverage on to Mary's file so we know to go

Page 194

1  to Mary's house if and when she needs service.
2    Q. How about "Revised plan type"? What --
3  that's No. 22.
4    **A. 22? Thank you.**
5      **We've been specifically carefully**
6  **talking about Master Protection Agreement. We**
7  **offer those other plans, the repair protection**
8  **agreement and that kind of stuff. So if the**
9  **customer was moving up or down from one of those**
10  **plans, always customer choice, that's what we**
11  **would use to cancel the old one before we create**
12  **the new one.**
13    Q. So then I think I understand what 23,
14  "Revised contract term," is. Is that referring
15  to the length?
16    **A. Yes. And it would always be a**
17  **reduction. Because these are cancel codes. So**
18  **we would be taking it from five down to, or**
19  **three down to.**
20    Q. Right.
21    **A. We'd have to record a new agreement to**
22  **revise the term up. That would be recording a**
23  **new agreement, not a cancel.**
24    Q. And how about 28, "Sears ending

Page 195

1  relationship with customer/product"?
2    **A. That's kind of the big version of**
3  **No. 13, where now we're saying that not only are**
4  **we not going to cover that item, but potentially**
5  **we're not going to -- we're wiping the slate**
6  **clean with that customer because they won't --**
7  **or we're eliminating that relationship because**
8  **they won't put the dog away.**
9    Q. So it's kind of a customer misbehavior
10  code for lack of a better term?
11    **A. That's an example of why we would use**
12  **that code, yes.**
13    Q. Okay.
14    **A. It's not all inclusive.**
15    Q. Well, how about the aspect of it that
16  Sears ending relationship with product, what is
17  that -- what could that mean?
18    **A. I'm struggling to think of a situation**
19  **in a call center environment where one of our**
20  **retention agents would use 28 specific to a**
21  **product. Frankly, I just don't like the way**
22  **that one is worded, because I can't think of an**
23  **example to give you that the agents would ever**
24  **use it in that way.**

Page 196

1    Q. When these codes are used and
2  agreements are canceled, other than the coding
3  of it, the number that you would save, have in
4  your system, be able to see, is there any other
5  information that's kept about the reasons for
6  cancellation?
7    **A. Yes. There's a free-form cancel**
8  **comments field where the retention agent can --**
9  **I don't know, like a -- you know, however many**
10  **characters, 50 characters, whatever it is, where**
11  **they can type in what the customer's telling**
12  **them and then the first name of who they spoke**
13  **with.**
14    Q. And do they have to put something in
15  there?
16    **A. Yes.**
17    Q. And can you use NPS to tell you exactly
18  how many customer cancellations occurred in any
19  particular category on here?
20    **A. No.**
21    Q. You can't say, you know, tell -- ask it
22  to run a report that says show me all the -- all
23  the situations where cancel reason No. 1 has
24  been inputted?

Page 197

1    **A. Data warehouse, yes.**
2    Q. Sorry. So you can use data warehouse
3  to tell you precisely how many cancellations
4  occurred in each of these categories?
5    **A. Yes.**
6    Q. And can you limit that by date? Can
7  you say I want to know all the No. 10s that
8  occurred between X date and Y date?
9    **A. Yeah. I mean, we don't have that**
10  **readily -- you know, it's not a "let me**
11  **refresh," but there's an SQL code that could be**
12  **written for it, I'm sure.**
13    MS. BRUNO: David, we produced a report
14  that has that information.
15    MR. DEVITO: Well, I'm going to get
16  there.
17    MS. BRUNO: Okay. I --
18    MR. DEVITO: The report is called a
19  replacement reasons report. I --
20    MS. BRUNO: That's a different report.
21    MR. DEVITO: That's a different report?
22  Okay. Do you know what -- that's not -- the
23  replacements -- can we go off the record?
24    (Discussion off the record.)

Thompson Court Reporters, Inc
(312) 421-3377

Page 198

1  BY MR. DEVITO:
2      Q.  And can you tell from the data
3  warehouse or otherwise whether a customer
4  received a refund upon cancellation?
5      A.  Yes.
6      Q.  And can you tell the amount of that
7  refund?
8      A.  Yes.
9      MR. DEVITO:  So I think we marked some
10  of the replacement reason report yesterday; is
11  that right?
12      MS. BRUNO:  Yes.  I believe that's
13  maybe number 1.
14  BY MR. DEVITO:
15      Q.  This is what was marked yesterday as
16  Exhibit 1.  (Tendering document to witness.)
17      Were you involved in preparing this
18  report?
19      A.  Yes.
20      MR. DEVITO:  So and -- forgive me if
21  Debbie did this yesterday with 15, but --
22      MS. BRUNO:  Oh, no, she didn't.
23      MR. DEVITO:  Okay.  All right.
24  BY MR. DEVITO:

Page 199

1      Q.  If you could just go across the columns
2  at the top, and I'm going to ask you what each
3  of those fields mean to the extent that they're
4  not totally self-explanatory.
5      I take it that each customer has its
6  own unique customer number; is that correct?
7      A.  Yes.
8      Q.  So the next column over is "Original
9  agreement number."  What does that mean?
10      A.  It means that it was a stand-alone
11  recorded protection agreement.  This was
12  recorded on such and such a date to cover such
13  items until such date for this price.  This was
14  the policy, the contract that we entered into.
15      Q.  So when it says, the first one, "48,"
16  what does that mean?
17      A.  The way it works is that you would take
18  the customer number and a five digit agreement
19  suffix to make up an agreement number.  So this
20  doesn't have the leading zeros, but if you were
21  to look up this customer, it would be customer
22  79885463500048 would be their full agreement
23  number if you were to look at their certificate,
24  for example.

Page 200

1      So it's just a way to identify.  You
2  know, as you're looking at customer record and
3  they purchase multiple agreements either because
4  they did a bunch of recent shopping or they have
5  been with us a long time or both, which
6  agreement are you looking at?  Oh, the one that
7  ends in 48?  Okay.  That's this one.  It was
8  bought on such and such a day, covering the
9  washer.
10      Q.  Okay.  So --
11      A.  Pretty similar to a policy number on a
12  car, if policy numbers changed each time you
13  renewed.
14      Q.  The first time a customer purchases an
15  MPA, they get No. 1; is that right?
16      A.  Close.  It's not one, two, three, four,
17  but it always goes up in number.  But it's not
18  sequential.  It's always ascending.
19      Q.  You can't read into it that this person
20  has 48 --
21      A.  47 underneath that one?
22      Q.  Yeah.
23      A.  No.
24      Q.  Is there any particular informational

Page 201

1  value in that other than it identifying
2  particular agreement?
3      A.  No.
4      Q.  So how about the column that says
5  "Agreement cancellation indicator"?
6      A.  That's indicating whether or not
7  original agreement number, in the second column,
8  as of the date running this report, either
9  yes -- Y for yes has been canceled in full or P,
10  like three rows down is partial, meaning we
11  revised the items or the term.
12      Q.  Okay.  So on -- and this may be a very
13  silly question, but why is this called a
14  replacement reasons report?
15      A.  All of the customer examples listed on
16  this report are customers who received a
17  replacement product under their protection
18  agreement.
19      Q.  And I guess because everything on here
20  is either "yes" or "partial cancellation," they
21  declined?
22      A.  No, not accurate.
23      Q.  Okay.
24      A.  The -- good guess.  But the way our

51  (Pages 198 to 201)

Page 202

1  system works is we can't move coverage from one
2  item to another. So I don't have a way to grab
3  agreement 48 and say it used to be on the old
4  refrigerator, now it's on the new refrigerator.
5  I don't have a way to just move the coverage
6  over. I have to cancel in the system agreement
7  48, and I would record a new agreement,
8  potentially 50 or 55 or whatever on the new
9  refrigerator.
10  So in order to move coverage when no
11  longer owns old one, now has new one, I have to
12  process a cancellation and enter a new agreement
13  so that the new refrigerator reflects the
14  coverage that the customer still has.
15  Q. Okay. And is that coded in a
16  particular way?
17  A. The cancellation?
18  Q. When you're canceling and then putting
19  it on to a new agreement.
20  A. Yes.
21  Q. And what does it say?
22  A. Ah, it's --
23  Q. Is that transfer coverage?
24  A. (Reviewing document.)

Page 203

1  Yeah.
2  Q. Could it be --
3  A. Yes.
4  Q. -- anything else?
5  A. I wanted to look and make sure there
6  wasn't anything else that somebody else could
7  pick. (Reviewing document.)
8  The training is to use 12, and the
9  group that handles the majority of these would
10  use 12. It's possible that somebody could use
11  No. 14, misunderstanding, you know, "oh, I don't
12  have that refrigerator anymore, I got this new
13  one" and the agent doesn't understand that it
14  was a PA replacement as opposed to just "I was
15  ready for this shiny new model." So they could
16  have used 14, but the training is 12.
17  MR. DEVITO: Maybe it will help if you
18  we take a break and I look at that other
19  document.
20  MS. BRUNO: Okay.
21  (Recess taken from 3:08 p.m.
22  to 3:11 p.m.)
23  MR. DEVITO: You can mark this as 14.
24

Page 204

1  (Exhibit 14 was marked for
2  ID.)
3  BY MR. DEVITO:
4  Q. So I'm going to sort of ask you to put
5  this side-by-side with Exhibit 1 because I'm --
6  what I'd like to do is understand sort of the
7  interplay between the two of them, if there is
8  any.
9  A. (Witness complying.)
10  Q. Is there a -- looking at Exhibit 1, is
11  there a cancel code associated with each of
12  these?
13  A. There would have to be, but it doesn't
14  appear to be displayed on this report.
15  Q. But there would be a cancel reason
16  associated with each one of these?
17  A. Yeah. In -- yes, in order to get an
18  agreement cancellation indicator of a Y or a P,
19  it means that a cancel was processed which
20  requires a cancellation reason code to be
21  selected.
22  Q. And can you tell from this whether
23  refunds were issued to customers in connection
24  with any of these cancellations?

Page 205

1  A. I can't tell from this report. They
2  shouldn't have been.
3  Q. And why not?
4  A. If we are replacing a product, we
5  wouldn't also refund you for the money. You get
6  one or the other as a general policy. I'm --
7  there's probably an exception to the rule
8  somewhere out there in the data warehouse, but
9  as our contract is written, you get one or the
10  other.
11  Q. Is every one listed on here, because
12  there's a replacement reason, mean that there
13  was actually a replacement done?
14  A. That's my understanding of this report,
15  yes, is that a new product was successfully
16  selected from the store.
17  Q. Okay. And so would you need a -- would
18  there be a separate report that would show every
19  instance in which a refund was issued instead?
20  A. (No response.)
21  Q. Let me ask it this way: Would you need
22  a different report to show you that?
23  A. Yeah.
24  Q. Now, on Exhibit 1, there's columns that

Thompson Court Reporters, Inc
(312) 421-3377

Page 206

1   say "Product description" and "New product
2   description." Does -- it doesn't say the brand
3   there, does it?
4     **A. No, it does not.**
5     Q. Could you generate a report that
6   indicated brands?
7     **A. Possible, yes. There's a brand name**
8   **field with each merchandise code, so yeah, the**
9   **data's available. I -- generate the report? It**
10   **would depend on the request and those kind of**
11   **things, but yeah, the data's there.**
12     Q. Now, if you look at Exhibit 14 --
13     A. Okay.
14     Q. -- on the second page, it appears to be
15   giving the gross value of canceled MPAs broken
16   down by each of these canceled reason codes on a
17   per month basis; is that accurate?
18     **A. Yes.**
19     Q. It does not indicate the number of
20   agreements that were canceled; is that accurate?
21     **A. Yes.**
22     Q. Would it be possible to create a report
23   that indicated the number of cancellations
24   associated with these dollar values?

Page 207

1     **A. The data's there. I -- so yeah, it's**
2   **possible. I don't have a report readily**
3   **available that has that, but the data's there.**
4   **So I'm sure it could be retrieved.**
5     Q. So, for example, on Exhibit 1 -- we
6   don't have the whole thing because it's 5,000
7   pages -- but could you make the report tell you,
8   for instance, how many different customer
9   numbers are in the report?
10     MS. BRUNO: Objection as to form.
11     THE WITNESS: How -- how many unique
12   customer numbers are there?
13   BY MR. DEVITO:
14     Q. How many are listed on any particular
15   report? Like, could you make totals at the
16   bottom that said -- or total number of lines?
17     **A. Probably. I mean, it's a function of**
18   **Excel. So I would say yes. I didn't mean --**
19     MS. BRUNO: No. You literally took the
20   words that were in my head when you said that.
21   BY MR. DEVITO:
22     Q. If it's an Excel spreadsheet, then yes,
23   sure, you could --
24     **A. Yes. Most of these things could be**

Page 208

1   **exported to Excel and manipulated that way. So**
2   **you get all the bells and whistles of Excel, so**
3   **yes, sir.**
4     MS. BRUNO: This was produced in Excel.
5     MR. DEVITO: I thought you produced it
6   in a searchable PDF, but I could be wrong. I
7   don't believe I've ever seen the columns with
8   the numbers next to them. If I had, I certainly
9   wouldn't have asked that question.
10     MS. BRUNO: I hear you. Got it.
11   BY MR. DEVITO:
12     Q. So moving away from these documents,
13   has there -- are you aware of any situation
14   in which Sears has changed its position on
15   whether or not a particular product is covered,
16   meaning up until X date we covered this product
17   and then we decided we're not going to cover
18   this anymore?
19     **A. Yes, we've exited the market on new**
20   **contracts for certain merchandise, but we've**
21   **always honored that contract at the customer**
22   **level for its original duration. So we**
23   **wouldn't -- vacuum cleaners, for example, we**
24   **stopped renewing, stopped selling new coverage,**

Page 209

1   honored all contracts up until they expired.
2     Q. And what goes into the determination
3   not to continue covering a product?
4     MS. BRUNO: Objection as to form.
5     If you know, you can answer.
6     THE WITNESS: A variety of factors,
7   including the value of the product in the
8   marketplace as -- you know, DVD players used to
9   be an MPA item and now they're an SPP item
10   because they're so cheap and inexpensive. They
11   become a disposable product rather than a
12   serviceable merchandise item.
13     Sometimes the manufacturer has gone out
14   of business, so we're not going to be able to
15   find a supply of aftermarket parts to repair
16   future items. So we don't want to expose
17   ourselves to any further coverage. So we
18   stopped renewing and extending. Maybe it's just
19   not a profitable venture for us anymore, that
20   product with the service costs and those kind of
21   things. So we just want to exit that space in
22   the market or any combination -- you know.
23   BY MR. DEVITO:
24     Q. Sure. I want to ask you a few

53 (Pages 206 to 209)

Page 210

1  questions about marketing of MPAs.
2      **A. Okay.**
3      Q. Who's responsible for MPA marketing?
4  Is there person that's in charge of marketing
5  for -- with respect to MPAs?
6      **A. Most directly responsible today would**
7  **be Demi. She's on -- she's the one that's on**
8  **there as channel manager.**
9      Q. Right. She has your old job?
10     **A. Yes, sir.**
11     Q. And what kind of marketing does Sears
12  do for MPAs?
13     **A. Outbound telemarketing, direct mail,**
14  **e-mail and answering inbound calls. There's**
15  **signage in the retail stores showing off our**
16  **protection agreements, and it's available as an**
17  **add-on product in the cart on Sears.com. And**
18  **technicians would talk about it, offer it in the**
19  **home.**
20     Q. And is there a portion of a Sears
21  website that's devoted to MPA sales?
22     **A. There's a page, yes.**
23     Q. And --
24     **A. It's -- well, I'm sorry. As I listen**

Page 211

1  **to your question more carefully, MPA sales?**
2  **There's a page on Sears.com that talks about the**
3  **Master Protection Agreement, but it's not a**
4  **place where you can just go in and sign in and**
5  **buy coverage. It's more of the explanation to**
6  **go with the refrigerator purchase.**
7      Q. So when you're buying a refrigerator on
8  Sears.com, would you be prompted to purchase an
9  MPA with respect to that product?
10     **A. Yes.**
11     Q. And what kind of e-mail marketing does
12  Sears do for MPAs?
13     **A. It's very limited today. We are**
14  **literally taking the direct mail list and**
15  **sending some customers an e-mail instead, and**
16  **some are getting both the direct mail, snail**
17  **mail letter and an e-mail, but it's the same**
18  **target audience that would have received a**
19  **letter, just trying to also send them an e-mail**
20  **to see if that gets us better response rates.**
21     Q. And what is that target audience?
22  Like, where do you get the contact information
23  for those people?
24     MS. BRUNO: Objection as to form.

Page 212

1      You can answer if you know.
2      THE WITNESS: Retail purchases, service
3  order history and general call-ins.
4  BY MR. DEVITO:
5      Q. So it's almost all to -- directed to
6  existing or prior Sears' customers?
7      **A. Yes. They have some sort -- they may**
8  **not be -- they may not have a protection**
9  **agreement record, but they've done something**
10  **with us where they've given us their name,**
11  **address, phone.**
12     (Exhibit 15 was marked for
13  ID.)
14  BY MR. DEVITO:
15     Q. I apologize for the copy quality of
16  this document. I don't know if it was better or
17  worse than the original was.
18     MS. BRUNO: Oh, it was better, I
19  promise. Oh.
20     MR. DEVITO: Do you want to go off the
21  record for a second?
22     MS. BRUNO: No. We can be on the
23  record. That's fine. Based on the Bates
24  number, I believe you produced this to us.

Page 213

1      MR. DEVITO: Yeah.
2      MS. BRUNO: Okay.
3  BY MR. DEVITO:
4      Q. So you've been and handed what's been
5  marked as Exhibit 15, and this is a document
6  that we produced, that our client had received
7  from Sears. Do you recognize this?
8      **A. No.**
9      Q. Is this the type of marketing material
10  Sears uses?
11     **A. I mean, it's -- yeah, it absolutely**
12  **looks like it's from Sears. It's not a letter**
13  **I've ever worked on personally or seen.**
14     Q. So you wouldn't think -- you don't
15  think that Sears is still using this form of
16  letter as marketing material?
17     **A. Oh, I wouldn't know either way.**
18  **There's -- the volume of material going out to**
19  **different customers from different lines of**
20  **business, I couldn't speak intelligently as to**
21  **whether this is current or not.**
22     Q. So is there a lot of different types of
23  direct mail, marketing going on?
24     **A. I would say so, yeah.**

54  (Pages 210 to 213)

Page 214

1     Q. But lots of different looking documents
2  that are sent out direct mail to different
3  customers?
4     MS. BRUNO: Objection as to form.
5     You can answer.
6     THE WITNESS: While this is a direct
7  mail piece, this isn't something that came from
8  the service contracts or protection agreement
9  division. So it's from some other part of
10 Sears. It looks to be from Sears Repair. So
11 yeah, I mean, Repair can send stuff out, Service
12 Contracts could send stuff out, and the two
13 don't necessarily talk.
14 BY MR. DEVITO:
15    Q. Although to some extent they're
16 cross-marketing each other's products and
17 services?
18    **A. They certainly appear to be, because**
19 **they talk about -- the third paragraph says "you**
20 **can also purchase a protection agreement."**
21    Q. And so, like, in the second paragraph
22 there, it says "We repair all major brand items,
23 large and small, even if they weren't purchased
24 at Sears - everything from dishwashers to DVDs."

Page 215

1     Is that an accurate statement, that
2  Sears repairs all major brand items?
3     **A. I don't know if there's a def- -- a**
4  **universal definition of what constitutes**
5  **"major." So I think in our opinion and most**
6  **practical purposes, we service quite bit of**
7  **stuff, but I don't know whether I could say --**
8  **that I could back up that statement. I'm not**
9  **part of the service organization. I'm sorry.**
10    Q. Well, we certainly looked at list of
11 brands that Sears does not repair; is that fair
12 to say?
13    MS. BRUNO: Objection to the form of
14 the question.
15    THE WITNESS: I don't think we looked
16 at a list like that, no.
17 BY MR. DEVITO:
18    Q. Okay. What's -- then sort of help me
19 out with what -- we looked at this list, which I
20 know you weren't familiar with, but this
21 Exhibit 12 --
22    **A. Um-hum.**
23    Q. -- brand list of nonserviceable brands.
24 Now, I understand that there's in-warranty

Page 216

1  repair services. Is that the distinction here
2  that you're saying, that Sears might offer
3  repair services on a -- I forget the term you
4  used but --
5     **A. Collect call.**
6     Q. -- on a collect call basis for other
7  brands?
8     **A. You're exactly right. That's the**
9  **distinction that exists in my mind as part of**
10 **this business, the difference between servicing**
11 **as a collect call versus servicing as a warranty**
12 **provider.**
13    Q. So are you aware of any major brand
14 items -- what you would consider major brand
15 items that Sears will not repair?
16    **A. Yeah.**
17    Q. Can you give me some examples?
18    **A. Um... I mean, like we talked earlier,**
19 **NordicTrack is a brand that I don't see -- this**
20 **isn't specific to home appliances and HVAC like**
21 **the previous document was, and so no, most**
22 **people would consider NordicTrack a major brand,**
23 **but we don't service it.**
24    Q. Any others that you can think of off

Page 217

1  the top of your head?
2     **A. I mean, some of those high-end brands**
3  **like we've been talking today from that list**
4  **earlier give us trouble.**
5     Q. And what do you mean by that?
6     **A. It's difficult to source parts and get**
7  **the technical information from some of those**
8  **manufacturers. They like to use their own**
9  **network.**
10    THE WITNESS: Can I get water?
11    MS. BRUNO: Yeah.
12    MR. DEVITO: Yeah. Sure. Let's take a
13 break.
14    (Recess taken from 3:29 p.m.
15    to 3:34 p.m.)
16    (Exhibit 16 was marked for
17    ID.)
18 BY MR. DEVITO:
19    Q. I've handed you what's been marked as
20 Exhibit 16. I believe this is a document --
21 well, it's Bates-numbered SEARS 2497, and I
22 think it's been excerpted. So it's not the full
23 document that this was taken from.
24    I just wanted you to -- if you would

Page 218

1  turn to the -- what's the third page. It says
2  "Highlights of Ciboodle" at the top. The third
3  paragraph down says "By tying together all of
4  the information by the customer, including past
5  interactions and current cases, Ciboodle will
6  enable you to provide a consistent and efficient
7  customer experience and eliminate the need to
8  copy notes into multiple systems."
9      So my question is about the reference
10 at the end there to copying notes into multiple
11 systems. What is that referring to?
12     MS. BRUNO: Objection as to form.
13     You can answer if you know.
14     THE WITNESS: I'm not sure I do.
15 (Reviewing document.)
16 BY MR. DEVITO:
17     Q. If you don't know, that's okay.
18     A. Yeah, I don't.
19     Q. Was there a time when customer service
20 people at Sears were required to copy notes into
21 multiple systems?
22     A. Probably. I mean, what's coming to
23 mind is, you know, we have NPS, we have
24 Ciboodle, not just Case Ciboodle but there's

Page 219

1  Ciboodle which is a separate sign-on, we have a
2  thing, GCRS, gift card request system, where if
3  we're requesting to send a gift card to a
4  customer for any reason whatsoever, that's how
5  you issue a gift card. That was a separate
6  system.
7      So perhaps this was intended to say you
8  can now document that stuff all in Case Ciboodle
9  instead of in Ciboodle and in GCRS, gift card
10 request, you know, those kind of things, but
11 that's me giving you my best guess right now.
12     Q. Okay. Were there any systems that
13 existed prior to the use of Ciboodle that were
14 eliminated by its introduction?
15     A. At the agent level, we stopped using
16 NPS to handle calls. NPS was certainly not
17 eliminated, but it was no longer used at the
18 associate call center level. We migrated from
19 NPS to Ciboodle as the daily system of working.
20     Q. Okay. Other than the systems that
21 you've mentioned, can you think of any other
22 systems that this might be referring to?
23     A. I can't.
24     Q. If you'd just flip one page, in the

Page 220

1  sixth paragraph down, it says "Current groups
2  utilizing CCD Ciboodle -- Ciboodle. Sorry.
3      A. No worries.
4      Q. We're not videoing this and no one is
5  ever going to know.
6      MS. BRUNO: Except you just talked
7  about it.
8      MR. DEVITO: I know.
9      MS. BRUNO: Sorry.
10     MR. DEVITO: No one would have ever
11 known. Now I'm a fool on the record. Silly me.
12 BY MR. DEVITO:
13     Q. "Current groups utilizing CCD Ciboodle
14 are Technical Specialists, Repair Customer Care,
15 PartsDirect, Service Contracts Outbound..."
16     My question is: What is CCD Ciboodle?
17     A. Case Ciboodle -- oh, no. I'm sorry.
18 CCD Ciboodle is Ciboodle. So it's an extraneous
19 differentiation between -- there's Case Ciboodle
20 and there's Ciboodle. CCD Ciboodle, Ciboodle,
21 the same thing --
22     Q. Okay.
23     A. -- extra first name.
24     Q. Does CCD stand for anything?

Page 221

1      A. Probably.
2      Q. But you don't know?
3      A. But I don't know what it is.
4      Q. And so what you're referring to is Case
5  Ciboodle is what's referenced in the next
6  paragraph down, which says "Business groups with
7  Case Management Ciboodle...?
8      A. Correct.
9      Q. If you flip one more page, there's a
10 reference after -- after it says "Introduction"
11 in that section, there are two paragraphs and at
12 the bottom of the second paragraph, there's a
13 reference to "Third Party Solutions."
14     Could you tell me what that is? It's
15 in the last line there.
16     A. (Reviewing document.)
17     To be honest, I'm not familiar with
18 that term, "Third Party Solutions," but from the
19 context of it, it would appear to say that we're
20 talking about referring to a group that handles
21 customer situations when a third party like the
22 Better Business Bureau or an attorney demand or
23 an Attorney General complaint has been engaged.
24     Q. Do you know who at Sears might know

56 (Pages 218 to 221)

Page 222

1  what this -- might know specifically what is
2  meant there by "Third Party Solutions"?
3      A. Like who would I ask?
4      Q. Yeah. Is there a better person to ask
5  than you about that?
6      A. Probably.
7      Q. Well, who would you ask?
8      A. I would probably ask Bilal.
9      Q. Could you spell that?
10     A. B-I-L-A-L.
11     Q. Is Bilal on the org chart that we
12  looked at?
13     A. No. But he is on Exhibit 6 right below
14  me.
15     Q. I see that. Thank you.
16     A. Yeah.
17     MR. DEVITO: That's all I've got. So
18  we're done.
19     MS. BRUNO: Okay. So I have no
20  questions for this witness.
21     THE REPORTER: Do you have a standing
22  order or did you tell the reporter yesterday?
23     MS. BRUNO: No, but we'll reserve
24  signature.

