UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| NINA GREENE AND GERALD GREENE, | ) | No. 1:15-cv-02546 |
| | ) | |
| Plaintiffs, | ) | Judge Jorge L. Alonso |
| v. | ) | |
| SEARS PROTECTION Company, SEARS, ROEBUCK and Co. and SEARS HOLDINGS Corporation, | ) ) ) | Magistrate Michael T. Mason |
| Defendants. | ) ) | |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE PURPORTED EXPERT OPINIONS OF CHRISTOPHER JACKMAN**

**I. INTRODUCTION**

Plaintiffs proffered Mr. Jackman's opinions in support of Plaintiffs' Motion for Class Certification to establish that a standard and reliable methodology exists that would allow him to utilize data and information possessed by Sears to measure damages suffered by the Class as a result of Defendants' illegal conduct. Relying on his extensive experience in the fields of consumer fraud and economics, Mr. Jackman examined the materials that were made available to him and determined that a standard and reliable methodology is available to calculate damages suffered by members of the proposed Breach of Contract, Unjust Enrichment, and Consumer Fraud Classes.

While the Defendants purportedly bring their motion pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579, 589, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), Defendants' papers are entirely divorced from the standards articulated in *Daubert* and instead

1

are an improper attempt to induce the Court to rule on the merits. For the reasons below, Defendants' motion must be denied.

## II. LEGAL STANDARD

Expert testimony is admissible under *Daubert* and Fed. R. Evid. 702 if it meets a three-part test: (1) is the expert qualified?; (2) is the expert's reasoning or methodology reliable?; and (3) does the testimony help the trier of fact understand the evidence or determine a fact in dispute? *Ervin v. Johnson & Johnson, Inc*., 492 F.3d 901, 904 (7th Cir. 2007). The first two prongs of this framework evaluate the reliability of the proposed testimony and the third prong evaluates the relevance of the proposed testimony. *Ammons v. Aramark Unif. Servs*., 368 F.3d 809, 816 (7th Cir. 2004).

The "reliability" test is lenient. It merely requires that the "reasoning or methodology underlying the testimony … [be] valid." *Daubert*, 509 U.S. at 600. Accordingly, the reliability test is an extremely limited inquiry:

> [T]he court's gatekeeping function focuses on an examination of the expert's methodology. The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact….

*Smith v. Ford Motor Co.*, 215 F.3d, 713, 718 (7th Cir. 2000); *see also Smith v. I-Flow Corp.*, No. 09 C 3908, 2011 WL 1750895, * 1 (N.D. Ill. May 5, 2011) ("[A party's] object[ions] to [an expert's] extrapolations from … evidence [examined], … go to the weight of [the expert's] testimony, not its admissibility."). Expert testimony is "relevant" so long as the testimony "will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. This standard is met if the testimony at issue "will assist the trier of fact with its analysis of *any* of the issues involved in the case." *Smith*, 215 F.3d at 718 (emphasis added).

2

The overall approach is one that only excludes patently unreliable expert testimony but relies upon cross-examination and other traditional methods to undercut potentially shaky, but nonetheless admissible expert testimony. *Daubert*, 509 U.S. at 595. Whether the three-part test has been satisfied is based upon the preponderance of the evidence standard. *U.S. v. Saunders*, 826 F.3d 363, 368 (7th Cir. 2016).

The permissible scope of expert testimony is quite broad. *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 810 (7th Cir. 2012). Consequently, "the rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702, Advisory Comm. Notes (2000); *see also Spearman Indus., Inc. v. St. Paul Fire & Marine Ins. Co.*, 128 F. Supp. 2d 1148, 1150 (N.D. Ill. 2001) (quoting same). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 595.

## III. ARGUMENT

### A. Mr. Jackman's Opinions are Reliable under *Daubert*

#### 1. Mr. Jackman is eminently qualified

Sears does not challenge Mr. Jackman's qualifications, and for good reason: he is eminently qualified. Indeed,

> Mr. Jackman's experience spans industries including telecommunications, energy, healthcare, investment services, chemicals, airlines, cabotage, real estate, banking, baby products, oil, and consumer electronics. His experience includes developing sophisticated econometric models used to measure overcharges in horizontal price-fixing conspiracies and implicit prices associated with bundled goods in consumer fraud matters, as well as complex income, market and asset-based financial models for use in the valuation and forecasting processes. He has also developed and maintained current and interactive indexes in various industries for use in the evaluation of assets and securities.