Page 223

1      MR. DEVITO: How long is regular
2  delivery?
3      THE REPORTER: I believe it's eight
4  business days.
5      MR. DEVITO: Okay. That should be
6  good.
7      (Deposition concluded at 3:46 p.m. CST.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 224

1          UNITED STATES DISTRICT COURT
2      FOR THE NORTHERN DISTRICT OF ILLINOIS
3              EASTERN DIVISION
4   NINA GREENE and GERALD GREENE,)
5          Plaintiffs,   )
6      -vs-            ) Case No.
7   SEARS PROTECTION Company,   ) 1:15-cv-02546
8   SEARS ROEBUCK and Co. and   )
9   SEARS HOLDINGS Corporation,  )
10         Defendants.   )
11
12     I hereby certify that I have read the
13  foregoing transcript of my deposition given at
14  the time and place aforesaid, consisting of
15  pages 1 to 223, inclusive, and I do again
16  subscribe and make oath that the same is a true,
17  correct, and complete transcript of my
18  deposition so given as aforesaid and includes
19  changes, if any, so made by me.
20
21      _____
21          DAINON SETZER
22  SUBSCRIBED AND SWORN TO
23  before me this _____ day
23  of _____, A.D. _____.
24

Page 225

1   STATE OF ILLINOIS  )
                    ) ss.
2   COUNTY OF C O O K  )
3       I, Deborah Habian, a Certified
    Shorthand Reporter within and for the State of
4   Illinois, do hereby certify:
5       That previous to the commencement of
    the examination of the witness, the witness was
6   duly sworn to testify the whole truth concerning
    the matters herein;
7
        That the foregoing deposition was
8   reported stenographically by me, was thereafter
    reduced to printed transcript by me, and
9   constitutes a true record of the testimony given
    and the proceedings had;
10
        That the said deposition was taken
11  before me at the time and place specified;
12      That the reading and signing by the
    witness of the deposition transcript was agreed
13  upon as stated herein;
14      That I am not a relative or employee
    of attorney or counsel, nor a relative or
15  employee of such attorney or counsel for any of
    the parties hereto, nor interested directly or
16  indirectly in the outcome of this action.
17      IN WITNESS WHEREOF, I do hereunto set
    my hand this ____ day of _____, 20___.
18
19
20
21
        _____
22  DEBORAH HABIAN, CSR, RMR, CRR, CLR
    Notary Public
    CSR No. 084-02432
23
24

57 (Pages 222 to 225)

# EXHIBIT 5 to EXHIBIT 2

# SUBJECT TO CONFIDENTIALITY ORDER

# DATED JULY 29, 2015

EXHIBIT 6 to EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

NINA GREENE and GERALD GREENE,      )
     )
     )
Plaintiffs,      )
     )     Civil Action No. 15-cv-02546
v.      )
     )     Judge Jorge L. Alonso
SEARS PROTECTION CO., SEARS,      )
ROEBUCK AND CO., and SEARS      )     JURY TRIAL DEMANDED
HOLDINGS CORP.,      )
     )
Defendants.      )
     )

## **DEFENDANTS' RULE 26(a)(1)(A) INITIAL DISCLOSURES**

Defendants Sears Protection Co., Sears, Roebuck and Co., and Sears Holding Corp.,

(collectively "Sears") by and through its undersigned counsel, and pursuant to Federal Rules of

Civil Procedure 26(a)(1)(A), hereby make the following disclosures to Plaintiffs Nina Greene

and Gerald Greene ("Plaintiffs") and state as follows:[1]

**I.**    **General Statement.**

Sears' investigation and discovery in this action are continuing. Accordingly, Sears

reserves the right to supplement and/or amend its disclosures.



---

[1] Nothing herein shall be deemed to waive any privilege or objection to discovery. Nor shall anything herein be deemed an admission about the relevancy, admissibility of, or weight to be accorded to, any evidence that may be offered by Plaintiffs at trial or at any class certification hearing. Sears reserves its right to amend or supplement these disclosures at any time, as permitted by law.

## II.    Individuals (F.R.C.P. 26(a)(1)(A)(i)).

Based upon information currently and reasonably available, Sears identifies the following

individuals as likely to have discoverable information that Sears may use to support its claims or

defenses:

1.    Nina Greene and Gerald Greene
      c/o Plaintiffs' Counsel

Plaintiffs have information relating to the issues and claims alleged in their Complaint, as

well as to defenses to those claims.  Plaintiffs further information regarding their Master

Protection Agreements ("MPAs") and the circumstances relating to the purchase of those

agreements as well any discussions with Sears or its agents regarding the agreements.

2.    Tina Anthony
      (Sears Claims Consultant in Executive Member Solutions and Recovery)
      c/o Dentons US LLP
      233 S. Wacker Drive, Suite 5900
      Chicago, IL 60606
      Attn:  Leah Bruno
      (312) 876-7456

Ms. Anthony has information on Sears' interactions with Ms. Greene regarding her

concerns with respect to her MPAs.  Ms. Anthony is also knowledgeable about the Greene's

MPA purchase history.

3.    Ashly Jobin,
      (Sears Manager of Service Contracts Administration)
      c/o Dentons US LLP
      233 S. Wacker Drive, Suite 5900
      Chicago, IL 60606
      Attn:  Leah Bruno
      (312) 876-7456

Ms. Jobin has information on issues relating to refunds for or buyouts of MPAs.  Ms.

Jobin also has information on issues relating to the investigation into Ms. Greene's MPA service

history and customer service interactions.

4.    Danion Setzer

(Sears Customer Segment Manager in Service Contracts)
c/o Dentons US LLP
233 S. Wacker Drive, Suite 5900
Chicago, IL 60606
Attn: Leah Bruno
(312) 876-7456

Mr. Setzer has information on (1) issues relating to post-point-of-purchase service

agreement sales and marketing, (2) issues relating to customer records system, (3) issues relating

to service under MPAs.

5.      Bilal Aslam
        (Sears National Inquiry Center & Resolutions Team Manager)
        c/o Dentons US LLP
        233 S. Wacker Drive, Suite 5900
        Chicago, IL 60606
        Attn: Leah Bruno
        (312) 876-7456

Mr. Aslam has information on issues related to customer refund requests as well as

refunds issued to Ms. Greene.

The above disclosures are based on the allegations in the Complaint and upon counsel's

investigation to date. Sears reserves the right to disclose additional individuals with knowledge

as they become known during the course of discovery.

**III.    Documents (F.R.C.P. 26(a)(1)(A)(II)).**

Sears may use the following categories of documents and/or tangible things to support its

arguments and defenses. The documents identified are located in, or are available in electronic

format through Sears' counsel.

- Sears Protection Company Master Protection Agreements;

- Sears internal procedures governing MPAs including intranet pages discussing

   service fulfillment guidance, selling rules, case creation and documentation

   process, product replacement and service issues;

- Sears Protection Plan marketing materials;

- Sears customer service records; and

- Plaintiffs' MPA worksheet, service history, contact history, replacement appliance authorization records, and payment records.

Sears reserves the right to rely on additional documents, document categories, and/or tangible things identified by the parties herein and/or discovered or obtained through the course of this action, including, but not limited to, documents produced by Plaintiffs and/or third parties.

**IV.     Damages (F.R.C.P. 26(a)(1)(A)(iii)).**

Not applicable.

**V.      Insurance F.R.C.P. 26(a)(1)(A)(iv)).**

Sears is currently investigating whether any applicable insurance agreements may exist, but states that if such insurance agreements exist it will provide, for inspection and copying under Rule 34, any such insurance agreements.

Dated: June 15, 2015                                   Respectfully Submitted,

By:     /s/ Leah R. Bruno

Natalie J. Spears
Leah R. Bruno
Christopher Q. King
Dentons US LLP
233 South Wacker Drive
Suite 5900
Chicago, Illinois 60606
312.876.8000 telephone
natalie.spears@dentons.com
leah.bruno@dentons.com
christopher.king@dentons.com

Attorneys for Defendants

- 4 -

## CERTIFICATE OF SERVICE

I, Leah R. Bruno, hereby certify that on June 15, 2015, I electronically served the

foregoing Defendants' Rule 26(a) Initial Disclosures to all counsel of record

/s/ Leah R. Bruno _____

EXHIBIT 7 to EXHIBIT 2

## Protection Agreements - Coverage Grid
*(Limitations Apply - See Contract for Details)*

| COVERAGE | Master Protection Agreement (MPA) | Repair Protection Agreement (RPA) | ServiceSmart Agreement (SSA) | Home Warranty (HW) |
|---|---|---|---|---|
| Coverage of Parts and Labor needed to keep products working under normal use | X | X | Parts & Labor only | $60 Deductible per trade |
| As Many Service Calls as Needed to keep the product in proper operating condition | X | X | X | $60 Deductible per trade |
| Nationwide Service available | X | | | All States except Alaska, Hawaii and Puerto Rico |
| Rapid Resolution — Fast Help by phone for all covered products | X | | | |
| Product Replacement with like item from Sears if repair cannot be completed due to unavailability of functional parts or technical information | X | | | Up to $10,000 (Ultra Premium products such as Viking, Wolf, GE Monogram up to $1,000) |
| No Lemon Guarantee — Replace product upon request if 4 or more product failures within 12 covered months. Requires repair or replace of functional parts | X | | | |
| Food Loss Protection | $250 / year | | $200 / year | |
| Rental Reimbursement | X | | | |
| 25% Discount on Non-Covered Repairs — 25% discount off regular price of service performed and parts installed | X | | X | 25% discount on non-covered repairs except plumbing and electrical |
| 25% Reimbursement on Non-Covered Parts purchased at Sears | X | | | |
| Annual Preventive Maintenance Check, at customer request | X | | | Two HVAC PM checks with every plan |
| Cancellation with Refund | Full refund within full warranty period or within 60 days, prorated after warranty expiration or after 60 days | | Full refund within 60 days, prorated after service plan month after service performed | Full refund within 30 days, pro-rated thereafter |
| Cosmetic Defects — Up to 3 years from date of original Product Purchase | X | | | |
| Multiple Years of Coverage available | Up to 5 years on most products | | | Monthly premium with auto-renew |
| Transferable to subsequent owners | X | | X | X |
| Sellable by Technicians or Sales Associates | X | | Call Center Only | Technicians and Call Center Only |
| Maximum Repair / Replace Liability | No Maximum | No Maximum | Maximum Repair $500 | $10,000 per repair up to an aggregate of $50,000 (Ultra premium appliances such as Wolf, Viking and GE Monogram Series up to $1,000) |

Revised 4_2014

SEARS0000587

# EXHIBIT 8 to EXHIBIT 2

# SUBJECT TO CONFIDENTIALITY ORDER

# DATED JULY 29, 2015

EXHIBIT 9 to EXHIBIT 2

## MASTER PROTECTION AGREEMENT
Retain this document as proof of ownership.
**This is not a contract of insurance.**

In this Master Protection Agreement (hereinafter referred to as "MPA" or "Agreement"), the terms "we," "us," "our" and "Obligor" refer to Sears Protection Company ("SPC"), a wholly-owned subsidiary of Sears, Roebuck and Co. ("Sears"), in states where SPC is the Obligor, Sears in states where Sears is the Obligor, Sears Home Improvement Products, Inc. ("SHIP"), a wholly-owned subsidiary of Sears in states where SHIP is the Obligor, and Sears Roebuck de Puerto Rico, Inc. ("Sears PR"), a wholly-owned subsidiary of Sears, in Puerto Rico. The terms "you" and "your" refer to the purchaser of this MPA. Obligations under this Agreement are backed by the full faith and credit of the Obligor. See Section 16 for a state specific Obligor listing. **ALSO SEE SPECIAL STATE EXCLUSIONS BELOW.**

1. COVERAGE AND TERM. Subject to the terms and conditions of this MPA, and during the Term (as that term is hereinafter defined) we will directly pay on your behalf the cost of parts and services performed by a qualified repair provider that we shall designate ("Sears Repair") necessary to maintain the proper operating condition of the product(s) as to which you specifically purchased this MPA to protect (the "Covered Product") as set forth on the reverse side, including repairs necessary due to normal wear and tear of such Covered Product(s). Any parts and service necessitated by a Sears Repair on Covered Product(s) which is then subject to any manufacturer's warranty or manufacturer's recall will be performed by Sears in accordance with the procedures and dictates of such manufacturer's warranty or manufacturer's recall. Parts used to repair out of warranty product(s) may be either new or rebuilt or non-original manufacturer's parts, at our option. Products including those within the original manufacturer's warranty period may be repaired or replaced with a comparable product (which may have a lower selling price than the Covered Product(s)) from a Sears or Sears affiliated store, or, at our discretion, we will issue a credit for the replacement value of the Non-Repairable Covered Product(s), which value could be substantially less than the price paid for the Covered Product(s).

The term of this MPA ("Term") begins on the date coverage was purchased on the Covered Product(s) and expires on the date set forth on the reverse side.

Any manufacturer's warranty period on the Covered Product(s) may run simultaneously with the Term or a portion of the Term, however at no time will the Total Price (as that term is defined in Section 14 of this MPA) you paid for this MPA include the scope of coverage within such coverage time period that is specifically set forth in such manufacturer's warranty as any manufacturer's warranty on the Covered Product(s) is separate and distinct from the coverage being provided to you under this MPA.

**THERE ARE CERTAIN LIMITATIONS TO COVERAGE UNDER THIS MPA WHICH ARE SET FORTH IN SECTIONS 2, 12, 13 AND 15 BELOW, INCLUDING CERTAIN SPECIAL STATE PROVISIONS WHICH ARE ALSO SET FORTH BELOW.**

2. ELIGIBILITY FOR COVERAGE. **You represent that the product(s) listed on the reverse side is in proper operating condition at the start of coverage and the information related to "Date Purchased" is correct.** Covered Products must have a legible model and serial number. Covered Products without the proper identification will not be eligible for any service under this agreement and this agreement will be cancelled. We reserve the right to inspect the products listed on the reverse side to determine eligibility for coverage. Coverage applies only to products which are located at one (1) address within a single dwelling unit.

3. DISCOUNT ON NON-COVERED REPAIRS. On the Covered Product(s), you are entitled to a 10% discount off the regular retail price on any service performed and related installed parts provided by Sears Repair that is not covered by this MPA.

4. TRANSFERABILITY. This MPA is transferable to any subsequent owner of the Covered Product(s) subject to the terms and conditions of this MPA.

5. PREVENTIVE MAINTENANCE. At your request, we will directly pay Sears Repair to perform one (1) preventive maintenance check-up within any contract year that the Covered Product(s) is covered. under this MPA

6. FOOD LOSS REIMBURSEMENT FOR REFRIGERATORS AND FREEZERS. We will reimburse you up to $250 within any continuous twelve (12) month period during the Term of this MPA for any food spoilage that is the result of a mechanical failure of the Covered Product(s) that is covered for such food spoilage. The food loss must be verified by us. If the Covered Product at issue is still under a manufacturer's warranty, any

National MPA AM E Jan2010



FORM 4/G

reimbursement under this MPA is in addition to any reimbursement under such manufacturer's warranty. In no case shall the total reimbursement under the manufacturer's warranty and this MPA, in the aggregate, exceed the value of the food loss.

7. RENTAL REIMBURSEMENT. In the event that you will be without the use of your Covered Product(s) due to a covered Sears Repair for a period of time that is longer than our original promised completion date, SPC will reimburse you for reasonable rental expenses of a comparable product for a period of time from one (1) day after the original promise date until the covered Sears Repair is completed. For in-home service, original promised completion date is the first date that a technician is scheduled to arrive to perform service on such Covered Product(s). All reimbursements for rental expenses must be pre-authorized by SPC and require copies of original receipts from a vendor approved by SPC along with completed claim forms for such rental. To secure authorization, call 1-800-927-7836.

8. REPLACEMENT AND NO LEMON GUARANTEE. If we determine that a Covered Product is not repairable due to unavailability of functional parts or technical information (a "Non-Repairable Covered Product"), you are entitled, at your option, to either: (1) a comparable product replacement based solely on the replacement value of such Non-Repairable Covered Product as determined by us, from a Sears or Sears affiliated store; or (2) a merchandise credit for such Non-Repairable Covered Product based solely upon the comparable product replacement value as determined by us. If neither of the two options in the immediately preceding sentence is selected by you, then SPC may cancel this MPA and refund the Total Price of your current MPA coverage for the Non-Repairable Covered Product. You have up to ninety (90) days from the date of authorization by SPC to select your replacement product. Replacement products may be new or rebuilt to meet the manufacturer's specifications of the original product. We shall not be responsible for reconfiguring space to accommodate replacement product(s) when a product of identical dimensions is not available. **TECHNOLOGICAL ADVANCES AND REPLACEMENT PRODUCT AVAILABILITY MAY RESULT IN A REPLACEMENT PRODUCT WITH A LOWER SELLING PRICE THAN THE ORIGINAL PRODUCT (BEING THE NON-REPAIRABLE COVERED PRODUCT). IN ALL CASES, PRODUCT COMPARABILITY FOR A REPLACMENT PRODUCT WILL BE DETERMINED BY US AT OUR SOLE DISCRETION.** In accordance with the foregoing provisions, we will also, at your request, replace the Covered Product(s) covered by this MPA in the event of four (4) or more separate product failures, as determined by us, due to a defect in parts or workmanship within any continuous twelve (12) month period that the Covered Product(s) is covered. Product failures for these purposes must include repair or replacement of a functional, non-expendable part, and do not include preventive maintenance, product diagnosis, customer instruction, accessory, cosmetic, or non-functional repair or replacement, or any repair covered under a manufacturer's product recall. Your request for replacement of a Covered Product(s) must occur within sixty (60) days from its fourth (4th) product failure (the "Fourth Failure Time Period"). To secure authorization, call 1-800-927-7836 prior to the expiration of the Fourth Failure Time Period.

9. COSMETIC DEFECTS COVERAGE. Cosmetic defects are covered under this MPA for the first three (3) years of ownership of the Covered Product(s) from its purchase date as set forth on the reverse side. Cosmetic defects or cosmetic incompatibility of parts are not eligible for product replacement, they are only eligible for repair. Limitations of coverage still apply. See Section 13 below.

10. BUSINESS OR COMMERCIAL USE. A product is "used for business or commercial purposes" if it is used for any purpose other than single family household purposes. Any product not listed in Section 13(c) below that is used for business or commercial purposes may be covered under this Agreement. All products used for business or commercial purposes must have been purchased from a Sears or Sears affiliated store. Central heating and cooling products must also have been installed by a Sears authorized installer with no modifications to the original installation.

11. TIME AND PLACE OF SERVICE. Service will be performed during the Sears Repair provider's normal business hours. If, due to the loss of the use of your Covered Product, your health or safety is endangered or if damage to or loss of your property is threatened, we will make commercially reasonable efforts to expedite service. To arrange for service where your Covered Product is located, call 1-800-4-MY-HOME® at any time. For service on digital cameras, computers and other home office equipment, call 1-800-877-8701. On some products, telephone support by a technician will be available and you will be required to check some basic operational functions and be given possible solutions before a technician is dispatched to your home. If the reverse side of this certificate indicates Shop Service, you must bring the Covered Product(s) to a Sears Repair location and pick it up following completed service. In some cases, you will be provided packaging and you must ship the Covered Product to our service provider, at our expense, for repair. For select types of merchandise, we

National MPA AM E Jan2010

FORM 4/G

may transfer Covered Product from your home to a specialized facility in order to complete the repair, at our expense if the Covered Product is covered by an in-home agreement.

12. SAFETY AND ACCESSIBILITY. In the event that Sears Repair determines that it cannot service your Covered Product(s) due to poor accessibility or unsafe working conditions or that it cannot restore your Covered Product(s) to safe, working conditions due to reasons beyond the scope of this Agreement, such as, but not limited to, code violations, improper storage, installation, use or movement of the product or equipment, including the failure to place the product or equipment in an area that complies with the manufacturer's published space or environmental requirements, Sears Repair shall not be required to proceed until you remedy the applicable cause.

13. LIMITATIONS OF COVERAGE. THIS MPA DOES NOT COVER:

    a.   any product located outside the United States, Puerto Rico and Guam. Service is available in Canada provided your Covered Product(s) is CSA certified.

    b.   any lawn and garden, gasoline powered or gas grill product.

    c.   any floor care, fitness, sewing, coin operative laundry, computer equipment or power tool product used for any business or commercial purposes.

    d.   repair of any product which is damaged or malfunctioning due to causes beyond our control including, but not limited to, repairs necessitated by operator or owner negligence (such as the failure to maintain the product according to the owner's manual instructions), improper installation, CRT-based or Plasma television burn-in, accidental damage, abuse, misuse, vandalism, theft, rust, corrosion, animal or insect infestation, damage caused by lightning and acts of nature.

    e.   service required as a result of any alteration of the product or equipment or repairs made during the Agreement Term which are not authorized by us, or are made by parties not specifically authorized by us, such as, but not limited to, product(s) that are in a disassembled state.

    f.   expendable items, including, but not limited to: any filters, bulbs (micro display lamps are covered) or batteries (camcorder batteries are covered), vacuum cleaner bags, ink jet print heads, printer cartridges or drums, fluids (gasoline, oil, etc.), sewing machine needles, saw blades, and other operating supplies and consumable items.

    g.   the following products, parts, and services: installation (other than re-installation required to complete a covered repair, or replacement required under Section 8 of this MPA), antenna systems, pulling and re-installing of deep well, jet or submersible well pumps.

    h.   telephone, water, gas, electrical or other lines, drains, or ductwork connecting to the product or equipment. Upgrades to your Covered Product(s), permits or any additional expense incurred in order to comply with local, state or federal building codes and other laws and regulations are your responsibility.

    i.   This MPA also does not cover any nonfunctional repairs, parts or cosmetic defects of product(s) purchased as "Reconditioned" or "Used" or purchased at Sears Outlet stores.

    j.   coverage to your Covered Product(s) if poor accessibility or unsafe working conditions exist.

The following additional exclusions and limitations specifically apply to computer equipment:

    k.   any software, including, but not limited to, application programs, databases, files, source codes, object codes or proprietary data, or any support, configuration, installation or reinstallation of any software or data. You are responsible for backing up copies of all your data and software on a regular basis.

    l.   service required as a result of non-compatible software or due to improper software use or software virus.

    m.   hardware upgrade(s) not purchased at Sears or Sears PR. Hardware upgrades include memory, hard disk drive, multimedia products, and printer font cartridges. Hardware upgrades purchased at Sears or Sears PR and installed into products and equipment are covered under this MPA. This MPA does not cover installation of hardware upgrades.

14. CANCELLATION AND REFUNDS. You may cancel this MPA at any time for any reason by calling 1-800-4-MY-HOME® or by mailing written notice of cancellation to: Cancellation Services, P.O. Box 2570, High Point, NC, 27263. We may cancel this MPA if you fail to pay, make a material misrepresentation, substantially breach your duties under this MPA, or if Sears Repair or its representatives determines that it cannot service or repair your Covered Product(s). We may also cancel this Agreement if the Covered Product(s) does not have a legible model or serial number. We will notify you of any cancellation being made by us for the reasons set forth above in accordance with applicable law and the terms and conditions of this MPA. If this MPA is cancelled by you or us, as the case may be, within the first sixty (60) days of the Term or prior to the expiration of the full manufacturer's warranty for the Covered Product at issue (whichever occurs last), excluding warranties covering component parts of the Covered Product, we will refund 100% of the total price you paid for this MPA (the "Total Price") for the MPA coverage on the Covered Product(s) actually being cancelled. If there is more than one

SEARS0000413

product being covered under the terms and conditions of this MPA and only one of the products is being cancelled from this Agreement, the Total Price shall mean the price paid for this MPA that is allocated to such product being cancelled as the MPA shall remain in effect for any other Covered Product(s) not the subject of such cancellation. For multiple Covered Product(s) covered by this MPA, refer to your sales receipt for the Total Price itemized allocation on each Covered Product(s).

If this MPA is cancelled after the first sixty (60) days of the Term or after the expiration of the full manufacturer's warranty for the Covered Product at issue (whichever occurs last), excluding warranties covering component parts of the Covered Product, we will refund the Total Price allocable to the remainder of the Term of this MPA prorated on a monthly basis, for the Covered Product that is specifically the subject of such cancellation. Any refund will be made in the same form as the original payment of this MPA.

15. LIMITATION OF LIABILITY. EXCEPT AS STATED IN SECTION 6, WE AND OUR AGENTS, CONTRACTORS OR LICENSEES ARE NOT LIABLE FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES, INCLUDING, BUT NOT LIMITED TO, PROPERTY DAMAGE, LOST TIME, LOSS OF USE OF COVERED PRODUCT(S) OR ANY OTHER DAMAGES RESULTING FROM THE BREAKDOWN OR FAILURE OF COVERED PRODUCT(S), DELAYS IN SERVICING OR THE INABILITY TO SERVICE ANY COVERED PRODUCT(S) EXCEPT AS MAY OTHERWISE BE REQUIRED BY LAW.

**UNDER NO CIRCUMSTANCES WHATSOEVER SHALL THE OBLIGATIONS OF OBLIGOR UNDER THIS MPA TO YOU FOR MONETARY RECOVERY EXCEED THE TOTAL PRICE PAID FOR THE COVERED PRODUCT(S) UNDER THIS MPA.**

16. OBLIGOR. The Obligor of this Agreement shall be determined by the ultimate location of the Covered Product(s) covered by this Agreement at the time of sale. For Covered Products located in California, SPC shall be the Obligor for the following products: home electronics, appliances, power tools and fitness equipment. For HVAC equipment located in California and purchased from SHIP, SHIP shall be the Obligor. For all other Covered Products in California, Sears shall be the Obligor. In Puerto Rico, Sears PR is the Obligor. In all other states, SPC shall be the Obligor.

17. RENEWAL. No party is obligated to renew this MPA beyond the expiration date of the Term. The Total Price paid by you for this MPA may change or increase upon a renewal of this MPA. By purchasing this Agreement, you agree that Sears may call you to notify you of renewals terms and upgrade plans for this MPA.

18. PUERTO RICO, CALIFORNIA, NEW MEXICO, WYOMING AND NEW YORK CUSTOMERS. A 10% penalty per month shall be added to any refund that we fail to make within thirty (30) days of your cancellation of this Agreement and request for a refund.

19. UTAH CUSTOMERS. Coverage under this Agreement is not guaranteed by the Property and Casualty Guaranty Association. In the event of cancellation of this Agreement by Obligor in accordance with the "Cancellation and Refunds" provisions above, Utah residents will receive thirty (30) day prior written notice of cancellation. There is no deductible applied for the performance of this Agreement.

20. KENTUCKY AND VIRGINIA CUSTOMERS. If we fail to pay any valid claim within sixty (60) days of proof of loss, you may make a claim directly against Safeco Insurance Company of America, Safeco Plaza, Seattle, WA 98185.