Jackman Report, Appendix A.[1]

A full detailed description of Mr. Jackman's unchallenged qualifications appears in his Curriculum Vitae, which is found in Appendix A to his Expert Report.

## 2. Mr. Jackman's methodology and reasoning are reliable

Mr. Jackman's proffered expert reports, opinions, and testimony satisfy the standards for admissibility set forth in *Daubert* and Fed. R. Evid. 702. First, Mr. Jackman extensively reviewed "a variety of materials that were produced as part of this litigation, including sample datasets, deposition transcripts, and miscellaneous Sears company documents," to craft a methodology that will allow him to measure damages suffered by members of the proposed Breach of Contract, Unjust Enrichment, and Consumer Fraud Classes during the Relevant Periods. *See* Jackman Rep. ¶ 9.

As part of his review to prepare his report, Mr. Jackman examined information relating to Defendants' key databases. *See* Jackman Rep. ¶¶11-14. Based on his examination, Mr. Jackman determined that while the "data and information appears to be spread out over a number of databases," a software platform—Ciboodle—serves to connect these databases for Defendants' sales associates. *See* Jackman Rep. ¶¶11. Mr. Jackman further determined that "feeding into Ciboodle are two key Sears databases: NPS and NPJ." *Id*. NPS stores information regarding the "service side of the business." *Id.* (internal quotations omitted). NPJ concerns the "service contract side of the business and stores all of the Pricing Customer Service Contract Agreements." *Id.* (internal quotations omitted). Defendants collectively refer to these two databases as the "Legacy System." *Id.* (internal quotations omitted). Defendants also maintain a

---

[1] The full version of the Expert Report of Christopher Jackman and related appendices can be found at ECF No. 142-20. Plaintiffs delivered courtesy copies of Mr. Jackman's report to this Court after it was filed.

4

data warehouse, or LCI to store the data the feeds Defendants' Legacy System. *Id.* On March 17, 2009, Sears implemented a "merchandise brand qualification" called Manage Merchandise Information ("MMI") "that is incorporated into Ciboodle's infrastructure that contains information on the brands and products that are covered under its MPAs." *Id.* at 12.

Through his review, Mr. Jackman also learned that since 1996, Defendants' associates relied on an "Eligible Brands List" that Defendants' maintained internally to determine whether a product was eligible for coverage under an MPA. *Id.* at ¶¶ 13, 18. Occasionally, the Defendants revised the Eligible Brands List; however, Defendants retained the previous Lists and can determine the "revision date" of the Lists. *Id.* at ¶ 13. That would allow for a determination whether a given product that appears on an MPA was covered. Moreover, the Defendants still use Eligible Brands Lists. *Id.* at ¶ 18.

After identifying Defendants' key databases, Mr. Jackman then considered the data and information likely contained in these databases that could allow him to apply his methodology to measure class-wide damages as a result of the Defendants' misconduct. *See* Jackman Rep. ¶¶ 16-24 (Discussing likelihood of available data relevant to Plaintiffs' Breach of Contract Claims); ¶30 (Discussing likelihood of available data relevant to Plaintiffs' Unjust Enrichment Claims); ¶33 (Discussing likelihood of available data relevant to Plaintiffs' Consumer Fraud Claims). For example, Defendants' "data warehouse can be queried in order to identify all MPAs in existence at a given time" and "limited to aftermarket MPAs sold by [Defendants]." Jackman Rep. ¶17. The Defendants also maintain "key information about the customers who purchased aftermarket MPAs from [Defendants]," including the name and address of each customer, as well as Defendant-generated customer numbers. *Id.* Furthermore, an MPA's agreement number and start and end dates can be queried from the data warehouse. *Id.* Defendants also maintain lists

5

of the products covered by each MPA that identify the product type and brand and can also be queried from Defendants' data warehouse. *Id.* Additionally, Defendants' Eligible Brands List, as well as records of the price paid for each product under an MPA, refund amounts, and replacement authorization credits are also likely available in Defendants' databases. *Id.* at ¶¶18, 20, 22-23. These pieces of information could also be used to measure class-wide damages as result of Defendants' misconduct. *Id.*