21. INDIANA AND WEST VIRGINIA CUSTOMERS. This Agreement is not an insurance policy and is not regulated by the Departments of Insurance for the states of Indiana and West Virginia.

22. IOWA CUSTOMERS. Obligor is subject to regulation by the insurance division of the Iowa Department of Commerce. Complaints that are not settled by us may be sent to the insurance division

23. TEXAS CUSTOMERS. Any questions concerning the regulation of us under this Agreement or any unresolved complaints may be directed to the Texas Department of Licensing and Regulations - P.O. Box 12157 Austin, Texas 78711 or (512) 463-6599.

24. SOUTH CAROLINA CUSTOMERS. Any questions concerning the regulation of us under this Agreement or any unresolved complaints (within sixty (60) days of proof of loss) may be directed to the South Carolina Department of Insurance – P.O. Box 100105 Columbia, South Carolina 29202-3105 or (800) 758-3467. A 10% penalty per

SEARS0000413

month shall be added to any refund that we fail to make within forty-five (45) days after the return of the Agreement to the provider.

25. **NORTH CAROLINA CUSTOMERS.** Upon cancellation a reasonable administrative fee not to exceed 10% of the pro rata refund may be charged. Obligor must notify the consumer before the purchase of this Agreement that its purchase is not necessary in order to purchase or obtain financing of the Covered Product.

26. **ALABAMA CUSTOMERS.** A 10% penalty per month shall be added to any refund that we fail to make within forty-five (45) days of your cancellation of this Agreement and request for a refund. This Agreement will not charge a deductible for services rendered.

27. **GEORGIA CUSTOMERS.** Notwithstanding the CANCELLATION AND REFUNDS section, we will only cancel this Agreement for fraud, material misrepresentation or nonpayment of amounts due under this Agreement. We will mail to you a written notice at least ten (10) days prior to the date of cancellation for nonpayment, or at least thirty (30) days prior to the date of cancellation for fraud or material misrepresentation. Obligor will not provide services under this Agreement if poor accessibility or unsafe working conditions exist, but these conditions are not grounds for cancellation. Nothing contained in any provision elsewhere in this Agreement shall affect your right to make a claim directly against Safeco Insurance Company of America if we fail to pay any valid claim within sixty (60) days. The claim should be sent to Safeco Insurance Company of America, Safeco Plaza, Seattle, WA 98185 or (847) 490-2320 Attn: Ms. Ann Hester.

28. **MINNESOTA CUSTOMERS.** In the event of cancellation of this Agreement by us in accordance with the "Cancellation and Refunds" provision above, Minnesota residents will receive five (5) days prior written notice of cancellation if for reason of nonpayment, material misrepresentation or substantial breach of duties, or at least fifteen (15) days for all other reasons. A 10% penalty per month shall be added to any refund that we fail to make within forty-five (45) days of your cancellation of this Agreement and request for a refund.

29. **NEW HAMPSHIRE CUSTOMERS.** In the event that you do not receive satisfaction under this Agreement, you may contact the New Hampshire Insurance Department, 21 South Fruit Street, Suite 14, Concord, NH 03301; telephone 1-800-852-3416; e-mail consumerinquiries@ins.nh.gov.

30. **ARKANSAS CUSTOMERS:** In the event of cancellation of this Agreement by us in accordance with the "Cancellation and Refunds" provision above, Arkansas residents will receive fifteen (15) days prior written notice of cancellation for reasons other than for nonpayment, material misrepresentation or substantial breach of duties. A 10% penalty per month shall be added to any refund that we fail to make within forty-five (45) days of your cancellation of this Agreement and request for a refund.

31. **WASHINGTON CUSTOMERS:** In the event of cancellation of this Agreement by us in accordance with the "Cancellation and Refunds" provision above, Washington residents will receive twenty-one (21) days prior written notice of cancellation for reasons other than for nonpayment, material misrepresentation or substantial breach of duties. A 10% penalty per month shall be added to any refund that we fail to make within forty-five (45) days of your cancellation of this Agreement and request for a refund.

Sears Protection Company, Obligor, Dept. 702SRC, 3333 Beverly Road, Hoffman Estates, IL 60179
Sears, Roebuck and Co., Obligor, Dept. 702SRC, 3333 Beverly Road, Hoffman Estates, IL 60179
Sears, Roebuck de Puerto Rico, Inc., Obligor, 9410 Los Romeros Ave., San Juan, Puerto Rico 00925
Sears Home Improvement Products, Inc., Obligor, 1024 Florida Central Parkway, Longwood, FL 32750

National MPA AM E Jan2010                                    FORM 4/G

National MPA AM E Jan2010                                    FORM 4/G

SEARS0000414

# EXHIBIT 10 to EXHIBIT 2

# SUBJECT TO CONFIDENTIALITY ORDER

# DATED JULY 29, 2015

# EXHIBIT 11 to EXHIBIT 2

## Eligible Brands List

**Eligible PA Products & Brands**

In order to sell a Protection Agreement, the following products must be purchased from Sears:

1. Gas Grills
2. Hardware / Workshop
3. Home Office Equipment
4. Lawn & Garden Equipment (Division 71)
5. Pumps - Sump & Well
6. Projection TV's
7. Digital Cameras
8. Water Treating Equipment - Distillers, Filters & Softeners

NordicTrack Fitness products <u>are NOT</u> eligible for Protection Agreement coverage, regardless of purchase location.

### Home Office Equipment

| Computer | Fax/Copier/Printer | Modem | Monitor | Typewriter |
|---|---|---|---|---|
| + | COMPAQ | COMPAQ | APPLE | COMPAQ |
| 3COM | DELL | DELL | COMPAQ | DELL |
| ACER | EPSON | HP | DELL | HP |
| APPLE | HP | | GATEWAY | SONY |
| ASUS | IBM | | HP | |
| ATI | PANASONIC | | IBM | |
| AVERATEC | SAMSUNG | | NEC | |
| CASIO | SONY | | SONY | |
| CISNET | TOSHIBA | | | |
| COMPAQ | | | | |
| CREATIVE LAB | | | | |
| DELL | | | | |
| EMA | | | | |
| EMACHINES | | | | |
| GATEWAY | | | | |
| HP | | | | |
| IBM | | | | |
| INFOCUS | | | | |
| LENOVO | | | | |
| LIQUID VIDEO | | | | |
| LITE-ON | | | | |
| MIRUS | | | | |
| MSI | | | | |
| SAMPO | | | | |
| SONY | | | | |
| TOSHIBA | | | | |
| VELOCITY | | | | |
| VIEWSONIC | | | | |

### Recreational

| Exerciser | Treadmill |
|---|---|
| AFG | AFG |
| BODY BY JAKE | BH |
| BOWFLEX | BODY BY JAKE |
| DIAMONDBACK | BOWFLEX |
| HEALTH RIDER | HEALTH RIDER |
| HORIZON | HORIZON |
| IMAGE | IMAGE |
| LIFESTYLER | LIFESTYLER |
| PROFORM | PROFORM |
| REEBOK | REEBOK |
| SEARS | SEARS |
| VELOPRO | WEIDER |
| WEIDER | WESLO |
| WESLO | |

### Workshop / Hardware & Garage Door Openers



SEARS0000516

| Air Compressor | Drill Press/Sander/Saw, Joiner/Planer/Shaper, Power Washer | Generator | Cleaning & Router | Welder | Garage Door Opener |
|---|---|---|---|---|---|
| BLACK&DECKER | BLACK&DECKER | AGRIFAB | BLACK&DECKER | BLACK&DECKER | CHAMBERLAIN |
| BOSCH | BOSCH | ARIENS | BOSCH (Cleaning Only) | BOSCH | CRAFTSMAN |
| CAMPBLHSFLD | CRAFTSMAN | BLACK&DECKER | CRAFTSMAN (Cleaning Only) | CRAFTSMAN | CRAFTSMANPRO |
| CRAFTSMAN | CRAFTSMANPRO | BRIGGS&STRAT | DELTA (Cleaning Only) | CRAFTSMANPRO | GENIE |
| DELTA | DELTA | COMPANION | DEWALT (Cleaning Only) | DELTA | SEARS |
| DEWALT | DEWALT | CRAFTSMAN | MAKITA (Cleaning Only) | DEWALT | |
| INGERSOLLRND | GENERAC | CRAFTSMANPRO | MILWAUKEE (Cleaning Only) | MAKITA | |
| MAKITA | MAKITA | GENERAC | PORTERCABLE (Cleaning Only) | MILWAUKEE | |
| MILWAUKEE | MILWAUKEE | HOMELITE | SEARS (Cleaning Only) | PORTERCABLE | |
| PORTERCABLE | PORTERCABLE | HONDA | WAGNER (Cleaning Only) | SEARS | |
| SEARS | SEARS | HUSQVARNA | BLACK&DECKER (Cleaning Only) | WAGNER | |
| SKIL | SKIL | KAWASAKI | COBALT (Cleaning Only) | | |
| WAGNER | WAGNER | KOHLER | ROTOZIP (Cleaning Only) | | |
| | | LAWNBOY | TRADESMAN (Cleaning Only) | | |
| | | LIFETIME | | | |
| | | MACKISSIC | | | |
| | | MANTIS | | | |
| | | MCCLANE | | | |
| | | MCCULLOCH | | | |
| | | MURRAY | | | |
| | | OHIOSTEEL | | | |
| | | POULAN | | | |
| | | ROBINS/SUBARU | | | |
| | | SEARS | | | |
| | | SNOWKING | | | |
| | | TECUMSEH | | | |
| | | WEEDEATER | | | |

## Heating and Cooling

| Central A/C | Window A/C | Air Treatment | Furnace | Boiler | Space, Floor & Wall Furnace |
|---|---|---|---|---|---|
| ADDISON | ADDISON | ADDISON | ADDISON | ADDISON | ADDISON |
| ADOBEAIR | ADOBEAIR | ADOBEAIR | ADOBE | ADOBEAIR | ADOBE |
| AIR QUEST | AIR QUEST | AIR QUEST | ADOBEAIR | AIR QUEST | ADOBEAIR |
| AMANA | AMANA | AMERICAN STD | AIR QUEST | AMERICAN STD | AIR QUEST |
| AMERICAN STD | AMERICAN STD | APRILAIRE | AMANA | ARCOAIRE | AMERICAN STD |
| APRILAIRE | APRILAIRE | ARCOAIRE | AMERICAN STD | ARMSTRONG | ARCOAIRE |
| ARCOAIRE | ARCOAIRE | ARMSTRONG | ARCOAIRE | BARD | ARMSTRONG |
| ARMSTRONG | ARMSTRONG | BARD | ARMSTRONG | BRYANT | BARD |
| BARD | BARD | BRYANT | BARD | COMFORTGLOW | BRYANT |
| BRYANT | BRYANT | COMFORTGLOW | BRYANT | COMFORTMAKER | COMFORTGLOW |
| CARRIER | CARRIER | COMFORTMAKER | CARRIER | DAY & NIGHT | COMFORTMAKER |
| COLEMAN | COLEMAN | DAY & NIGHT | COLEMAN | DUNKIRK | DAY & NIGHT |
| COMFORTGLOW | COMFORTGLOW | DELONGHI | COMFORTGLOW | GE | GE |
| COMFORTMAKER | COMFORTMAKER | DYNAMIC | COMFORTMAKER | GOODMAN | GOODMAN |
| DAY & NIGHT | DAY & NIGHT | FEDDERS | DAY & NIGHT | HEIL-QUAKER | HEIL-QUAKER |
| DELONGHI | EMERSON | FRIGIDAIRE | GE | ICP | ICP |
| FEDDERS | FEDDERS | GE | GOODMAN | INTERCITY | INTERCITY |

SEARS0000517

| | | | | | |
|---|---|---|---|---|---|
| FRIGIDAIRE | FRIGIDAIRE | GOODMAN | HEIL-QUAKER | INTL CMF PRD | INTL CMF PRD |
| GE | GE | HEIL-QUAKER | ICP | JANITROL | JANITROL |
| GOODMAN | GOODMAN | HONEYWELL | INTERCITY | KEEPRITE | KEEPRITE |
| HEIL-QUAKER | HEIL-QUAKER | ICP | INTL CMF PRD | KENMORE | KENMORE |
| ICP | ICP | INTERCITY | JANITROL | LUXAIRE | LUXAIRE |
| INTERCITY | INGLIS | INTL CMF PRD | KEEPRITE | MAGIC CHEF | MAGIC CHEF |
| INTL CMF PRD | INTL CMF PRD | JANITROL | KENMORE | NORDYNE | NORDYNE |
| JANITROL | JANITROL | KEEPRITE | LENNOX | ONEIDA ROYAL | PANASONIC |
| KEEPRITE | KEEPRITE | KENMORE | LUXAIRE | PANASONIC | RHEEM |
| KENMORE | KENMORE | LG | MAGIC CHEF | RHEEM | RUUD |
| LENNOX | LG | LUXAIRE | NORDYNE | RUUD | SEARS |
| LG | LUXAIRE | MAGIC CHEF | PANASONIC | SEARS | SINGER |
| LUXAIRE | MAGIC CHEF | NORDYNE | PAYNE | SINGER | SNYDER GENER |
| MAGIC CHEF | NORDYNE | PANASONIC | RHEEM | SNYDER GENER | STYLECREST |
| MAGICPAK | PANASONIC | PAYNE | RUUD | STYLECREST | TAPPAN |
| MASTER COOL | PAYNE | RHEEM | SEARS | TAPPAN | TEMPSTAR |
| MASTERCOOL | RHEEM | RUUD | SINGER | TEMPSTAR | WEATHERKING |
| MIDEA | ROYAL SOVERE | SEARS | SNYDER GENER | WEATHERKING | WESTINGHOUSE |
| MITSUBISHI | RUUD | SINGER | STYLECREST | WESTINGHOUSE | WHIRLPOOL |
| NORDYNE | SEARS | SNYDER GENER | TAPPAN | WHIRLPOOL | WILLIAMS |
| PANASONIC | SINGER | STYLECREST | TEMPSTAR | WILLIAMS | WILLIAMSON |
| PAYNE | SNYDER GENER | TAPPAN | TRANE | YORK | YORK |
| RHEEM | SOLEUS AIR | TEMPSTAR | WEATHERKING | ZONAIRE | ZONAIRE |
| RUUD | STYLECREST | TRANE | WESTINGHOUSE | | |
| SEARS | TAPPAN | WEATHERKING | WHIRLPOOL | | |
| SINGER | TEMPSTAR | WESTINGHOUSE | WILLIAMS | | |
| SNYDER GENER | TOYOTOMI | WHIRLPOOL | YORK | | |
| SPACE PAC | TRANE | WILLIAMS | ZONAIRE | | |
| STYLECREST | WEATHERKING | YORK | | | |
| TAPPAN | WESTINGHOUSE | ZONAIRE | | | |
| TEMPSTAR | WHIRLPOOL | | | | |
| TRANE | WILLIAMS | | | | |
| WEATHERKING | YORK | | | | |
| WESTINGHOUSE | ZONAIRE | | | | |
| WHIRLPOOL | | | | | |
| WILLIAMS | | | | | |
| YORK | | | | | |
| ZONAIRE | | | | | |

## Cooking Products

| Cooktop | Range | Rangehood | Walloven | Warming Drawer | Microwave |
|---|---|---|---|---|---|
| ADMIRAL | ADMIRAL | ADMIRAL | ADMIRAL | ADMIRAL | ADMIRAL |
| AMANA | AMANA | AMANA | AMANA | AMANA | AMANA |
| APOLLO | APOLLO | APOLLO | APOLLO | BOSCH | APOLLO |
| BOSCH | BOSCH | BOSCH | BOSCH | CALORIC | BOSCH |
| CALORIC | CALORIC | BROAN | CALORIC | ELCTRLX ICON | CALORIC |
| ELCTRLX ICON | ELCTRLX ICON | CALORIC | ELCTRLX ICON | ELECTROLUX | CROSLEY |
| ELECTROLUX | ELECTROLUX | ELCTRLX ICON | ELECTROLUX | ESTATE | ELCTRLX ICON |
| ESTATE | ESTATE | ELECTROLUX | ESTATE | FISHERPAYKEL | ELECTROLUX |
| FISHERPAYKEL | FISHERPAYKEL | ESTATE | FISHERPAYKEL | FRIGIDAIRE | ESTATE |
| FRIGIDAIRE | FRIGIDAIRE | FISHERPAYKEL | FRIGIDAIRE | GALAXY | FISHERPAYKEL |
| GALAXY | GALAXY | FRIGIDAIRE | GALAXY | GALLERY | FRIGIDAIRE |
| GALLERY | GALLERY | GALAXY | GALLERY | GE | GALAXY |
| GE | GE | GALLERY | GE | GE PROFILE | GALLERY |
| GE PROFILE | GE PROFILE | GE | GE PROFILE | GIBSON | GE |
| GIBSON | GIBSON | GE PROFILE | GIBSON | HAIER | GE PROFILE |
| HAIER | HAIER | GIBSON | HAIER | HOTPOINT | GIBSON |
| HOTPOINT | HOTPOINT | HAIER | HOTPOINT | IKEA | GOLDSTAR |
| IKEA | IKEA | HOTPOINT | IKEA | INGLIS | HAIER |
| INGLIS | INGLIS | IKEA | INGLIS | JENN-AIR | HOTPOINT |
| JENN-AIR | JENN-AIR | INGLIS | JENN-AIR | KELVINATOR | IKEA |
| KELVINATOR | KELVINATOR | JENN-AIR | KELVINATOR | KENMORE | INGLIS |
| KENMORE | KENMORE | KELVINATOR | KENMORE | KENMORE ELIT | JENN-AIR |
| KENMORE ELIT | KENMORE ELIT | KENMORE | KENMORE ELIT | KENMORE PRO | KELVINATOR |
| KENMORE PRO | KENMORE PRO | KENMORE ELIT | KENMORE PRO | KITCHENAID | KENMORE |
| KITCHENAID | KITCHENAID | KENMORE PRO | KITCHENAID | LG | KENMORE ELIT |

SEARS0000518

| | | | | | |
|---|---|---|---|---|---|
| LG | LG | KITCHENAID | LG | MAGIC CHEF | KENMORE PRO |
| MAGIC CHEF | MAGIC CHEF | LG | MAGIC CHEF | MAYTAG | KITCHENAID |
| MAYTAG | MAYTAG | MAGIC CHEF | MAYTAG | MODERN MAID | LG |
| MODERN MAID | MODERN MAID | MAYTAG | MODERN MAID | NORGE | MAGIC CHEF |
| NORGE | NORGE | MODERN MAID | NORGE | ROPER | MAYTAG |
| ROPER | ROPER | NORGE | ROPER | SEARS | MODERN MAID |
| SEARS | SAMSUNG | ROPER | SEARS | SHARP | NORGE |
| SHARP | SEARS | SEARS | SHARP | TAPPAN | PANASONIC |
| TAPPAN | SHARP | TAPPAN | TAPPAN | WCI | ROPER |
| WCI | TAPPAN | WHIRLPOOL | WCI | WHIRLPOOL | SAMSUNG |
| WHIRLPOOL | WHIRLPOOL | | WHIRLPOOL | | SANYO |
| | | | | | SEARS |
| | | | | | SHARP |
| | | | | | TAPPAN |
| | | | | | WCI |
| | | | | | WHIRLPOOL |

## Compactor, Dishwasher & Disposer

| Compactor | Dishwasher | Disposer |
|---|---|---|
| ADMIRAL | ADMIRAL | ADMIRAL |
| AMANA | AMANA | AMANA |
| BOSCH | BOSCH | BOSCH |
| BROAN | CALORIC | ELCTRLX ICON |
| ELCTRLX ICON | ELCTRLX ICON | ELECTROLUX |
| ELECTROLUX | ELECTROLUX | EMERSON |
| ESTATE | ESTATE | ESTATE |
| FRIGIDAIRE | FISHERPAYKEL | FRIGIDAIRE |
| GALAXY | FRIGIDAIRE | GE |
| GALLERY | GALAXY | GE PROFILE |
| GE | GALLERY | GIBSON |
| GE PROFILE | GE | HOTPOINT |
| GIBSON | GE PROFILE | IKEA |
| GLADIATOR | GIBSON | INGLIS |
| HOTPOINT | GLADIATOR | INSINKERATOR |
| IKEA | HAIER | JENN-AIR |
| INGLIS | HOTPOINT | KELVINATOR |
| JENN-AIR | IKEA | KENMORE |
| KELVINATOR | INGLIS | KENMORE ELIT |
| KENMORE | JENN-AIR | KENMORE PRO |
| KENMORE ELIT | KELVINATOR | KITCHENAID |
| KENMORE PRO | KENMORE | LG |
| KITCHENAID | KENMORE ELIT | MAYTAG |
| LG | KITCHENAID | MODERN MAID |
| MAYTAG | LG | NORGE |
| MODERN MAID | MAGIC CHEF | ROPER |
| NORGE | MAYTAG | SEARS |
| ROPER | MODERN MAID | TAPPAN |
| SEARS | NORGE | WHIRLPOOL |
| TAPPAN | ROPER | |
| WHIRLPOOL | SAMSUNG | |
| | SEARS | |
| | SHARP | |
| | TAPPAN | |
| | WHIRLPOOL | |

## Laundry

| Washer | Dryer | Dryer Cabinet | Dispenser | Iron Center |
|---|---|---|---|---|
| ADMIRAL | ADMIRAL | ADMIRAL | ADMIRAL | ADMIRAL |
| AMANA | AMANA | AMANA | AMANA | AMANA |
| BOSCH | BOSCH | BOSCH | BOSCH | BOSCH |
| ELCTRLX ICON | ELCTRLX ICON | ELCTRLX ICON | ELCTRLX ICON | ELCTRLX ICON |
| ELECTROLUX | ELECTROLUX | ELECTROLUX | ELECTROLUX | ELECTROLUX |
| ESTATE | ESTATE | ESTATE | ESTATE | ESTATE |
| FISHERPAYKEL | FISHERPAYKEL | FISHERPAYKEL | FRIGIDAIRE | FRIGIDAIRE |
| FRIGIDAIRE | FRIGIDAIRE | FRIGIDAIRE | GALAXY | GALAXY |

SEARS0000519

| | | | | |
|---|---|---|---|---|
| GALAXY | GALAXY | GALAXY | GALLERY | GALLERY |
| GALLERY | GALLERY | GALLERY | GE | GE |
| GE | GE | GE | GE PROFILE | GIBSON |
| GE PROFILE | GE PROFILE | GE PROFILE | GIBSON | HOTPOINT |
| GIBSON | GIBSON | GIBSON | HOTPOINT | IKEA |
| HAIER | HAIER | HOTPOINT | IKEA | INGLIS |
| HOTPOINT | HOTPOINT | IKEA | INGLIS | JENN-AIR |
| IKEA | IKEA | INGLIS | JENN-AIR | KELVINATOR |
| INGLIS | INGLIS | JENN-AIR | KELVINATOR | KENMORE |
| JENN-AIR | JENN-AIR | KELVINATOR | KENMORE | KENMORE ELIT |
| KELVINATOR | KELVINATOR | KENMORE | KENMORE ELIT | KENMORE PRO |
| KENMORE (including SDS) | KENMORE (including SDS) | KENMORE ELIT | KENMORE PRO | KITCHENAID |
| KENMORE ELIT (including SDS) | KENMORE ELIT (including SDS) | KENMORE PRO | KITCHENAID | LG |
| KENMORE PRO | KENMORE PRO | KITCHENAID | LG | MAYTAG |
| KITCHENAID | KITCHENAID | MAYTAG | MAYTAG | MODERN MAID |
| LG (including SDS) | LG (including SDS) | MODERN MAID | MODERN MAID | NORGE |
| MAGIC CHEF | MAGIC CHEF | NORGE | NORGE | ROPER |
| MAYTAG | MAYTAG | ROPER | ROPER | SEARS |
| MODERN MAID | MODERN MAID | SEARS | SEARS | TAPPAN |
| NORGE | NORGE | TAPPAN | TAPPAN | WCI |
| ROPER | ROPER | WCI | | |
| SAMSUNG | SAMSUNG | | | |
| SEARS | SEARS | | | |
| TAPPAN | TAPPAN | | | |
| WHIRLPOOL | WHIRLPOOL | | | |

### Water Equipment

| Water Heater | Water Treatment | Pump |
|---|---|---|
| ACE | ACE | CRAFTSMAN |
| AMBASSADOR | AMBASSADOR | CRAFTSMANPRO |
| AMERICAN | AMERICAN | SIMER |
| AOSMITH | AOSMITH | |
| GE | ECODYNE | |
| KENMORE | ECOWATER | |
| KENMORE ELIT | KENMORE | |
| MARATHON | KENMORE ELIT | |
| MAYTAG | MARATHON | |
| RELIANCE | MAYTAG | |
| REXEL | RELIANCE | |
| RHEEM | REXEL | |
| RUUD | RHEEM | |
| SEARS | RUUD | |
| SENTRY | SEARS | |
| STATE | SENTRY | |
| SUPERIOR | STATE | |
| THE BOSS | SUPERIOR | |
| THERMO-KING | THE BOSS | |
| WHEELERS | THERMO-KING | |
| WHIRLPOOL | WHEELERS | |
| | WHIRLPOOL | |