Mr. Jackman next proposed a valid and reliable methodology to measure damages suffered by members of each of the proposed Classes that incorporated the information the Defendants produced—including Defendants' own deposition testimony—and likely possessed that would be relevant to his analysis. With respect to the Breach of Contract Class, Mr. Jackman would "creat[e] an MPA dataset ("Master BOC MPA Dataset") that includes the following fields of data discussed above: agreement number, MPA start date, MPA end data, MPA type (point-of-sale or aftermarket), customer name, customer address, customer number, product brand, product type, and price." Jackman Rep. ¶25. Mr. Jackman would then limit the MPA dataset to aftermarket MPAs with the start date for the Relevant Period. Jackman Rep. ¶25. Next, Mr. Jackman developed a method that would allow him to "identify the products in the Master BOC MPA Dataset that were included as part of an aftermarket MPA sold by Sears, yet were not covered by or eligible for coverage under the MPA." Jackman Rep. ¶ 26. Mr. Jackman would then determine whether "[Defendants] had issued any refunds or replacement authorization credits (that were fulfilled by the customer) in connection with any of the products that remain in the Master BOC MPA Database." Jackman Rep. ¶ 27. Finally, to measure damages, Mr. Jackman could "simply subtract the refund or replacement authorization credit amounts (if any) associated with the remaining products in the Master BOC MPA Database from the MPA prices

6

paid by customers for those products" and summarize the differences across all products in the Master BOC MPA Database to yield damages suffered by members of the proposed Breach of Contract Class. Jackman Rep. ¶ 28.

To measure damages sustained by the proposed Unjust Enrichment and Consumer Fraud Classes, Mr. Jackman could use substantially the same methodology and data that he proposed for the Breach of Contract Class, while adjusting his model to account for slight differences in the class definitions. Therefore, to calculate damages suffered by proposed Unjust Enrichment Class members, "[i]n light of the later start date to the Relevant Unjust Enrichment Period as compared to the Relevant Breach of Contract Period, [Mr. Jackman] would create alternate versions of the Master BOC MPA Database and the BOC Eligible Brands Database that are limited to the Relevant Unjust Enrichment Period…" Jackman Rep. ¶31. To calculate damages suffered by proposed Consumer Fraud Class members, "[i]n light of this later start date to the Relevant Consumer Fraud Period as compared to the Relevant Breach of Contract Period, [Mr. Jackman] would create alternate versions of the Master BOC MPA Database and the BOC Eligible Brands Database that are limited to the Relevant Consumer Fraud Period." *Id.* at ¶34. Moreover, because the proposed Consumer Fraud Class is restricted to residents of Pennsylvania, Mr. Jackman would "limit the Master CF MPA Database to residents of Pennsylvania using the customer address data field." Jackman Rep. ¶34.

Mr. Jackman's proposed methodology is sound. His methodology is firmly rooted in the information **made available to him by the Defendants in this litigation** and is the product of "reliable principles and methods" that Mr. Jackman has "reliably applied" to the facts of this case in full satisfaction of *Daubert*. *See Daubert*, Fed. R. Evid. 702. Moreover, "questions relating to the bases and sources of an expert's opinion affect only the weight to be assigned that opinion

7

rather than its admissibility." *Loeffel Steel Products, Inc. v. Delta Brands, Inc*. 372 F.Supp.2d 1104, 1119 (N.D. Ill. 2005).