### Refrigeration

| Refrigerator | Beer Cooler | Freezer | Icemaker | Wine Cooler |
|---|---|---|---|---|
| ADMIRAL | ADMIRAL | ADMIRAL | ADMIRAL | ADMIRAL |
| AMANA | AMANA | AMANA | AMANA | AMANA |
| AMERICANA | BOSCH | AMERICANA | BOSCH | BOSCH |
| BOSCH | ELCTRLX ICON | BOSCH | ELCTRLX ICON | ELCTRLX ICON |
| DANBY | ELECTROLUX | DANBY | ELECTROLUX | ELECTROLUX |
| ELCTRLX ICON | ESTATE | ELCTRLX ICON | ESTATE | ESTATE |
| ELECTROLUX | FRIGIDAIRE | ELECTROLUX | FRIGIDAIRE | FRIGIDAIRE |
| ESTATE | GE | ESTATE | GALAXY | GALAXY |
| FISHERPAYKEL | GE PROFILE | FRIGIDAIRE | GALLERY | GALLERY |
| FRIGIDAIRE | GIBSON | GALAXY | GE | GE |
| GALAXY | HAIER | GALLERY | GE PROFILE | GE PROFILE |

| | | | | |
|---|---|---|---|---|
| GALLERY | HOTPOINT | GE | GIBSON | GIBSON |
| GE | IKEA | GE PROFILE | HOTPOINT | HOTPOINT |
| GE PROFILE | INGLIS | GIBSON | IKEA | IKEA |
| GIBSON | JENN-AIR | GLADIATOR | INGLIS | INGLIS |
| GLADIATOR | KELVINATOR | HAIER | JENN-AIR | JENN-AIR |
| HAIER | KENMORE | HOTPOINT | KELVINATOR | KELVINATOR |
| HOTPOINT | KENMORE ELIT | IKEA | KENMORE | KENMORE |
| IKEA | KENMORE PRO | IMPERIAL | KENMORE ELIT | KENMORE ELIT |
| INGLIS | KITCHENAID | INGLIS | KENMORE PRO | KENMORE PRO |
| JENN-AIR | LG | JENN-AIR | KITCHENAID | KITCHENAID |
| KELVINATOR | MAYTAG | KELVINATOR | LG | LG |
| KENMORE (including SDS) | MODERN MAID | KENMORE | MAGIC CHEF | MAGIC CHEF |
| KENMORE ELIT (including SDS) | NORGE | KENMORE ELIT | MAYTAG | MAYTAG |
| KENMORE PRO | ROPER | KENMORE PRO | MODERN MAID | MODERN MAID |
| KITCHENAID | SEARS | KITCHENAID | NORGE | NORGE |
| LG (including SDS) | TAPPAN | LG | ROPER | ROPER |
| MAGIC CHEF | WHIRLPOOL | MAGIC CHEF | SEARS | SEARS |
| MAYTAG | | MAYTAG | TAPPAN | TAPPAN |
| MODERN MAID | | MODERN MAID | WHIRLPOOL | WHIRLPOOL |
| NORGE | | NORGE | | |
| ROPER | | ROPER | | |
| SAMSUNG | | SAMSUNG | | |
| SANYO | | SANYO | | |
| SEARS | | SEARS | | |
| TAPPAN | | TAPPAN | | |
| WHIRLPOOL | | WHIRLPOOL | | |

## Electronics

| Audio | Camcorder | Digital Camera | Home Theater & Players/Recorders | Television | TV/Player |
|---|---|---|---|---|---|
| Audio Video System | | | | | |
| Cassette Player | | | | | |
| Compact Disc - Play/Record | | | | | |
| Equalizer | | | | | |
| Receiver | | | | | |
| Speaker(s) | | | | | |
| Stereo System | | | | | |
| Turntable | | | | | |
| AIWA | BOSE | CANON | BOSE | ELEMENT | FUNAI |
| BOSE | CANON | CASIO | FUNAI | FISHER | GE |
| CERWIN VEGA | FUNAI | FUNAI | GE | FUNAI | GOLDSTAR |
| DENON | GE | GE | GO VIDEO (VCR Only) | GE | HAIER |
| FISHER | GOLDSTAR | GOLDSTAR | GOLDSTAR | GOLDSTAR | HITACHI |
| FUNAI | HAIER | HAIER | HAIER | HAIER | JVC |
| GE | HITACHI | HITACHI | HITACHI | HITACHI | LG |
| GOLDSTAR | JVC | JVC | JVC | JVC | LXI |
| HAIER | LG | KODAK | LG | LG | MAGNAVOX |
| HARMAN KARDO | LXI | LG | LXI | LXI | MEMOREX |
| HARMON KARDO | MAGNAVOX | LXI | MAGNAVOX | MAGNAVOX | MITSUBISHI |
| HITACHI | MEMOREX | MAGNAVOX | MEMOREX | MEMOREX | PANASONIC |
| INFINITY | MITSUBISHI | MEMOREX | MITSUBISHI | MITSUBISHI | PHILIPS |
| JBL | PANASONIC | MITSUBISHI | PANASONIC | NEC | PROSCAN |
| JENSEN | PHILIPS | NIKON | PHILIPS | PANASONIC | QUASAR |
| JVC | PROSCAN | PANASONIC | PIONEER | PHILIPS | RCA |
| KENWOOD | QUASAR | PHILIPS | PROSCAN | PIONEER | SAMSUNG |
| LG | RCA | POLAROID | QUASAR | PROSCAN | SANSUI |
| LXI | SAMSUNG | PROSCAN | RCA | QUASAR | SEARS |
| MAGNAVOX | SEARS | QUASAR | SAMSUNG | RCA | SHARP |
| MEMOREX | SHARP | RCA | SEARS | SAMSUNG | SONY |
| MITSUBISHI | SONY | SAMSUNG | SHARP | SANSUI | SYLVANIA |
| ONKYO | SYLVANIA | SHARP | SONY | SEARS | SYMPHONIC |
| ORION | SYMPHONIC | SONY | SYLVANIA | SEIKI | TOSHIBA |
| PANASONIC | TOSHIBA | SYLVANIA | SYMPHONIC | SHARP | VENTURER |

SEARS0000521

| PHILIPS | VIZIO | SYMPHONIC | TOSHIBA | SONY | VIORE |
|---|---|---|---|---|---|
| PIONEER | YORX | TOSHIBA | VIZIO | SYLVANIA | VIZIO |
| POLK AUDIO | ZENITH | VIZIO | YORX | SYMPHONIC | YORX |
| PROSCAN | | YORX | VENTURER (VCR Only) | TOSHIBA | ZENITH |
| QUASAR | | ZENITH | ZENITH | VENTURER | |
| RCA | | | | VIORE | |
| SAMSUNG | | | | VIZIO | |
| SANSUI | | | | YORX | |
| SEARS (VCR Only) | | | | ZENITH | |
| SHARP | | | | | |
| SONY | | | | | |
| SYLVANIA | | | | | |
| SYMPHONIC | | | | | |
| TECHNICS | | | | | |
| TOSHIBA | | | | | |
| VIZIO | | | | | |
| YAMAHA | | | | | |
| YORX | | | | | |
| ZENITH | | | | | |

## Lawn and Garden

| Lawn Mower / Riding Mower / Tractor | Snow Thrower / Gas Attachment | Brush Wacker / Chain Saw / Chipper Shredder / Edge Trimmer / Log Splitter / Tiller / Weed Wacker | Blower | Grill |
|---|---|---|---|---|
| AGRIFAB | AGRIFAB | AGRIFAB | AGRIFAB | CHAR-BROIL |
| ALLPOWER | ARIENS | ARIENS | ARIENS | COLEMAN |
| ARIENS | BLACK&DECKER | BLACK&DECKER | BLACK&DECKER | FIESTA |
| BLACK&DECKER | BRIGGS&STRAT | BRIGGS&STRAT | BRIGGS&STRAT | KENMORE |
| BRIGGS&STRAT | CRAFTSMAN | CRAFTSMAN | CRAFTSMAN | KENMORE ELIT |
| CRAFTSMAN | CRAFTSMANPRO | CRAFTSMANPRO | EAGER 1 | KITCHENAID |
| CRAFTSMANPRO | EAGER 1 | EAGER 1 | GENERAC | NEXGRILL |
| EAGER 1 | GENERAC | GENERAC | HOMELITE | SEARS |
| GENERAC | HOMELITE | HOMELITE | HONDA | SUNBEAM |
| HOMELITE | HONDA | HONDA | HUSQVARNA | THERMOS |
| HONDA | HUSQVARNA | HUSQVARNA | KAWASAKI | |
| HUSQVARNA | KAWASAKI | KAWASAKI | KOHLER | |
| KAWASAKI | KOHLER | KOHLER | LAWNBOY | |
| KOHLER | LAWNBOY | LAWNBOY | LIFETIME | |
| LAWNBOY | LIFETIME | LIFETIME | MACKISSIC | |
| LIFETIME | MACKISSIC | MACKISSIC | MANTIS | |
| MACKISSIC | MANTIS | MANTIS | MCCLANE | |
| MANTIS | MCCLANE | MCCLANE | MCCULLOCH | |
| MCCLANE | MCCULLOCH | MCCULLOCH | MURRAY | |
| MCCULLOCH | MURRAY | MURRAY | OHIOSTEEL | |
| MURRAY | OHIOSTEEL | OHIOSTEEL | POULAN | |
| OHIOSTEEL | POULAN | POULAN | ROBINS/SUBARU | |
| POULAN | ROBINS/SUBARU | ROBINS/SUBARU | SEARS | |
| ROBINS/SUBARU | SEARS | SEARS | SNOWKING | |
| SEARS | SNAPPER (Snow Thrower Only) | SNOWKING | SWISHER | |
| SNAPPER | SNOWKING | TECUMSEH | TECUMSEH | |
| SNOWKING | SWISHER | WEEDEATER | WEEDEATER | |
| SWISHER | TECUMSEH | | | |
| TECUMSEH | WEEDEATER | | | |
| WEEDEATER | | | | |
| YARDMAN (Riding Mower / Tractor Only) | | | | |

## Sears, Kmart, The Great Indoors and High-End Merchandise

The following is a list of merchandise codes and brands sold at Sears, Kmart or The Great Indoors (TGI) or are otherwise considered High-End. These products are eligible for PA coverage AT THE TIME OF SALE ONLY. You are **NOT** able to sell PA's on these items in the Aftermarket. The following documentation is for informational puposes only.
Currently covered items cannot be bundled, upsold, or renewed.

SEARS0000522

## Game Tables & Scooters

| Game Table | Power Vehicle | Scooter |
|---|---|---|
| DMI SPORTS | AMERICAN SPO | BAJA MOTOR |
| SPORTCRAFT | EAGER 1 | E-MOTO |

## Cooking

| Oven | Cooktop | Warming Drawer | Range | Range Hood | Microwave |
|---|---|---|---|---|---|
| AGA | AGA | AGA | AGA | AGA | AGA |
| BEST | BEST | BEST | BEST | BEST | BEST |
| BROAN | BROAN | BROAN | BROAN | BROAN | BROAN |
| DACOR | DACOR | DACOR | DACOR | DACOR | DACOR |
| DYNAMIC COOKING SYSTEMS (DCS) | DYNAMIC COOKING SYSTEMS (DCS) | DYNAMIC COOKING SYSTEMS (DCS) | DYNAMIC COOKING SYSTEMS (DCS) | DYNAMIC COOKING SYSTEMS (DCS) | DYNAMIC COOKING SYSTEMS (DCS) |
| DYNASTY | DYNASTY | DYNASTY | DYNASTY | DYNASTY | DYNASTY |
| FIVE STAR | FIVE STAR | FIVE STAR | FIVE STAR | FIVE STAR | FIVE STAR |
| GAGGENAU | GAGGENAU | GAGGENAU | GAGGENAU | GAGGENAU | GAGGENAU |
| GARLAND | GARLAND | GARLAND | GARLAND | GARLAND | GARLAND |
| MIELE | MIELE | MIELE | MIELE | MIELE | MIELE |
| MONOGRAM | MONOGRAM | MONOGRAM | MONOGRAM | MONOGRAM | MONOGRAM |
| THERMADOR | THERMADOR | THERMADOR | THERMADOR | THERMADOR | THERMADOR |
| VENMAR | VENMAR | VENMAR | VENMAR | VENMAR | VENMAR |
| VENT-A-HOOD | VENT-A-HOOD | VENT-A-HOOD | VENT-A-HOOD | VENT-A-HOOD | VENT-A-HOOD |
| VIKING | VIKING | VIKING | VIKING | VIKING | VIKING |
| WOLF | WOLF | WOLF | WOLF | WOLF | WOLF |
| ZEPHYR | ZEPHYR | ZEPHYR | ZEPHYR | ZEPHYR | ZEPHYR |

## Dishwasher & Compactors

| Compactor | Dishwasher |
|---|---|
| ASKO | ASKO |
| DACOR | DACOR |
| GAGGENAU | GAGGENAU |
| MONOGRAM | MONOGRAM |
| THERMADOR | THERMADOR |
| VIKING | VIKING |

## Laundry

| Dryer | Washer |
|---|---|
| ASKO | ASKO |
| EQUATOR | EQUATOR |
| LG | LG |

## Refrigeration

| Dispenser | Freezer | Humidor | Ice Maker | Refrigerator | Wine Cooler |
|---|---|---|---|---|---|
| EQUATOR | EQUATOR | EQUATOR | EQUATOR | EQUATOR | EQUATOR |
| DACOR | DACOR | DACOR | DACOR | DACOR | DACOR |
| MARVEL | MARVEL | MARVEL | MARVEL | MARVEL | MARVEL |
| MONOGRAM | MONOGRAM | MONOGRAM | MONOGRAM | MONOGRAM | MONOGRAM |
| SCOTSMAN | SCOTSMAN | SCOTSMAN | SCOTSMAN | SCOTSMAN | SCOTSMAN |
| SUB-ZERO | SUB-ZERO | SUB-ZERO | SUB-ZERO | SUB-ZERO | SUB-ZERO |
| U-LINE | U-LINE | U-LINE | U-LINE | U-LINE | U-LINE |
| VIKING | VIKING | VIKING | VIKING | VIKING | VIKING |

SEARS0000523

EXHIBIT 12 to EXHIBIT 2

SUBJECT TO CONFIDENTIALITY ORDER

DATED JULY 29, 2015

EXHIBIT 13 to EXHIBIT 2

**Cancel Reasons**

1. Changed Mind
2. Duplicate Charge
3. Price Too High
4. Questions Value
5. Coverage Misunderstood
6. Moving/Sell Property
7. Service Related Problem
8. Item(s) Returned
9. Charged Wrong credit card account
10. Commercial Usage
11. Disputed Sale
12. Transfer Coverage
13. Technician Requested Cancel
14. No Longer has Merchandise
16. Credit Collection Request
17. Coverage Credit Cancel
18. Input Error, No $ Refunded
19. Customer Deceased
20. Wants 1 Year only
21. Wants 2 Year only
22. Revised Plan Type
23. Revised Contract Term
24. Revised # items covered
25. Purchased Competitive Product
26. Selling associate used cancellation clause in sell
27. Exceeded Repair Limit
28. Sears ending relationship with customer/product
29. SSA – Selling Agent Misquoted Price
30. SSA – Unacceptable Service Date
31. SSA – SSA More than Cost of Repair
32. SSA – Product Now Working



EXHIBIT 14 to EXHIBIT 2

SUBJECT TO CONFIDENTIALITY
ORDER

DATED JULY 29, 2015

# EXHIBIT 15 to EXHIBIT 2







# thank you
## for choosing Sears

**Sears**
Parts & Repair Services



NINA GREENE
5 SAINT DAVIDS RD
WAYNE, PA 19087-4756

Thank you for your trust in Sears. We are glad we were able to provide you with Protection Agreement service for your refrigerator on 06/01/2005.

But who do you choose to service your items NOT covered by a Protection Agreement? Trust Sears. We repair all major brand items large and small, even if they weren't purchased at Sears — everything from dishwashers to DVDs.

And of course you can also purchase Protection Agreements for your unprotected items* too, and enjoy even more peace of mind.

There's a lot more Sears can offer for you and your home — take a look at some of our suggestions below.

As an additional thank you, we've included coupons with a variety of great savings for you, our valued customer. Take advantage of them today!

*Some exclusions apply — call 1-800-831-9926 for details.



### We service all major brands of vacuums!

Here are signs that your vacuum may need service:

- Bag not filling as frequently
- Weak suction
- Strange noises
- Belt broken or frayed

Just bring it in and our trained technicians can service it. Didn't buy it at Sears? It doesn't matter what brand or model.

Stop by your local Sears Parts & Repair Center today! For location nearest you, call 1-800-4-MY-HOME® (see "Sears locations") or click sears.com.

### It's Time to Schedule Your Pre-Season Cooling Check. Call Sears Today!

**Our Repair Specialist will:**

- Inspect and clean condenser coils, condensate lines and pumps
- Lubricate condenser fan motor and air handler blower
- Check filter & vacuum interior furnace for maximum air circulation
- Check refrigerant levels, electrical system and temperature

Sears services all major brands, no matter where you bought them.

Call 1-877-807-7621 to schedule an appointment.

### Save 10% On Parts

Sears carries parts for all your major brands, no matter where you bought them.

To order from over 4.2 million parts: Call 1-800-4-MY-HOME®, click sears.com/parts or visit your Sears Parts & Repair Center

### Save 10% Carpet, Upholstery Cleaning

- The Sears Two-Step Deep-Clean Process is recommended by America's largest carpet manufacturer

Call for an appointment: 1-866-827-9885

### More Worry-Free Protection

Now that you have seen the benefits of your current protection agreement, increase your peace of mind by protecting your other major appliances and home electronics with Sears Protection Agreements, no matter where you bought them. We provide:

- No charge for parts & labor on all covered repairs
- Troubleshooting help over the phone
- Product replacement if we can't fix your product

We offer a variety of coverage plans to fit your needs.

To Order: Call 1-800-827-6655 and our customer service representatives will help find the right plan for you.



EXHIBIT
Plaintiff 15



Greene0150




# thank you
## for choosing Sears






NIKA GREENE
5 SAINT DAVIDS RD
WAYNE, PA 19087-4769

Thank you for your trust in Sears. We are glad we were able to provide you with Protection Agreement service for your refrigerator on 06/01/2006.

But who do you choose to service your items NOT covered by a Protection Agreement? Trust Sears. We repair all major brand items large and small, even if they weren't purchased at Sears — everything from dishwashers to DVDs.

And of course you can also purchase Protection Agreements for your unprotected items* too, and enjoy even more peace of mind.

There's a lot more Sears can offer for you and your home — take a look at some of our suggestions below.

As an additional thank-you, we've included coupons with a variety of great savings for you, our valued customer. Take advantage of them today.

*Some exclusions apply — call 1-800-831-9928 for details.



### We service all major brands of vacuums!

Here are signs that your vacuum may need service:

- Bag not filling as frequently
- Weak suction
- Strange noises
- Belt broken or frayed

Just bring it in and our trained technicians can service it. Didn't buy it at Sears? It doesn't matter what brand or model.

Stop by your local Sears Parts & Repair Center today! For location nearest you, call 1-800-4-MY-HOME® (say "Sears locations") or click sears.com.

### Save 10% On Parts

Sears carries parts for all major brands, no matter where you bought them.

To order hard-to-find mail order parts: Call 1-800-4-MY-HOME®, click sears.com/parts or visit your Sears Parts & Repair Center.

### Save 10% Carpet, Upholstery Cleaning

- The Sears Two-Step Deep-Clean Process is recommended by America's largest carpet manufacturer

Call for an appointment 1-866-621-5895

### It's Time to Schedule Your Pre-Season Cooling Check. Call Sears Today!

Our Repair Specialist will:

- Inspect and clean condenser coils, condensate lines and pumps
- Lubricate condenser fan motor and air handler blower
- Check filter & vacuum interior furnace for maximum air circulation
- Check refrigerant levels, electrical system and temperature

Sears services all major brands, no matter where you bought them.

Call 1-877-800-7031 to schedule an appointment

### More Worry-Free Protection

Now that you have seen the benefits of your current protection agreement, increase your peace of mind by protecting your other major appliances and home electronics with Sears Protection Agreements, no matter where you bought them. We provide:

- No charge for parts & labor on all covered repairs
- Troubleshooting help over the phone
- Product replacement if we cannot fix your product

We offer a variety of coverage plans to fit your needs.

To Order: Call 1-800-831-9928 and our customer service representative will help find the right plan for you.

### Sears services all major brands, no matter where you bought them.

Greene0151

# EXHIBIT 16 to EXHIBIT 2

# SUBJECT TO CONFIDENTIALITY ORDER

# DATED JULY 29, 2015

# EXHIBIT 3

# SUBJECT TO CONFIDENTIALITY ORDER

# DATED JULY 29, 2015

EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

NINA GREENE and GERALD        )

GREENE,                       )

           Plaintiffs,    )

          vs.            )   No. 1:15-CV-02546

SEARS PROTECTION COMPANY,     )

SEARS ROEBUCK AND CO. and     )

SEARS HOLDINGS CORPORATION,   )

         Defendants.    )


The deposition of KATRINA MEANS, called for examination, taken pursuant to the Federal Rules of Civil Procedure of the United States District Courts pertaining to the taking of depositions, taken before Lynn A. McCauley, CSR No. 84-003268, RPR, a Certified Shorthand Reporter of the State of Illinois, at 115 South LaSalle Street, Suite 2910, Chicago, Illinois, on June 29, 2016, at 9:30 a.m.

Page 2

```
1    PRESENT:
2        KAUFMAN, COHEN & RESS, P.C., by
         MS. DEBORAH R. GROSS
3        Two Commerce Square, Suite 3900
         2001 Market Street
4        Philadelphia, Pennsylvania 19103-7042
         215-735-8700
5        dgross@kcr-law.com
             Appeared on behalf of Plaintiffs;
6
7            and
8
         BAKER HOSTETLER, by
9        MR. ERIN BOLAN HINES
         191 North Wacker Drive, Suite 3100
10       Chicago, Illinois 60606-1901
         312-416-6215
11       ehines@bakerlaw.com
             Appeared on behalf of Defendants.
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 3

```
1              I N D E X
2    WITNESS:
     KATRINA MEANS
3
     EXAMINATION BY:          PG    LN
4      MS. GROSS              4     7
5    EXHIBITS:     DESCRIPTION     PG    LN
       None Marked
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 4

```
1             (WHEREUPON, the witness was
2        duly sworn.)
3             KATRINA MEANS
4    called as a witness herein, having been first duly
5    sworn, was examined and testified as follows:
6             EXAMINATION
7    BY MS. GROSS:
8        Q.  Good morning.
9             Could you kindly state your name and
10   address for the record?
11       A.  Katrina Means.  10476 Dawson Street,
12   Hoffman Illinois.
13       Q.  Have you ever been deposed before?
14       A.  No.
15       Q.  So I'm going to ask you a series of
16   questions to which you will hopefully respond.
17            If you don't understand my
18   questions, please feel free to tell me you don't
19   understand.
20            Your attorney may object to my
21   questions.  You can still answer them if you
22   understand them.
23            If you need a break, please let me
24   know.  I'm more than happy to take a break.  The only
```

Page 5

```
1    caveat is the break should not be while a question is
2    pending, but after you answer the question.
3        A.  Okay.
4        Q.  Did you do anything prior to this
5    deposition today to prepare for this deposition?
6        A.  Other than talking to Erin, no.
7        Q.  Did you review any documents?
8        A.  I have briefly seen I think the Complaint
9    and where my name was mentioned.
10       Q.  Okay.  How long approximately was your
11   meeting with counsel?
12       A.  An hour and a half, two hours.
13       Q.  And how long ago did that occur?
14       A.  Last week.
15       Q.  Are you aware that Dannon Setzer's
16   deposition occurred?
17       A.  Yes.
18       Q.  Did you speak to Mr. Setzer at all about
19   his deposition?
20       A.  No.
21       Q.  Did you read the transcript of his
22   deposition?
23       A.  Only where my name was mentioned.
24       Q.  Are you aware that the deposition of Tina
```

Page 6

1  Anthony occurred?
2      A.  No.
3      Q.  What is your -- I guess could you briefly
4  give me your educational background?
5      A.  I have a Bachelor's Degree in Management.
6      Q.  Okay.  And from where did you graduate?
7      A.  California State University of Fresno.
8      Q.  Okay.  And for how long have you been
9  employed by Sears?
10     A.  28 years.
11     Q.  So I'm not going to go back to the
12 beginning of time --
13     A.  Please.
14     Q.  -- but let's go back -- well, actually
15 let's start it this way.
16         What is your current position at
17 Sears?
18     A.  Director of Service Contracts.
19     Q.  And for how long have you maintained that
20 position?
21     A.  A little over five years.
22     Q.  So that takes us back to approximately
23 2011; is that correct?
24     A.  Yes.

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 7

1      Q.  Okay.  Prior to the position of Director
2  of Service Contracts, what were you?
3      A.  Product Manager.
4      Q.  And was that in a particular department?
5      A.  Service Contracts.
6      Q.  And for how long were you Product
7  Manager?
8      A.  I want to say four years.
9      Q.  And when you use the term Service
10 Contracts, what does that encompass?
11     A.  It includes Protection Agreements.  Some
12 people might refer to them -- while they're not --
13 but some people might refer to them as an Extended
14 Warranty.
15     Q.  Have you been involved in the Protection
16 Agreement Service Contracts area for longer than nine
17 years?
18     A.  Yes.
19     Q.  So just approximately how long have you
20 been involved in the Service Contracts area?
21     A.  Probably -- let me think about this
22 again.  I would say probably about 20 years.
23     Q.  When you were Product Manager of Service
24 Contracts --

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 8

1      A.  Yes.
2      Q.  -- where were your offices located?
3      A.  In Hoffman Estates.
4      Q.  And currently as Director of Service
5  Contracts, are your offices located in Hoffman
6  Estates?
7      A.  Yes.
8      Q.  Did you move offices within Hoffman
9  Estates between the two positions when you --
10     A.  Like physically move offices --
11     Q.  Yes.
12     A.  -- within the corporate office?
13     Q.  Correct.
14     A.  Yes.
15     Q.  Okay.  And as Product Manager in Service
16 Contracts, to whom did you report?
17     A.  Gary Mitzner.
18     Q.  And what was his title at that time, if
19 you recall?
20     A.  Director of Service Contracts.
21     Q.  So he had your position?
22     A.  Yes.
23     Q.  Okay.  So now that you were promoted to
24 Director of Service Contracts is Mr. Mitzner still

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 9

1  there?
2      A.  Yes.
3      Q.  And what is his current position?
4      A.  DVP of Service Contracts.
5      Q.  What does DVP stand for?
6      A.  Divisional Vice President.
7      Q.  So do you report to him currently?
8      A.  Yes.
9      Q.  And is he one of a number of Divisional
10 Vice Presidents?
11     A.  Within the corporation?
12     Q.  Yes.
13     A.  Yes.
14     Q.  Do you know approximately how many
15 Divisional Vice Presidents Sears has?
16     A.  No.
17     Q.  Do you know if it's greater than 20?
18     A.  I have no idea.
19     Q.  When you were Product Manager for Service
20 Contracts, what were your duties and
21 responsibilities?
22     A.  At the end of that role I had some report
23 directs.
24     Q.  And when you say you had some report

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 10

1   directs, what do you mean?
2       A.   I had people reporting in to me.
3       Q.   Who reported in to you?
4       A.   The names of the people who reported to
5   me at that time was Sheila Dunaway, Jackie Kfoury,
6   Ashlie Jobin.
7       Q.   And do you know generally what --
8       A.   And Kevin Warrix.
9       Q.   Sorry.  I didn't mean to interrupt you.
10      A.   That was all.
11      Q.   Okay.  Do you know generally what Kevin
12  Warrix was responsible for?
13      A.   Direct Mail.
14      Q.   And was that Direct Mail with regard to
15  all kinds of Protection Agreements?
16      A.   Direct Mail -- all kinds in what way?
17      Q.   All the different -- so are there
18  different kinds of Protection Agreements?
19      A.   Yes.  Of products, yes.
20      Q.   And so what are the different kinds of
21  Protection Agreements?
22      A.   There's -- the names of them.
23           There is a Mass Protection
24  Agreement, a Repair Protection Agreement, a Value

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 11

1   Protection Agreement, a Budget Protection Agreement,
2   a Sears Purchase Protect, K-Mart, Service Mart.
3       Q.   So for the direct --
4       A.   And that's all of them.
5       Q.   I'm sorry.
6            And so for the Direct Mail aspect
7   that Mr. Warrix was responsible for, was that for all
8   these various types of Protection Agreements?
9       A.   For -- yes.
10      Q.   Okay.  What was Ashlie Jobin responsible
11  for when she was your direct report?
12      A.   Product Administration.
13      Q.   And what is your understanding of what
14  that meant?
15      A.   It is a point of contact with Fulfillment
16  and Call Center Administration.
17      Q.   So what do you mean when you answered
18  point of contact with Fulfillment?
19      A.   She interacts with them if there's
20  questions, process changes.
21      Q.   And who is the them?
22      A.   Service Fulfillment is our Products
23  Repair Services and Home Technicians.  Carry and
24  Depot.  The them is the management of that team,

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 12

1   those teams.
2       Q.   And with respect to Jackie Kfoury, what
3   was her responsibility?
4       A.   Product Manager.
5       Q.   And what does that mean?
6       A.   She managed the features and the price
7   points of two of the products.
8       Q.   And which products?
9       A.   The K-Mart Smart Plan and the Purchase
10  Protect.
11      Q.   With respect to Sheila Dunaway, what were
12  her responsibilities?
13      A.   Service Contracts Administration.
14      Q.   And what does that mean?
15      A.   She handles all of the State filings and
16  registration of the products.
17      Q.   So who was at this point in time
18  responsible for the Price Points for the MPAs?
19      A.   It was managed by our Pricing Team.
20      Q.   And did you have any responsibility at
21  this point in time over the Pricing Team?
22      A.   That was prior to 2010?
23      Q.   Correct.
24      A.   When I was Product Manager?