### a. Factual disputes are not relevant to reliability

The bedrock of Defendants' argument for the exclusion of Mr. Jackman's opinions is a glut of contested issues of material fact. The Defendants entirely fail to challenge the reliability of Mr. Jackman's opinions as *Daubert* commands and instead, ask this Court to make a premature adjudication of the weight of the evidence on merits. This is an improper basis for exclusion under *Daubert*. Defendants' flawed contentions invoke summary judgment scrutiny, **not** *Daubert* scrutiny. *See, e.g*., ECF No. 157 at 2 ("Jackman's assumption that Sears did not repair or replace products that were not on the eligible brands list has no evidence to support it"); *Id*. at 3 ("Contrary to Jackman's assumption, Sears does not maintain eligible brands lists with effective dates going back to 2000")[2]; *Id*. at 5 ("Even if the eligible brands list were historically complete, it cannot be used to determine which products Sears intended to repair or replace"); *Id.* at 8 ("Not only does the Jackman Report ignore contrary facts, such as the repairs, it lacks evidence to support its theory…"). Defendants raised many of the same disputed issues of fact in their papers in support of their motion for leave to file a motion for summary judgment which the District Court denied.[3] *See, e.g*., ECF 128-1 at 2, 14 and ECF 128-2 Nos. 6, 10, 12, 21, 23, 31, 68, 74, 78.

Defendants' recitation of disputed facts is entirely irrelevant to a *Daubert* analysis:

> [T]he court's gatekeeping function focuses on an examination of the expert's methodology. *The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact, or, where appropriate, on summary judgment.*

---

[2] Defendants rely on an undated declaration from Defendants' National Operations Manager-Service Contracts and which the Plaintiffs first received on October 27, 2017, as an attachment to Defendants' Motion to Exclude Mr. Jackman's opinions. *See* ECF No. 159.
[3] On May 18, 2017, the Judge Alonso denied Defendants' Motion for Leave to File Motion for Summary Judgment. *See* ECF No. 131.

*Smith v. Ford Motor Co*., 215 F. 3d 713, 718 (7th Cir. 2000) (emphasis added). Thus, *Daubert* prohibits this Court from making a determination regarding the "factual underpinnings of [Mr. Jackman's] analysis and the correctness of [Mr. Jackman's] conclusions based on [his] analysis" because those matters are "factual matters to be determined by the trier of fact, or, where appropriate on summary judgment." *Id.*

Although factual disputes may not be considered in a *Daubert* analysis, it bears noting that the Defendants greatly misread and distort the Record, including Mr. Jackman's opinions and testimony with respect to the Defendants' Eligible Brands List. First, Mr. Jackman *did not* concede that "he does not know whether Sears maintains Eligible Brands Lists dating back to 2000." *See* ECF No. 157 at 4. Rather, Mr. Jackman opined:

> Eligible Brands Lists have been used by Sears to determine product eligibility for MPAs since at least 1996…and are still currently in use. As I previously discussed, from time to time, Sears revised its Eligible Brands List as certain brands were added or removed from eligibility for MPA coverage over time. In addition, as I previously discussed, evidence indicates that prior version of the Eligible Brands List have been "saved somewhere" by Sears, and that there is a way to determine the "revision date" of those documents.

Jackman Rep. ¶18.

Additionally, Mr. Jackman testified that while Sears' employee Dainon Setzer could only confirm revision dates going back to 2010—when Mr. Setzer was in charge of putting those dates on the eligible brands list—other evidence available to Mr. Jackman indicated that Defendants were using the eligible brands list in as early as 1996, including Mr. Setzer's own testimony "that the eligible brands list was in use going back to at least 1996." Jackman Dep. Tr. 63:22-25[4]. Moreover, Mr. Jackman noted in his report and during his deposition that the absence of a complete record of Eligible Brands Lists for the relevant periods would not render his

---

[4] The Defendants deposed Mr. Jackman on August 22, 2017. The transcript of Mr. Jackman's deposition can be found in the Record at ECF 157-1.

9

methodology ineffective. To the contrary, reasonable assumptions could be made to overcome incomplete or uninterpretable data, as is commonly done in damages analyses based on large data sets. *See* Jackman Rep. ¶25, FN 51 (opining that his damages methodology would allow him to use "reasonable assumptions where necessary"); Jackman Dep. Tr. 58:18-23 (testifying "[t]o the extent that there could be missing data or incomplete data or data that is perhaps difficult to interpret, there are often other ways of either supplementing that data or using a data or just using the data that you do have with reasonable assumptions").