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 13

1       Q.   Correct.
2       A.   No.
3       Q.   Do you know who headed up the Pricing
4   Team which was responsible for the MPAs in 2010?
5       A.   No.
6       Q.   And with respect to Sheila, Jackie,
7   Ashlie, and Kevin, was -- did you hold any kind of
8   meetings for your team, your direct reports?
9       A.   Yeah.  One-on-ones and occasional
10  meetings.
11      Q.   Was there any kind of regular reporting
12  that each of them did to you?
13      A.   No.
14      Q.   When you were the Product Manager and
15  reported to Mr. Mitzner, did you participate in any
16  kinds of regular meetings with the direct reports to
17  Mr. Mitzner?
18      MS. HINES:  Object to form.
19      MS. GROSS:  You can still answer.
20      MS. HINES:  Yeah, you can answer.  Sorry.
21  BY THE WITNESS:
22      A.   I'm thinking.  I -- with him and his
23  direct reports?
24      Q.   Uh-huh.

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 14

1      A.  Only at a national meeting.
2      Q.  So take a step back.
3            Who else were the direct reports to
4  Mr. Mitzner in the 2010, 2011 timeframe while you
5  were Product Manager?
6      A.  Call Center General Managers.
7      Q.  And were those for inbound as well as
8  outbound Call Centers?
9      A.  Yes.
10     Q.  Okay.  So that was for -- therefore there
11 were six different Managers at that point in time or
12 approximately?
13          MS. HINES:  Object to form.
14 BY THE WITNESS:
15     A.  I don't remember at that time.
16 BY MS. GROSS:
17     Q.  Did you have any kind of regularly-
18 scheduled meetings with Mr. Mitzner at that point in
19 time?
20     A.  One-on-ones.
21     Q.  And when you say one-on-ones, what do you
22 mean?
23     A.  We check in once a month I believe.
24     Q.  And in preparation for your one-on-ones

Page 15

1  with Mr. Mitzner, did you prepare any form of report?
2      A.  No.
3      Q.  So the one-on-ones was just a general
4  discussion?
5      A.  A general discussion, and I would write
6  notes on a note pad.
7      Q.  You previously testified that you
8  attended a national meeting.  What was that?
9      A.  The updates strategy meetings.
10     Q.  And how often do they occur?
11     A.  Two to three times a year.
12     Q.  And during the 2010, 2011 timeframe when
13 you were Product Manager, where did those meetings
14 occur?
15     A.  Oh, I wouldn't know.
16     Q.  So how did you participate in those
17 national meetings?
18     A.  Where did they occur?
19     Q.  Yes.
20     A.  They occur throughout the U.S.  I
21 couldn't tell you specific locations.
22     Q.  Okay.  Did you attend them?
23     A.  Yes.
24     Q.  Okay.  So you just don't recall where you

Page 16

1  attended?
2      A.  Not within Hoffman.  I can't tell you
3  what state I was in for these national meetings in
4  2010 if that's the question.
5      Q.  Did you participate by telephone?
6      A.  No, the meetings are held nationally, so
7  they're in different locations, and I don't know
8  where -- I don't know the locations from six years
9  ago.
10     Q.  Okay.  Do you recall generally what
11 states you were in?
12     A.  No.
13     Q.  How many people attended -- how many
14 people generally attend a national meeting?
15     A.  At that time it was the General Manager,
16 myself, and probably a few Support people, so maybe
17 12.
18     Q.  And when you say General Manager is
19 that --
20     A.  The Call Center.
21     Q.  Okay.  Call Center?
22     A.  Yeah.
23     Q.  And approximately how long does a
24 national meeting last?

Page 17

1      A.  Two-and-a-half days.
2      Q.  And for the national meetings, were
3  documents or memos distributed prior to the meeting
4  to discuss -- to prepare you for discussions at the
5  meeting?
6      A.  No.  We did PowerPoint presentations.
7      Q.  Okay.  And when you say we do PowerPoint
8  presentations, do you prepare them for the meeting?
9      A.  Uh-huh.
10          MS. HINES:  You have to say yes.
11 BY THE WITNESS:
12     A.  Yes.  Sorry.
13          MS. GROSS:  Oh.  Thank you.
14 BY MS. GROSS:
15     Q.  And with respect to the national meetings
16 which occurred in 2011 and 2010 where you were a
17 Product Manager, do you recall if there were
18 discussions about MPAs at those meetings?
19     A.  Yes, there would be.
20     Q.  Do you recall anything in general about
21 the topics of discussion about MPAs at the meetings
22 in 2010 and 2011?
23     A.  Not specifically.
24     Q.  Do you recall whether coverage -- whether

1 the extent of coverage by an MPA was discussed?
2     **A.** Typically that's not covered at these
3 meetings.
4     **Q.** So what is typically covered at these
5 meetings?
6     **A.** Dialer conversations, staffing
7 conversations, workforce management, any updates on
8 initiatives.
9     **Q.** Were there any discussions, if you
10 recall, during the 2010 and 2011 timeframe of Sears'
11 software and computer systems related to MPA
12 agreements?
13     **A.** Software discussions around MPA
14 agreements? No.
15     **Q.** Or computer systems?
16     **A.** No.
17     **Q.** Was there any discussion at the national
18 meetings concerning the training of the Sears
19 employees at the Call Centers as to how to handle
20 inbound calls concerning MPAs?
21     **A.** Was there any training discussions?
22     I don't know specifically if there
23 was.
24     **Q.** Okay. When you became Director of

1 Service Contracts, did you continue attending the
2 national meetings?
3     **A.** Yes.
4     **Q.** Okay. And did they continue to occur two
5 to three times a year?
6     **A.** Yes.
7     **Q.** Did you run the national meetings when
8 you became the Director of Service Contracts?
9     **A.** No.
10     **Q.** Who ran the meetings when you became
11 Director of Service Contracts?
12     **A.** Gary Mitzner.
13     **Q.** Okay. Who ran the meetings when you were
14 Product Manager of service contracts?
15     **A.** Gary Mitzner.
16     **Q.** Okay. During your tenure as Director of
17 Service Contracts -- I'm just trying to make sure we
18 understand the timeframe, I'm being specific -- when
19 the national meetings occurred, who typically
20 attended?
21     **A.** The Call Center General Managers, Gary's
22 direct reports -- some of Gary's direct reports I
23 should say, and some of them -- the General Manager's
24 Sales and Service Managers.

1     **Q.** I'm sorry. I didn't hear you. Some of
2 the General Manager's --
3     **A.** The Sales and Service Managers.
4     **Q.** So as Director of Service Contracts,
5 first who is your employer? What is the name of your
6 employer?
7     **A.** Sears Protection Company.
8     **Q.** Okay. And was that the same employer
9 when you had the position of Product Manager?
10     **A.** Yes.
11     **Q.** Okay. As Director of Service Contracts,
12 who are your direct reports or who have been for the
13 past -- in general? If you don't know the names,
14 just the concepts of the titles.
15     **A.** Currently?
16     **Q.** Currently.
17     **A.** Product Managers, Product Administration,
18 Call Center Applications, Call Center Reporting and
19 Development, Member Experience.
20     I believe that's all.
21     **Q.** And currently how many Product Managers
22 report to you?
23     **A.** Three.
24     **Q.** And who are they currently?

1     **A.** Jackie Kfoury, Ashlie Jobin, Jason
2 Andrea.
3     **Q.** And is Jackie Kfoury still responsible
4 for the features and price points of K-Mart and
5 Purchase Protection?
6     **A.** Yes.
7     **Q.** Is Ashlie Jobin still currently
8 responsible for the point of contact with Fulfillment
9 and Call Center Administration?
10     **A.** No.
11     **Q.** What is she currently?
12     **A.** Product Manager.
13     **Q.** So what -- what product is she
14 responsible for?
15     **A.** Master Protection Agreement, Repair
16 Protection Agreement.
17     **Q.** And Jason Andrea, what is he currently
18 responsible for?
19     **A.** He has Service Smart and Budgets.
20     **Q.** And you say that a Product Administrator
21 currently reports to you?
22     **A.** Sheila Dunaway.
23     **Q.** And what is her general --
24     **A.** Same position.

Page 22

1    Q.  With respect to the Call Center
2    Application, how many individuals report to you
3    with --
4    A.  One.
5    Q.  And who is that individual?
6    A.  Kathy Earl.
7    Q.  And what generally is her responsibility?
8    A.  Developing business requirements for
9    system enhancements.
10   Q.  So what do you mean by that?
11   A.  If we want to upgrade or enhance the
12   system, she will take the business terms and put them
13   in a technical way to hand them off to IT to scope.
14   Q.  And is she responsible for any one
15   particular system?
16   A.  Ciboodle.
17   Q.  Is that the only system she's responsible
18   for?
19   A.  She's -- well, she's not responsible for
20   them.  She is putting the business requirements
21   together for them, and she does that as well for
22   NPJ and NPS.
23   Q.  And what does NPJ stand for?
24   A.  National Product -- and I don't remember

Page 23

1    the last part.
2    Q.  Okay.  What does NPS stand for?
3    A.  It's also National Product.
4    Q.  So what is the difference between the two
5    systems?
6    A.  One is the service side of the business,
7    and the other is the service contract side.
8         NPJ is the service contract side.
9    Q.  And when you say NPJ is the service
10   contract side, what do you mean?
11   A.  It is the system that has all of the
12   Pricing Customer Service Contract Agreements.
13   Q.  And who uses the NPJ system?
14   A.  The Ciboodle system pulls off of the NPJ
15   system.
16   Q.  And does the Ciboodle system also pull
17   off of the NPS system?
18   A.  Yes.
19   Q.  Okay.  And does the -- is the NPJ
20   system -- strike that.
21        Are either the NPJ system or the NPS
22   system known -- also known as the Legacy system?
23   A.  Yes.
24   Q.  So are they both?

Page 24

1    A.  Yes.
2    Q.  And have you heard the term MMI?
3    A.  Yes.
4    Q.  And what's your understanding of what
5    that is?
6    A.  Brand's list.
7    Q.  And is that any type of software program?
8    A.  It resides in Ciboodle.
9    Q.  And did Kathy have any involvement in
10   developing MMI do you know?
11   A.  She was in the Business Requirements when
12   it was developed.
13   Q.  Did you have any involvement in the
14   development of MMI?
15   A.  I was in the discussions.
16   Q.  Do you recall who else was involved in
17   the discussions?
18   A.  Not specific people.
19   Q.  General concept areas?
20   A.  Application Manager from -- at the time
21   it was called Customer Care Network.
22   Q.  Anyone else that you recall?
23   A.  IT.
24   Q.  And when you use the term Customer Care

Page 25

1    Network, to what are you referring?
2    A.  Call Centers -- Nonservice Contract Call
3    Centers.
4    Q.  Prior -- strike that.
5         You also indicated that currently
6    Call Center Reporting and Development report to you.
7         Do you recall that?
8    A.  Correct.
9    Q.  And who is that individual currently?
10   A.  Joe Finley.
11   Q.  And in general what -- what does Call
12   Center Reporting and Development mean?
13   A.  So it's for Service Contracts only, and
14   it has the daily and monthly agent level reporting.
15   Q.  And what do you mean by that?
16   A.  It provides reports for the Management
17   team in the Service Contract Call Centers on the
18   performances of their agents.
19   Q.  Did you say Management team in the
20   Service Call Centers and Call Centers?
21   A.  Within the Service Contract Call Centers.
22   Q.  Okay.  Thank you.
23        What -- what types of information
24   are included in that reporting?

Page 26

1      MS. HINES:  Object to form.  You can answer
2  if you can.
3      THE WITNESS:  Pardon?
4      MS. HINES:  You can answer if you can.
5  BY THE WITNESS:
6      A.  What type of information was the
7  question?
8  BY MS. GROSS:
9      Q.  Uh-huh.
10     A.  It has number of transactions, dollars,
11 connects.
12     Q.  Those would also include number of
13 renewals?
14     A.  That would be in the transactions.
15     Q.  Okay.  Does it include number of
16 cancellations?
17     A.  Yes.
18     Q.  Does it include number of replacements?
19     A.  No.
20     Q.  Does it include number of buyouts?
21     A.  No.
22     Q.  Do you receive copies of these daily and
23 monthly reports prepared by Mr. Finley?
24     A.  No.

Page 27

1      Q.  Do you receive any kind of summary
2  information concerning the reports that Mr. Finley
3  prepares?
4      A.  No.
5      Q.  How are you informed by Mr. Finley of the
6  daily -- strike that.
7           How are you informed by Mr. Finley
8  of the agent level production?
9      A.  I --
10     MS. HINES:  Object to form.
11 BY THE WITNESS:
12     A.  I don't look at agent level.
13 BY MS. GROSS:
14     Q.  Does Mr. Finley -- strike that.
15          What type of reporting to you does
16 Mr. Finley do?
17     MS. HINES:  Object to form.
18 BY THE WITNESS:
19     A.  He doesn't do any reporting for me.
20 BY MS. GROSS:
21     Q.  You previously testified that he was a
22 direct report to you; correct?
23     A.  He is, but he doesn't do any reporting
24 for me.

Page 28

1      Q.  Okay.  How -- do you have any one-on-one
2  meetings with Mr. Finley?
3      A.  I do have one-on-ones, yes.
4      Q.  And how often do they occur?
5      A.  Every other week.
6      Q.  And are those in-person meetings?
7      A.  No, they're by phone.
8      Q.  And typically how long do they last?
9      A.  30 minutes.
10     Q.  And is there any kind of memorandum
11 reporting that accompanies those one-on-one meetings
12 with Mr. Finley?
13     A.  Initiatives list.
14     Q.  And what is an initiatives list?
15     A.  It says what he's working on and timing
16 and prioritization.
17     Q.  Okay.  I forgot to ask you these
18 questions.
19          With respect to any of your Product
20 Managers, do you have one-on-ones with them?
21     A.  Yes.
22     Q.  Are they on an individual basis?
23     A.  Yes.
24     Q.  And how often do they occur?

Page 29

1      A.  Every other week.
2      Q.  And do they also prepare an initiatives
3  list?
4      A.  No.
5      Q.  Is there any kind of memorandum or
6  written reporting that any of the products that
7  Managers do in anticipation of the one-on-one
8  meetings?
9      A.  They may have notes, but they don't
10 provide anything to me.
11     Q.  Okay.  Is there any information that you
12 provide to them for the one-on-one meetings with the
13 Product Managers?
14     A.  They're verbal discussions.
15     Q.  Okay.  Do any of your reports provide
16 information on replacements for Protection
17 Agreements?
18     MS. HINES:  Object to form.
19     THE WITNESS:  I'm sorry.  Could you ask that
20 again?
21 BY MS. GROSS:
22     Q.  Do any of your direct reports provide
23 information concerning replacements with respect to
24 Protection Agreements?

Page 30

1    A.  No.
2    Q.  Do any of your direct reports provide
3  information to you concerning buyouts of Protection
4  Agreements?
5    A.  No.
6    Q.  If you know, what area is responsible for
7  maintaining information on replacements arising from
8  Protection Agreements?
9    A.  Who is responsible for providing reports?
10    Q.  Correct.
11    A.  The Underwriting.
12    Q.  When you say Underwriting, what do you
13  mean?
14    A.  It's the Underwriting team.
15    Q.  And what is the Underwriting team?
16    Sears has a lot of technical groups,
17  I'm sure, and we don't have any organizational
18  charts, so bear with me?
19    A.  They will do the analysis and reporting
20  around service contracts.
21    Q.  And is the Underwriting team housed in
22  any particular division of Sears?
23    A.  Under Service Contracts.
24    Q.  Okay.  And during your tenure as Director

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 31

1  of Service Contracts, who I guess is the point person
2  responsible for the Underwriting team?
3    A.  Ryan Smith.
4    Q.  And do you happen to know like his
5  official title?
6    A.  Director of Underwriting.
7    Q.  That's an easy one.
8    Thank you?
9    MS. HINES:  Makes sense.
10  BY MS. GROSS:
11    Q.  Do you know to whom he reported during
12  the past five years?
13    A.  Gary Mitzner.
14    Q.  Similarly, with respect to information
15  concerning buyouts of Protection Agreements, do you
16  know what individual or group would be responsible
17  for that information?
18    A.  No.
19    Q.  Okay.  Does the underwriting team do any
20  kind of analysis in reporting of cancellations of
21  Protection Agreements?
22    A.  No.
23    Q.  Do you have one-on-one meetings with
24  Kathy -- whose last name I can't read in my own

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 32

1  writing --
2    A.  Earl.
3    Q.  Earl?
4    A.  Yes.
5    Q.  And how often do you have those meetings?
6    A.  Weekly.
7    Q.  And are those meetings in person or by
8  phone?
9    A.  In person.
10    Q.  And does Ms. Earl produce any kind of
11  memorandum in anticipation of these weekly meetings?
12    A.  No.
13    Q.  Does Ms. Earl produce any memorandum as a
14  result of these one-on-one meetings?
15    A.  No.
16    Q.  Does -- is there an initiatives list for
17  Ms. Earl?
18    A.  No.
19    Q.  Okay.  And with respect to member
20  experience as a direct report --
21    A.  Yes.
22    Q.  -- what do you mean by that?
23    A.  She looks at NPS scores.
24    Q.  And what does that mean?

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 33

1    A.  The customer level of satisfaction.
2    Q.  And do you have one-on-one meetings with
3  the individual responsible for member experience?
4    A.  Yes.
5    Q.  And how often do they occur?
6    A.  Once a month.
7    Q.  And is there any initiative list for the
8  individual responsible for member experience?
9    A.  No.
10    Q.  Is there any kind of written memorandum
11  produced for or arising from your one-on-one meetings
12  with the individual responsible for member
13  experience?
14    A.  No.
15    Q.  Okay.  And do all of your direct
16  reports -- or strike that.
17    Have all of your direct reports
18  participated in national meetings in the past five
19  years while you were Director of Service Contracts?
20    A.  Have all of them?  No.
21    Q.  How has it changed?
22    MS. HINES:  Object to form.
23    MS. GROSS:  Okay.  Strike that.
24

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 34

1  BY MS. GROSS:
2      Q.  What -- who -- which one of your direct
3  reports has participated in the national meetings
4  that have occurred during the past five years as you
5  were Director of Service Contracts?
6      A.  So they don't consistently attend them.
7      Q.  Okay.
8      A.  The only one who typically attends them
9  is the Member Experience, Kelly.
10          And Dannon Setzer.
11     Q.  And has Mr. Mitzner participated on a
12  regular basis in the national meetings?
13     A.  Yes.
14     Q.  Okay.  Do any of -- in the past five
15  years when Mr. Mitzner was DVP, what other
16  individuals participated on a regular basis in the
17  national meetings?
18     A.  The Service Contract General Managers,
19  myself, and his -- the two team members I gave you
20  Dannon and Kelly.  Those are usually the ones.
21          Oh, and Matt Pennies.
22     Q.  And what is Matt's position?
23     A.  He's Senior Director of Call Center
24  Operations.

Page 35

1      Q.  And during the past five years has he
2  been located at Hoffman Estates?
3      A.  No.
4      Q.  Do you know where he has been located?
5      A.  Texas.
6      Q.  Okay.  Do you know if anyone from the
7  Underwriting team has participated in the national
8  meetings?
9      A.  On a regular basis.
10     Q.  Correct.
11     A.  No, they do not.
12     Q.  On an as-needed basis?
13     MS. HINES:  Object to form.
14  BY THE WITNESS:
15     A.  I think they've attended once.
16  BY MS. GROSS:
17     Q.  Do you recall why they attended one time?
18     A.  They were new.
19     Q.  When you say they were new, was it the
20  individual that was new to the position?
21     A.  Yes.
22     Q.  Thank you.
23          Have you heard of an individual by
24  the name of Mike Nadeu?

Page 36

1      A.  Yes.
2      Q.  And what is his position at Sears?
3      A.  Director of Analytics and Support.
4      Q.  Have you worked with Mr. Nadeu in the
5  past five years as Director of Service Contracts?
6      A.  Yes.
7      Q.  And in what capacity have you worked with
8  Mr. Nadeu?
9      A.  He supports the business for Data and
10  Analysis.
11     Q.  So what does that mean?
12     MS. HINES:  Object to form.
13          Answer if you can.
14  BY THE WITNESS:
15     A.  If we are needing data to do an analysis
16  or an analysis completed, Mike Nadeu and his team
17  will assist.
18  BY MS. GROSS:
19     Q.  Do you have an understanding of the term
20  high-end merchandise with respect to the NPA
21  products?
22     A.  Yes.
23     Q.  And what is your understanding?
24     A.  Of high-end?

Page 37

1      Q.  Of high-end merchandise with respect to
2  the NPA products?
3      A.  It is certain types of merchandise.
4      Q.  Do you recall having seen any kind of
5  data or analysis of high-end merchandise for NPAs?
6      A.  Data or analysis, no.
7      Q.  Do you recall having any -- do you have
8  any responsibility over high-end merchandise with
9  respect to MPAs?
10     A.  I'm not sure I understand the question by
11  responsibility.
12     Q.  Do -- strike that.  I'll start a
13  different way.
14          You indicated that Mr. Finley --
15  that there is an initiatives list that is used by
16  yourself and Mr. Finley.
17          Do you recall that?
18     A.  Yes.
19     Q.  On what system is that initiatives list
20  housed?  Like what computer system?
21     A.  It's an Excel spreadsheet.
22     Q.  Okay.  And do you have a file on your
23  computer that houses, or is entitled initiatives
24  list?

Page 38

1    A.  From Mr. Finley?
2    Q.  Right.
3    A.  No.
4    Q.  How do you receive updates of the
5  initiatives list?
6    A.  He sends me his latest by e-mail.
7    Q.  Are there any type of meetings that you
8  attend on a regular basis with Mr. Mitzner?
9    A.  Regular meetings that I attend?
10   Q.  Uh-huh.
11   A.  A staff meeting that's been recently
12  started and -- you say on a regular basis?
13   Q.  Uh-huh.
14   A.  That's primarily.
15   Q.  And when was that regularly started -- I
16  mean strike that.
17      When was that recently started?
18   A.  I believe the end of 2015.
19   Q.  And how often has that occurred?
20   A.  Once a week.
21   Q.  And who else participates in that
22  meeting?
23   A.  His direct reports, marketing, finance
24  and PMO office -- one person from the PMO office.

Page 39

1    Q.  And when you say PMO office by what -- to
2  what are you referring?
3    A.  Project Management Office.
4    Q.  And what is that office?
5    A.  It's a person who supports any large
6  initiatives.
7    Q.  Large initiatives with respect to service
8  contracts?
9    A.  Yes.
10   Q.  And has that office existed for the past
11  10 years during your tenure as Director of Service
12  Contracts and Product Manager for Service Contracts?
13   A.  Yes.
14   Q.  Where -- strike that.
15      Who is the person responsible for
16  the Project Management Office?
17   A.  That's in the staff meeting?
18      Mary Nelson.
19   Q.  And do you happen to know her title?
20   A.  Project Manager.
21   Q.  Okay.  And during the past five years
22  while you've been Director of Service Contracts, do
23  you recall any of the large initiatives with respect
24  to service contracts that have occurred?

Page 40

1    A.  In the last -- I'm sorry -- five years?
2    Q.  While you've been Director of Service
3  Contracts.
4    A.  Large initiatives?
5      We have started a home warranty, a
6  new product called Tech Protect.
7      I believe those are primarily it,
8  the last five that I can remember.
9    Q.  So does large initiatives refer to
10  projects or products that have been started?
11   A.  Large initiatives are when you're going
12  to have multiple businesses engaged.
13      Oh, and another one was Shop Your
14  Way Points, ability to Shop Your Way Points for
15  purchases.
16   Q.  Do you recall if during the past five
17  years the Project Management Office has analyzed any
18  kind of initiatives with respect to Master Protection
19  Agreements?
20   A.  Analyze, no.
21   Q.  Okay.  Has the Project Management Office
22  been involved in Master Protection Agreements in the
23  past five years?
24   MS. HINES:  Object to form.

Page 41

1  BY THE WITNESS:
2    A.  On Shop Your Way.
3  BY MS. GROSS:
4    Q.  When you say that an individual from
5  Finance participates in the staff meetings with
6  Mr. Mitzner, to what do you mean with respect to
7  Finance?
8   MS. HINES:  Object to form.
9  BY THE WITNESS:
10   A.  Yeah, I'm not sure I understand the
11  question.
12  BY MS. GROSS:
13   Q.  So what is Sears Finance?  Is there a Finance
14  within the Sears Protection Agreements?
15   A.  They're somebody who supports Service
16  Contracts.
17   Q.  And so what does -- strike that.
18      What type of support does the
19  Finance Department provide for Service Contracts?
20   A.  They provide the P&L.
21   Q.  Do you see a P&L for Service Contracts?
22   A.  Yes.
23   Q.  Okay.  And have you seen a P&L for
24  Service Contracts during your past five years as

Page 42

1  Director of Service Contracts?
2      A.  Yes.
3      Q.  And how often do you see a P&L?
4      A.  Monthly.
5      Q.  Okay.  And what type of information is
6  broken down in the P&L?  Is it with respect to the
7  various forms of Protection Agreements?
8      A.  Referring to products?
9      Q.  I'll try this a different way.
10         Is the P&L that you see on a monthly
11  basis broken down by MPA versus RPA versus Budget
12  versus K-Mart?
13      A.  The -- the only ones that are broken out
14  on the P&L are the Sears Purchase Protect, the
15  K-Mart, and the newer Home Warranty and Tech Protect
16         All others roll up to one number.
17      Q.  During the five years as Director of
18  Service Contracts, have you ever seen a P&L for MPAs?
19      A.  P&L for MPAs?
20         No.
21      Q.  Do you participate in any -- strike that.
22         Within the past five years have you
23  participated in any meetings with Mr. Nadeu?
24      A.  Yes.