Defendants also incorrectly suggest that Mr. Jackman did not account for those class members who received replacements, refunds and buyouts, when, in fact, his damages model *explicitly* considers those class members. *See, e.g.,* Jackman Rep ¶¶ 22-23, 27-28, 31, 33 (accounting for those class members who received refunds or replacement authorization credits); *See also*, Jackman Dep. Tr. 102:4-103:7 (testifying that his understanding is that a buyout is equivalent to a refund and that Sears maintained data regarding buyouts that is accounted for in his report). Mr. Jackman's damages analysis does not consider repairs because repairs are not relevant to Plaintiffs' allegations. *See* Jackman Report at ¶4 ("I understand that Plaintiffs allege that Defendants…entered in master protection agreements ("MPAs") that were 'deceptive and illusory because Sears did not in fact provide the bargained for coverage of the products that the agreements purported to cover.'"). *See also*, Jackman Dep. Tr. 100:10-20 (testifying that his analysis did not consider repairs because repairs are inconsistent with Plaintiffs' allegations that Defendants sold MPAs for products it never intended to service). Moreover, while Mr. Jackman's methodology purposely did not account for repairs because repairs are not relevant to the class definition, the Defendants purportedly track repairs, thus if necessary, and presuming

the Defendants make the data available to him, Mr. Jackman could incorporate repairs into his analyses. *See* Jackman Dep. Tr. 98:2-99:21.

### b. An expert's conclusions are not relevant to reliability

Defendants' criticism of Mr. Jackman's conclusions is also improper in a *Daubert* analysis. *See* Def. Br. at 6. Under *Daubert,* the Court's role is that of a gatekeeper and "the key to the gate is *not* the ultimate correctness of the expert's conclusions." *Schultz v. Akzo Nobel Paints*, *LLC*, 721 F. 3d 426, 431 (7th Cir. 2013) (emphasis added). "Instead, it is the soundness and care with which the expert arrived at her opinion: the inquiry must 'focus…solely on principles and methodology, not on the conclusions they generate." *Id., quoting Daubert*, 509 U.S. at 595, 113 S. Ct. 2786. *See also*, *See Heard v. Illinois Dept. of Corrections*, No. 06 C 0644, 2012 WL 2524748, at *3 (June 29, 2012) ("The *Daubert* analysis of an expert witness's reliability rests on the expert's process rather than his conclusions."); *Winters v. Fru-Con Inc.*, 498 F. 3d 734, 742 (7th Cir. 2007) ("The focus of the district court's *Daubert* inquiry must be solely on principles and methodology, not on the conclusions they generate.") (internal quotations omitted). Defendants' discussion of the merits is entirely premature and irrelevant because the court is not being asked to adjudicate the merits of the case at this stage of the litigation. *See* ECF No. 157 at 6. Instead, the court's consideration is limited to whether class certification is appropriate. To demonstrate that class certification is appropriate, Plaintiffs must show that "common methods of proof can be used to demonstrate the existence of the alleged [misconduct]," as Mr. Jackman has shown.[5] *See Kleen Prods. LLC v. International Paper Co.*,

---

[5] Defendants have proffered the opinions of Mr. Mark J. Hosfield in opposition to Plaintiffs' Renewed Motion for Class Certification. *See* ECF No. 161. While Defendants' papers in support of its Motion to Exclude Mr. Jackman do not rely on Mr. Hosfield's opinions, his report criticizes Mr. Jackman. Thus, Plaintiffs will address Mr. Hosfield's opinions in their

11

831 F. 3d 919, 926 (7th Cir. 2016), *cert denied,* 137 S. Ct. 1582, 197 L. Ed. 2d 705 (2017). Defendants' reliance on *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1053, 194 L. Ed. 2d 124 (2016) is equally misplaced and premature. In *Tyson*, the district court denied a defendant's motion for decertification under Rule 23, and after the jury returned a verdict for the class, denied the defendant's motion for judgment as a matter of law and motion to decertify or, in the alternative, for a new trial on damages. The defendant appealed and the Eighth Circuit affirmed. The Supreme Court granted *certiorari* and considered the defendant's argument that the lower courts' reliance on plaintiff's expert's study deprived the defendant of its ability to litigate individual defenses. *Id.* at 1047. However, *Daubert* was not part of the defendant's appeal. The defendant *never* raised *Daubert* in the district court. *Id.* at 1049. The Supreme Court held that because the "[p]etitioner…did not raise a challenge to respondents' experts' methodology under *Daubert*…there is no basis in the record to conclude it was legal error to admit that evidence." *Id*.