Page 43

1      Q.  What -- in general what type of meetings
2  have you participated in with Mr. Nadeu?
3      A.  Staff meetings, just any type of meetings
4  in which his team is needed.
5      Q.  Do you travel to visit any of the Call
6  Centers?
7      A.  No.
8      Q.  Do you have any interaction with any
9  Sears customers concerning Protection Agreements?
10      A.  No.
11      Q.  Do you have any involvement in the
12  training programs with respect to agents at the Call
13  Centers?
14      A.  Involvement?
15      Q.  Correct.
16      A.  No.
17      Q.  Do you have any oversight of the training
18  programs at the Call Centers?
19      A.  No.
20      Q.  Is your department -- strike that.
21         Is the department in which you are
22  involved the Service Contracts Department?
23      A.  Yes.
24      Q.  Is that department ever audited by Sears

Page 44

1  in any fashion?
2      A.  By Sears?  Yes.
3      Q.  And how often is it audited?
4      A.  They're random.
5      Q.  During your five years as Director of
6  Service Contracts, have you ever seen any reports of
7  audits of your department?
8      A.  Yes.
9      Q.  Okay.  What is the department or company
10  I guess that's responsible for auditing your
11  department?
12      A.  Internal Audit.
13      Q.  And is that Internal Audit at Sears
14  headquarters in Hoffman Estates?
15      A.  Yes.
16      Q.  Do you recall if any of the reports which
17  you've seen in the past five years from Internal
18  Audits concerned MPAs?
19      A.  Yes.
20      Q.  Do you recall what in general they
21  discussed?
22      A.  Yes.
23      Q.  And what was that?
24      A.  It was around the ringing procedure in

Page 45

1  the retail store on replacements.
2         MS. HINES:  Did you say ringing?
3         THE WITNESS:  Yeah, POS system.  Sorry
4  California accent.
5  BY MS. GROSS:
6      Q.  So do you recall approximately when that
7  report was issued?
8      A.  Three years ago.
9      Q.  And do you recall what in general the
10  report found?
11      A.  Yes.
12      Q.  And what was that?
13      A.  We have a gap in the -- on the
14  authorization number that could lead to potential
15  fraud.
16      Q.  So what do you mean by a gap in the
17  authorization number?
18      A.  The -- this is proprietary.  I wouldn't
19  want it open.  The authorization number that is used
20  by retail when they ring it only authorizes only on
21  the first four numbers and not on the whole number
22  allowing the authorization number to either be made
23  up or reused.
24      Q.  During the -- during your tenure as

Page 46

1    Director of Service Contracts, did you ever see any
2    information concerning -- strike that. Let me do a
3    prior question.
4            Have you heard of the Great Indoors
5    stores?
6        A.  Yes.
7        Q.  And what are they?
8        A.  They were stores that Sears had open to
9    offer home appliances and home goods.
10       Q.  And are you aware that the stores closed?
11       A.  Yes.
12       Q.  Do you recall when they closed?
13       A.  Six years ago.
14       Q.  So did you have any responsibility with
15   resect to Protection Agreements issued with respect
16   to products sold at the Great Indoors stores?
17       A.  Okay.  I got lost on the question.  Did I
18   what?
19       MS. GROSS:  Can you read back the question?
20           (WHEREUPON, the record was
21           read by the reporter.)
22   BY THE WITNESS:
23       A.  The stores closed before I became
24   Director of Service Contracts.

Page 47

1    BY MS. GROSS:
2        Q.  But when you were Product Manager of
3    Service Contracts, did you have any involvement with
4    respect to Protection Agreements I guess sold at
5    the --
6        A.  They were being sold.
7        Q.  Let me finish.
8            (Continuing.) -- Protection
9    Agreements issued with respect to products sold at
10   the Great Indoors stores?
11       A.  They were being sold at the time I was a
12   Product Manager, but I don't remember anything I
13   worked on that was in regards to that.
14       Q.  So what -- I don't actually think I asked
15   this question for some reason.
16           What have been your job
17   responsibilities as Director of Service Contracts for
18   the past five years?
19       A.  The -- so I oversee the team of 10 that
20   has product features, pricing, call center
21   applications, enhancement agent reporting, member
22   experience, so I set the strategy and initiatives.
23       Q.  When you say you set the strategy
24   initiatives, what do you mean?

Page 48

1        A.  I determine what we are going to work on
2    and develop for the business around product pricing
3    and the other functions of my team.
4        Q.  And how do you go about setting these
5    strategy initiatives?
6        A.  Align to the corporate, and you find --
7    as time goes you find there are new opportunities or
8    things that need to be adjusted or changed with the
9    market.
10       Q.  How often do you set these strategy
11   initiatives?
12       A.  At the end of the year for the following
13   year.
14       Q.  And how do you inform your direct reports
15   of these strategy initiatives?
16       A.  Through one-on-ones.
17       Q.  Do the strategy initiatives ever take any
18   kind of written form?
19       A.  Yes.
20       Q.  And what is that written form that they
21   take?
22       A.  An Excel spreadsheet.
23       Q.  And do you create a new Excel spreadsheet
24   each time you create a new strategy initiative?

Page 49

1        A.  Add it to it.
2        Q.  Okay.
3        A.  So a new one each year.  It's a new sheet
4    each year, and then things may change throughout the
5    year.
6        Q.  And do you keep track of the progress
7    made towards the strategy initiatives each year?
8        A.  Yes.
9        Q.  And how do you do that?
10       A.  One-on-ones and an occasional team
11   meeting.
12       Q.  And do you record in some written fashion
13   the progress made towards the initiatives?
14       A.  On the Excel spreadsheet.
15       Q.  And where is this Excel spreadsheet
16   housed?
17       A.  For the current year it's kept on a
18   shared drive.
19       Q.  And when you say kept on a shared drive,
20   what do you mean?
21       A.  It's a drive that multiple people can get
22   to that is not private.
23       Q.  So can all your direct reports get to it?
24       A.  Yes.

1    Q.  Who else can get to it?
2    A.  Multiple people if they know where to go.
3    Q.  Does -- can Mr. Mitzner -- strike that.
4        Does Mr. Mitzner have access to your
5  strategy initiatives?
6    A.  He has access to the shared drive.
7    Q.  Uh-huh.
8    A.  He doesn't know where the list is nor
9  does he see the list.
10   Q.  Does your strategy initiatives include
11 revenue goals?
12   A.  No.
13   Q.  What -- what type of information is
14 included in your strategy initiatives?
15   A.  The initiative who owns it, timing,
16 resources needed, and if it's on track or not.
17   Q.  And typically how many initiatives are
18 included in your strategy initiative?
19   A.  Probably 40.
20   Q.  And do you recall whether any of the
21 initiatives have discussed NPAs in the past five
22 years?
23   A.  Yes.
24   Q.  And what are some examples of initiatives

1  coverage of those products?
2    A.  Yes.
3    Q.  Okay.  In an NPA?
4    A.  Yes, yes.  When you're doing a
5  competitive -- like if you're doing a competitive
6  review of the contract, it includes what products are
7  sold.
8    Q.  Have any of your initiatives included
9  high-end merchandise products coverage?
10   A.  Not specifically high-end, no.
11   Q.  Okay.  Have they included them generally?
12 MS. HINES:  Object to form.
13 MS. GROSS:  Okay.  I'll withdraw the
14 question.
15 BY MS. GROSS:
16   Q.  What do you mean by not specifically.
17   A.  There isn't a specific initiative that
18 looks at high-end and contracts on high-end.
19   Q.  Okay.  Got it.  Thank you.
20       Have there been any initiatives
21 which look at the language included in the NPA
22 Agreement?
23   A.  Yes.
24   Q.  And what do you recall about those

1  that you have set for NPAs within the past five
2  years?
3    A.  Testing out new direct mail creatives,
4  Shop Your Way.  I'm trying to think of what else.
5        Competitive feature review,
6  installment billing.  That's some of them.
7    Q.  Have any of your initiatives in the past
8  five years discussed coverage of products for Master
9  Protection Agreements?
10   A.  Could you define products for me?  Are
11 you talking about the Service Contract products or
12 are you talking about products like in merchandise?
13   Q.  With -- well, either quite honestly with
14 respect to the Master Protection Agreements.
15       What do Master Protection Agreements
16 cover?
17   A.  Home appliances, home electronics, lawn
18 and garden, and tools.
19   Q.  The products?
20   A.  Yes.  The Master Protection Agreement is
21 home appliances and electronics and tools.
22   Q.  And their products; correct?
23   A.  Yes.
24   Q.  So have any of your initiatives addressed

1  initiatives?
2    A.  We looked at our competitors last year
3  and -- or other -- and looked at the feature sets and
4  made decisions on changes.
5    Q.  What involvement do you have in
6  formulating the language in a Master Protection
7  Agreement?
8    A.  I will review them, part of the decision
9  making of the changes; and Sheila, who works for me,
10 works with our Legal Department on the wording of
11 them.
12   Q.  And when you reference the term Legal
13 Department, is that Legal Department for Service
14 Contracts?
15   A.  They're Legal Department for Home
16 Services that includes Service Contracts.
17   Q.  Does anybody from the Legal Department
18 for Home Services participate in your staff meetings
19 with Mr. Mitzner?
20   A.  No.
21   Q.  Okay.  In one of your prior answers you
22 made a reference to a line to corporate.
23       Do you recall that when you were
24 describing your responsibilities?

Page 54

1     A.   A strategy aligning to corporate.
2     Q.   A strategy aligning to corporate.  Sorry.
3 Thank you.
4          And what did you mean by that?
5     A.   So the company is -- strategy is
6 integrated retailer, so you make sure that the --
7 that includes digital.
8          So you make sure that -- you're
9 trying to align to make sure you have the same
10 digital presence or digital capabilities that your
11 corporate would.
12     Q.   Are you familiar with how NPAs are
13 purchased by customers?
14     A.   Yes.
15     Q.   And what is your understanding of how
16 NPAs are purchased by customers?
17     A.   They are purchased with the product at
18 retail point of sale, they are purchased from one
19 of -- they can be purchased online with the product,
20 and they can be purchased in the -- from the Call
21 Centers in the aftermarket Contracts, and they can be
22 purchased from a technician in the home.
23     Q.   And with respect to purchasing with a
24 product at a retail point of sale, can those NPAs

Page 55

1 only be purchased for the product purchased at the
2 point of sale?
3     A.   At retail, yes.
4     Q.   There -- an NPA agreement cannot be
5 purchased for other products outside of the retail
6 purchase; correct, at the point of sale purchase?
7     A.   They cannot purchase contracts on other
8 items other than the item they're buying.
9     Q.   Right.  Thank you.
10          With respect to -- strike that.
11          You also indicated an NPA can be
12 purchased online with a product.
13          Is that a newer feature?
14     A.   No.
15     Q.   How long has that been in existence?
16     A.   Since we went online, and I don't know
17 when that was.
18     Q.   And when an NPA is purchased online with
19 a product, can the NPA also cover products not
20 purchased online?
21     A.   So when the customer is going on
22 Sears.com and buying a product, they can only buy the
23 PA that is in relationship to that product.
24     Q.   With respect to NPAs purchased from Call

Page 56

1 Centers in the aftermarket, can a customer purchase
2 an NPA for all products in their home?
3     MS. HINES:  Object to form.
4     MS. GROSS:  Strike that.  I'll try a
5 different way.
6 BY MS. GROSS:
7     Q.   With respect to NPAs purchased from Call
8 Centers in the aftermarket, what products can be
9 covered by an NPA?
10     A.   Purchase from the Call Centers can be
11 covered for -- by an NPA would be the home
12 appliances, home electronics, tools, and meeting
13 certain eligibility criteria.
14     Q.   And when an NPA is purchased by a
15 customer from a Call Center, is that typically a
16 telephone conversation?
17     A.   It's telephone and direct mail.
18     Q.   Okay.  And when you say direct mail, what
19 do you mean?
20     A.   U.S. Postal Service, a direct mail offer.
21     Q.   So a customer would be responding to a
22 direct mail offer which contains a phone number to
23 call with respect to an NPA agreement?
24     A.   They can phone, or they can tear it off

Page 57

1 and send it back.
2     Q.   And if they send it back, would then a
3 Call Center representative call a customer and
4 communicate with them concerning an NPA agreement?
5     A.   If the customer just tore off and sent in
6 their payment information, no.
7     Q.   Not with respect to payment information
8 but with respect to finding out information about an
9 NPA, about purchasing an NPA?
10     MS. HINES:  Object to form.
11 BY THE WITNESS:
12     A.   Yeah, I'm not understanding the question.
13 Sorry.
14     MS. GROSS:  Okay.  Can you read back a
15 question, like three before?
16          (WHEREUPON, the record was
17          read by the reporter.)
18 BY MS. GROSS:
19     Q.   With respect to a direct mail
20 solicitation for an NPA agreement, after a customer
21 either tears off -- after a customer tears off the
22 piece of paper and responds, would a Call Center
23 representative communicate with that customer
24 concerning the purchase of an NPA agreement by

Page 58

1 telephone?
2    A.  From that response, no.
3    Q.  How does it -- how does that
4 communication occur?
5    A.  The customer sends in the information to
6 purchase, we would process that information, which
7 includes the payment information, and then we would
8 send the customer the terms and conditions contract.
9    Q.  So there's a possibility that no
10 communication --
11    A.  Verbal.
12    Q.  No verbal communication has occurred
13 between the Call Center and the customer when -- to
14 discuss the purchase of an NPA agreement?
15    A.  For a direct marketing response, that's
16 correct.
17    Q.  With respect to that situation where it's
18 a direct mail response, how does Sears learn of the
19 products that the customer wants included in the NPA?
20    A.  They -- it's in the customer's file
21 either from a retail purchase or from when they've
22 had service on the product.
23    Q.  Would there also be a situation where
24 there is a direct mail response without any verbal

Page 59

1 communications with respect to a renewal of an NPA
2 without a retail purchase?
3    MS. HINES:  Object to form.
4       Answer if you can.
5 BY THE WITNESS:
6    A.  A direct mail response to a renewal from
7 a retail purchase.
8    MS. GROSS:  No.  Direct -- all right.  Let's
9 start again.
10    THE WITNESS:  Okay.
11 BY MS. GROSS:
12    Q.  Are there NPAs that are renewed by direct
13 mail which cover products that have not been
14 purchased at the Sears store or Sears online?
15    A.  Is there a direct mail response -- I'm
16 sorry could you...
17       (WHEREUPON, the record was
18         read by the reporter.)
19 BY THE WITNESS:
20    A.  Yes, they could have come through the
21 file service.
22 BY MS. GROSS:
23    Q.  When you say file service, what do you
24 mean?

Page 60

1    A.  They could have added the item when they
2 had the service call.
3    Q.  Can NPAs be issued for products that are
4 in a customer's home which may not have been
5 purchased at the Sears store or have not been
6 serviced by a technician?
7    A.  In general can they cover those --
8    Q.  Uh-huh.
9    A.  -- yes.
10    Q.  Is there some way for you to determine
11 whether there are Sears NPAs which have been issued
12 to cover products not purchased in the Sears store or
13 Sears online or not serviced by a Sears technician?
14    A.  Is there a way for us to find if we sold
15 NPAs on items that were not Sears sold or serviced?
16    Q.  Correct.
17    A.  I would say yes with some matching logic.
18    Q.  So can you explain that?
19    A.  You would have to build a query that is
20 looking for certain criteria to do that.
21    Q.  Do you know if that analysis has ever
22 been performed by, you know, anyone in your direct
23 report?
24    A.  No, not that I know of.

Page 61

1    Q.  Do you know if that analysis has been --
2 strike that.
3       Do you know if that query has been
4 performed by anyone in the underwriting team?
5    A.  Nope, not that I know of.
6    MS. GROSS:  Okay.  If you don't mind, I would
7 like to take a break to go to the bathroom.
8    MS. HINES:  Sure.
9       (WHEREUPON, a recess was
10         had.)
11 BY MS. GROSS:
12    Q.  During your tenure as Director of Service
13 Contracts, have you analyzed sales of NPAs from point
14 of sale versus aftermarket?
15    A.  Yes.
16    Q.  And how have you done that analysis, or
17 how has that analysis been performed?
18    A.  Through queries, data queries.
19    Q.  And why have you looked at such
20 information?
21    A.  You're looking for -- that determine the
22 margin on -- for pricing.
23    Q.  And how often do you look at that kind of
24 information?

Page 62

1      A.   A couple times a year maybe.
2      Q.   What information do you look at?
3      A.   Cost per service call, frequency of
4  service information, and dollars sold.
5      Q.   And where do you obtain the information
6  that you look at?
7      A.   The warehouse.
8      Q.   Okay.  I mean you say warehouse.  To what
9  are you referring?
10     A.   Corporate warehouse also known as LCI.
11     Q.   So what is corporate warehouse LCI?
12     A.   It holds customer information including
13  customer household; name; address; phone number, if
14  it's available; products; Shop Your Way; Service
15  Contracts; service; just different variables.
16     Q.   And does it also include price
17  information?
18     MS. HINES:  Object to form.
19  BY THE WITNESS:
20     A.   It includes price sold.
21  BY MS. GROSS:
22     Q.   Price sold.  Okay.
23          And is that data warehouse different
24  from the NPS and NPJ system?

Page 63

1      A.   NPS and NPJ feed to the data warehouse.
2      Q.   Got it.  Thank you.
3          Does Ciboodle feed to the data
4  warehouse.
5      A.   Ciboodle feeds off of NPJ and NPS,
6  therefore, the data would go into the warehouse.
7      Q.   Has any similar analysis been performed
8  for Master Protection Agreements sold for high-end
9  merchandise?
10     A.   No.
11     Q.   When an analysis is performed to
12  determine the margin for pricing, what format does
13  that occur in?
14     A.   Excel.
15     Q.   Does it have a name?
16     A.   When we're doing the analysis?
17     Q.   Uh-huh.
18     A.   No.
19     Q.   And who participates in that analysis?
20     A.   Product Managers and someone from
21  underwriting.
22     Q.   Is it an Excel -- does it take the form
23  of an Excel spreadsheet that is revised a couple
24  times a year?

Page 64

1      A.   It depends upon what your analysis --
2  right.  You're running a query and then you're taking
3  the information from the query and you're putting it
4  into an Excel spreadsheet so that you can do your
5  analysis and it varies based upon what you're trying
6  to look at.
7      Q.   And as a result of the analysis that's
8  performed, are prices for NPAs changed on any kind of
9  frequency?
10     A.   Is there a set frequency for changing
11  prices?  No.
12     Q.   How is a determination made to change
13  prices for NPAs?
14     MS. HINES:  Object to form.
15  BY THE WITNESS:
16     A.   We will -- you're looking at customer
17  acceptance levels, response rates, those types of
18  things; and if you see something that has changed,
19  you may go back and look to see what has caused the
20  change.
21  BY MS. GROSS:
22     Q.   And that's a determinative factor for
23  changes in pricing for NPAs?
24     A.   You may have new products that have come

Page 65

1  in it, price points of products may have changed.  It
2  will happen more frequently in consumer electronics
3  where the technology is changing.
4      Q.   Do you -- who has the final authorization
5  to approve a price change?
6      A.   Myself and Gary.
7      Q.   How is a price change implemented?
8      A.   Through NPJ and on the retail side price
9  management.
10     Q.   So when you say it's implemented through
11  NPJ, how is that information of the price change
12  communicated into the NPJ system?
13     A.   There's someone on my team who types in
14  the prices.
15     Q.   Okay.  Who is that person or who was that
16  person during --
17     A.   Ernestine Miller.
18     Q.   And what is Ernestine Miller's -- or what
19  has Ernestine Miller's job responsibilities been
20  within the last five years?
21     A.   Data entry for pricing.  She assists a
22  couple of other businesses, too, but I don't know
23  everything that she is...
24     Q.   And when you say a couple other

1 businesses, what do you mean?
2     A.  Our in-home side of our business, she'll
3 also do some data entry for them.
4     Q.  Is she a direct report to you?
5     A.  No, she reports to somebody on my team.
6     Q.  And which person is that?
7     A.  Currently Ashlie Jobin.
8     Q.  Got it.  Thank you.
9         When information about price change
10 is implemented through NPJ, does that also affect the
11 calculation with respect to refunds and cancellations
12 of NPAs?
13     A.  Historically on what's already been sold?
14         No.
15     Q.  With respect to calculations of refunds,
16 how do you obtain information about that?
17         Sorry.  With respect to calculation
18 of refunds for NPAs, how do you obtain information on
19 that?
20     A.  How are they calculated or?
21     Q.  First how -- do you obtain information on
22 the calculation of refunds for NPAs?
23     MS. HINES:  Object to form.
24     MS. GROSS:  As part of your job

1 responsibilities.
2 BY THE WITNESS:
3     A.  Yeah, I'm not sure I understand.
4         Do I receive --
5 BY MS. GROSS:
6     Q.  Do you ever look at information on the
7 amount, dollar amounts of refunds for NPAs?
8     A.  I see total dollar amounts canceled.
9     Q.  And do you see information about total
10 dollar amounts canceled on any type of regular basis?
11     A.  Monthly.
12     Q.  And when you say you see total dollar
13 amounts, is it for each, I'll say, product group, so
14 it's for NPAs versus RPAs, versus --
15     A.  No.
16     Q.  So what type of information do you see on
17 a monthly basis?
18     A.  I see a cancellation to net sales by the
19 channel it was sold, meaning whether it was a retail
20 contract or an aftermarket contract, and I see -- the
21 Service Smart is broken out differently just like it
22 is on the P&Ls, and the rest of them that are rolled
23 up.
24     Q.  And what area or department is

1 responsible for producing this monthly analysis that
2 you see with respect to dollar amounts canceled?
3     A.  It's on my team.
4     Q.  And which individual?
5     A.  It is Demi Richardson, which I think I
6 may have left her off earlier.
7     Q.  And what is her responsibility?
8     A.  Her title is Marketing and Customer
9 Segment Manager, but she's primary a Channel Manager.
10     Q.  So let's take this one at a time.
11         What is a Channel Manager?
12     A.  Sorry.
13     Q.  That's okay.  No, no.  It's helpful to
14 all of us honestly.
15         So what is the Channel Manager?
16     A.  Channel Manager works on -- how do you
17 explain this?  They are the point of contact for
18 initiatives that would impact or go into the Service
19 Contract Call Centers.
20         So she coordinates all of the
21 communication of whose got what going on at what
22 point.
23     Q.  And what is a Marketing and Customer
24 Segment Manager, or was that included in your prior

1 answer?
2     A.  That's her official title.
3     Q.  Okay.
4     A.  So -- and the other part of her role is
5 looking at the customer -- how we're reaching out to
6 customers to contact them around purchasing of a
7 contract.
8         Is it direct -- are we going to
9 direct mail, or are we going to telemarketing?
10     Q.  Do you have one-on-ones with
11 Ms. Richardson?
12     A.  Yes.
13     Q.  How often?
14     A.  Weekly.
15     Q.  In person or by telephone?
16     A.  In person.
17     Q.  And does she prepare any kind of regular
18 written report for you?
19     A.  She works off of that initiatives list
20 that we talked about earlier.
21     Q.  So the initiatives list that is used for
22 Mr. Finley is also used for Ms. Richardson?
23     A.  Yes.
24     Q.  Does anyone else work off of the

Page 70

1  initiatives list?
2      A.  The majority of the team has access to
3  that list and will list their items on there.
4      Q.  Does Mr. Setzer have access to that
5  initiatives list?
6      A.  Yes.
7      Q.  Has he listed items on that list in the
8  past five years?
9      A.  Yes.
10     Q.  Do you recall if that initiatives list
11  has included information concerning MMI?
12     A.  No, it does not.
13     Q.  You indicated that you see monthly a
14  report on the total dollar amounts canceled.
15         Do you recall that?
16     A.  Uh-huh.
17     Q.  Does that information also include why
18  NPAs are canceled?
19     A.  No.
20     Q.  Do you receive any information -- strike
21  that.
22         Have you received any information
23  during your tenure as Director of Service Contracts
24  on why NPAs are canceled?

Page 71

1      MS. HINES:  Object to form.
2  BY THE WITNESS:
3      A.  Have I ever seen anything?
4  BY MS. GROSS:
5      Q.  Uh-huh.
6      A.  Not that I recall.
7      Q.  Have you ever seen anything concerning
8  the reasons -- the various reasons why NPAs are
9  canceled?
10     A.  I don't remember seeing anything.
11     Q.  Are you aware that there is a list of
12  reasons that Sears uses to attribute -- which are
13  attributed -- strike that.
14         Are you aware that there is a list
15  of reasons used by Sears attributed to various
16  cancellations of NPAs?
17     A.  Yes.
18     Q.  Okay.
19     A.  I'm aware of the list.
20     Q.  Okay.  Do you know where that list
21  resides?
22     A.  It's an option in Ciboodle.
23     Q.  And have you or any of your direct
24  reports analyzed cancellations of NPAs for purposes

Page 72

1  of determining, you know, their reasons?
2      MS. HINES:  Object to form.
3  BY THE WITNESS:
4      A.  Not that I'm aware.
5  BY MS. GROSS:
6      Q.  What is your understanding as to why
7  there are a list of cancel reasons which resides in
8  Ciboodle?
9      MS. HINES:  Object to form.
10  BY THE WITNESS:
11     A.  Why is there a list?
12  BY MS. GROSS:
13     Q.  Correct.
14     A.  I'm sure so it can be bucketed.
15     Q.  Do you have any reason as to who looks at
16  the reasons attributed to cancellations of NPAs?
17     MS. HINES:  Object to form.
18  BY THE WITNESS:
19     A.  I'm not aware who looks at it.
20  BY MS. GROSS:
21     Q.  Okay.  Is there any other financial
22  information concerning NPAs that you review on a
23  regular basis?
24     MS. HINES:  Object to form.