Defendants' citation to the pre-*Daubert, Mid-State Fertilizer Co. v. Exchange Nat. Bank of Chicago*, 877 F.2d 1333 (7th Cir. 1989) is inapposite as the *Daubert* standard did not exist. In *Mid-State Fertilizer*, plaintiffs brought an action against a bank alleging Racketeer Influenced and Corrupt Organizations Act and Bank Holding Company Act violations. The district court granted summary judgment in favor of the defendant and the plaintiffs appealed. *Id.* at 1334. As part of the appeal, plaintiffs challenged the district court's ruling that an affidavit from plaintiffs' expert did not establish a genuine issue of material fact, but the court did not conduct a *Daubert* analysis. *Id.* at 1338. Instead, the Seventh Circuit's analysis of the expert's affidavit was limited

---

motion to exclude his opinions, as well as in their Reply in Support of their Renewed Motion for Class Certification.

to Fed. R. Civ. Pro. 56(e) that provides that "affidavits supporting and opposing motion for summary judgment must do more than present something that will be admissible." *Id.* at 1339.

### B. Mr. Jackman's Opinions will Assist the Trier of Fact

*Daubert* also requires a court to assess whether an expert's proposed opinions will assist the trier of fact in determining a factual issue. *See Cage v. City of Chicago*, 979 F. Supp.2d 787, 804 (N.D. Ill. 2013). A court must ask whether the expert's proposed opinions are relevant. *Id.*

Mr. Jackman's opinions are directly relevant to the Plaintiffs' Renewed Motion for Class Certification. Counsel for Plaintiffs retained Mr. Jackman to:

> [A]nalyze whether a standard and reliable methodology exists that would allow [him] to utilize data and information possessed by Sears to measure damages suffered by proposed class members as a result of the alleged misconduct…without resorting to individualized inquiry under three causes of action: a breach of express contract; unjust enrichment; and a violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law.

Jackman Report ¶ 5.

Through his report and testimony, Mr. Jackman has directly addressed the issue of whether the Plaintiffs can show that a standard and reliable methodology can be used to calculate class-wide damages that is consistent with Plaintiffs' proposed Class Definitions. *See Messner v. NorthShore University HealthSystem*, 669 F.3d 802, 819 (7th Cir. 2012) ("common evidence and common methodology to prove a class's claims is sufficient to support a finding of predominance on the issue of…impact for certification under Rule 23(b)(3)"). As Mr. Jackman opined:

> Based on the materials I have reviewed to date, I have determined that a standard and reliable methodology exits that could allow me to utilize data and information likely possessed by Sears to measure damages suffered by members of the proposed Breach of Contract, Unjust Enrichment, and Consumer Fraud Classes during the Relevant Breach of Contract Period, Relevant Unjust Enrichment Period, and Relevant Consumer Fraud Period, respectively, as a result of the alleged misconduct (if it is found to have taken place) without resorting to individualized inquiry.

Jackman Rep. ¶ 35.

13

Thus, Mr. Jackman's opinions fully satisfy *Daubert* and must not be excluded.

## IV. CONCLUSION

As explained in detail above, Mr. Jackman's opinions are the result of reliable principles and methods that are directly relevant to Plaintiffs' Motion for Class Certification. Mr. Jackman has demonstrated the necessary link between the facts available to him and the conclusions his testimony supports. Therefore, Defendants' motion to exclude his expert testimony should be denied.

Dated: December 8, 2017

By: /s/ *Kathleen E. Boychuck*
Marvin A. Miller
Lori A. Fanning
Kathleen E. Boychuck
**MILLER LAW LLC**
115 South LaSalle Street, Suite 2910
Chicago, IL 60603
Telephone: (312) 332-3400

Deborah R. Gross
Andrew Belli
**KAUFMAN, COREN & RESS, P.C.**
2001 Market Street, Suite 3900
Two Commerce Square
Philadelphia, PA 19103
Telephone: (215) 735-8700

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on December 8, 2017, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system. The electronic filing system sent a "Notice of Electronic Filing" to the attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means.

/s/ *Kathleen E. Boychuck*
Kathleen E. Boychuck