Page 73

1  BY THE WITNESS:
2      A.  Financial information?  No.
3  BY MS. GROSS:
4      Q.  Well, you had previously testified that
5  you received monthly total dollar amounts canceled
6  for NPAs.  You also testified that you received
7  monthly a P&L report for NPAs.
8         So is there any other kind of
9  financial analysis?
10     A.  On NPAs?
11     Q.  Correct.
12     A.  No.
13     Q.  Do you receive any kind of information on
14  dollar amounts of products replaced which had been
15  covered by NPAs?
16     A.  Yes.
17     Q.  And what format do you receive that
18  information?
19     A.  In Excel.
20     Q.  And how often do you receive that
21  information?
22     A.  Weekly.
23     Q.  And does that type of information have a
24  name?

Page 74

1    A. It's just replacement reporting.
2    Q. What information other than the dollar
3 amounts in products replaced is included in the
4 replacement report?
5    A. It breaks out monthly, weekly, reasons
6 for replacement, quantity, dollar that was
7 authorized. It also breaks out the Service Smart and
8 the New Home Warranty separate.
9    Q. Does it also break out the -- not only
10 the dollar information authorized but the dollar
11 information of replacements fulfilled?
12    A. No.
13    Q. How do you learn information about
14 whether the dollar amount authorized for replacement
15 products compares to the dollar amount fulfilled for
16 replacement products?
17    MS. HINES: Object to form.
18    MS. GROSS: Strike that.
19 BY MS. GROSS:
20    Q. Are you aware that -- strike that.
21       When you say dollar amount
22 authorized, what do you mean?
23    A. The amount that has been authorized to
24 replace the product.

Page 75

1    Q. Okay.
2    A. For the consumer.
3    Q. Are you aware that not all replacement
4 authorizations are fulfilled or completed by the
5 customer?
6    MS. HINES: Object to form.
7    THE WITNESS: Yeah, I'm not following the
8 question either.
9 BY MS. GROSS:
10    Q. Is there a difference between a dollar
11 amount authorized for a replacement product and a
12 dollar amount fulfilled with respect to the actual
13 purchase of that product?
14    A. Yes, the customer can upgrade and spend
15 more or less than what was authorized.
16    Q. Or the customer could not take the
17 authorization?
18    A. Yeah, that -- probably.
19    Q. So is there any kind of analysis that you
20 see that's performed as to whether the dollar amount
21 authorized differs from the, you know, dollar amount
22 fulfilled?
23    A. Yes.
24    Q. And what -- how do you -- what

Page 76

1 information do you see?
2    A. I've seen the analysis I think twice.
3    Q. And what type of report does that take?
4    A. It's just an Excel spreadsheet, but you
5 have timing issues in there.
6    Q. Who produces that report?
7    A. It's been done I think twice by two
8 different people. I don't know who did them.
9    Q. Is that, if you know, the responsibility
10 of someone in Finance?
11    A. No, it wasn't in Finance.
12    Q. Do you know what area or department that
13 was from?
14    A. I think it was somebody on the Analytics
15 Team, and it's looking at a point in time so, you
16 know, you've been authorized let's say in Week 17,
17 and if you're looking at those spends in Week 18, you
18 have -- there's this timing of when you're actually
19 shopping to when it was authorized.
20    Q. Okay. Have you seen any kind of
21 financial analysis of renewals of NPAs?
22    A. Yes.
23    Q. And what form -- strike that.
24       During your tenure as Director of

Page 77

1 Service Contracts, what form has that analysis taken?
2    A. Excel spreadsheets.
3    Q. And how often is that information
4 prepared? If you know.
5    A. I looked at it about once a quarter.
6    Q. And does that Excel spreadsheet have a
7 name?
8    A. Response Reporting Tool.
9    Q. And what other information is -- strike
10 that.
11       What information is contained in the
12 Response Reporting Tool?
13    A. Number of events that were generated to
14 reach out to a customer, number of responders,
15 dollars sold, net and gross duration of the
16 contract -- average duration of the contract, average
17 number of items purchased.
18    Q. And is that broken out by different types
19 of Protection Agreements?
20    A. The type that are purchased is broken
21 out, yes.
22    Q. So that information would be provided
23 for -- strike that.
24       That information has been provided

Page 78

1  for NPAs?
2      A.  Of those purchased, yes.
3      Q.  Right.
4          Do you know what department or
5  individual prepares that information?
6      A.  It's an automated report.
7      Q.  So can you explain to me what you mean by
8  it's an automated report?
9      A.  It's an SQL query that's already been
10  built, Sequel, and it goes off the warehouse and you
11  go in and you just refresh the data on a pivot table.
12      Q.  So what do you mean when you say refresh
13  data on a pivot table?
14      A.  It's changing the -- bringing in the most
15  recent data from the warehouse, so it's just going
16  out and retrieving the data and bringing it back in
17  and summarizing it into this Excel.
18      Q.  What other automated reports are
19  available to you from the data warehouse?
20      A.  Automated reports from the data
21  warehouse?  Give me a second to think about this.
22      Q.  Take your time.
23      A.  I have to kind of walk through my day.
24          What we call a -- we call it a PA

Page 80

1  approximate time period?
2      A.  That this was my organization?
3      Q.  Correct.
4      A.  It looks like it's about four months old.
5      Q.  Four months from today?
6      A.  Yeah.
7      Q.  Do you keep organizational charts such as
8  this?
9      A.  For my team?
10      Q.  Correct.
11      A.  I think I have my most recent one, this
12  one, and probably one back.
13      Q.  Are you responsible for inputting changes
14  with respect to your team into an organizational
15  chart?
16      A.  Yeah.
17      Q.  Okay.
18      A.  Sorry.  Yes.
19      Q.  Do you know whether organizational charts
20  greater than, you know, one year exist somewhere in
21  the Sears data warehouse system?
22      A.  No.
23      Q.  So you don't know?
24      A.  I'm not aware of any, no.

Page 79

1  Unit Pen Report, and that provides retail
2  information, merchandise sold, PA sold, average
3  dollar value of the PA sold, average dollar of the
4  merchandise sold.
5      Q.  Any other kinds of automated reports that
6  are available to you?
7      A.  Those are the primary ones that I use
8  that I can think of offhand.
9      Q.  Okay.  Is there any kind of automated
10  report that you review for aftermarket purchases of
11  NPS?
12      A.  That Response Reporting Tool.
13      Q.  Do you know what Sears' document
14  retention policy is?
15      A.  No.
16      Q.  Just to be thorough -- I want to make
17  sure I haven't forgotten anything -- I want to show
18  you what's been previously marked as Plaintiffs'
19  Exhibit 5, which is an organizational chart with your
20  name at the top which says -- do you have an
21  understanding as to what this organizational chart
22  reflects?
23      A.  It's my organization.
24      Q.  Okay.  Do you have a -- do you have an

Page 81

1      Q.  Okay.  Is there a similar organizational
2  chart that is prepared which would reflect
3  individuals who are on the same reporting level as
4  you who report up to Mr. Mitzner?
5      A.  I think there's one about the same age as
6  this one that I did for him.
7      Q.  Okay.  You indicated that you believe
8  it's about four months old.
9          What on this document leads you to
10  believe it's about four months old?
11      A.  Project Manager wasn't filled, and that's
12  now Jason, the third one in.
13      Q.  Got it.
14          With respect to Mr. Setzer, is he
15  one of your direct reports?
16      A.  Yes.
17      Q.  So how does he report to you?
18      A.  He's the National Operations Manager.
19      Q.  Do you have one-on-one meetings with him?
20      A.  Yes.
21      Q.  And how often do those occur?
22      A.  They're once a month.
23      Q.  And are those in person or by phone?
24      A.  By phone.

Page 82

1      **Q.** Is there any form of written
2  communication between you and Mr. Setzer that is
3  prepared on a regular basis?
4      **A.** No.
5      **Q.** What's your understanding of what
6  Mr. Setzer's responsibilities are as a National
7  Operations Manager?
8      **A.** He handles the day-to-day operations that
9  might include process changes, RMT, vacation bids,
10  rolling out of a new initiative such as work force
11  management. He also conducts -- goes into the sites
12  every couple of months to work with them and make
13  sure that they're -- work force management and RMT is
14  following processes.
15      **Q.** Does RMT stand for anything?
16      **A.** Resource Management.
17      **Q.** Okay. In the bottom right corner of this
18  organizational chart there's a box that says, Team
19  Responsible for Service Contracts, and it's divided
20  into two. One is Product Development, and the other
21  is Call Center.
22      **A.** Uh-huh. Yes.
23      **Q.** Why is there a division like that?
24      **A.** Because my team is mixed with a variety

Page 83

1  of responsibilities, and this PowerPoint was put
2  together to explain my role, and since it's mixed,
3  that was the best way I could explain it.
4      **Q.** So with respect to Call Center policies
5  and procedures, who from your team is responsible for
6  that topic?
7      **A.** If it is in regards to outbound and
8  inbound direct mail, that would be between the --
9  the -- depending upon the topic, it's between the
10  Channel Manager, Demi; the Market Segment Manager;
11  and Dannon.
12      **Q.** And if it has to do with telephone
13  communications, who would be responsible for that?
14      **A.** It depends on what telephone
15  communications you're referring to.
16      **Q.** So explain that to me.
17      **A.** There's the administration side, which is
18  the food loss replacements, those types of things,
19  they do not report into me.
20      And then the -- but the direct mail
21  telemarketing side we support is on my team, so the
22  Call Center applications, the reporting, the process
23  changes. My team supports those.
24      **Q.** What about with respect to renewals of

Page 84

1  Protection Agreements?
2      **A.** Reaping out to members?
3      **Q.** Correct.
4      **A.** That would be on my side.
5      **Q.** You used the phrase reaching out to
6  members?
7      **A.** Uh-huh.
8      **Q.** What does members --
9      **A.** Oh, sorry. We refer to customers as both
10  customers and members.
11      **Q.** Okay.
12      **A.** So I'll interchange those terms.
13      **Q.** That's okay. I just want to make sure
14  the record is clear.
15      Are you also responsible in any
16  fashion for technician or service visits?
17      **A.** No.
18      **Q.** How do you learn of information
19  concerning NPAs purchased through technician or
20  service visits?
21      **A.** It's on our P&L.
22      **Q.** And how is it on your P&L? How is it
23  delineated?
24      **A.** It's a line item on the P&L that's broken

Page 85

1  out in total dollars sold.
2      **Q.** Do you have any responsibility with
3  respect to purchases of NPAs through service or
4  technician visits?
5      **A.** (Indicating.)
6      MS. HINES: Object to form.
7      MS. GROSS: You have to answer.
8  BY THE WITNESS:
9      **A.** No, I do not.
10      MS. GROSS: You're shaking your head.
11      THE WITNESS: You can't hear that?
12          (WHEREUPON, there was
13          laughter.)
14  BY THE WITNESS:
15      **A.** No.
16  BY MS. GROSS:
17      **Q.** And on the left-hand side of this
18  organizational chart there are three dotted line
19  boxes.
20      **A.** Yes.
21      **Q.** What did you mean by the three dotted
22  line boxes?
23      **A.** That's the products, service contract
24  products in which the Product Managers help support.

Page 86

1      **Q.** Okay. When it says "NPA-FS/AM," what
2   does that mean?
3      **A.** FS is Sales Floor. Slash AM is
4   aftermarket.
5      **Q.** Do you know whether there was any form of
6   reporting as a line item for NPAs sold at the Great
7   Indoors stores when they were in existence?
8      **A.** I'm not aware of any.
9      **Q.** Do you have any responsibility with
10  respect to marketing of NPAs?
11     **A.** That's handled by our Marketing team.
12     **Q.** Okay. During your tenure as Director of
13  Contract -- Service Contracts, do you know who was
14  the person responsible for Marketing?
15     **A.** Currently it is Stewart Gottesman is the
16  Director for Service Contracts Marketing.
17     **Q.** Does he also report to Mr. Mitzner?
18     **A.** No.
19     **Q.** To whom does he report?
20     **A.** Matthew Moore.
21     **Q.** Do you know what Matthew Moore's title
22  is?
23     **A.** Senior Director of Marketing.
24     **Q.** Is there an individual with marketing

Page 87

1   responsibility who reports to Mr. Mitzner?
2      **A.** No.
3      **Q.** Do you have -- strike that.
4         Have you had occasion during your
5   tenure as Director of Service Contracts to see any
6   form of memorandum prepared by the Service Contracts
7   Marketing Department?
8      **A.** Could you define memorandum prepared?
9      **Q.** Anything written.
10     **A.** From the Marketing team?
11     **Q.** Correct.
12     **A.** I see creatives and brochures.
13     **Q.** Do you -- have you had occasion to
14  participate in discussions with members of the
15  Marketing team for Service Contracts concerning NPAs?
16     **A.** The creatives and those types of things
17  are going to go out on the NPAs, yes.
18     **Q.** Do you see the communications or
19  information that goes out to NPA customers concerning
20  renewals?
21     **A.** I see the creative that goes out to them,
22  yes.
23     **Q.** So when you use the term creative, what
24  do you mean?

Page 88

1      **A.** It's the direct mail piece that is sent.
2      **Q.** Okay.
3      **A.** I see the copy that will be used. I
4   don't see specific customer information that is used.
5      **Q.** Do you provide any comments or suggestion
6   with respect to those creatives -- strike that.
7         Have you provided any comments or
8   suggestion with respect to those creators during your
9   five-year tenure as Director of Service Contracts?
10     **A.** Yes.
11     **Q.** Do you recall any in particular, any kind
12  of comments that you've provided in particular?
13     **A.** We did a creative refresh a year ago and
14  commented just on the layouts of them, the look.
15     **Q.** I'd like to show you what's been
16  previously marked as Plaintiffs' Exhibit 9.
17        Are you familiar with this document?
18     **A.** Yes.
19     **Q.** And what is this document? What's your
20  understanding of what this document is?
21     **A.** This is the terms and conditions that are
22  used with the Master Protection Agreement from back
23  in the last revision of 2010.
24     **Q.** Do you know if there has been a revision

Page 89

1   since 2010 of the Master Protection Agreement?
2      **A.** Yes.
3      **Q.** Do you recall when that revision
4   occurred?
5      **A.** The last one we did was middle of last
6   year.
7      **Q.** Do you recall generally what the
8   revisions entailed?
9      **A.** We have added in -- we changed the food
10  loss coverage on the Master Protection Agreement to
11  go from $250 per year to $300 per service incident.
12        We added in and reworded rental
13  reimbursement.
14        We added in a wording of service
15  promise and took out rental reimbursement and added
16  in product specific and up to $50.
17        And we redid the -- there's a
18  discount -- where it says discount, we say discount
19  and reimbursement, on line Covered Parts.
20        We reworded the no lemon, didn't
21  change the terms of it, it just reworded it in a
22  different way.
23     **Q.** Do you know if you reworded the
24  Replacement, which is Item No. 8?

Page 90

1     A.  Yes, that's the one we reworded.
2     Q.  Do you recall whether you reworded No. 2,
3   the Eligibility for Coverage?
4     A.  I don't -- we -- I'm not positive on that
5   one.  We may have.
6     Q.  With respect to this Agreement and
7   Paragraph 1 entitled Coverage and Term, there is a
8   quoted term of Covered Product.
9         Do you see that?
10     A.  Yeah.
11     Q.  What is your understanding as to why
12   there are quotes around Covered Product?
13     MS. HINES:  Object to form.
14   BY THE WITNESS:
15     A.  Yeah, I don't understand the specific
16   question.
17   BY MS. GROSS:
18     Q.  Is Covered Product used in quotes to
19   define something for this Master Protection
20   Agreement?
21     A.  It is a way to define that the terms are
22   on the products that are covered under the contract.
23     Q.  Okay.  And is there anywhere in this
24   agreement which sets forth what products are covered?

Page 91

1     A.  Would the customer know what products are
2   covered?
3     Q.  Correct.
4     A.  Is that what you're asking?
5         This is not the -- what they
6   received is a list of products and then the contract.
7     Q.  Okay.  When you say a list of products,
8   are those the list --
9     A.  The Covered Products.  Sorry.
10     Q.  Sorry.
11         Are those -- what do you mean by
12   that?
13     A.  They receive terms and conditions that
14   specify the item that is -- that has the contract,
15   and if it's in-home or carrying coverage is on that
16   terms of the contract along with the duration of the
17   contract.
18     Q.  And is there any -- strike that.
19         And the products that are in the
20   agreement that's received by the customer, are
21   they -- how are they delineated?
22     A.  There's a list of the type of product,
23   like it will tell them it's a washer or a dryer.  I
24   believe it gives them the date of purchase.

Page 92

1     Q.  And how does Sears have that information
2   with respect to the list of products?
3     A.  It's in NPJ.
4     Q.  And in NPJ -- strike that.
5         And the products that are in NPJ
6   with respect to a particular customer is based on
7   either information received from the customer for an
8   aftermarket purchase or received from a Sears retail
9   or online?
10     A.  Yes.
11     Q.  Okay.  So, therefore, any product which
12   is listed on a Master Protection Agreement is a
13   covered product?
14     A.  Any item that is listed on the terms and
15   conditions is a covered product.
16     Q.  In Paragraph 2 of the Agreement there is
17   a section on Eligibility for Coverage.
18         Do you see that paragraph?
19     A.  Yes.
20     Q.  And the Eligibility for Coverage is
21   limited to products in proper operating condition at
22   the start of coverage and information related -- and
23   I guess correct information related to date
24   purchased.

Page 93

1         Do you know if there are any other
2   limitations for eligibility for coverage?
3     A.  There are limitations of coverage that
4   are listed under Section 13.
5     Q.  Okay.
6     A.  Like where the product resides, how it's
7   being used, that would also apply.
8     Q.  Do you know if there are any other
9   limitations on Eligibility for Coverage for an NPA
10   that are not included in the terms of the Master
11   Protection Agreement?
12     A.  There are some internal criteria that is
13   used for coverage, but once it's sold, unless it's
14   listed under Eligibility in the Terms and
15   Conditions, it is -- it's after fact.
16     Q.  It's after -- I'm sorry.  What did you
17   say?
18     A.  You don't -- you may use some internal --
19   something internally when you're determining
20   eligibility of coverage, but once it's sold, this is
21   the contract the customer has, and this is what is
22   gone by.
23     Q.  Okay.  I'd like to show you what has been
24   previously marked as Plaintiffs' Exhibit 11.

Page 94

1    Do you have an understanding as to
2  what this document is?
3    A.  It's an Eligible Brands List.
4    Q.  And what does that mean to you?
5    A.  It means when an Agreement is originally
6  sold, is it on this list to determine eligibility.
7    Q.  The it meaning a product?
8    A.  Product, yes.
9    Q.  And where does the -- this list reside or
10  where has this list resided during your tenure as
11  Director of Service Contracts?
12    A.  It's within the MMI table.
13    Q.  Is there any other information within the
14  MMI table?
15    A.  It has -- it has brand, it has type of
16  merchandise, primarily those are the variables that
17  are in there.
18    Q.  And is this information within the MMI
19  table available to the Call Center agents?
20    A.  They do receive it in Ciboodle as a
21  drop-down list.
22    Q.  So the call agents have not received it
23  in the format in which it is in the Plaintiffs'
24  Exhibit 11?

Page 95

1    A.  Not that I'm aware, no.
2    Q.  Okay.  In the format in which it resides
3  in Plaintiffs' Exhibit 11, is it part of a larger
4  document somewhere?
5    A.  I --
6    MS. HINES:  Object to form.
7  BY THE WITNESS:
8    A.  I don't know.
9  BY MS. GROSS:
10    Q.  If you turn to the page Bates numbered
11  522 of this document, and it's -- the bottom of the
12  page is captioned or has a line that is underlined
13  that says, "Sears, K-Mart, the Great Indoors, and
14  High-End Merchandise."
15    Do you see that?
16    A.  Uh-huh.
17    Q.  And it reads.
18    "The following is a list of
19  merchandise codes and brands sold at Sears, K-Mart,
20  or Great Indoors (TGI) or are otherwise considered
21  high-end.  These products are eligible for PA
22  coverage at the time of sale only.  You are not able
23  to sell PAs on these items in the aftermarket."
24    What's your understanding of what

Page 96

1  that means first?
2    A.  It would mean that if it was considered a
3  high-end, that we would sell it at point of purchase
4  and not in the aftermarket program.
5    Q.  Okay.  Then following that section on the
6  next page at 523 is a chart.
7    What does that chart represent?
8    A.  It represents the type of product and
9  brands.
10    Q.  And are those brands represented on this
11  page the high-end merchandise brands?
12    A.  Yes.
13    Q.  And do you know how -- is there any kind
14  of internal coding at Sears to represent that these
15  brands are high-end merchandise?
16    A.  There's merchandise codes that these
17  brands would go to.
18    Q.  And do the merchandise codes reside in
19  some system?
20    A.  NPJ.
21    Q.  Do you know -- I can't remember if I
22  asked this question, so I apologize.
23    How long has NPJ been in existence?
24    A.  It was developed and rolled out in 1990,

Page 97

1  early 1990.
2    Q.  And is it currently still used today?
3    A.  Yes, primarily with a gooey, which
4  interfaces on the front of it.
5    Q.  Primary with what kind of interface?
6    A.  Ciboodle is a gooey interface that just
7  uses NPJ.
8    Q.  Can I ask you for my information what a
9  gooey interface means?
10    A.  It's like a Web form, and it just has --
11  it has data pulls that goes back and forth between.
12    Q.  So that the user doesn't necessarily have
13  to formulate the query for the data pool, but the
14  software itself does that?
15    A.  Yes.
16    Q.  So the list of products -- not list of
17  products -- yeah, the list of products and names of
18  brands on 523 are not eligible for NPA coverage in
19  the aftermarket; is that correct?
20    MS. HINES:  Object to form.
21  BY THE WITNESS:
22    A.  They are used to determine eligibility
23  for the aftermarket.
24

Page 98

BY MS. GROSS:

1     Q. But -- okay. And these -- the list at
2 523 are for those items and brands which are not
3 eligible for aftermarket purchase of NPAs?
4     A. If it's one of these brands, they should
5 not be eligible.
6     Q. Okay. Do you recall having any
7 discussions with anyone at Sears about including in
8 the Eligibility for Coverage Limitations in the
9 Master Protection Agreement at Plaintiffs' Exhibit 9
10 a limitation concerning certain aftermarket products
11 or brands?
12     MS. HINES: Object to form.
13 BY THE WITNESS:
14     A. I'm not sure I understand the question.
15 BY MS. GROSS:
16     Q. Was there ever a discussion with anyone
17 at Sears about including in the language in the
18 Master Protection Agreement, Exhibit 9, a reference
19 to limitations on aftermarket purchases of particular
20 brands or products?
21     MS. HINES: Object to form.
22 BY THE WITNESS:
23     A. I'm still not understanding the question.

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 99

BY MS. GROSS:

1     Q. Okay. No problem.
2     So with respect to the merchandise
3 codes that reside in NPJ with respect to high-end
4 merchandise, is there a I guess query that you would
5 do or that you are familiar with to request the list
6 of products and brands that correspond to high-end
7 merchandise?
8     A. Am I aware of any query that's been done?
9     Q. Yeah.
10     A. No.
11     Q. Like how do you find the list of high-end
12 merchandise that's been coded as such?
13     MS. HINES: Object to form.
14 BY THE WITNESS:
15     A. How do you find?
16 BY MS. GROSS:
17     Q. Well, you said that this merchandise
18 codes that these brands would go into resides in NPJ,
19 so what did you mean by that?
20     A. They're in production of NPJ.
21     When you pull up the customer
22 record, it gives you the type of merchandise it is,
23 and it just tells you it's a merchandise, and it

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 100

1 tells you the brand that's in production.
2     Q. So when a contract is renewed, that's one
3 of the fields that a Call Center representative
4 either automatically fills out or inquires of the
5 customer?
6     MS. HINES: Object to form.
7 BY THE WITNESS:
8     A. The Call Center associate, if it's one of
9 the merchandise codes that is high-end the agent
10 would not receive that -- would not -- it's -- a
11 merchandise code with high-end is not something an
12 agent is receiving.
13     It's not eligible for an
14 aftermarket, so they're not going to -- they're not
15 going to get any -- the outbound site, if it's a
16 high-end brand and it's in that merchandise code,
17 that site isn't going to get anything to make a call
18 to that customer.
19 BY MS. GROSS:
20     Q. It may not be making a call to that
21 customer, but what if the customer calls in?
22     A. If they select on that code for that
23 high-end brand, it will tell them that it's not
24 eligible.

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 101

1     Q. Okay. Then how have NPAs for high-end
2 merchandise been renewed?
3     MS. HINES: Object to form.
4 BY THE WITNESS:
5     A. Yeah, I don't know they have been.
6 BY MS. GROSS:
7     Q. Okay. So I'm going to show you a
8 document that's been marked as Exhibit 19 and ask if
9 you've ever seen this document before?
10     A. No.
11     Q. Do you recall seeing this document with
12 counsel prior to your deposition today?
13     A. Nope.
14     Q. Okay. This document sets forth the
15 number of NPA agreements entered into for high-end
16 merchandise based on the years of each column.
17     A. Okay.
18     Q. Do you know where -- so -- strike that.
19     This document was produced by Sears
20 and was -- represents the number of NPA agreements
21 entered into for high-end merchandise based on the
22 years of each column, so what is your understanding
23 of explanation for how NPA agreements for high-end
24 merchandise brands could have been entered into in

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 102

1 2010, 2011, 2012, 2013, 2014?
2 MS. HINES: I'll just object to form.
3 BY THE WITNESS:
4 A. Can I ask a question since I haven't seen
5 this before? Just so I understand the -- because I
6 don't know the query that was used for this.
7 MS. GROSS: We don't either.
8 BY THE WITNESS:
9 A. So I don't know -- is this the year it
10 was sold or the year it's in force?
11 BY MS. GROSS:
12 Q. So I don't -- so based on testimony from
13 Mr. Setzer yesterday, this was the year it was sold.
14 A. In the aftermarket?
15 Q. Yeah.
16 A. Okay. So the only way that it would get
17 sold in the aftermarket would be is if we were not
18 aware of the brand at the time it was sold.
19 Q. So --
20 MS. HINES: I'm just going to object to his
21 testimony from yesterday because I don't know if
22 that's --
23 MS. GROSS: Okay. That's fair.
24 MS. HINES: -- what he said precisely.

Page 104

1 National Inbound Sales NHT Facilitator Guide, so the
2 table of contents was printed up as well as, you
3 know, limited pages from this lengthy document.
4 And I ask you if you've ever seen
5 this document before?
6 A. No.
7 Q. Do you have an understanding as to what a
8 National Inbound Sales NHT Facilitator Guide is?
9 A. Yes.
10 Q. And what's your understanding?
11 A. It's inbound new hire training.
12 Q. Okay. And when it uses the term
13 inbound -- when you use the term inbound new hire
14 training, what do you mean?
15 A. It means a service contract where a
16 customer is calling us and we're not reaching out to
17 them as a telemarketing to purchase a contract or
18 have inquiries.
19 Q. If you know, would this be used to train
20 someone at an Inbound Call Center?
21 A. Yes.
22 Q. Would any of your direct reports be
23 responsible for reviewing this Facilitator Guide?
24 A. No.

Page 103

1 MS. GROSS: Okay.
2 BY MS. GROSS:
3 Q. So would a -- is it possible that a blank
4 could have been -- strike that.
5 Is it possible that a brand name
6 could have been left -- could have been left blank in
7 a sale of an aftermarket NPA?
8 A. I believe it requires a brand.
9 Q. Okay. So then how could it not -- strike
10 that.
11 Your prior response was that it
12 would not have been known.
13 So how could it have fallen through
14 the cracks?
15 MS. HINES: Object to form.
16 BY THE WITNESS:
17 A. You're relying upon the brand in which
18 that is -- that your confirming with the customer.
19 BY MS. GROSS:
20 Q. Okay.
21 Okay. I'd like to show you what's
22 been previously marked as Plaintiffs' Exhibit 10.
23 I will represent to you it is a very
24 lengthy document, and so the -- it's entitled,

Page 105

1 Q. Do you know what area within Service
2 Contracts would be responsible for reviewing this
3 Facilitator Guide?
4 A. National Training Manager.
5 Q. And is National Training Manager
6 responsible for Inbound as well as Outbound Call
7 Centers?
8 A. Yes.
9 Q. And do you know who that person has been
10 for the past five years?
11 A. Gina Barbeour.
12 Q. And to whom does -- strike that.
13 To whom has Gina reported for the
14 past five years if you know?
15 A. She currently reports to Matt Pennies,
16 but has not reported to him for five years.
17 Q. Do you know prior to Matt Pennies to whom
18 she reported?
19 A. Bill Moehlenkamp, who is no longer with
20 the company.
21 Q. And I know you told me this previously,
22 but what was Matt -- no, you didn't because we
23 discussed Matt Moore.
24 What is Matt Pennies title?

Page 106

1    A.  Senior Director Call Center Operations.
2    Q.  Does Mr. Pennies report to Mr. Mitzner?
3    A.  Yes.
4    Q.  Have you ever heard the term authorized
5  brands list?
6    A.  That's what that would be.
7    Q.  That you're --
8    A.  I'm sorry that -- that's what eligible
9  brands list would be, which would be the same as the
10  authorized.
11    Q.  As Exhibit 11?
12    A.  Yes.
13    Q.  If you would turn to Page 123 of
14  Plaintiffs' Exhibit 10, and actually I'll take you
15  back a little bit just so you know the context in
16  which you're --
17    MS. HINES:  Excuse me.  Did you say this was
18  an excerpt?
19    MS. GROSS:  Yes, it's an 800 page document.
20  I didn't feel like killing that many trees.
21    MS. HINES:  That's all right.
22  BY MS. GROSS:
23    Q.  Page 123 is part of a section beginning
24  at 120 entitled Master -- Lesson Master Protection

Page 107

1  Agreements.
2    Do you see that?
3    A.  Yes.
4    Q.  Okay.  Do you have any understanding as
5  to whether new hires have to go through some kind of
6  computerized module, you know, sample training?
7    A.  They go through training.
8    Q.  Okay.  So included in this section on
9  Lesson Master Protection Agreements at 123 is a
10  section entitled Agreement Product Eligibility.
11    Do you see that?
12    A.  Yes.
13    Q.  It's at Bates No. 2761.  Sorry.  123 on
14  the document, but Bates No. 2761.
15    And it has a note for a trainer that
16  says, "The Authorized Brands List is covered in more
17  detail later in the training."
18    The next bullet point says,
19  "High-End merchandise products are on file with
20  special merchandise codes that will not price via
21  Ciboodle."
22    So are there different codes for the
23  different high-end merchandise?
24    A.  Yes, those are the merchandise codes I

Page 108

1  was referring to.
2    Q.  Okay.  And so what are those codes?
3    I guess is it -- I thought it -- so
4  this is -- I'm asking in terms of is it more than
5  simply the code HE?  Is there a numerical code?
6    A.  It's the -- the beginning of it is the
7  type of merchandise, so if it's Oven, and then at the
8  end it has HE.
9    Q.  Got it.
10    So is it -- all merchandise codes
11  for high-end merchandise begin with the type of
12  product and end with HE?
13    A.  Yes.
14    Q.  Got it.  Thank you.
15    This also has a bullet point that
16  says, "A list of eligible Protection Agreement
17  products and brands."
18    Is that also a way of referring to
19  the Eligible Brands List which was marked as
20  Exhibit 11?
21    A.  Yes, which is the same as authorized
22  brands.
23    Q.  Got it.  And it says, "It can be found
24  online at the PA Resource Center."

Page 109

1    A.  Yes.
2    Q.  What is that?
3    A.  It's an internal intranet that has some
4  reference material.
5    Q.  Do you have any responsibility with
6  respect to information included in the PA Resource
7  Center?
8    A.  My team does.
9    Q.  And what responsibility does your team
10  have?
11    A.  They will go in and make any updates to
12  the Resource Center if we've changed something.
13    Q.  And how are you informed of changes made
14  by your team to the PA Resource Center?
15    A.  They usually will verbally tell me that
16  they've made the changes.
17    Q.  Are there any other departments within
18  Service Contracts that are responsible for
19  information in the PA Resource Center?
20    A.  No.
21    Q.  Okay.  Have you also heard of a New Hire
22  Training Manual for Retention Associates?
23    A.  No.
24    Q.  Have you heard of the term Retention

Page 110

1 Associates?

2     A. I'm assuming those are longer-term

3 associates. The two together didn't correlate.

4     Q. Do you know how -- for how long the

5 Authorized Brands List or Eligible Brands List have

6 been in existence at Sears?

7     A. It has been there longer than I've been a

8 Director, and I know if it was there when I was

9 Product Manager. I don't know beyond that.

10     Q. Do you know who has responsibility for

11 updating or reviewing the Eligible Brands List?

12     A. The Product Managers along with other

13 team members.

14     Q. And the Product Managers are those

15 individuals we previously discussed who report to

16 you?

17     A. Yes.

18     Q. And how do you learn of changes to the

19 Eligible Brands List or Authorized List as it's also

20 been referred to?

21     MS. HINES: Object to form.

22 BY THE WITNESS:

23     A. They may tell me in a one-on-one.

24

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

---

Page 111

1 BY MS. GROSS:

2     Q. What is your understanding as to how

3 changes to the Eligible Brands List comes about?

4     Like how do the Product Managers --

5 how do the Product Managers make decisions concerning

6 changes to the Eligible Brands List?

7     A. Usually with conversations they've had

8 with the Engineering Team, Product Engineering Team,

9 and the Buyers as new products come into market.

10     Q. And so is the Product Engineering Team a

11 different segment than -- or reporting segment at

12 Sears?

13     A. They reported to Home Services. They do

14 not report to Gary Mitzner.

15     MS. GROSS: Got it. Okay. Let's take a

16 quick break.

17     (WHEREUPON, a recess was

18     had.)

19     MS. GROSS: Back on.

20 BY MS. GROSS:

21     Q. I'd like to show you what's been

22 previously marked as Plaintiffs' Exhibit 13.

23     Have you ever seen this document

24 before?

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

---

Page 112

1     A. Not this document, no.

2     Q. Do you have -- but we previously

3 discussed that there is a list available in the

4 system of cancellation reasons?

5     A. Yes.

6     Q. So does this document represent the list

7 of cancellation reasons for NPAs of which you're

8 aware?

9     A. Yes.

10     Q. Okay. And looking at this document, is

11 this a complete list based on your familiarity with

12 cancel reasons?

13     A. I believe so.

14     Q. Okay. Do you know?

15     MS. HINES: Was there a Bates number on this

16 at one point?

17     MS. GROSS: So this is probably another

18 document that was produced in Excel spreadsheet, and

19 I don't have it at the moment as to what Bates

20 number, so it was but it's definitely --

21     MS. HINES: Okay. Thanks.

22 BY MS. GROSS:

23     Q. Have you during your tenure as Director

24 of Service Contracts had any discussions with any of

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

---

Page 113

1 your direct reports concerning these cancel reasons?

2     A. No.

3     Q. Do you recall having any discussions with

4 anyone at Sears concerning these cancel reasons?

5     A. No.

6     Q. Okay. Do you have an understanding as to

7 what any of these cancel reasons represent?

8     A. I know some of them.

9     Q. Which ones do you know?

10     A. Well, I mean some of them are pretty

11 clear on like change mind, price too high.

12     I'm not as familiar with the ones in

13 which they use -- when they use coverage

14 misunderstood or the technician requested cancel.

15 I'm not as familiar with those.

16     Q. Okay. Do you have -- have you ever seen

17 any report prepared which delineates, you know, the

18 number of contracts canceled -- number of Protection

19 Agreements canceled based on the various reasons?

20     A. Have I ever? I'm sure at some point I

21 have seen something. I don't remember when or what

22 it was about.

23     Q. Okay. Do you recall ever seeing anything

24 which explains what each of the canceled reasons are?

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 114

1    A.  No.
2    Q.  Okay.  Would anybody in your team be
3  familiar with the existence of any kind of
4  explanations for each of the cancel reasons?
5    A.  I haven't had the conversations with them
6  to understand how much they would know.
7    Q.  Okay.  Let me show you what we've
8  previously marked as Plaintiffs' Exhibit 14 and ask
9  you if -- it's a two-page document, so there's two
10  different calculations on this.
11        Have you ever seen information
12  reported on cancellations in this fashion as set
13  forth in Exhibit 14?
14    MS. HINES:  Object to form.
15  BY THE WITNESS:
16    A.  No.
17  BY MS. GROSS:
18    Q.  Do you have this information available to
19  you as cancellations based on -- strike that.
20        Do you have an understanding of what
21  the first page of this document, which is Bates No.
22  3967, represents?
23    MS. HINES:  Object to form.
24

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 115

1  BY THE WITNESS:
2    A.  I would be assuming based upon the
3  labeling on the pivot table.
4  BY MS. GROSS:
5    Q.  Okay.  And when you use the term pivot
6  table, what are you referring to so then we can
7  circle back to the last answer?
8    A.  What is pivot table?
9    Q.  Yeah.
10    A.  It's a way of summarizing data.
11    Q.  So the entire document is called the
12  pivot table?
13    A.  This section is off an Excel pivot table.
14    Q.  Got it.  Thank you.
15        So there's a reference to percent of
16  net?
17    A.  Yes.
18    Q.  Do you have an understanding of what that
19  means?
20    A.  Yeah, it's just -- it's your
21  cancellations to your dollars sold.
22    Q.  Okay.
23    A.  The totals that I refer to when I see
24  monthly canceled, that's what I see is just this

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 116

1  total percent.
2    Q.  So you see the line that says "Grand
3  Total" as opposed to the breakout line that says
4  "NPA"?
5    A.  Yes.
6    Q.  And when you say it's percent of
7  cancellations to dollars sold, do you see it also
8  with respect to the grand totals as to what you see
9  based on a monthly basis similar to that which is
10  included in this report?
11    MS. HINES:  Object to form.
12    MS. GROSS:  Strike that.  We'll start again.
13  BY MS. GROSS:
14    Q.  You say you see it as a grand total and
15  it's a percent of the dollars sold; is that what you
16  just said?
17    A.  Yes.
18    Q.  Okay.  So is it the same -- so is it the
19  same month?  So the question is, for example, with
20  respect to September 2014, is the analysis performed
21  5 percent cancellations in the month of September as
22  compared to the dollars sold for agreements in the
23  month of September?
24    A.  I would not know that without seeing how

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 117

1  they ran the query.
2    Q.  Okay.
3    MS. HINES:  I'm just going to have -- I'll
4  just have a standing objection to the foundation of
5  the exhibit.
6    MS. GROSS:  I do, too.  I'll join you in that
7  objection.
8  BY MS. GROSS:
9    Q.  Okay.  So let's turn to the next page at
10  Bates No. 3968.
11        And have you ever seen the
12  information reported in this format at 3968 before?
13    A.  I haven't seen this document.
14        Have I ever seen something that gave
15  cancellations in my tenure?  Probably.
16    Q.  Okay.  And the information about dollar
17  amounts for cancellations based on product code is
18  available from the data warehouse; is that correct?
19    A.  Yes.
20    Q.  Okay.  And it -- the query that is put in
21  is able to determine or provide the information
22  that's put onto this document -- strike that.
23        The information on this document and
24  what it displays is dependent upon knowledge of the

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 118

1 query that's been put in?
2   A. Yes.
3   **Q.** Okay. On the top left-hand corner of
4 this page on both documents is a chart that says,
5 "Fiscal Year, Physical Month, Region, District,
6 Selling Unit."
7        Do you have an understanding of what
8 that top table is?
9   A. Yes.
10   **Q.** What is it?
11   A. That's a drop down in your pivot table
12 that you can sort what you're looking for.
13        An example is on the second exhibit,
14 Plan Codes says, "NPA." That's the drop down.
15   **Q.** Is there an ability to search based on
16 merchandise code?
17   A. Not in this query, no.
18   **Q.** Okay. So does this table at the top
19 indicate what information is used for query?
20   A. It indicates, yeah, the variables that
21 were pulled for the query.
22   **Q.** Are you able to tell me based on simply
23 the variables that are pulled whether this includes
24 information for NPAs sold in stores as well as

Page 120

1   **Q.** And what area is he or she?
2   A. She reports to Gary Mitzner.
3   **Q.** Do you know what area it is called?
4   A. I don't remember her title.
5   **Q.** Okay. Does she participate in the staff
6 meetings --
7   A. Yes.
8   **Q.** -- that Mr. Mitzner holds?
9   A. Yes.
10   **Q.** Other than the staff meetings that you
11 attend, do you have any other occasions to have
12 meetings with Terry?
13   A. I may occasionally have a meeting with
14 her.
15   **Q.** Okay. I'm going to show you what's been
16 marked as Plaintiffs' Exhibit 17 and ask if you've
17 ever seen this document?
18   A. No.
19   **Q.** Have you ever seen a document which
20 reports information, cancellations, and includes, you
21 know, agreement start date, agreement expiration
22 date?
23   A. Have I ever seen --
24   **Q.** Any kind of information reported on

Page 119

1 aftermarket sales of NPAs?
2   A. Not without seeing what's behind the All.
3   **Q.** Okay. And when you say -- when you say
4 All, which All are you referring to?
5   A. When it drops down, it says "Selling
6 Organization," so it's all.
7   **Q.** Okay.
8   A. I don't --
9   **Q.** That's what would indicate whether it's
10 point of sale versus aftermarket?
11   A. Yeah. Yeah, without seeing what's in
12 there, I don't know.
13   **Q.** Does the cancel reasons codes that are
14 listed -- do the cancel reasons codes that are listed
15 in Exhibit 13 also cover buyouts do you know?
16   A. I don't know.
17   **Q.** Who has -- you said you didn't -- strike
18 that.
19        Do you have any responsibility for
20 buyouts of NPAs?
21   A. No.
22   **Q.** Who or what department has responsibility
23 for buyouts of NPAs?
24   A. Terry Jamel.

Page 121

1 cancellations which includes, you know, the agreement
2 start date from customers as well as agreement
3 expiration dates?
4   A. I'm sure I have at some point.
5   **Q.** Okay. Have you ever seen information
6 which reports on cancellations and the method of
7 refund of those cancellations?
8   A. Such as the one here?
9   **Q.** Correct.
10   A. No.
11   **Q.** With respect to this document, there's a
12 column entitled, Division?
13   A. Yes.
14   **Q.** Do you have any understanding as to what
15 that refers?
16   A. It's product groupings.
17   **Q.** And so what is your understanding of what
18 product groupings is?
19   A. As an example, Division 26 would mean
20 it's Laundry.
21   **Q.** Okay. So is Laundry a washer and dryer?
22   A. Correct.
23   **Q.** So when an NPA for a washer or dryer is
24 canceled, does the system automatically -- strike

Page 122

1 that.
2      When an NPA for a washer or dryer is
3 purchased, does the system automatically generate a
4 division number?
5     A.  Yes.
6     Q.  Okay.  And is information -- when an NPA
7 Agreement is purchased -- strike that.
8      Do you have any knowledge of how a
9 customer is informed that an NPA has been canceled?
10     A.  Usually it's a conversation with the
11 customer.
12     Q.  Have you ever had any conversations with
13 any customers concerning cancellation of their NPA?
14     A.  No.
15     Q.  Have you ever had conversations with any
16 of your direct reports concerning cancellations by
17 particular customers of NPAs?
18     A.  No.
19     Q.  Have you ever had any conversations with
20 anyone concerning the Plaintiffs' situation in this
21 case?
22     A.  No.
23     Q.  Do you have any understanding as to
24 whether similar types of information, such as dollar

Page 124

1      So are all -- let me take a step
2 back.
3      Are all cancellations made based on
4 decisions of customers.
5     A.  The only time in which a cancellation
6 that can occur that is not a decision of the customer
7 is within the contract terms.
8     Q.  And what do you mean by that?
9     A.  If you go to the contract itself --
10     Q.  Which was Bates numbered Plaintiffs'
11 Exhibit 9.
12     MS. HINES:  You read the exhibit number.
13     MS. GROSS:  Not Bates number.  Which is
14 marked as Plaintiffs' Exhibit 9.  Sorry.
15 BY THE WITNESS:
16     A.  Item 14, it specifies when the company
17 can cancel.
18 BY MS. GROSS:
19     Q.  Got it.  Okay.
20      And so when you see information on
21 cancellations --
22     A.  Yes.
23     Q.  -- does it delineate as to whether it's a
24 customer cancelling or Sears cancelling?

Page 123

1 amount, product is available in the data warehouse
2 for buyouts of NPAs?
3     A.  It would not be -- I'm not aware that the
4 buyouts go to the warehouse.
5     Q.  Do you know where information on buyouts
6 of NPAs goes?
7     A.  No.
8     Q.  Do you know the process by which an NPA
9 is canceled?
10     A.  Like how it gets canceled in the system?
11     Q.  Correct or -- yes, in general, yes.
12     A.  The agent would use Ciboodle and put in
13 what is being canceled and whether it's a full
14 cancellation or if it's a partial cancellation, and
15 then the system will determine the refund amount and
16 then how to -- how it's to be refunded.
17     Q.  And is there any ability to determine
18 whether the cancellation has occurred by the customer
19 or by Sears?
20     A.  By Sears?
21     Q.  Like Sears made the determination to
22 cancel the NPA?
23     A.  As part of a buyout?  Is that?
24     Q.  Well, strike that.

Page 125

1     A.  No, because all I've seen is that rolled
2 up percent.
3     MS. HINES:  Object to form.
4 BY MS. GROSS:
5     Q.  I would like to show you what's been
6 previously marked as Plaintiffs' Exhibit 20A.
7      Have you ever seen a report like
8 this before?
9     A.  No.
10     Q.  Have you seen a report which sets forth
11 information on replacements of products covered by
12 NPAs?
13     A.  I'm sorry.  What was the question again?
14     Q.  Have you seen any reports which set forth
15 information on replacements of products covered by
16 NPAs?
17     A.  The only reporting I get on replacements
18 is that weekly report.
19     Q.  Okay.  Then I'm done with that exhibit.
20      Do you have any familiarity with how
21 Sears determines what it will charge for an NPA?
22     A.  Yes.
23     Q.  And how is that determination made?
24     A.  We start with the point of sale, retail

Page 126

1  point of sale, and we use a regression model and --
2  that determines guides in the pricing, and then the
3  aftermarket pricing follows that.
4      Q.  When you say the aftermarket pricing
5  follows that, what do you mean?
6      A.  So once you set the price in the sales
7  floor, you know how much you're going to charge and
8  you do that and you know how much per year and then
9  you just follow the same pricing into the
10  aftermarket.
11         So you start at that same point and
12  then take it forward.
13      Q.  So how is pricing determined on a product
14  that was not -- that is not sold at Sears?
15      A.  It would be in relation to ship-to
16  products that are similar to what is sold at Sears.
17      Q.  Is there any other information that's
18  taken into the calculation for pricing of NPAs?
19      A.  The regression model uses a relationship
20  between the purchase price of the product and the
21  service contract price.
22      Q.  Is the age of a product taken into
23  consideration in the regression model?
24      A.  Not in the regression model, no.

Page 127

1      Q.  Is the age taken into consideration in
2  any way in pricing an NPA?
3      A.  The pricing will slightly change with the
4  age of the product.
5      Q.  And how -- how is that determination
6  made?
7      A.  Based upon -- it was done before I had
8  that pricing piece.
9      Q.  So it's some software or regression
10  analysis that's automatically done?
11      A.  Based upon prior analysis, yes.
12      Q.  Does the pricing of an NPA change based
13  on whether a product has been serviced before?
14      A.  No.
15      Q.  Okay.  Is there any written list of
16  prices for an NPA based on a -- set forth on a
17  product basis like washing machines are typically in
18  this range?
19      A.  The only -- in a written form the only
20  place we have anything that's in a written form is
21  the sales floor pricing.  The aftermarket pricing is
22  all system.
23      Q.  When you say sales floor pricing, at a
24  Sears store available to an employee is a list of NPA

Page 128

1  pricing?
2      A.  They can get to it, but their register
3  tells them the price.
4      Q.  Are you aware of any discussions within
5  your group concerning the need to inspect products
6  that -- for which NPAs have been entered into?
7      MS. HINES:  Object to form.
8  BY THE WITNESS:
9      A.  No.
10  BY MS. GROSS:
11      Q.  Is there any kind of analysis of the
12  number of inspections of products for which NPAs have
13  been entered into?
14      MS. HINES:  Object to form.
15  BY THE WITNESS:
16      A.  I don't know what you mean by
17  inspections.
18      MS. GROSS:  Okay.  Let me try it a different
19  way.
20  BY MS. GROSS:
21      Q.  In the NPA agreement Sears reserves the
22  right to inspect a product.
23         Do you recall that?
24      A.  Yes.

Page 129

1      Q.  Okay.  So has there ever been any
2  discussions at Sears or within your group about Sears
3  performing such inspections?
4      A.  No.
5      Q.  Okay.  Do you know if any such
6  inspections of products for which NPAs have been
7  entered into have been done other than when a service
8  call is made?
9      A.  That we would just go out to inspect?
10      Q.  Correct.
11      A.  No, we would not.
12      Q.  So the only time Sears performs an
13  inspection of a product for which an NPA has been
14  purchased is when a Sears -- when a service call has
15  been made?
16      A.  Correct.
17      Q.  Okay.  Have you heard of a person named
18  Sujatha?
19      A.  Yes.
20      Q.  And have you had any dealings with her?
21      A.  Uh-huh.
22      Q.  For what purpose?
23      A.  If I want her to assist with a query.
24      Q.  Okay.  And do you know what type of query

Page 130

1 you have asked her to do for you?
2  A. I will ask her to do some internal
3 operations like where the -- like how -- when the
4 customer is responding what was driving the response,
5 like was it technician, or was it one of our
6 telemarketing calls, or was it an inbound activity,
7 direct mail, those types of queries.
8  Q. And when you ask her to perform that type
9 of query, what is the format of her report to you?
10  A. Excel.
11  Q. And is there any queries that you have
12 asked her to perform on any type of regular basis?
13  A. No.
14  Q. Okay. I'm going to show you what has
15 been previously marked -- it's
16 Plaintiffs' Exhibit 15, which is another unfortunate
17 quality that's not the best, and it is comprised of
18 two pages of information which actually look very
19 similar in form.
20  Have you ever seen a document
21 similar to this?
22  A. No.
23  Q. Do you know what department or area from
24 which this emanates?

Page 131

1  A. I can't read all of the offers, but it
2 would look like it came from a home services
3 marketing team.
4  Q. Are you aware that after a service
5 technician's visit there is a communication with a
6 customer?
7  A. Yes.
8  Q. What -- how do you find out about that
9 information?
10  A. There's a communication that goes to the
11 customer on kind of a survey, NPS survey scores, and
12 there may be a communication to them if the product
13 is uncovered that had service, it was uncovered, and
14 it's eligible for coverage.
15  Based upon that information, there
16 may be a direct mail offer to them or a telemarketing
17 offer.
18  MS. GROSS: Okay. I think that's all the
19 questions I have.
20  MS. REPORTER: Are you ordering the
21 transcript at this time?
22  MS. GROSS: Yeah.
23  MS. REPORTER: Would you like a copy?
24  MS. HINES: Yes. And reserve signature.

Page 132

1  (Whereupon, at 1:34 p.m.
2  the deposition was
3  concluded.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 133

1  IN THE UNITED STATES DISTRICT COURT
2  FOR THE NORTHERN DISTRICT OF ILLINOIS
3  EASTERN DIVISION
4 NINA GREENE AND GERALD   )
5 GREENE,   )
6  Plaintiffs,   )
7  vs.   ) No. 1:15-CV-02546
8 SEARS PROTECTION COMPANY,   )
9 SEARS ROEBUCK AND CO. AND   )
10 SEARS HOLDINGS   )
11 CORPORATION,   )
12  Defendants.   )
13  I hereby certify that I have read the
14 foregoing transcript of my deposition given at the
15 time and place aforesaid, consisting of Pages 1 to
16 132, inclusive, and I do again subscribe and make
17 oath that the same is a true, correct and complete
18 transcript of my deposition so given as aforesaid,
19 and includes changes, if any, so made by me.
20  _____
21  KATRINA MEANS
22 SUBSCRIBED AND SWORN TO before me
23 this   day of   2016.
24  _____
  Notary Public

Page 134

1              CERTIFICATE
2                  OF
3         CERTIFIED SHORTHAND REPORTER
4
5         I, Lynn A. McCauley, a Certified
6    Shorthand Reporter of the State of Illinois, CSR,
7    RPR, License No. 84-003268, do hereby certify:
8         That previous to the commencement of the
9    examination of the aforesaid witness, the witness was
10   duly sworn by me to testify the whole truth
11   concerning the matters herein;
12        That the foregoing deposition transcript
13   was reported stenographically by me, was thereafter
14   reduced to typewriting under my personal direction
15   and constitutes a true and accurate record of the
16   testimony given and the proceedings had at the
17   aforesaid deposition;
18        That the said deposition was taken before
19   me at the time and place specified;
20        That I am not a relative or employee or
21   attorney or counsel for any of the parties herein,
22   nor a relative or employee of such attorney or
23   counsel for any of the parties hereto, nor am I
24   interested directly or indirectly in the outcome of

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 135

1    this action.
2         IN WITNESS WHEREOF, I do hereunto set my
3    hand at Chicago, Illinois, this 14th day of July
4    2016.
5
     <%Signature%>
6    _____
7         LYNN A. MC CAULEY, CSR, RPR
8         License No. 84-003268
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

# EXHIBIT 5

# SUBJECT TO CONFIDENTIALITY ORDER

# DATED JULY 29, 2015